UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| | | |
|---|---|---|
| _____ ) | | |
| In re: | ) | |
| | ) | Chapter 11 |
| COMMUNITY INTERVENTION SERVICES, INC., | ) | |
| COMMUNITY INTERVENTION SERVICES | ) | |
| HOLDINGS, INC., SOUTH BAY MENTAL HEALTH | ) | Case No. 21-40002-EDK |
| CENTER, INC., and FUTURES BEHAVIOR | ) | (Jointly Administered) |
| THERAPY CENTER, LLC | ) | |
| | ) | |
| Debtors. | ) | |
| _____ ) | | |

## DECLARATION OF ANDREW CALKINS IN SUPPORT OF FIRST DAY MOTIONS

I, Andrew Calkins, declare and state as follows:

### Introduction

1.       I am the Chief Executive Officer of Community Intervention Services, Inc.

("CIS").  CIS's stock is held solely by Community Intervention Services Holdings, Inc.

("Holdings"), and CIS is the sole shareholder of South Bay Mental Health Center, Inc. ("South

Bay").  CIS is the sole Member of Futures Behavior Therapy Center, LLC ("Futures" and with

CIS, Holdings, and South Bay, the "Debtors").

2.       In my work for the Debtors, I have been involved in all aspects of the Debtors'

business, and am familiar with the Debtors' operations, finances, and books and records.

3.       The Debtors each filed a voluntary petition for relief under Chapter 11 of the

Bankruptcy Code on January 5, 2021 (the "Petition Date").  Pursuant to MLBR 1015-1(c), their

Chapter 11 cases are being jointly administered under the CIS lead case (such jointly-

administered cases, together, the "Chapter 11 case").  The Debtors intend to manage their

business and financial affairs as debtors-in-possession pursuant to Sections 1107 and 1108 of the

1

Bankruptcy Code.  In order to enable the Debtors to operate effectively and without undue disruption during the early stages of its Chapter 11 case, and to place the Chapter 11 case on solid footing, the Debtors seek certain "first day" relief from the Court.

4.      I submit this declaration in support of the Debtors' first day motions in this Chapter 11 case.  For the convenience of the Court, unless otherwise defined herein, the capitalized terms I use shall have the meaning ascribed to them in the respective motions referred to herein.  In addition, except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based on my experience and knowledge of the Debtors' operations and financial condition, or information provided to me by the Debtors' owners or employees.  If I were called to testify, I could and would testify competently to the facts set forth herein.  I am authorized by the Debtors to submit this Declaration on their behalf.

**The Chapter 11 Cases**

5.      Along with the Debtors' "first day" requests for relief, the Debtors—a consolidated group of companies engaged in the behavioral health field—have filed motions (the "Sale Motions") seeking authority to sell substantially all of the assets of South Bay (together with selected assets of CIS), and to sell substantially all of the assets of Futures.  The purchaser identified in each of these motions is The Mentor Network ("Mentor"), which has formed separate entities to close the transactions.  Although not requesting such relief on an emergency basis, the Debtors are seeking, through the Sale Motions and accompanying motions seeking approval of the Debtors' proposed procedures for soliciting higher and better offers (the "Sale Procedures Motions"), this Court's approval of the two asset sales on a relatively expedited basis.

2

6.     In addition to explaining the Debtors' requests for "first day" relief, this Declaration is intended to provide background on the Debtors' businesses, their financial problems, and their efforts to market and sell their assets leading up to the Chapter 11 filing. Through this narrative, it will become clear why the fast-track sale of the businesses of South Bay and Futures is not only in the best interests of the Debtors' creditors, but is vital to the health of a vulnerable client population—and will have the additional effect of preserving approximately 1,000 jobs in the Commonwealth.

**Background**

*A.     Debtors' Business and Organizational Structure*

7.     CIS was formed in 2012 by the private equity fund manager H.I.G. Capital, LLC ("H.I.G.") to pursue acquisitions of behavioral health companies.[1] H.I.G.'s business plan, implemented by its H.I.G. Growth Partners fund, was to create a broad-based regional, or possibly national, for-profit behavioral health company, which would be able to deliver, efficiently and cost-effectively, behavioral health services to a chronically under-served population. This strategy was driven in significant part by the passage of the Mental Health Parity and Addiction Equity Act ("MHPAEA"), federal legislation enacted prior to the Affordable Care Act, expanding health insurance coverage and, in particular, requiring public and private health insurers to cover behavioral health. Pub. L. No. 110-343, 122 Stat. 3881 (2008) (codified as amended at 26 U.S.C. § 9812; 29 U.S.C. § 1185a; 42 U.S.C. § 300gg-5).[2]

8.     CIS's first acquisition, consummated in 2012, was South Bay. Founded in 1986, South Bay has grown to be one of the largest for-profit outpatient and community-based

---

[1] H.I.G. holds a majority (more than 70%) of Holdings' shares.
[2] Comparable Massachusetts legislation, the Mental Health Parity Act ("MHPA") was also enacted in 2008. See An Act Relative to Mental Health Parity, ch. 256, MASS. GEN. LAWS ch. 32A, § 22, ch. 175 §§ 47B, 110, ch. 176A §§ 8A, 10, ch. 176B, §§ 4A, 4A$^1$/$_2$, ch. 176G, § 4M (2008). The MHPAEA is enforced in Massachusetts through Chapter 26 of the General Laws. MASS. GEN. LAWS ch. 26 § 8k (2012).

providers of behavioral health services in Massachusetts.  At present, South Bay operates

through 22 offices, with 21 located throughout the Commonwealth and one office in Hartford,

Connecticut.  The services provided by South Bay clinicians include:

- early intervention counseling, to assist clients age 21 or younger on the autism spectrum, and clients up to 3 years of age experiencing development delays;

- outpatient counseling for children, adults and families, with a focus on issues involving abuse or neglect, trauma, and addiction and substance abuse; and

- in-home community-based counseling for children and families, responding to behavioral, social and educational issues.

These services are provided by a staff of more than 930 professionals and paraprofessionals

located at South Bay's 22 offices, and generated more than $60 million in revenue in 2019.  In

the first ten months of 2020, South Bay generated approximately $48.45 million in revenue.  It

provides services to more than 20,000 clients, for whom these services provide critical assistance

in managing behavioral health and substance abuse problems.

9.      As noted above, South Bay's growth was fueled, in significant part, by the

passage of MHPAEA and MHPA.  In fact, thirty-four percent (34%) of South Bay's 2019

revenue was comprised of payments from Medicaid (a program administered by MassHealth),

and sixty percent (60%) was derived from Medicaid-funded managed care plans.  Of the balance

of South Bay's revenue, five percent (5%) came from commercial insurers, and one percent (1%)

from Medicare.

10.     After acquiring South Bay, CIS acquired additional subsidiaries operating in the

behavioral health field, including Futures, a provider of services to clients with autism spectrum

disorders based in Beverly and West Boylston, Massachusetts; Family Behavioral Resources,

Inc. ("FBR"), Autism Education and Treatment Institute ("AERI"), and AHEADD Services, LLC ("AHEADD"), providing services to clients in Pennsylvania; Access Family Services, Inc. ("AFS"), operating in North Carolina and South Carolina; and Northstar Psychological Services, Inc. ("NPS"), operating in Georgia.  Substantially all of the assets of AFS and FBR, together with the assets of AERI and AHEADD, (the "Non-Operating Entities") were sold in a secured party disposition that occurred prior to the Petition Date.  Between the date of that transaction and the filing of these Chapter 11 cases, NPS transferred its clients to alternative service providers in order to wind up its operations (NPS and the Non-Operating Entities, collectively, the "Non-Debtor Entities").  Thus, as of the Petition Date, CIS's only remaining operating subsidiaries were South Bay and Futures.

11.     Futures was acquired by CIS in 2015.  Futures commenced operations in Beverly, Massachusetts in 2006, initially as a one-room and later as a two-room facility, providing treatment to children and adolescents with autism spectrum disorders ("ASD's").  As noted above, the program operates at two locations, in Beverly and West Boylston, Massachusetts. The West Boylston location opened in March of 2019.  In total, Futures employs approximately 104 individuals (including applied behavior analysis therapists, registered behavior technicians, occupational therapists, speech pathologists) on a full-time basis, and approximately 22 employees on a part-time basis.  At present, the Beverly center provides services to approximately 105 children, adolescents and young adults, while the newer West Boylston center has an enrollment of 25.  Revenue for 2019 totaled $8.4 million; of that amount, 40 percent was received under managed Medicaid programs, while 57 percent was received from commercial insurance providers.

12.     CIS provides administrative services to South Bay and Futures, managing such functions as payroll processing, revenue cycle management, accounting, accounts payable activities, recruiting, human resource support, and information technology services.  Those services are charged in proportion to the percent of CIS portfolio's revenue attributable to CIS's operating subsidiaries.

13.     As a result of the acquisitions described above, CIS is now one of the largest for-profit providers of behavioral health services in the Commonwealth of Massachusetts.  The full continuum of behavioral health services provided by South Bay are thus critical to the well-being of thousands of Massachusetts and Connecticut residents.  Without the therapeutic services that South Bay provides to its clients, many would experience serious mental health deterioration, made worse by the isolation resulting from the COVID-19 pandemic.  Families would be without early intervention or counseling services, autistic children would be without "ABA" services,[3] and those suffering from a mental health or substance abuse disorder would be without counseling support and medication services.  In addition, as South Bay is one of the largest providers of such services in the Commonwealth, South Bay's failure could well trigger a health care crisis across the state, destabilizing an already vulnerable population during the pandemic.

14.     The services Futures provides to its current client children and families are equally important, and its closure would require those families to seek comparable services in an environment where alternative treatment options are not readily available—or , in the Debtors' view, of comparable quality.

---

[3] Applied Behavioral Analysis is a type of therapy that is employed in the treatment of  children with autism spectrum disorders.

**B.** **The Debtors' Creditors**

15.     CIS financed its acquisitions and its subsidiaries' operations with secured

financing provided by institutional and private lenders.  The Debtors' largest creditors are the

Capital One, National Association ("Capital One") and Fifth Third Bank ("Fifth Third" and,

together with Capital One, the "Senior Lenders"), who made available to the Debtors a $55

million credit facility.[4]  As of the Petition Date, the total aggregate amount due to the Senior

Lenders was at least $48,708,644.51 (including principal, interest, and certain fees, costs and

expenses but excluding prepetition professional fees, including attorneys' fees incurred on or

after December 30, 2020)  (the "Senior Secured Claim").  Capital One, as agent, on behalf of

itself and the Senior Lenders, holds a first priority security interest in substantially all assets of

the Debtors to secure the Senior Secured Claim.

16.     The Debtors (together with the Non-Debtor Entities) also obtained subordinated

secured financing pursuant to a Credit Agreement dated July 16, 2015, as amended, with

Triangle Mezzanine Fund LLLP ("Triangle"), acting for itself and as agent for certain other

lenders ("Mezzanine Agent"), pursuant to which they borrowed approximately $25,250,000

secured by a second-priority security interest in the assets of the Debtors and the Non-Debtor

Entities (the "Mezzanine Loan Facility"; the documents evidencing, governing and/or securing

the Mezzanine Loan Facility are referred to herein as the "Mezzanine Loan Documents").

Triangle subsequently assigned its rights under the Mezzanine Loan Documents to BSP Agency,

LLC (together with OFS SBIC I, LLP, the "Mezzanine Lenders").  Pursuant to the Mezzanine

Loan Documents and the Subordination Agreement dated July 16, 2015, the Mezzanine Lenders

---

[4] In addition to the Debtors (CIS, Holdings, South Bay, and Futures), the Non-Debtor Entities are also borrowers or guarantors under the Senior Loan Documents.

hold a security interest in substantially all assets of the Debtors that is junior in priority to the security interest held by the Senior Lenders.

17.     Aside from their substantial obligations to their secured creditors, the Debtor South Bay is obligated to pay $1,820,000 to the Commonwealth of Massachusetts arising out of a 2018 settlement of the Qui Tam Litigation (as defined and further described below), and $7.8 million in advance payments made in spring 2020 to support the Debtors' operations during the COVID-19 pandemic (also discussed below).  The Debtors have generally maintained good relationships with their trade creditors, and have endeavored to avoid any substantial build-up of "out-of-term" trade payables during the period leading up to this Chapter 11 filing.

18.     Other significant liabilities include the Debtors' obligations under leases of real property at which they conduct their business operations; South Bay is a tenant under 22 leases, Futures is a tenant under two leases, and CIS is a tenant under one lease.  As of the Petition Date, the Debtors were current in the payment of their lease obligations.  The Debtors expect that most if not all of these leases will be assumed and assigned to Mentor (or other purchaser) pursuant to Section 365 of the Bankruptcy Code as part of the proposed asset sales, and that there will be minimal if any cure costs associated with such assumption and assignment.

## C.     *Financial Difficulties*

19.     CIS's business plan has encountered significant implementation issues for a number of years.  Starting in 2016, the Debtors were besieged with a multitude of operational and regulatory challenges.  Extensive clinical employee turnover at South Bay and CIS subsidiaries (other than Futures) greatly impacted the ability of the Debtors to generate revenues sufficient to cover operating expenses and debt service requirements.  As new clinicians were

hired, they took longer to train and generate a full panel of clients. In fact, the recruitment and retention of clinicians continues to be an ongoing challenge.

20.     Changes in the service reimbursement landscape posed additional challenges for the Debtors, including financial pressure resulting from increased expenses unmatched by corresponding increases in payor reimbursement rates. Compounding matters further, the Debtors struggled to obtain reliable, timely financial reporting and analysis to help them manage through the increasing financial pressures, due to the fact that the multiple operating companies all maintained separate and inconsistent finance and accounting practices. These financial management issues were ultimately addressed in 2017 by centralizing all accounting and financial reporting resources under CIS and by opening a shared service center in Massachusetts, but the previous inattention to these issues had already affected the Debtors' financial condition.

21.     Expansion of the West Boylston Futures location in 2018 created further financial challenges for the Debtors. CIS invested more than $1 million in the build-out of the West Boylston location, and another $1 million in the cost of ramping up its operation. Due in part to the COVID-19 health crisis, the West Boylston location has been slow to grow census count and has yet to achieve profitability.

22.     Although the changes described above led to improvement in the Debtors' operating performance, their turnaround was impaired, and ultimately derailed, by the commencement in 2015 of the ongoing litigation entitled *United States ex rel. Martino-Fleming v. South Bay Mental Health Center Inc. et al.*, Civ. Action No. 1:15-cv-13065-PBS (D. Mass.) (the "Qui Tam Litigation").[5] A *qui tam* lawsuit commenced by a former South Bay employee, the Qui Tam Litigation asserted that South Bay had engaged in inadequate training and

---

[5] Although filed in 2015, the Qui Tam Litigation was not made known to the Debtors until it was unsealed in 2017.

supervision of certain of its clinical employees.[6]  As a result, according to the complaint filed in

the Qui Tam Litigation, South Bay's claims for payment failed to meet the regulatory

requirements applicable under Massachusetts's Medicaid program, and constituted overpayments

recoverable under federal and state False Claims Acts, 31 U.S.C. §3729 *et seq*. (the "Federal

Claims"); M.G.L. c. 12, §5A *et seq*. and M.G.L. c. 118E, §§40, 44 (the "State Law Claims").

23.     Both the Commonwealth of Massachusetts and the United States were entitled to

intervene in the Qui Tam Litigation, and pursue on their own behalf the State Law Claims and

the Federal Claims, respectively.  After the Commonwealth of Massachusetts intervened in the

Qui Tam Litigation, the Debtors South Bay and CIS were able to obtain a consensual resolution

of the State Law Claims.  Pursuant to a Settlement Agreement and Release signed in February

2018 (the "Massachusetts Settlement Agreement"), South Bay, CIS and Holdings agreed to pay

the Executive Office of Health and Human Services of Massachusetts ("EOHHS") a total of

$4,000,000 through a series of payments commencing upon settlement and continuing through

December 2022.  As of the Petition Date, the balance due to EOHHS under the Massachusetts

Settlement Agreement is approximately $1,820,000.[7]

24.     The Federal Claims were not resolved by the Massachusetts Settlement

Agreement, and the United States has thus far not elected to intervene in the litigation of those

claims.  Thus, the Federal Claims remain under the control of the original plaintiff in the Qui

Tam Litigation.  Efforts to settle the Federal Claims with the original plaintiff have thus far been

---

[6] Additional defendants in the Qui Tam Litigation were CIS, Holdings, H.I.G. Growth Partners, LLC, H.I.G. Capital, LLC, Peter J. Scanlon and Kevin P. Sheehan.

[7] A recoupment in the amount of $12,500 is scheduled was scheduled to occur, under the Massachusetts Settlement Agreement, on January 4, 2021.  If that recoupment did, in fact, occur on the scheduled date, the balance due under the Massachusetts Settlement Agreement will have been reduced to $1,807,500.

unsuccessful.  Recently, in response to the trial judge's urging, the parties to the Qui Tam

Litigation have agreed once again to mediate their disputes.

26. The multi-year defense of the Qui Tam Litigation has been both expensive and

time-consuming, and has had a deleterious effect on the Debtors' business and finances.  The

Qui Tam Litigation has made it impossible for the Debtors to obtain financing for their

operations, and has made the assets of South Bay unmarketable outside of bankruptcy.

Ultimately, the Qui Tam Litigation has prevented the execution of CIS's strategy of building a

regional, or possibly national, provider of behavior health services, and rendering fatally

inefficient the corporate infrastructure that was intentionally built to deliver those services in a

cost-effective manner.

26. The Debtors' precarious financial position left them extremely vulnerable to the

shock of COVID-19 and the attendant disruption of the Debtors' business operations and

revenues.  In early spring 2020, the pandemic's effect on the Debtors' operations left the Debtors

close to running out of cash and being forced to cease operations.  As a result of the pandemic

and governmental "lockdown" orders, South Bay professionals could no longer offer in-person

counseling or other services.  A rapid conversion to tele-health was able, after a number of

months, to restore revenue from outpatient counseling to their former levels, but revenue from

other services, which require in-patient assistance, have continued to lag; in fact, total South Bay

revenue is currently running at approximately 69 percent of its pre-COVID level.

27. The pandemic created equally difficult pressures for Futures operations.  Futures

was required by the Massachusetts Department of Early Education and Care ("EEC") to close its

two facilities for approximately four months, and gradually thereafter re-open to clients.

Futures' revenue is currently performing at 65 percent of pre-pandemic levels, hindered by the

capacity guidelines set by the EEC, and by ongoing compliance with safety guidelines of the

Centers for Disease Control and other agencies for operating both locations during the pandemic.

28.      Fortunately, South Bay during spring of 2020 was able to obtain emergency

funding totaling $7.8 million from the Commonwealth of Massachusetts, funding that the

Commonwealth provided and which the Debtors have been advised must be repaid in six

installments (each in the amount of $1.3 million) commencing in January, 2021.  This funding

not only permitted the Debtors to maintain ongoing business operations—including importantly

South Bay's essential role in delivering much-needed behavioral health services to

Commonwealth residents—it served to lengthen the runway for the Debtors' pursuit of a sales

transactions intended to place their businesses in stronger financial hands.

### D.      *Marketing Efforts and Sale of South Bay, CIS and Futures to Mentor*

29.      Recognizing the importance of the services provided by South Bay and Futures,

the Debtors, faced with a deteriorating financial situation, determined to sell the assets of both, in

order to facilitate the continued provision of their services by a better-capitalized buyer able to

continue those services without interruption.  The Debtors believe that the proposed sale of

South Bay's and Futures' businesses is therefore in the best interests not only of their creditors,

but—even  more important—the vulnerable client population that the Debtors serve.  It will also

preserve the jobs of South Bay's and Futures' approximately 1,000 employees and contract

clinicians.  To effect these important sales, the Debtors have filed the Chapter 11 case.

30.      In October 2018, CIS retained the services of Duff & Phelps Securities, LLC

("D&P"), a well-known investment banking firm with substantial experience in the healthcare

industry, to explore possible sale options for various of CIS's operating subsidiaries.  Upon its

engagement, D&P began marketing the assets of CIS subsidiaries AFS, FBR, AERI, NPS and

Futures.  A 2019 transaction for AFS and NPS failed just short of a closing.  D&P's

commencement of a new sale process ultimately led to the sale of FBR, AERI, and AFS on

October 1, 2020.  NPS, unable to be sold, ceased operations in November, 2020.

31.     Beginning in January, 2020, D&P launched a full sales process for the Futures

business primarily focused on strategic buyers and private-equity backed portfolio companies.

D&P contacted 38 potential buyers, 24 of which signed an NDA and received preliminary

marketing materials that included a detailed overview of the facilities, programs, insurance

payors and financial profile.  The closing of the Futures facility due to the COVID-19 pandemic

substantially complicated the marketing process.  Four letters of intent were ultimately received,

and one was selected as presenting the best proposal.  However, the risk of additional facility

shutdowns, the COVID-19 impact on operations and changes to regulatory guidelines affecting

available capacity led to the initial offeror withdrawing from the transaction, and to D&P's

engagement in a second marketing process.

32.     In April 2020, CIS expanded D&P's engagement to include the prospective sale

of South Bay.  In light of South Bay's historical performance and the pending Qui Tam

Litigation, South Bay's management determined that a sale free and clear of liens, claims and

interests under Section 363 of the Bankruptcy Code would be necessary to effectuate a sale.

Accordingly, South Bay and D&P concluded that firming up a stalking horse offer with a

definitive agreement, to be followed by solicitation of competing bids through a Section 363 sale

process, would be the best way to market the South Bay business enterprise to potential

purchasers.  Beginning on May 11, 2020, D&P began a full sales process for the South Bay

business focused on broad list of strategic buyers, private-equity backed portfolio companies,

and financial buyers.  D&P contacted 197 potential buyers.  A total of 31 potential buyers signed

a non-disclosure agreement and were provided D&P's preliminary marketing materials.

33.     At the conclusion of these marketing efforts, South Bay negotiated a letter of

intent with Mentor, executed on September 1, 2020, pursuant to which Mentor indicated its

intent to acquire South Bay's assets and willingness to serve as a stalking horse bidder for a

Section 363 sale.  Mentor is a national leader of behavioral health services.  Being reputable and

well-respected in the industry, the Debtors believe Mentor to be an ideal buyer for South Bay.

During due diligence, Mentor determined that it desired to acquire certain assets of CIS that is

viewed as integral to the smooth transition of business operations.   In addition, Mentor, having

become aware of the Futures acquisition opportunity, decided to make an offer for Futures'

assets, and the Debtors quickly reached agreement with Mentor regarding that transaction as

well.  Given the timing of the two transactions, and the relationships among the entities to be

acquired, the Debtors and Mentor agreed that the assets of Futures would also be acquired

through a sale under Section 363 of the Bankruptcy Code, under a separate asset purchase

agreement.  The consummation of the sale transactions involving CIS, South Bay and Futures

will substantially conclude the winding up of the business operations of all of CIS's subsidiaries.

Once the two sales are consummated, CIS will wind up its own affairs.

**First Day Relief**

34.     Concurrently with the commencement of the Chapter 11 case, the Debtors have

filed several motions seeking orders that the Debtors believe are necessary to enable the Debtors

to operate their businesses with minimal disruption, to effectively administer their bankruptcy

estates, and to pursue the planned sales of their assets.  Three of these motions seek immediate

relief: one, the Debtors' motion for authority to use the Senior Lenders' Cash Collateral, as such

term is defined therein (the "Cash Collateral Motion"); second, the Debtors' motion to honor

their obligations to their employees (including prepetition payroll and fringe benefits, and related

tax obligations) in the ordinary course (the "Wage Motion"); and third, the Debtors' request to

maintain their current cash management systems and bank accounts (the "Cash Management

Motion").  Without the use of Cash Collateral, the Debtor lacks funds with which to operate its

business.  If the Debtor cannot pay its employees in the normal course, the spirit and motivation

of its workforce will diminish, to the detriment of the Debtors' business operations.  And,

because the Debtors receive payment for their services by electronic funds transfer from

numerous payors (both governmental and non-governmental), the inability to use their current

cash management system would require the Debtors to re-direct payment from these payors; the

resulting delays, which are likely to be significant, would cause great disruption to the Debtors'

cash flow and business operations.  Accordingly, I believe that prompt consideration and

approval of the Cash Collateral Motion, the Wage Motion and the Cash Management Motion is

necessary to promote the efficient administration of this Chapter 11 case and the proposed sales

of the Debtors' assets.

A.     Cash Collateral Motion

35.     The Debtors have concurrently herewith filed their Motion for Interim and Final

Orders Authorizing Use of Cash Collateral, whereby the Debtors seek Court approval, on both an

interim and final basis, of arrangements for financing the Debtors' businesses operations pending

the sales of South Bay, CIS and Futures.  The Debtors require immediate funding to ensure that

they are able to continue operating their businesses and provide critical counseling and support

services to their clients.  To that end, prior to filing this Chapter 11 case, the Debtors secured the

Senior Lenders' agreement to permit the Debtors' use of the Senior Lenders' Cash Collateral for

15

the Debtor's payment of necessary costs and expenses substantially in accordance with the budget attached to the Cash Collateral Motion (the "Budget").

36.     The Debtors' use of Cash Collateral is to be governed by a proposed order (the "Proposed Cash Collateral Order") filed as an exhibit to the Cash Collateral Motion, which was negotiated with and agreed to by the Senior Lenders, and which is subject to the approval of this Court.  The Proposed Cash Collateral Order provides, among other terms, as follows:

- As adequate protection for the Debtors' use of Cash Collateral, the Proposed Cash Collateral Order would grant Capital One, as agent for the Senior Lenders, a postpetition adequate protection lien, to the extent of any actual diminution in the value of the Senior Lenders' prepetition collateral, on all of the Debtors' postpetition assets of the same types and forms in which the Senior Lenders holds valid, perfected, enforceable security interest as of the Petition Date (the "Adequate Protection Lien"), plus a claim  pursuant to Section 507(b) of the Bankruptcy Code, to the extent the Adequate Protection Lien is determined by the Bankruptcy Court to have been inadequate protection, with priority over all other claims entitled to priority under Section 507(a)(2) except as provided in the Proposed Cash Collateral Order;

- Monthly adequate protection payment of $615,000;

- Certain "Termination Events" based, in part, on events occurring in the Chapter 11 cases, as well as the Debtors' failure to achieve certain milestones in connection with the proposed asset sales that are identified in the Proposed Cash Collateral Order;

16

- The acknowledgement of the amount of the Secured Lenders' claim, and the validity, extent and priority of the liens and security interests securing the same, subject to certain rights of any statutory committee appointed in the Chapter 11 cases to challenge such matters within the period of time set forth in the Proposed Cash Collateral Order; and

- A carve-out for the payment of certain fees and expenses of professionals incurred during the Chapter 11 case.

37.     These proposed financing arrangements will ensure that ongoing business operations and behavioral health services can continue without disruption.  Among other things, Cash Collateral will be used to honor employee wages and benefits, procure goods and services integral to the Debtors' ongoing business operations, and otherwise satisfy the Debtors' working capital needs in the ordinary course.  This will allow the Debtors to pay (and to maintain favorable relationships with) their vendors, suppliers, employees, and clients, and will enable the Debtors to defray the costs of administration of the bankruptcy estate, including through payments of allowed compensation to estate professionals permitted by the Budget.

38.     Absent prompt, interim approval of the proposed financing arrangements, there is a significant risk of disruption to the Debtors' business operations and concomitant threat to the health and safety of their more than 20,000 clients, and which in turn would cause irreparable harm to the bankruptcy estate and the Debtors' sale efforts.  Based on my knowledge of the Debtors' finances, business operations, and current circumstances, I believe that the proposed cash collateral arrangements are quite reasonable, and are in the best interests of the Debtors and their bankruptcy estate.   Any alternative source of financing—if one were available—would almost certainly be more costly, requiring the payment of interest and fees to a lender, and any

such lender would almost certainly seek a first priority security interest which is simply not available in light of the Debtors' current debt structure.  For this reason, I do not think that there is any viable alternative financing source at all, much less one that could compete on economic terms with the proposed Cash Collateral Order.

39.     I therefore believe that the Debtors' decision to agree to the financing arrangements set forth in the Cash Collateral Motion constitutes their exercise of sound business judgment.  I believe that the negotiations between the Debtor and the Senior Lenders leading to the Proposed Cash Collateral Order were conducted at arm's length and in good faith, that the proposed financing arrangements are the best available to the Debtor under the circumstances, and that entry of the Court's orders approving the use of Cash Collateral both on an interim and a final basis would be in the best interests of the Debtors' bankruptcy estates.

**B.**     Wage Motion

40.     As of the Petition Date, the Debtors collectively employ approximately 705 full-time employees and 375 part-time employees (the "Employees").[8]  The Employees are responsible for supporting the Debtors' day-to-day operations, providing behavioral health and therapy services to members of the community, and maintaining the Debtors' multiple facilities.[9]

---

[8] As of the most recent employee census shortly before the Petition Date, CIS employed 37 full-time employees, South Bay employed 565 full-time employees and 353 part-time employees, and Futures employed 104 full-time employees and 22 part-time employees.  As noted, Holdings has no employees and no payroll to process.

[9] In addition to the Employees, South Bay currently engages, on an independent contractor basis, two (2) clinicians who provide services that are essential to South Bay's ability to provide care to its clients (the "Independent Clinicians"), and two (2) maintenance workers that maintain all of South Bay's facilities (the "IC Maintenance Personnel").  The Independent Clinicians provide essential child and adolescent psychiatric services, and interpreter services for South Bay clients who are deaf, that Employees are not able to provide.  South Bay views these Independent Clinicians as essential to the ongoing, ordinary course conduct of South Bay's business, and any inability to maintain the goodwill of the Independent Clinicians, or to pay them for their important services, could potentially disrupt South Bay's business and the necessary care provided to clients.  The two IC Maintenance Personnel's services are also essential to the Debtors' ongoing business, as they ensure that all locations are safe and appropriate for the provision of care and services.  While not Employees, these Independent Clinicians and IC Maintenance Personnel are considered by the Debtors' management to be as integral to South Bay's operations as the Employees.

18

41.     In addition to offering competitive wages and salaries, each of CIS, South Bay, and Futures offers its Employees a comprehensive package of health and welfare benefits, eligibility for which is based on a number of factors including hours worked and time employed, and compliance with applicable laws governing employment and paid leave. Each of CIS, South Bay, and Futures offers substantially similar benefits packages covering, for eligible employees. The Debtors intend to maintain these benefit packages without change throughout the Chapter 11 cases; they are described in greater detail below.

*Wages and Salaries; Expense Reimbursement*

42.     As of the Petition Date, the Debtors have payroll obligations with respect to Employees totaling approximately $2.05 million for the prepetition period through January 4, 2021.  All of the wages and salary covered by these two payrolls will have been incurred within the past 180 days, and no Employee covered by the payroll will have a claim for wages or salary in excess of the $13,650 priority claim cap specified in Section 507(a)(4) of the Bankruptcy Code.  As of the Petition Date, South Bay estimates that its accrued obligations with respect to the Independent Clinicians and the IC Maintenance Personnel totaled approximately $250 for the prepetition period ending January 4, 2021.  The Wage Motion seeks authority to pay all these amounts as they come due, beginning with the Debtors' next scheduled payroll processed on January 6, 2021 and paid on January 8, 2021.

43.     As an adjunct to wage and salary compensation, the Debtors provide a mileage stipend to approximately 800 South Bay clinicians as part of their normal bi-weekly compensation.  In addition to the mileage stipend provided to South Bay clinicians, the Debtors typically reimburse Employees for certain out-of-pocket business expenses incurred by Employees on the Debtors' behalf in the ordinary course of business.  These payments are

19

processed as part of ordinary course payroll.  The Debtors seek authority to make any such

Employee expense reimbursements as may be or become due and owing, whether or not

allocable to the period before the Petition Date.

*Paid Time Off; Paid Sick Leave; Other Paid Leave*

44.      Each Debtor provides "paid time off" ("PTO") to all full-time Employees, and,

with some exceptions, to regular part-time employees who are currently active with the Debtor.

Each Debtor also provides sick leave to all Employees.  The terms of each policy are described

in greater detail in the Wage Motion.  The Debtors pay accrued PTO upon termination of

employment, as required under Massachusetts law.  M.G.L. ch. 149, § 148.  Accrued but unused

paid sick leave is not paid at separation.

45.      In addition to PTO and sick leave, the Debtors are required by applicable state or

federal law to provide in certain circumstances paid leave for specified durations, such as for

military leave, or to comply with the federal Family and Medical Leave Act.  In addition to such

legally required paid leave, the Debtors provide up to three (3) paid days leave for jury duty or

bereavement.

46.      As of the Petition Date the Debtors estimate that the Debtors' aggregate

prepetition liability on account of accrued PTO is approximately $1.209 million, including

approximately $914,000 for South Bay (covering 579 Employees), approximately $40,000 for

Futures (covering 103 Employees), and approximately $255,000 for CIS (covering 29

Employees).  The Debtors believe that substantially all of these amounts owed to Employees,

when combined with amounts owed for accrued prepetition payroll, are entitled to priority under

Section 507(a)(4) of the Bankruptcy Code.[10]  By the Wage Motion, the Debtors seek authority to

continue to administer their PTO and other paid leave policies as in effect and administered

prepetition, and to honor, in the ordinary course, all Employee requests for PTO and other paid

leave consistent with the Debtors' PTO and other paid leave policies.

*Medical, Dental and Vision Insurance*

47.     The Debtors offer medical insurance to their Employees through Blue Cross Blue

Shield of Massachusetts ("BCBS").  As of the Petition Date, 425 Employees participated in

South Bay's medical insurance plan, including 325 obtaining individual coverage and 100 with

some type of family coverage.  As of the Petition Date, 45 Employees participated in Futures'

medical insurance plan, including 38 obtaining individual coverage and seven with some type of

family coverage.  As of the Petition Date, 23 Employees participated in CIS's medical insurance

plan, including 13 obtaining individual coverage and 10 with some type of family coverage.  The

Debtors pay either half, two-thirds, or 70 percent of the medical insurance premiums, depending

on the plan selected by the Employee, and the Employee pays the remaining portion through a

payroll deduction.  The Debtors pay BCBS monthly for medical coverage.  The Debtors'

monthly payments for medical coverage currently run about $428,000, including approximately

$370,000 for South Bay, approximately $35,000 for Futures, and approximately $23,000 for CIS

(these amounts do not include the Employee portions paid through payroll deductions).

48.     The Debtors make dental insurance available to the Employees through BCBS.

An Employee selecting dental coverage pays all of the premiums, which are deducted from the

Employee's bi-weekly pay.  The Debtors pay dental premiums to BCBS on a monthly basis.  The

Debtors' monthly payments for dental coverage currently run about $19,500, including

---

[10] It is possible that for a handful of Employees, the aggregate accruals of prepetition payroll obligations and PTO
would exceed the priority limit by a relatively small amount.

approximately $16,600 for South Bay, approximately $1,600 for Futures, and approximately

$1,300 for CIS, all of which is funded through covered Employees' payroll deductions.

49.     The Debtors also provide vision insurance to Employees, and participating

Employees pay the entire premium cost associated with such insurance.  Such premiums are

deducted from such Employees' paychecks, and remitted to the carrier by the Debtors on a

monthly basis.

50.     As of the Petition Date, the Debtors estimate that they have fully paid for the

Debtors' prepetition liability on account of medical, dental and vision coverage; nevertheless, the

Wage Motion seeks authority to pay any such prepetition medical coverage obligation as may be

or become due and owing, whether or not allocable to the period before the Petition Date.

*Health Savings Accounts; Flexible Spending Accounts*

51.     One of the BCBS medical insurance coverages available to Employees is a high-

deductible plan ("HDHP") linked to a Health Savings Account ("HSA").  For Employees who

select coverage under the HDHP option, the Debtors fund the HSA up to $750 annually for

individual plan coverage and up to $1,500 annually for family plan coverage; the Debtors fund

the contributions quarterly to the employees, through their payrolls processed by ADP.

Employees may make additional, self-funded HSA contributions up to the permissible limit

established by law.  The Debtors have funded their 2020 HSA contributions in full; their next

scheduled contributions will be made in March 2021 covering the first quarter of 2021.  In

addition, as an adjunct to its provision of medical and dental insurance, the Debtors make

"Flexible Spending Accounts" (FSAs) available to Employees, enabling Employees to save for

payment of certain out-of-pocket medical and health-related expenses on a pre-tax basis.  These

FSAs are funded entirely by Employee contributions made through payroll deductions.

*Other Benefit Programs*

52.  In addition to the above-described benefits, the Debtors intend to maintain the following benefit programs during the Chapter 11 cases (to the extent paid by the Debtors, all premiums and contributions required under the programs were fully paid as of the Petition Date):

- A 401(k) retirement plan made available through Fidelity Investments ("Fidelity"), to which the Debtors ceased making matching contributions in 2019.

- Life insurance accidental death and dismemberment insurance and disability insurance, with CIGNA..  The Debtors pay all premiums for life insurance and AD&D insurance, and half the premiums for disability insurance.

- The Debtors obtain and provide their clinician Employees with professional liability insurance as part of the Debtors' general liability/professional liability umbrella policy with AON.  The Debtors pay all premiums for this coverage.  The Debtors provide the Employees with enrollment in an Employee Assistance Program (EAP) that provides resources and support to Employees in a wide array of subjects such as financial planning, family planning, substance abuse, legal issues, and counseling.  The Debtors' EAP is administered by Benefit Resource, LLC.

53.    In sum, to enable the Debtors to transition seamlessly to postpetition business operations, it is essential that it be permitted to meet its obligations to the Employees in the ordinary course of business.  As to the Employees, to the extent these obligations represent the Debtors' prepetition obligations, they are predominantly, if not entirely, entitled to priority status under Section 507(a)(4), (5), or (8) of the Bankruptcy Code.  In addition, the payments are appropriately authorized under the doctrine of necessity applied by bankruptcy courts in similar

circumstances.  Only by providing the Debtors with the tools necessary to achieve undisrupted

business operations will the Debtors be able to maintain the value of their businesses, provide

high-quality care to existing and new clients, and keep the pending sale processes on track

toward a successful result.  For these reasons, the Debtors respectfully request that they be

authorized to pay, in the exercise of their business judgment, their prepetition obligations to the

Employees as described in the Wage Motion, and maintain on a postpetition basis the benefit

programs described therein, as and when such obligations become due in the ordinary course of

the Debtors' businesses.

C.      Cash Management Motion

54.      Revenue generated by the Debtors' business operations is primarily paid in the

form of wire transfers or ACH deposits received from a number of payors, including

MassHealth, managed Medicaid programs, and private insurers.  These payments are made to

three existing deposit accounts in the names of South Bay or Futures, under remittance

instructions on file with the relevant payors.  Two of the accounts into which remittances are

paid (one for South Bay, and one for Futures) are kept at Fifth Third Bank, National Association

("Fifth Third") (one of the two Senior Lenders and a nationally chartered bank).  The third

account, for South Bay, is maintained at TD Bank, and is the account into which South Bay's

government payors have remitted funds for a significant period of time.  Collections into South

Bay's  TD Bank account are automatically swept into the South Bay account at Fifth Third.

Under the Debtors' centralized cash management system, the balances in the Fifth Third

accounts are used to pay Futures or South Bay expenses (e.g., payroll, rent), and the balance

remitted to the CIS account at Fifth Third (the "Concentration Account") as needed.

Administrative and overhead expenses for all entities are paid from the Concentration Account.

55.    By the Cash Management Motion, the Debtors are seeking an order permitting them to maintain their existing accounts at Fifth Third or TD Bank, as applicable, and to continue to utilize the cash management system described above for the payment of expenses incurred in the operation of their businesses.  It would be extremely time-consuming to change payment directions currently on file with all of the payors who are the source of the Debtors' revenues, and the change requests would encounter significant administrative delays when processed the payors.  The result would be an extreme disruption in the Debtors' cash flow, jeopardizing the Debtors' viability and the contemplated sales to Mentor.  The Debtors' ability to provide continued counseling and related services to their clients, an already vulnerable population, would be endangered as well.  For these reasons, I believe that the relief sought by the Cash Management Motion is appropriate, as it will facilitate a smooth transition to the Debtors' postpetition operations and avoid disruption to the Debtors' efforts to complete the proposed sales of their assets.

D.    <u>Other Motions</u>

56.    In addition to the Cash Collateral Motion, the Wage Motion and the Cash Management Motion, and the Sale Motions and Sale Procedures Motions, the Debtors are today filing the following motions, for which they are not requesting "first day" emergency relief:

- Application for Order Authorizing Retention and Employment of Casner & Edwards, LLP as Counsel for the Debtors;

- Debtors' Application for Order Authorizing Retention and Employment of Getzler Henrich & Associates, LLC as Financial Advisor to the Debtors;

- Debtors' Application for Order Authorizing Retention and Employment of Investment Banker;

- Debtors' Motion for Authority to Employ and Compensate Certain Professionals in the Ordinary Course of Business; and

- Debtors' Motion for Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals.

The Debtors' continued access to the professionals to be retained and compensated pursuant to these motions will be vital to their ability to continue their business operations in the Chapter 11 cases and consummate the proposed asset sales to Mentor. I therefore believe that the relief sought therein is appropriate, and request that it be granted by the Court in due course.

## Conclusion

57. The Debtors have filed the Chapter 11 case to facilitate the sale of the assets of South Bay, CIS and Futures, having determined that such sales are in the best interests of their creditors, clients and employees. To preserve the value of their businesses pending completion of the sale process, the Debtors require the continued use of Cash Collateral to which the Senior Lenders have agreed.

58 Allowance of the Wage Motion will promote the seamless transition of the Debtors' business operations into Chapter 11, by minimizing the disruption to operations and employee morale that would undoubtedly ensue were the Debtors unable to pay their workforce in the normal course. Authorizing the Debtors to maintain their existing cash management systems, critical to the uninterrupted receipt of payments for their services from governmental and non-governmental payors, will likewise promote undisrupted business operations, to the benefit of all interested parties.

59. Accordingly, for the reasons stated herein and in each of the Cash Collateral Motion, the Wage Motion, and the Cash Management Motion, I believe that the relief requested

in such motions is instrumental to the success of the Debtors' Chapter 11 cases, and that prompt

approval of such motions is in the best interests of the Debtors and their bankruptcy estates.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information and belief.

Executed at _Westborough_, Massachusetts this _4th_ day of January, 2021.

Andrew Calkins, Chief Executive Officer of
Community Intervention Services, Inc.,
South Bay Mental Health Center, Inc., and
Futures Behavior Therapy Center, LLC