UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| COMMUNITY INTERVENTION SERVICES, INC., | ) | |
| COMMUNITY INTERVENTION SERVICES | ) | |
| HOLDINGS, INC., SOUTH BAY MENTAL HEALTH | ) | Case No. 21-40002-EDK |
| CENTER, INC., and FUTURES BEHAVIOR | ) | (Jointly Administered) |
| THERAPY CENTER, LLC | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |

**DEBTORS' MOTION FOR AUTHORITY TO SELL SUBSTANTIALLY
ALL ASSETS OF SOUTH BAY MENTAL HEALTH CENTER, INC. AND CERTAIN
ASSETS OF COMMUNITY INTERVENTION SERVICES, INC., INCLUDING
CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS,
PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE,
FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS**

Community Intervention Services, Inc. ("CIS") and South Bay Mental Health Center,

Inc. ("South Bay" and, with CIS, the "Debtors")[1] hereby move this Court pursuant to Sections

363 and 365 of the Bankruptcy Code, Fed. R. Bankr. P. 6004 and 6006, and MLBR 6004-1 for

authority to sell:  (A) substantially all of South Bay's assets utilized by South Bay in operating

its assets (collectively, the "SB Assets"), including without limitation (i) South Bay's rights

under leases of real property at which South Bay operates its clinics (collectively, the "Leases"),

(ii) certain personal property, including equipment, furniture and inventory, (iii) certain contracts

with third parties (together with the Leases, the "SB Assumed Contracts"), (iv) certain permits

and licenses authorizing the provision of certain services to South Bay clients (to the extent

---

[1] The Debtors' affiliates Community Intervention Services Holdings, Inc. ("Holdings") and Futures Behavior
Therapy Center, LLC ("Futures") are also debtors and debtors-in-possession in Chapter 11 cases that are being
jointly administered with the Debtors' Chapter 11 cases; Futures is by separate sale motion seeking authority to sell
substantially all of its assets.  Where appropriate in the presentation of information concerning the four debtors and
their jointly-administered cases, the term "Debtors" will encompass Holdings and Futures as well as CIS and South
Bay.

transferable), and (v) certain other miscellaneous, specified assets as set forth in that certain

Asset Purchase Agreement dated as of January 5, 2021 (the "APA") between the Debtors and SB

Transitional Sub, LLC, a Delaware limited liability company ("SBTS") including, without

limitation, the right to use South Bay's trade names and other intellectual property; and (B)

certain assets of CIS integral to the operation of the South Bay business enterprise (the "CIS

Assets" and, together with the SB Assets, the "Assets"), including, without limitation, certain

executory contracts (the "CIS Assumed Contracts" and, collectively with the SB Assumed

Contracts, the "Assumed Contracts"), to SBTS, or its eligible designee, or to such other entity

that submits the highest or otherwise best offer to acquire the Assets as determined through the

sale process to be governed by the proposed sale procedures as set forth in the Debtors' related

motion for approval of sale procedures filed concurrently herewith.  The Proposed Sale is to be

made pursuant to the APA between the Debtors and SBTS attached as Exhibit A, including as it

may be modified by agreement between the Debtors and the successful bidder for the Assets.  By

the APA, SBTS has agreed to pay $32,000,000 for the Assets, subject to certain adjustments

customary for a sale of a business as a going concern, as set forth in the APA.

The Proposed Sale of the Assets, including the assignment of the Assumed Contracts, is

to be made free and clear of all liens, claims, and interests, whether consensual or arising under

applicable law, except as otherwise provided for by the APA or the order of the Bankruptcy

Court approving the sale.  The Proposed Sale is subject to the satisfaction of certain conditions,

chief among them this Court's approval of the Proposed Sale, the lack of any material adverse

change to the Debtors' business operations or prospects, and SBTS's receipt of all necessary

consents, approvals, licenses and certifications of governmental agencies necessary to maintain

post-closing operation of South Bay's business as a going concern, including without limitation from the Massachusetts Department of Public Health ("DPH").

The Assets are subject to various liens and security interests, including those senior secured liens and security interests of Capital One, National Association ("Capital One") and Fifth Third Bank ("Fifth Third"), acting through Capital One as their agent (Capital One and Fifth Third as lenders, the "Senior Lenders", and Capital One as agent, the "Senior Agent").  As of January 5, 2021 (the "Petition Date"), the Senior Lenders hold a prepetition first priority senior secured claim against the Debtors in the amount of at least $48,708,644.51, exclusive of accrued and accruing legal fees and expenses and additional interest and loan charges accruing on or after December 30, 2020 (the "Senior Lender Claim"), evidenced by a series of agreements and instruments including, *inter alia*, (i) that certain Credit Agreement dated as of July 16, 2015, by and among CIS, South Bay, Futures, and certain other non-Debtors, as borrowers (collectively, the "Borrowers"), Debtor Community Intervention Services Holdings, Inc., and certain other non-Debtors as guarantors (collectively, the "Guarantors"), Senior Agent and the other Senior Lenders (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") and (ii) that certain Guaranty and Security Agreement dated as of July 16, 2015, by and among the Borrowers, Guarantors, and Senior Agent (as amended, restated, supplemented or otherwise modified from time to time, the "Guaranty"' and collectively with the Credit Agreement, and with all other instruments and agreements evidencing, governing and/or securing the Senior Lender Claim, all as more fully described in the Cash Collateral Motion (as defined below), the "Senior Loan Documents").  The Senior Lenders have agreed to fund the Debtors' sale effort through the Chapter 11 case pursuant to an agreed budget and proposed cash collateral order attached to the Debtors' Motion for Interim and

Final Orders Authorizing Use of Cash Collateral (the "Cash Collateral Motion"), based on the

Debtors' agreement that the net sale proceeds from each of the two asset sales (i.e. (i) this

Proposed Sale and (ii) the Futures sale) will immediately be turned over to the Senior Agent, on

behalf of the Senior Lenders, on account of the Senior Lender Claim.

As described in greater detail below, the APA and the designation of SBTS as the

stalking horse bidder for the Proposed Sale is the result of a prepetition sale process undertaken

by the Debtors under the guidance of their financial and legal advisors and with the assistance of

their investment bankers.  That sale process will continue pursuant to sale procedures approved

by the Bankruptcy Court.  The Debtors have filed a motion seeking such approval, for a sale

process leading to solicitation of competing bids by mid-February; an auction among competing

bidders conducted soon thereafter; the Debtors' prompt post-auction selection of the winning

bidder to purchase the Assets pursuant to the final negotiated APA; a sale hearing to be

conducted promptly thereafter to obtain this Court's approval of the Proposed Sale; and the

closing of the sale of the Assets pursuant to the final APA as promptly as the closing conditions

can be satisfied.

Pursuant to MLBR 6004-1(c)(1)(F), the Debtors provide the practical and abbreviated

equivalent of the adequate information that would be required in a disclosure statement for a

Chapter 11 plan involving the sale of South Bay's Assets.[2]

---

[2] Because only South Bay is selling substantially all of its assets, the "mini disclosure statement" required by MLBR 6004-1(c)(1)(F) will focus on South Bay's business and financial affairs, but pertinent information concerning CIS will also be provided.

## I.    __The Debtors' Business and Financial Affairs__

### A.    __Overview__

Founded in 1986, South Bay has grown to be one of the largest for-profit outpatient and community-based providers of behavioral health services in Massachusetts.  At present, South Bay operates through 22 offices, with 21 located throughout the Commonwealth and one office in Hartford, Connecticut.  The services provided by South Bay clinicians include:

- early intervention counseling, to assist clients age 21 or younger on the autism spectrum, and clients up to 3 years of age experiencing development delays;

- outpatient counseling for children, adults and families, with a focus on issues involving abuse or neglect, trauma, and addiction and substance abuse; and

- in-home community-based counseling for children and families, responding to behavioral, social and educational issues.

These services are provided by a staff of more than 930 professionals and paraprofessionals located at South Bay's 22 offices, and generated more than $60 million in revenue in 2019.  In the first ten months of 2020, South Bay generated approximately $48.45 million in revenue.  It provides services to more than 20,000 clients, for whom these services provide critical assistance in managing behavioral health and substance abuse problems.

South Bay's growth was fueled, in significant part, by the Mental Health Parity and Addiction Equity Act ("MHPAEA"), federal legislation enacted prior to the Affordable Care Act, expanding health insurance coverage and, in particular, requiring public and private health insurers to cover behavioral health.  Pub. L. No. 110-343, 122 Stat. 3881 (2008) (codified as

amended at 26 U.S.C. § 9812; 29 U.S.C. § 1185a; 42 U.S.C. § 300gg-5).[3]  In fact, thirty-four

percent (34%) of South Bay's 2019 revenue was comprised of payments from Medicaid (a

program administered by MassHealth), and sixty percent (60%) was derived from Medicaid-

funded managed care plans.  Of the balance of South Bay's revenue, five percent (5%) came

from commercial insurers, and one percent (1%) from Medicare.

In 2012, South Bay was acquired by CIS, its sole stockholder.  CIS was formed in 2012

by the private equity fund manager H.I.G. Capital, LLC ("H.I.G.") to pursue acquisitions of

behavioral health companies; South Bay was its first acquisition.  H.I.G.'s business plan,

implemented by its H.I.G. Growth Partners fund, was to create a broad-based regional, or

possibly national, for-profit behavioral health company, which would be able to deliver,

efficiently and cost-effectively, behavioral health services to a chronically under-served

population.  This strategy was driven in significant part by the passage of the MPHA, the

MHPAEA and additional federal legislation, such as the 21st Century Cures Act and the

Omnibus Spending Bill of 2018.  After acquiring South Bay, CIS acquired additional

subsidiaries operating in the behavioral health field, including Futures Behavior Therapy Center,

LLC ("Futures"), based in Beverly and West Boylston, Massachusetts; Family Behavioral

Resources, Inc. ("FBR"), Autism Education and Treatment Institute ("AERI"), and AHEADD

Services, LLC ("AHEADD"), providing services to clients in Pennsylvania; Access Family

Services, Inc. ("AFS"), operating in North Carolina and South Carolina; and Northstar

Psychological Services, Inc. ("NPS"), operating in Georgia.[4]

---

[3] Comparable Massachusetts legislation, the Mental Health Parity Act ("MHPA") was also enacted in 2008.  See An
Act Relative to Mental Health Parity, ch. 256, MASS. GEN. LAWS ch. 32A, § 22, ch. 175 §§ 47B, 110, ch. 176A §§
8A, 10, ch. 176B, §§ 4A, 4A$^1$/$_2$, ch. 176G, § 4M (2008).  The MHPAEA is enforced in Massachusetts through
Chapter 26 of the General Laws.  MASS. GEN. LAWS ch. 26 § 8k (2012).

[4] Futures, a provider of services to clients with autism spectrum disorders, is a debtor in this jointly-administered
Chapter 11 case.  Substantially all of the assets of AFS and FBR, together with the assets of AERI and AHEADD,

One hundred percent (100%) of the shares of CIS are held by Community Intervention Services Holdings, Inc., a Delaware corporation ("Holdings").  H.I.G. Growth Partners-CIS, LLC holds a majority of Holdings' shares (over 70 percent); the remaining shares are held by various investors.

CIS provides administrative services to South Bay (as well as Futures), managing such functions as payroll processing, revenue cycle management, accounting, accounts payable activities, recruiting, human resource support, and information technology services.  Those services are charged in proportion to the percent of CIS portfolio's revenue attributable to South Bay.  Because of the importance of these services to South Bay's continuing operations, the APA contemplates that the third-party contracts pursuant to which these services are obtained by CIS, as well as certain additional selected assets of CIS, will be transferred to SBTS (or other purchaser of the Assets).[5]

**B.      Prepetition Financing of the Debtors**

CIS financed its acquisitions and its subsidiaries' operations with secured financing provided by institutional and private lenders.  The Debtors' largest creditors are the Senior Lenders, who made available a $55 million credit facility evidenced by the Senior Loan Documents.[6]  As of the Petition Date, as noted, the total aggregate amount of the Senior Lender Claim was at least $48,708,644.51, exclusive of accrued and accruing legal fees and expenses

---

(the "Non-Operating Entities") were sold in a secured party disposition that occurred prior to the Petition Date.  As of the Petition Date, NPS had transferred its clients to alternative service providers and was in the latter stages of winding up its operations (NPS and the Non-Operating Entities, collectively, the "Non-Debtor Entities").

[5] CIS, South Bay and SBTS have separately agreed that, in exchange for a fee to be paid by South Bay, SBTS will provide assistance to CIS and South Bay in collecting pre-closing date billings for the benefit of the Debtors' estates and their creditors.

[6] In addition to the Debtors (CIS, Holdings, South Bay, and Futures), the Non-Debtor Entities are also borrowers or guarantors under the Senior Loan Documents.

and additional interest and loan charges accruing on or after December 30, 2020.  Pursuant to the

Senior Loan Documents, the Senior Agent, on behalf of itself and the Senior Lenders, holds a

first priority security interest in substantially all assets of the Debtors.  That security interest

entitles the Senior Lenders to the net proceeds of the Proposed Sale, and the Debtors in their

proposed sale order provide for such payment.

The Debtors (together with the Non-Debtor Entities) also obtained subordinated secured

financing pursuant to a Credit Agreement dated July 16, 2015, as amended, with Triangle

Mezzanine Fund LLLP ("Triangle"), acting for itself and as agent for certain other lenders

("Mezzanine Agent"), pursuant to which they borrowed $25,250,000 secured by a second-

priority security interest in the assets of the Debtors and the Non-Debtor Entities (the

"Mezzanine Loan Facility"; the documents evidencing, governing and/or securing the Mezzanine

Loan Facility are referred to herein as the "Mezzanine Loan Documents").  Triangle

subsequently assigned its rights under the Mezzanine Loan Documents to BSP Agency, LLC

(together with OFS SBIC I, LLP, the "Mezzanine Lenders").  Pursuant to the Mezzanine Loan

Documents and the Subordination Agreement (as defined below), the Mezzanine Lenders hold a

security interest in substantially all assets of the Debtors that is junior in priority to the security

interest held by the Senior Lenders

Pursuant to that certain Subordination Agreement dated July 16, 2015 (as amended,

restated, or otherwise modified from time to time, the "Subordination Agreement"), by and

among the Debtors, the Non-Debtor Entities, Senior Agent, the Mezzanine Agent and the

Mezzanine Lenders, the Mezzanine Agent and the Mezzanine Lenders subordinated, among

other things, all of the obligations and liabilities owed by the Debtors and the Non-Debtor

Entities and all of the security interests and liens granted by the Debtors and the Non-Debtor

Entities to the Mezzanine Agent and the Mezzanine Lenders to the Senior Lender Claim and the Senior Agent and Senior Lenders' liens with respect to the collateral.

Because of this payment and lien subordination along with the magnitude of the Senior Lender Claim and the apparent value of the Debtors' assets subject to the Senior Prepetition Liens, the Debtors believe that the Mezzanine Agent and the Mezzanine Lenders will receive no sale proceeds.

Aside from their substantial obligations to their secured creditors, the Debtor South Bay is obligated to pay $1,820,000 to the Commonwealth of Massachusetts arising out of a 2018 settlement of certain whistleblower litigation, and $7.8 million in advance payments made in spring 2020 to support the Debtors' operations during the COVID-19 pandemic, discussed below. The Debtors have generally maintained good relationships with their trade creditors, and have endeavored to avoid any substantial build-up of "out-of-term" trade payables.

Other significant liabilities include the Debtors' obligations under leases of real property at which they conduct their business operations; South Bay is a tenant under 22 leases, and CIS is a tenant under one lease. As of the Petition Date, the Debtors were current in the payment of their lease obligations. The Debtors' expect that most if not all of these leases will be assumed and assigned to SBTS (or other purchaser) pursuant to Section 365 of the Bankruptcy Code as part of the Proposed Sale, and that there will be minimal if any cure costs associated with such assumption and assignment.

### C.    Financial Difficulties

CIS's business plan has encountered significant implementation issues for a number of years. Starting in 2016, the Debtors were besieged with a multitude of operational and regulatory challenges. Extensive clinical employee turnover at South Bay and CIS subsidiaries

(other than Futures) greatly impacted the ability of the Debtors to generate revenues sufficient to cover operating expenses and debt service requirements.  As new clinicians were hired, they took longer to train and generate a full panel of clients.  In fact, the recruitment and retention of clinicians continues to be an ongoing challenge.

Changes in the service reimbursement landscape posed additional challenges for the Debtors, including financial pressure resulting from increased expenses unmatched by corresponding increases in payor reimbursement rates.  Compounding matters further, the Debtors struggled to obtain reliable, timely financial reporting and analysis to help them manage through the increasing financial pressures, due to the fact that the multiple operating companies all maintained separate and inconsistent finance and accounting practices.  These financial management issues were ultimately addressed in 2017 by centralizing all accounting and financial reporting resources under CIS and by opening a shared service center in Massachusetts, but the previously inattention to these issues had already affected the Debtors' financial condition.

Although the changes described above led to improvement in the Debtors' operating performance, their turnaround was impaired, and ultimately derailed, by the commencement in 2015 of the ongoing litigation entitled *United States ex rel. Martino-Fleming v. South Bay Mental Health Center Inc. et al.*, Civ. Action No. 1:15-cv-13065-PBS (D. Mass.) (the "Qui Tam Litigation").[7]  A *qui tam* lawsuit commenced by a former South Bay employee, the Qui Tam Litigation asserted that South Bay had engaged in inadequate training and supervision of certain of its clinical employees.[8]  As a result, according to the complaint filed in the Qui Tam

---

[7] Although filed in 2015, the Qui Tam Litigation was not made known to the Debtors until it was unsealed in 2017.

[8] Additional defendants in the Qui Tam Litigation were CIS, Holdings, H.I.G. Growth Partners, LLC, H.I.G. Capital, LLC, Peter J. Scanlon and Kevin P. Sheehan.

Litigation, South Bay's claims for payment failed to meet the regulatory requirements applicable under Massachusetts's Medicaid program, and constituted overpayments recoverable under federal and state False Claims Acts, 31 U.S.C. §3729 *et seq.* (the "Federal Claims"); M.G.L. c. 12, §5A *et seq.* and M.G.L. c. 118E, §§40, 44 (the "State Law Claims").

Both the Commonwealth of Massachusetts and the United States were entitled to intervene in the Qui Tam Litigation, and pursue on their own behalf the State Law Claims and the Federal Claims, respectively. After the Commonwealth of Massachusetts intervened in the Qui Tam Litigation, the Debtors South Bay and CIS were able to obtain a consensual resolution of the State Law Claims. Pursuant to a Settlement Agreement and Release signed in February 2018 (the "Massachusetts Settlement Agreement"), South Bay, CIS and Holdings agreed to pay the Executive Office of Health and Human Services of Massachusetts ("EOHHS") a total of $4,000,000 through a series of payments commencing upon settlement and continuing through December 2022. As noted above, the balance due to EOHHS under the Massachusetts Settlement Agreement is $1,820,000.[9]

The Federal Claims were not resolved by the Massachusetts Settlement Agreement, and the United States has thus far not elected to intervene in the litigation of those claims. Thus, the Federal Claims remain under the control of the original plaintiff in the Qui Tam Litigation. Efforts to settle the Federal Claims with the original plaintiff have thus far been unsuccessful. Recently, in response to the trial judge's urging, the parties to the Qui Tam Litigation have agreed once again to mediate their disputes.

---

[9] A recoupment in the amount of $12,500 was scheduled to occur, under the Massachusetts Settlement Agreement, on January 4, 2021. If that recoupment did, in fact, occur on the scheduled date, the balance due under the Massachusetts Settlement Agreement will have been reduced to $1,807,500.

The multi-year defense of the Qui Tam Litigation has been both expensive and time-consuming, and has had a deleterious effect on the Debtors' business and finances.  The Qui Tam Litigation has made it impossible for the Debtors to obtain financing for their operations, and has made the assets of South Bay unmarketable outside of bankruptcy.  Ultimately, the Qui Tam Litigation has prevented the execution of CIS's strategy of building a regional, or possibly national, provider of behavior health services, and rendering fatally inefficient the corporate infrastructure that was intentionally built to deliver those services in a cost-effective manner.

The Debtors' precarious financial position left them extremely vulnerable to the shock of COVID-19 and the attendant disruption of the Debtors' business operations and revenues.  In early spring 2020, the pandemic's effect on the Debtors' operations left the Debtors close to running out of cash and being forced to cease operations.  As a result of the pandemic and governmental "lockdown" orders, South Bay professionals could no longer offer in-person counseling or other services.  A rapid conversion to tele-health was able, after a number of months, to restore revenue from outpatient counseling to their former levels, but revenue from other services, which require in-patient assistance, have continued to lag; in fact, total South Bay revenue is currently running at approximately 69 percent of its pre-COVID level.  Fortunately, South Bay during spring of 2020 was able to obtain emergency funding totaling $7.8 million from the Commonwealth of Massachusetts, funding that the Commonwealth provided and which the Debtors have been advised must be repaid in six installments (each in the amount of $1.3 million) commencing in January, 2021.  This funding not only permitted the Debtors to maintain ongoing business operations—including importantly South Bay's essential role in delivering much-needed behavioral health services to Commonwealth residents—it served to lengthen the

runway for the Debtors' pursuit of a sales transactions intended to place their businesses in stronger financial hands.

### D.        Prepetition Development of Proposed Sale

In October 2018, CIS retained the services of Duff & Phelps Securities, LLC ("D&P"), a well-known investment banking firm with substantial experience in the healthcare industry, to explore possible sale options for various of CIS's operating subsidiaries.  Upon its engagement, D&P began marketing the assets of CIS subsidiaries AFS, FBR, AERI, NPS and Futures.  A 2019 transaction for AFS and NPS failed just short of a closing.  D&P's commencement of a new sale process ultimately led to the sale of FBR, AERI, and AFS on October 1, 2020, and the proposed sale of Futures that is the subject of a separate sale motion in this Chapter 11 case. NPS, unable to be sold, ceased operations in November, 2020.

In April 2020, CIS expanded D&P's engagement to include the prospective sale of South Bay.  In light of South Bay's historical performance and the pending Qui Tam Litigation, South Bay's management determined that a sale free and clear of liens, claims and interests under Section 363 of the Bankruptcy Code would be necessary to effectuate a sale.  Accordingly, South Bay and D&P concluded that firming up a stalking horse offer with a definitive agreement, to be followed by solicitation of competing bids through a Section 363 sale process, would be the best way to market the South Bay business enterprise to potential purchasers.  Beginning on May 11, 2020, D&P began a full sales process for the South Bay business focused on broad list of strategic buyers, private-equity backed portfolio companies, and financial buyers.  D&P contacted 197 potential buyers.  A total of 31 potential buyers signed a non-disclosure agreement and were provided D&P's preliminary marketing materials.

At the conclusion of these marketing efforts, South Bay negotiated a letter of intent with The Mentor Network ("Mentor"), executed on September 1, 2020, pursuant to which Mentor indicated its intent to acquire South Bay's assets and willingness to serve as a stalking horse bidder for a Section 363 sale.[10]   South Bay and D&P then turned to facilitating Mentor's completion of due diligence, and the parties negotiated the APA that is the subject of this Motion and the Sale Motion.   During that process, Mentor determined that it desired to acquire certain assets of CIS that is viewed as integral to the smooth transition of business operations, and designated SBTS as its nominee to acquire the Assets, as reflected in the APA between the Debtors and SBTS.

The consummation of the sale transactions involving South Bay and CIS pursuant to the APA, and Futures under its separate asset purchase agreement, will substantially conclude the winding up of the business operations of all of CIS's subsidiaries (other than the collection of accounts receivable of South Bay and Futures not being sold to SBTS).   Once the two sales are consummated, CIS will wind up its own affairs.

### E.      Importance of Proposed Sale

The full continuum of behavioral health services provided by South Bay is critical to the well-being of thousands of Massachusetts and Connecticut residents.   Without the therapeutic services that South Bay provides to its clients, many would experience serious mental health deterioration, made worse by the isolation resulting from the COVID-19 pandemic.   Families would be without early intervention or counseling services, autistic children would be without ABA services, and those suffering from a mental health or substance abuse disorder would be

---

[10] Mentor is a national leader of behavioral health services.  Being reputable and well-respected in the industry, the Debtors believed Mentor to be an ideal buyer for South Bay.  SBTS was formed by Mentor to acquire the Assets under the APA.

without counseling support and medication services.  In addition, as South Bay is one of the

largest providers of such services in the Commonwealth, South Bay's failure could well trigger a

health care crisis across the state, destabilizing an already vulnerable population during the

pandemic.

Recognizing the importance of the services provided by South Bay, the Debtors, faced

with a deteriorating financial situation, have determined to sell the assets of South Bay, in order

to facilitate the continued provision of its services by a better-capitalized buyer able to continue

those services without interruption.  The Debtors believe that the Proposed Sale of South Bay's

business is therefore in the best interests not only of their creditors, but—even more important—

the vulnerable client population that the Debtors serve.  It will also preserve the jobs of South

Bay's almost 1,000 employees and contract clinicians.  To effect this important sale, the Debtors

have filed the Chapter 11 case.

**F.      Need For Prompt Sale**

The Debtors have a limited amount of time to complete the sale of their assets.  As

revealed by the budget attached to the proposed cash collateral order, the Debtors are not

profitable and are consuming cash at a significant rate.  In addition, the Commonwealth of

Massachusetts has previously indicated that it expects South Bay to begin repaying in January

2021, on a monthly basis the $7.8 million emergency funding it provided to South Bay at the

outset of the pandemic.  If so, such repayment would further strain the Debtors' resources.

Adding further urgency to the Debtors' timeline is the fact that the licensing authorities whose

approval is required for any purchaser to provide and bill for the services needed by South Bay's

clients could take several months.

In addition to the above factors, maintenance of South Bay's workforce—in particular, its clinical staff—is critical to its continued operations.  A lengthy sale process could lead to the loss of employees, and potentially lead to significant service cuts.  Accordingly, time is of the essence if the Debtors are to be able to sustain ongoing operations and protect the needs of its vulnerable clients.  To promote the prompt solicitation of competing bids, and the prompt determination and Court approval of the winning bid, the Debtors require prompt consideration and approval of the Proposed Sale.  To that end, the Debtors have concurrently herewith filed a motion seeking approval, on an expedited basis, of sale procedures intended to provide a focused and expedited marketing, bidding, and auction process intended to obtain any higher or otherwise better offers to acquire the Assets.[11]

## II.   **The Chapter 11 Case**

The Debtors filed their voluntary petitions commencing their Chapter 11 cases on January 5, 2021.  The Chapter 11 case will provide the Debtors with a stable operating environment during the Proposed Sale process.

### A.   **"First Day" Relief**

Upon filing for Chapter 11, the Debtors filed several motions with the Bankruptcy Court requesting certain "first day" relief to enable the Debtors to seamlessly transition their business operations into Chapter 11.  These motions included requests for: (i) joint administration of their cases, (ii) authority to use cash collateral subject to the security interest of the Senior Lenders to meet the Debtors' ordinary course operating expenses and the ongoing expenses of administering

---

[11] As detailed above and in the sale procedures motion, the Debtors undertook an extensive prepetition marketing effort that culminated in their selection of SBTS as the stalking horse bidder to acquire South Bay's business; the proposed post-petition marketing effort will be focused toward those entities already aware of the South Bay's business and who should be well-positioned to assess the opportunity to acquire the Assets within the time frame made available by the Debtors' operational, financial, and regulatory circumstances.

16

their Chapter 11 cases; (iii) authority to maintain their prepetition cash management system and

Senior Lender bank accounts, and (iv) authority to honor their prepetition obligations to

employees (i.e., to meet payroll accrued before their bankruptcy filing and otherwise to pay paid

time off and other employee benefits in the ordinary course).  The relief sought in these motions

is needed to ensure the continued services of the Debtors' workforce essential for providing

quality services to the Debtors' clients and thereby generating the Debtors' revenues.  These

requests for "first day" relief are intended to ensure that the Debtors' normal business operations

not become disrupted as a result of the bankruptcy filing.

By local bankruptcy rule (MLBR 1015-1(c)), the Debtors' motion for joint administration

was automatically granted upon its filing.  The Debtors expect that the relief sought by the

remaining first day motions will be granted, at least in substantial part, once the Bankruptcy

Court considers the Debtors' motions upon appropriate notice to creditors and other parties in

interest.

### B.      Post-petition Financing

When they filed the Chapter 11 case, the Debtors had no means of paying for ongoing

expenses of operating their businesses and preserving and protecting their assets during the case

except through the use of funds constituting the Senior Lenders' cash collateral (i.e., proceeds of

the Debtors' accounts receivable).  Accordingly, when the Debtors filed for bankruptcy, they

filed the Cash Collateral Motion, seeking approval of financing arrangements agreed to with the

Senior Lenders prior to filing.  These arrangements included the Senior Lenders' agreement to

permit the Debtors' use of the Senior Lenders' cash collateral for the Debtors' payment of

necessary costs and expenses substantially in accordance with the budget attached to the

financing motion (including as such budget may be updated with the Senior Lenders' approval,

the "Budget").  In exchange for the Senior Lenders' agreement concerning use of their cash collateral, the Debtors agreed to several matters required by the Senior Lenders, including monthly adequate protection payments and confirmation of the amount and validity of the Senior Lenders' claims and of the validity and priority of the Senior Agent's security interest in the Debtors' assets (including cash collateral).  Notably, the Debtors agreed to undertake to seek Court approval of the Proposed Sale (and of the related sale of Futures' assets) expeditiously, and to seek Court authority to pay the net sale proceeds to the Senior Lenders on account of its secured claim.  This Sale Motion effects that agreement.

The Debtors have asked the Bankruptcy Court to consider the Debtors' Cash Collateral Motion on an expedited basis, so that the Debtors will have the ability to meet their ordinary course operating expenses (notably, employee payroll) and avoid disruption to their businesses. The Debtors expect that the Court will grant emergency relief authorizing the Debtors' use of cash collateral pursuant to the Budget pending a final hearing on the Cash Collateral Motion that the Debtors expect will be scheduled for mid-January 2021.

### C.    Creditors' Committee

Since it is usually impractical for unsecured creditors to participate directly in a Chapter 11 case, bankruptcy law provides for an official committee of unsecured creditors (which usually selects and is represented by counsel compensated by the bankruptcy estate) to represent the interests of the unsecured creditors as a group.  The membership of the creditors' committee typically includes the largest unsecured creditors who are willing to serve, provided that they are representative of the creditor body.  The committee is appointed by the United States Trustee, a federal official with administrative responsibilities in bankruptcy cases.  Once appointed, a creditors' committee will typically play an active role in the Chapter 11 case, including to

oversee the administration of the bankruptcy estate, to monitor the debtor's business operations, to evaluate any planned disposition of estate assets, to negotiate with the debtor and its secured creditors regarding any proposed Chapter 11 plan or sale of assets, and otherwise to provide its views on other issues in this case.  In light of the Debtors' having remained substantially current in the payment of their trade creditors, it is not known at the time whether there will be sufficient interest among its unsecured creditors to form a creditors committee.

### D.    Other Matters

Other Chapter 11 administrative matters requiring the attention of the Debtors and the Bankruptcy Court will include the Court's approval of the Debtors' engagement of its legal and financial advisors to assist and guide the Debtors through the bankruptcy process and the Proposed Sale, and arrangements governing the payment of compensation to such professionals and to counsel and any financial advisor to any creditors' committee.  These are matters typical to a bankruptcy case such as the Debtors' Chapter 11 case, and all of the matters are intended to be addressed in a straightforward, effective manner.

### III.    <u>Summary of the Proposed Sale</u>

The Proposed Sale is embodied in, and is to be effected through the closing of the transactions contemplated by, the APA, including as the APA may be modified through agreement between the Debtors and any competing bidder that submits the highest or otherwise best offer to acquire the Assets (including SBTS should there be an auction at which SBTS submits the winning bid).  The principal terms of the APA, and the principal terms and conditions of the Proposed Sale, are summarized below:

- **<u>Assets Being Sold</u>**

Under the APA, the Assets to be sold constitute substantially all of South Bay's assets utilized by South Bay in operating its business, including without limitation the Leases and the

SB Assumed Contracts, and certain assets of CIS integral to the operation of the South Bay business, including without limitation the CIS Assumed Contracts. Certain assets will not be included, including the Debtors' cash on hand, accounts receivable, and other assets identified as "Excluded Assets" under the APA. Because the Proposed Sale contemplates the sale of South Bay's business as a going concern, and because the Debtors believe that the highest and best value for the Debtors' assets will be obtained through a sale of South Bay's business as a going concern, the Debtors do not anticipate that prospective competing bidders will be interested in acquiring less than substantially all of South Bay's assets and the assets of CIS integral to South Bay's business. Only those of the Debtors' assets constituting "Assets" as defined in the APA (including specific designated "Assumed Contracts"), or in any other purchase agreement with the winning bidder (including SBTS), will be sold at the closing of the Proposed Sale. The Debtors, in consultation with the Senior Agent, will designate which offer (or combination of offers) represents the highest or otherwise best offer for the Assets, and will seek Bankruptcy Court approval of such offer.

- **Cash Consideration; Deposit**

SBTS has agreed to pay the Debtors $32,000,000 for the Assets (subject to certain adjustments as set forth in the APA). Under the APA, SBTS has delivered an earnest money deposit of $1,600,000. This deposit will be applied to the cash purchase price at closing. If the sale does not close, then disposition of the deposit will be governed by the APA, which, depending on the basis for non-closing (or for termination of the APA) may be retained by the Debtors as liquidated damages or returned to SBTS.

- **Assumption or Payment of Certain Liabilities**

Under the APA, SBTS has agreed to assume only certain, limited liabilities of the Debtors—principally, the Debtors' obligations under the Assumed Contracts that first arise post-closing. SBTS has, however, conditioned its acquisition of the Assets on the full payment of all pre-closing obligations owed by the Debtors to those of their employees that will be hired by SBTS incident to the closing of the sale (the "Transferred Employee Expenses"). In addition, the APA requires that the following obligations be paid from closing proceeds: (i) the costs of curing defaults arising under the Assumed Contracts, (ii) payments to The Commonwealth of Massachusetts deemed necessary to effectuate the conveyance of the Assets and (iii) investment banking fees (collectively, with the Transferred Employee Expenses, the "Buyer Payment Amount"). The Debtors' proposed sale order provides for the payment of the Buyer Payment Amount by SBTS with the remainder of the sale proceeds at closing being remitted at closing to the Senior Agent in partial satisfaction of the Senior Lender Claim. Prospective purchasers are not restricted to the approach taken by SBTS, and may propose through their marked APA to assume certain of the Debtors' liabilities that might appropriately be assumed by an acquirer intending to maintain the Debtors' ongoing business enterprise, including the obligations to employees that SBTS insists be paid at closing. The Debtors, in consultation with the Senior Agent, will take offers to assume liabilities into account in determining the highest or otherwise best offer to be obtained by the Debtors and their bankruptcy estates through the sale process.

- **Utilization of the Debtors' Workforce**

The Debtors presume that any prospective purchaser of the Assets would want to retain most of the Debtors' employees through offers of employment to be effective at closing of the sale transaction. SBTS contemplates that it will do so, and the Debtors would expect any prospective bidder to offer employment to substantially the same degree as SBTS has indicated it plans to do. Significant differences between prospective purchasers' willingness to offer employment to the Debtors' employees will be a factor in determining the highest or otherwise best bid, both in respect of fairness to employees, and to the purchaser's ability to demonstrate an ability to maintain business operations and deliver client services in a manner necessary to obtain regulatory approval to take over South Bay's business.

- **Excluded Assets**

While the Proposed Sale will involve substantially all of South Bay's assets utilized in operation of its business, and certain of CIS's assets integral to the smooth operation of South Bay's business, certain assets will be excluded from the sale. Excluded assets include the Debtors' cash, cash equivalents, and bank deposits, all deposits such as customer deposits and security deposits for utilities, all accounts receivable, all tax refunds, and other assets denoted as "Excluded Assets" under the APA. Many of CIS's assets constitute excluded assets. The Debtors' rights, claims and causes of action against others, including those arising under Chapter 5 of the Bankruptcy Code (e.g., the Debtors' rights to seek avoidance and recovery of preferential and fraudulent transfers for the benefit of creditors), will also be excluded from the assets to be sold.

- **Sale Free and Clear**

The Proposed Sale of the Assets will, pursuant to Section 363 of the Bankruptcy Code, be free and clear of all liens, claims, and interests, including without limitation all consensual liens and security interests and all liens, claims and interests arising by operation of applicable law, except for those permitted exceptions specified in the APA or in the Bankruptcy Court order approving the Proposed Sale. Any and all such liens, claims, and interests shall attach with equal effect and priority to the proceeds of sale.

- **Disposition of Contracts**

As part of the Proposed Sale, and as contemplated by the APA, the Debtors will seek the Bankruptcy Court's approval of their assumption and assignment to SBTS, pursuant to Section 365 of the Bankruptcy Code, of the Assumed Contracts. The proposed assumption and assignment of the Assumed Contracts will be undertaken as part of and in accordance with the sale procedures to be approved by the Bankruptcy Court, and will be conditioned upon, and take effect upon, the closing of the Proposed Sale. The APA requires that the cost of curing any defaults under assigned contracts be paid at closing; the Debtors do not expect that such costs will be material, as the Debtors do not believe that they were in default under the terms of their executory contracts and leases on the Petition Date. Whether competing bidders will want to acquire the same contracts, or a different set of contracts, remains to be seen; as noted, each

prospective bidder may designate the particular contracts that it desires to acquire.  Certain of the Debtors' contracts may be terminated by agreement of the non-Debtor party incident to the Proposed Sale.  For contracts that are not assigned to SBTS or otherwise disposed of incident to the closing of the Proposed Sale, the Debtors will retain the right to dispose of such contracts at the appropriate time and in the appropriate manner post-closing, including through proposed assumption or rejection of such contracts pursuant to Section 365 of the Bankruptcy Code.  If the Debtors were to reject an executory contract, the non-Debtor party to the rejected contract would be entitled to assert a claim against the Debtors' bankruptcy estate for any damages suffered as a result of such rejection.

- **Regulatory Approval**

The ability of SBTS—or of any other acquirer of the Assets—to operate South Bay's business is conditioned on its having been approved and licensed to do so by the Commonwealth of Massachusetts acting through its Department of Public Health (the "Mass DPH").  The Debtors expect that necessary regulatory approval can be sought promptly after Bankruptcy Court approval of the Proposed Sale, and that such approval can reasonably be obtained within sixty (60) days after being sought.  Prompt regulatory approval is an important consideration, and bidders' willingness to move quickly, and their prospects for successful licensing, are important considerations for the Debtors' evaluation of bids.

- **Contingencies to Closing**

The APA contains a number of conditions to closing that if not satisfied would permit either the Debtors or SBTS to terminate the agreement.  From the Debtors' perspective, SBTS's conditions to closing have been narrowly tailored to ensure as much certainty of closing as possible.  Nevertheless, there are several material conditions that, unless waived by SBTS, must be satisfied before SBTS can be required to close the Proposed Sale, including (i) Bankruptcy Court approval of the Proposed Sale, (ii) the lack of any material breach of the Debtors' representations, warranties, and covenants set forth in the APA, (iii) the lack of any events or circumstances that would have a material adverse effect on the operation of, or the financial condition or prospects of, South Bay's business, other than as a result of certain matters more particularly described in the APA, (iv) SBTS having obtained all necessary licenses and regulatory approvals, and (v) the lack of termination of the employment agreement that SBTS has entered into with Sara Hart, South Bay's President and Chief Operating Officer, that is to become effective as of the closing of the sale.  The Debtors in consultation with the Senior Agent will review closely any conditions to closing imposed by competing bidders that place certainty of closing at risk.

- **Break-Up Fee and Overbid Protection**

In consideration of SBTS's expenditure of considerable time and expense in pursuing the Proposed Sale and entering into the APA by which SBTS serves as the stalking horse bidder, the Debtors have agreed to pay SBTS a break-up fee of $640,000 if another competing bidder submits a higher or otherwise better offer to acquire the Assets that is accepted by the Debtors, approved by the Bankruptcy Court, and closes.  The break-up fee will be paid only upon closing

of the alternate sale transaction, and only out of the proceeds of sale.  To ensure that the overall value from sale of the Assets is not diminished by the necessity of paying the break-up fee, the Debtors' proposed sale procedures provide that the minimum amount of any competing bids must have a value not less than $890,000 more than the $32,000,000 cash purchase price provided by the APA.  These arrangements are subject to approval of the Bankruptcy Court incident to the Debtors' motion to establish sale procedures for the Proposed Sale.

- **Sale Procedures; Competing Bids**

The Debtors have concurrently with this sale motion filed a motion for an order of the Bankruptcy Court establishing procedures for the Debtors' solicitation of competing bids to acquire the Assets, and otherwise governing the conduct of the Proposed Sale.  These proposed sale procedures contemplate that prospective bidders will abide by confidentiality restrictions with respect to the Debtors' confidential information, and that each prospective bidder will (except for the payment of the break-up fee to SBTS, if required) bear its own expenses associated with negotiation, documentation, and efforts to obtain Bankruptcy Court approval of its offer and related definitive purchase agreement.  The proposed sale procedures contemplate that "Qualified Bids" to purchase Assets must be submitted to the Debtors by the bid deadline established by the Bankruptcy Court.  If more than one Qualified Bid is submitted (inclusive of SBTS's Qualified Bid embodied in the APA), the Debtors, in accordance with the proposed sale procedures, will conduct an auction among Qualified Bidders at which each Qualified Bidder will be entitled to participate in accordance with the applicable sale procedures.  At the conclusion of such auction, the Debtor, in consultation with the Senior Agent, will designate the highest or otherwise best offer for the Assets to be submitted to the Bankruptcy Court for approval.  The proposed sale procedures also contemplate other terms and conditions customary to bankruptcy sales of the type involved.  For a thorough review and understanding of such terms and conditions, and for greater detail of the specific terms and conditions of the APA summarized above, it is recommended that interested parties review the APA and the Debtors' motion for approval of sale procedures filed concurrently herewith.  The Debtors encourage all prospective bidders to contact the Debtors' investment banker Duff & Phelps immediately in order to obtain further information about the Assets, the Debtors' business operations, and the procedures for obtaining due diligence and participating in the sale process.

## IV.   Disposition of Sale Proceeds

Incident to the Proposed Sale and following the payment by SBTS of the Buyer Payment Amount, the Debtors will seek Bankruptcy Court authority to disburse sale proceeds to pay the remaining net sale proceeds to the Senior Agent, on behalf of and for the benefit of the Senior Lenders, on account of the Senior Lender Claim.  Payments proposed to be made from sale proceeds at closing that would otherwise be paid to the Senior Lenders include the payment of amounts due to certain members of the Debtors' senior management team pursuant to a

management incentive plan approved by the Senior Agent and Senior Lenders.[12]  Paying the

claims associated with the Buyer Payment Amount at or incident to closing of the Proposed Sale

will provide the greatest comfort to SBTS that the proposed sale of the Assets will indeed be free

and clear of liens, claims, and interests.  Payment of the net sale proceeds following the payment

of the Buyer Payment Amount to the Senior Agent, on behalf of and for the benefit of the Senior

Lenders, will provide to the Senior Lenders the recovery that they are owed on account of their

security interests in the Assets and for having funded the Debtors' operations through a sale

process that has preserved and will preserve an essential behavioral health business for the

benefit of South Bay's clients and the Commonwealth itself.

**V.    Possible Alternatives to the Proposed Sale**

The Debtors believe that there are three alternatives to the Proposed Sale:  (i) liquidation

of the Debtors under Chapter 7, (ii) a Chapter 11 liquidating plan providing for a sale of the

Debtors as a going concern, or (iii) a Chapter 11 plan of reorganization whereby the Debtors

would restructure their operations and finances to emerge from bankruptcy in a stronger financial

and operational condition, better able to provide the necessary behavioral health services to the

vulnerable population that the Debtors serve.

The Debtors currently believe that the Proposed Sale presents the best option for their

bankruptcy estates, creditors, and clients than any of these three options, for the simple reason

---

[12] Under the Senior Loan Documents—specifically, the Fifth Forbearance Agreement and Amendment to Credit Agreement dated as of October 30, 2020 (the "Fifth Forbearance Agreement")—the Senior Agent and the Senior Lenders agreed to the payment of "Qualifying MIP Expenses" (as such term is defined in the Fifth Forbearance Agreement) to Andrew Calkins (CIS's Chief Executive Officer), Matthew Lesniewski (CIS's Chief Financial Officer) and Sara Hart (South Bay's President) as a carve-out from the proceeds of the Proposed Sale otherwise payable to the Senior Lenders.  For purposes of this Motion and any order entered thereon, the term "Qualifying MIP Expenses" shall have the meaning given to such term in the Fifth Forbearance Agreement, provided that  the Proposed Sale shall be a Qualifying Disposition (as such term is defined in the Fifth Forbearance Agreement) regardless of when consummated and closed, and all references to the May 31, 2021 deadline in the definition of Qualifying Disposition shall be disregarded.

that the Debtors have no prospect for attracting the necessary capital investment needed to survive, thrive, and maintain services to their clients.  Indeed, the Proposed Sale appears to provide the most direct and certain path to ensuring that South Bay's important business operations will be continued and improved under the management of a well-capitalized, responsible, and attentive new owner/operator without the overhanging burden of the Qui Tam Litigation and the Debtors' other significant liabilities to the Senior Lenders and other creditors, and that the bests interests of the Debtors' clients will be served and protected.

A liquidating Chapter 11 plan could achieve the same result, but at greater cost, delay, and uncertainty than the Proposed Sale.  A Chapter 11 reorganization leaving the Debtors in place would necessarily require substantial new capital, and the Debtors currently do not see any prospect for obtaining new capital.  Accordingly, pursuing a liquidating Chapter 11 plan would likely result in South Bay being forced to cease operations and would cause immediate and significant disruption of essential behavioral health services to the vulnerable population that South Bay serves.

A Chapter 7 liquidation offers no better prospect.  Either a Chapter 7 trustee would conduct an expedited sale process that would almost certainly compare unfavorably to the one the Debtors are now pursuing, or the trustee would turn South Bay's assets over to the Senior Lenders.

Given these considerations, the Debtors believe that the Proposed Sale provides the best path forward for the bankruptcy estates, the Debtors' creditors, and the Debtors' clients, who stand to greatly benefit from the sale of South Bay's business as a going concern.

## VI.    Claims Against the Debtors

The following is a summary of the Debtors' liabilities:

### A.    Secured Claims

A claim is "secured" when a creditor holds a lien on particular assets ("collateral") to assure payment of the claim.  In general, proceeds from any sale of collateral must be applied first to the repayment of any claims secured by the collateral.  If the amount of the claim exceeds the value of the collateral, then the claim is considered to be a "secured claim" under the Bankruptcy Code only to the extent of value of the collateral.  The Bankruptcy Code permits the holder of a secured claim to require that the claim be paid in full, although payment may be made over a period of time if the secured creditor keeps its lien or receives equivalent assurance of payment.

The Senior Lenders are the Debtors' primary secured creditor.  As of the Petition Date, the Debtors were obligated to the Senior Lenders in the approximate amount of at least $48,708,644.51, exclusive of accrued and accruing legal fees and expenses and additional interest and loan charges accruing on or after December 30, 2020.  As noted above, the Debtors' obligations to the Senior Lenders are secured by a first priority security interest in the Debtors' assets.  As noted, the Debtors intend to pay the Senior Lenders the net proceeds of sale on account of the Senior Lender Claim.

The Mezzanine Lenders hold a subordinated security interest in the Debtors' assets, so their putative secured claim in the amount of approximately $43.7 million is, because the value of the Debtors' assets is less than the amount owed to the Senior Lenders, effectively an unsecured claim.  No payment will be made to the Mezzanine Lenders from sale proceeds.

The Commonwealth of Massachusetts does not hold liens against the Debtors' assets, but the Debtors owe the Commonwealth $1,820,000 under the Massachusetts Settlement Agreement and $7,800,000 arising from the emergency funding provided during the initial stages of the COVID-19 pandemic.  At the same time, the Commonwealth has certain future payment obligations to South Bay.  Discussions between the Debtors and the Commonwealth are ongoing with respect to the repayment of the Debtors' obligations.

### B.  Priority Claims

The Bankruptcy Code entitles certain types of unsecured claims to be paid in full prior to other claims.  These "priority claims" include expenses incurred during the Chapter 11 case (including fees of professional persons), wages incurred within 90 days and employee benefits incurred within 180 days before the beginning of the Chapter 11 case (up to $13,650 per employee), and most taxes arising before the Chapter 11 case.  The Debtors believe that they have paid most if not all prepetition taxes entitled to priority.  The Debtors expect that prepetition priority claims of employees either will be paid in the ordinary course pursuant to an order of the Bankruptcy Court authorizing the Debtors to pay them (as noted, the Debtors have filed a first day motion seeking such authority), or will be paid at closing of the Proposed Sale out of sale proceeds before the net sale proceeds are paid to the Senior Lenders.  Accordingly, the Debtors anticipate that there will be little if any prepetition priority claims remaining to be paid once the Proposed Sale takes place.

Post-petition liabilities entitled to priority as administrative expenses include professional fees of Chapter 11 professionals (i.e., the Debtors' and any creditors' committee's attorneys and other professionals), and other costs of administering the Debtors' bankruptcy estates, which will be paid in the ordinary course from ongoing business revenues or from prepetition retainers

27

received.[13]  Moreover, the Senior Lenders have allowed for a carve-out and wind-down budget with respect to certain professional fees as a part of the Cash Collateral Motion and proposed order.

Post-petition priority claims could also potentially include any claims of the Debtors' vendors not paid in the ordinary course.  The Debtors ordinary course expenditures are covered by the Budget governing the Debtors' use of the Senior Lenders' cash collateral, so the Debtors expect that there will be budgeted funds available to pay all post-petition administrative expenses.

### C.      General Unsecured Claims

Unsecured claims not entitled to priority under the Bankruptcy Code are called "general unsecured claims."  If a claimant supplied goods or services to the Debtors prior to January 5, 2021 (when the Debtors' Chapter 11 case was filed) and has not been paid, then that claimant probably holds a general unsecured claim against the Debtor to whom the goods or services were provided.

As of the Petition Date, each of South Bay and CIS was largely current with its trade payables.  South Bay's trade payables as of the Petition Date totaled approximately $125,000. Additional South Bay unsecured liabilities totaled approximately $3.2 million, and consisted of approximately $2.5 million of accrued obligations to employees for compensation and paid time off (which the Debtors expect will be paid and honored in the ordinary course), and approximately $700,000 of deferred employer payroll taxes deferred in accordance with the CARES Act.

---

[13] In the case of professionals' fees, upon compliance with and subject to the compensation procedures established by the Bankruptcy Court.

As of the Petition Date, CIS had accrued approximately $550,000 of accrued obligations to employees for compensation and paid time off (which the Debtors expect will be paid and honored in the ordinary course), and approximately $100,000 of deferred employer payroll taxes deferred in accordance with the CARES Act.  Additional unsecured liabilities totaled approximately $14.6 million, almost all of which was owed to an insider (H.I.G. Growth Partners) and to two law firms that had provided legal services to CIS including in connection with the Qui Tam Litigation.

These foregoing amounts do not include any unsecured portion of the Senior Lender Claim held by the Senior Lenders, the putatively secured claim of the Mezzanine Lenders, or the amounts owed to the Commonwealth of Massachusetts on account of the Commonwealth obligations, all as discussed above.  Nor do these amounts reflect contingent, unliquidated, or disputed liabilities including any liability on account of the Federal Claims asserted in the Qui Tam Litigation.

The amount of these Petition Date unsecured liabilities also does not include potential claims that could arise in favor of non-Debtor parties to leases or executory contracts if the Debtors were to reject such agreements.  The Debtors expect that many if not all of their significant agreements would be assumed by SBTS or any other acquirer of South Bay's going-concern business, and consequently the Debtors currently does not anticipate significant contract rejection claims to be asserted.

The Debtors currently anticipate that there will be insufficient proceeds from the sale of the Assets to pay anything on account of general unsecured claims.

## VII.    <u>Other Assets of the Estate</u>

As noted above in the summary description of the Proposed Sale, certain of the Debtors' assets are to be excluded from sale, including cash and cash equivalents, accounts receivable, and deposits with banks and third parties.  The Proposed Sale does not affect the Debtors' rights to assert claims, such as actions to avoid preferential or fraudulent transfers.  Potential avoidance actions arising under Sections 544 through 553 of the Bankruptcy Code are not subject to the liens of the Senior Lenders or any other creditor.  Typically, principal avoidance actions would include avoidance of preferential transfers and avoidance of fraudulent transfers.

### A.    **Preferential Transfers**

The Bankruptcy Code permits a debtor's bankruptcy estate to avoid and recover certain transfers of an interest in the debtor in property, if the transfers were made within 90 days before the bankruptcy filing or, in the case of a transfer to an insider of the debtor, within one year before the bankruptcy filing.  In general terms, such a transfer can be recovered if it was made by an insolvent debtor, to or for the benefit of a creditor, on account of an antecedent debt, and the transfer allowed the creditor to receive more than it would have under a Chapter 7 liquidation.  However, the Bankruptcy Code also provides various defenses to recipients of such transfers.  An otherwise preferential transfer is excepted from recovery if, for example, the transfer was made in the ordinary course of business, or the creditor receiving the transfer provided the debtor with new value (such as additional products or services) after the transfer.

The Debtors have not yet conducted an analysis of potential available preferences.  Because the Debtors operated normally during the prepetition period, the Debtors do not expect there to be significant, if any, avoidable preferences once ordinary course and new value defenses are taken into consideration.  The Debtors anticipate that determination of whether and

when to pursue potential preference actions would most properly be made in consultation with

any creditors' committee upon conclusion of the sale process.  Any proceeds of preference

actions are not subject to the liens of secured creditors, and would therefore be available for

payment of priority claims (including the expenses of administration of this Chapter 11 case),

and, thereafter, for distribution to general unsecured creditors.  The absence of colorable

preference claims would support a determination to seek dismissal of the Chapter 11 case after

closing of the Proposed Sale, rather than maintain a bankruptcy case with no assets to administer.

### B.       Fraudulent Transfers

The Bankruptcy Code and state law also permit a debtor to recover fraudulent transfers.

There are two categories of transfers which could be fraudulent:  first, transfers made for less

than reasonably equivalent value while the debtor was in financial distress; and second, transfers

made by the debtor with actual intent to hinder, delay or defraud its creditors.  The Debtors do

not believe that they have made any fraudulent transfers.  The Debtors expects that any creditors'

committee would undertake its independent assessment of whether there exist grounds for

assertion of any avoidable fraudulent transfers.  The absence of colorable fraudulent transfer

claims would support a determination to seek dismissal of the Chapter 11 case after closing of

the Proposed Sale, rather than maintain a bankruptcy case with no assets to administer.

### VIII.   <u>Assertion and Resolution of Claims Not Paid From Sale Proceeds</u>

If, after the conclusion of the sale process, the Debtors' Chapter 11 case is neither

dismissed nor converted to a Chapter 7 liquidation case, and if it appears likely that there will at

some future time be assets available for distribution to unsecured creditors, the Debtors will

discuss with any creditors' committee an appropriate deadline for the assertion of claims against

the Debtors' bankruptcy estates, and will seek an order of the Bankruptcy Court to establish a

deadline and related procedures for the assertion of claims.  At this time, given the apparent

unlikelihood that there will be any funds available for distribution to general unsecured creditors,

it is uncertain whether a bar date will ever be established even if the Debtors' Chapter 11 case is

not dismissed.

If a bar date is established, and a claimant files a valid proof of claim before the deadline

established by the Bankruptcy Court, then the claim will be automatically allowed unless the

Debtors or another interested party files a written objection with the Bankruptcy Court.  Even if a

claimant does not file a proof of claim, any liability of the Debtors that the Debtors have listed in

their respective schedules of liabilities filed with the Bankruptcy Court, and that is not listed

therein as disputed, unliquidated or contingent, will, for purposes of this Chapter 11 case (but not

for purposes of any succeeding Chapter 7 case), be automatically allowed unless an objection to

allowance is filed with the Bankruptcy Court.

If an objection to a claim is filed, a copy of the objection will be sent to the claimant, who

will also receive a notice specifying the deadline to file a written response to the objection, as

well as the date, time and place of the hearing regarding the merits of the claim.

**VIII.**   <u>**The Bankruptcy Process for Approval of the Proposed Sale**</u>

**A.**      **Objections**

If a party in interest, such as a creditor, does not believe that the Proposed Sale is

reasonable or in the best interest of the Debtors and their creditors, it can object to this Motion by

filing a written objection setting forth the basis for the objection.  The deadline for submitting an

objection will be set by the Court, as will the date of the hearing on this Motion at which

objecting parties may be heard.  Notice of the objection deadline and hearing will be provided to

the Debtors' creditors.  The Debtors believe that the Proposed Sale is in the best interest of

creditors, particularly since the Proposed Sale contemplates, and the sale procedures governing the Proposed Sale are intended to elicit, the highest or otherwise best offer to purchase the Assets through an acquisition of the South Bay business as a going concern.

### B.      Offers to Acquire the Assets

Any party interested in submitting an offer to purchase the Assets (or any portion thereof) should contact the undersigned Debtors' counsel at the earliest possible date, and comply with the deadline and governing procedures for submission of offers to be established by the Bankruptcy Court.

### C.      Sale Order

The Debtors intend that Bankruptcy Court approval of the Proposed Sale will be effected through entry of a sale order (i) approving the APA, (ii) authorizing the Debtors' sale of the Assets free and clear of liens, claims, and interests (other than the permitted liens set forth in the APA), with any and all such liens, claims, and interests to attach to sale proceeds, (iii) authorizing the Debtors' assumption and assignment of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, (iv) authorizing the buyer to pay the Buyer Payment Amount to the respective parties with the remaining net sale proceeds going to the Senior Agent, on behalf of and for the benefit of itself and the Senior Lenders, with the Qualifying MIP Expenses being then paid by the Senior Agent from proceeds at the closing that would otherwise be paid to the Senior Lenders, and (v) containing such additional provisions and protections of the estate and the purchaser as are typical for an all-asset sale pursuant to Sections 363 and 365 of the Bankruptcy Code.  A proposed form of sale order is attached hereto as Exhibit B.

**<u>Conclusion</u>**

WHEREFORE, the Debtors respectfully requests that this Court: (a) enter an order, in

substantially the form attached as <u>Exhibit B</u>, granting this Motion; and (b) grant such other and

further relief as this Court may deem just and proper.

Dated:  January 5, 2021                COMMUNITY INTERVENTION SERVICES, INC.,
                                       COMMUNITY INTERVENTION  SERVICES
                                       HOLDINGS, INC., SOUTH BAY MENTAL
                                       HEALTH CENTER, INC.,  and FUTURES
                                       BEHAVIOR THERAPY CENTER, LLC

                                       By their attorneys,


                                       */s/ A. Davis Whitesell*
                                       Michael J. Goldberg (BBO #551869)
                                       A. Davis Whitesell (BBO #551462)
                                       Hanna J. Ciechanowski (BBO #705222)
                                       Casner & Edwards, LLP
                                       303 Congress Street
                                       Boston, MA  02210
                                       Tel: 617-426-5900
                                       Email: whitesell@casneredwards.com

## **List of Exhibits**

Exhibit A—SBTS's Asset Purchase Agreement  [*filed as attachment separately*]


Exhibit B—Proposed Order [*filed as attachment separately*]