UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| | | |
|---|---|---|
| | ) | |
| In re: | ) | |
| | ) | Chapter 11 |
| COMMUNITY INTERVENTION SERVICES, INC., | ) | |
| COMMUNITY INTERVENTION SERVICES | ) | |
| HOLDINGS, INC., SOUTH BAY MENTAL HEALTH | ) | Case No. 21-40002-EDK |
| CENTER, INC., and FUTURES BEHAVIOR | ) | |
| THERAPY CENTER, LLC | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

**NOTICE OF AUCTION RESULTS AND OF
WINNING BIDDER ASSET PURCHASE AGREEMENT**

Pursuant to Futures Behavior Therapy Center, LLC's (the "Debtor") sale motion [Doc.

No. 10] (the "Sale Motion") and the sale procedures approved by this Court's order entered

January 15, 2021 [Doc. No. 83], the Debtor on February 10, 2021 conducted by Zoom

videoconference an auction sale (the "Auction") for substantially all of the Debtor's assets (the

"Assets") among stalking horse bidder FBTC Transitional Sub, LLC ("FBTS") and two qualified

competing bidders including Centria Healthcare LLC ("Centria") and Little Leaves Early

Learning Therapy and Program, Inc. ("Little Leaves").  At the conclusion of the Auction, the

Debtor designated FBTS's final bid to acquire the Assets for purchase price consideration of

$12.2 million[1] as the "Winning Bid", and Little Leaves' final bid to acquire the Assets for

purchase price consideration of $12.1 million as the "Back-Up Bid".  The Winning Bid is

embodied in the Winning Bidder Asset Purchase Agreement between the Debtor and FBTS, the

---

[1] FBTS will be provided a $350,000 credit against the $12.2 million purchase price to account for the estate's
avoidance of payment of a $350,000 break-up fee to FBTS that would otherwise be payable out of sale proceeds
generated through a sale to a different qualified bidder.

final form of which is attached as Exhibit A (the "Winning Bidder APA").  A marked version of

the Winning Bidder APA, showing changes from the stalking horse APA attached as Exhibit A

to the Sale Motion [Doc. No. 10-1], is attached as Exhibit B.  The schedules to the Winning

Bidder APA are the same as those for FBTS's stalking horse bid APA [Doc. No. 10-1], and

accordingly are not repeated by filing herewith.

Dated:  February 12, 2021                    FUTURES BEHAVIOR THERAPY CENTER,
                                             LLC

                                             By its attorneys,


                                             /s/ A. Davis Whitesell
                                             Michael J. Goldberg (BBO #551869)
                                             A. Davis Whitesell (BBO #551462)
                                             Hanna J. Ciechanowski (BBO #705222)
                                             Casner & Edwards, LLP
                                             303 Congress Street
                                             Boston, MA  02210
                                             Tel: 617-426-5900
                                             Email: whitesell@casneredwards.com

## Exhibit A

[Winning Bidder APA]

**EXECUTION**

## WINNING BIDDER ASSET PURCHASE AGREEMENT

This Winning Bidder Asset Purchase Agreement (this "Agreement") is entered into and made effective as of the 10th day of February, 2021, by and between Futures Behavior Therapy Center, LLC, a Massachusetts limited liability company ("Seller"), and FBTC Transitional Sub, LLC, a Delaware limited liability company ("Purchaser").

## Recitals

A.      Seller provides community-based, school-based and outpatient behavioral health and autism services primarily to adolescents in Massachusetts (the "Business") at the locations listed on Exhibit A (each location individually a "Facility" and, collectively, the "Facilities").

B.      Purchaser wishes to purchase from Seller, and Seller is willing to sell to Purchaser, substantially all of the assets of the Business, including without limitation Seller's leases of the real properties at which the Facilities are located, and Seller's agreements with clients and providers underlying the Business and its revenues, all on the terms and conditions hereinafter set forth.

C.      Purchaser and Seller entered into that certain Asset Purchase Agreement dated January 5, 2021 (the "Original Agreement") setting forth the terms and conditions respecting the Purchaser's acquisition of the assets of the Business from Seller and by this Agreement Purchaser and Seller hereby amend and restate the Original Agreement.

D.      On January 5, 2021 (the "Petition Date"), Seller filed a voluntary chapter 11 petition (the "Petition") in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"), commencing a chapter 11 bankruptcy case that is jointly administered under Case No. 21-40002-EDK, and, pursuant to Sections 1107 and 1108 of title 11, United States Code (the "Bankruptcy Code"), is managing its properties and operating its businesses as a debtor in possession.

E.      Pursuant to the Bankruptcy Court's Order (A) Approving Procedures Governing Debtor's Proposed Sale of Substantially All Assets of Futures Behavior Therapy Center, LLC, Including Certain Unexpired Leases and Executory Contracts, Pursuant to Sections 363 and 365 of the Bankruptcy Code, Free and Clear of Liens, Claims, and Interests; (B) Approving Form and Manner of Notice of Sale; (C) Approving Debtor's Assumption of Asset Purchase Agreement Pursuant to Section 365 of the Bankruptcy Code; and (D) Granting Related Relief dated January 15, 2021 [Doc. No. 81] (the "Sale Procedures Order"), Seller, in connection with obtaining the Bankruptcy Court's authorization to consummate the transactions provided in the Original Agreement, solicited higher and better offers for the assets of the Business, including the conduct of an auction on February 10, 2021 (the "Auction").

F.      At the conclusion of the Auction, it was determined that Purchaser submitted the highest and best offer for the assets of the Business, and Purchaser and Seller are entering into this Agreement in order to memorialize the outcome of the Auction and the designation of Purchaser as the "Winning Bidder" pursuant to the Sale Procedures Order.

**Agreement**

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, Purchaser and Seller agree as follows:

## ARTICLE I

## SALE OF ASSETS

1.1     Purchased Assets.  Subject to the terms, provisions and conditions contained in this Agreement, Purchaser shall purchase from Seller, and Seller shall sell, convey or cause to be conveyed to Purchaser, free and clear of all Liens: all of Seller's right, title, and interest in and to all assets real, personal and mixed, tangible and intangible, which relate to, or are used or held for use in connection with, the Business, including but not limited to the assets described in Sections 1.1(A) through (D), other than the Excluded Assets (as defined in Section 1.2 below) (collectively, the "Assets"):

(A)     the leases, subleases, licenses or other agreements to occupy all or any part of the real property at which the Facilities are located as set forth on Schedule 1.1(A) hereto (collectively, the "Assumed Leases");

(B)     all furniture, equipment, fixtures, furnishings, medical apparatuses, motor vehicles, marketing and promotional materials and brochures, stationery, policy manuals, operating manuals, kitchen equipment, supplies and inventories, and other tangible personal property;

(C)     all rights to lease deposits made under Assumed Leases, including those set forth on Schedule 1.1(C) attached hereto;

(D)     all intangible property, including, but not limited to:

(i)     all licenses, Permits, certifications (including determinations of need and pending determination of need applications), provider numbers, accreditations and authorizations issued by any Governmental Entity, including but not limited to such property described on Schedule 1.1(D)(i) attached hereto;

(ii)     all business records, including, but not limited to, financial books and records, payroll records, personnel records and manuals;

(iii)     all current and historical client records maintained by or for Seller, including without limitation, billing, medical, and clinical notes, and the entire "designated record set" as that term is defined by HIPAA (collectively, "Client Records");

2

          (iv)     those existing commitments, Contracts, equipment or other personal property leases, purchase orders and agreements, as listed on <u>Schedule 1.1(D)(iv)</u> (the "<u>Assumed Contracts</u>");

          (v)     the right to use the current name of each of the Facilities;

          (vi)     all third-party warranties to the extent transferable;

          (vii)     all proceeds under insurance policies and rights of recovery relating thereto that arise after the date of the Original Agreement and are pending as of the Closing, in each case, solely with respect to any tangible Assets or with respect to any insurance claims that affect the Business and the Assets; and

          (viii)     (1) all patents and patent applications for inventions and discoveries, (2) all copyrights, copyright registrations and applications, and all related rights in mask works and works of authorship, including moral rights, (3) all registered and common law trademarks, trademark registrations and applications therefor, trade dress rights, trade names, registered and common law service marks, service mark registrations and applications therefor, (4) all corporate names, (5) all domain name registrations, IP addresses, network addresses and the like and the applications therefor in respect of internet domain names, (6) all email accounts, telephone numbers and fax numbers, (7) all ideas, concepts, discoveries, inventions, developments, technologies, works of authorship, trade secrets, software, firmware, tools, processes, techniques, know-how, methodologies, data, plans, devices, apparatuses, specifications, designs, circuits, layouts, mask works, algorithms, programs, code, documentation and other material and information, tangible or intangible, whether or not it may be patented, copyrighted or otherwise protected (including all versions, modifications, enhancements and derivative works thereof), (8) any and all patent rights, copyright rights, mask work rights, trade secret rights, sui generis database rights and all other intellectual and industrial property rights of any sort throughout the world (including any application therefor) and (9) any rights to any of the foregoing pursuant to a license or other agreement (collectively, "<u>Intellectual Property</u>").

The Assets described in <u>Section 1.1(B)</u>, <u>(C)</u>, and <u>(D)</u> are collectively referred to herein as the "<u>Personal Property</u>".  Subject to the terms of this Agreement, Seller and Purchaser may supplement or amend the Schedules of specific Personal Property at any time prior to Closing and the Schedules as so amended and supplemented as of the Closing Date shall operate to delineate those particular Assets identified in such Schedules to be acquired by Purchaser at Closing.

     1.2    <u>Excluded Assets</u>.  Notwithstanding <u>Section 1.1</u> above, the following shall be excluded from the assets sold by Seller to Purchaser hereunder (the "<u>Excluded Assets</u>"):

          (A)     the accounts receivable, prepaid expenses, cash on hand, and other cash equivalents of the Business, and all rights and interests in and to bank accounts;

          (B)     Seller's leases subleases, licenses or other agreements to occupy all or any part of the real property, in each case that are not Assumed Leases;

(C)     Seller's Contracts that are not Assumed Contracts;

(D)     Seller's corporate records and securities, including stock in affiliated entities;

(E)     Seller's insurance policies and Employee Benefit Plans;

(F)     Seller's claims and causes of action, including without limitation causes of action arising under Chapter 5 of the Bankruptcy Code;

(G)     Seller's interest in and rights under this Agreement and any other agreement between Purchaser and Seller executed in connection with this Agreement;

(H)     all intercompany claims between Seller and its Affiliates;

(I)     such other assets as may be described in Schedule 1.2(I);

(J)     all claims, refunds, credits, causes of action, choices in action, rights of recovery and rights of set-off of any kind, and all proceeds under insurance policies and rights of recovery relating thereto, other than as provided in in Section 1.1(D)(vii);

(K)     all obligations with respect to client deposits and trust funds;

(L)     claims and causes of action arising under Assumed Leases and Assumed Contracts;  and

(M)     all claims for and rights to receive tax refunds with respect to taxable periods (or portions thereof) ending on or prior to the Closing Date.

1.3     <u>Assumed Obligations</u>.  On the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely pay, perform and discharge in accordance with their respective terms, only the following liabilities of Seller, other than any that are Excluded Liabilities (as defined in Section 1.4 below) (collectively, the "<u>Assumed Obligations</u>"):

(A)     all liabilities and obligations of Seller under the Assumed Leases and the Assumed Contracts, but only to the extent (i) such liabilities or obligations arise after the Closing Date and (ii) such Assumed Leases and Assumed Contracts are assigned to Purchaser or Purchaser otherwise receives the rights and benefits of such Assumed Leases and Assumed Contracts pursuant to Section 1.5, and, in any case, specifically excluding any liability or obligation relating to or arising out of such Assumed Leases or Assumed Contracts as a result of (1) any breach of such Assumed Leases or Assumed Contracts occurring on or prior to the Closing Date, (2) any violation of applicable Law, breach of warranty, tort or infringement occurring on or prior to the Closing Date, or (3) any Action occurring on or prior to the Closing Date; and

(B)     the liabilities or obligations, if any, expressly described on Schedule 1.3(B).

4

1.4   Excluded Liabilities.  Notwithstanding anything herein to the contrary, Purchaser shall not assume or incur any liability or obligation for any other liabilities or obligations of Seller other than the Assumed Obligations (collectively, the "Excluded Liabilities"), including, but not limited to, the following:

(A)   subject to Section 2.5 herein, any amounts ("Cure Costs") that must be paid and obligations that must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption by Seller and assignment to Purchaser of Assumed Leases and Assumed Contracts;

(B)   any of Seller's liabilities or obligations under this Agreement or any other agreements entered into by a Seller in connection with the transactions contemplated by this Agreement;

(C)   any of Seller's liabilities or obligations for expenses or fees incident to or arising out of the negotiation, preparation, approval or authorization of this Agreement or the consummation (or preparation for the consummation) of the transactions contemplated hereby (including all attorneys' and accountants' fees and brokerage fees) and transfer taxes;

(D)   any liability or obligation of any Seller or any of its Affiliates for taxes for any period;

(E)   any liability or obligation under or with respect to any Employee Benefit Plan or any other employee benefit plan, program, policy or arrangement presently or formerly maintained or contributed to by a Seller or its ERISA Affiliates, or with respect to which a Seller or any such ERISA Affiliate has any liability;

(F)   any liability or obligation with respect to any products or services that were marketed or sold prior to the Closing, including product liability, malpractice, tort liability, infringement claims and any related claims and Actions;

(G)   any of Seller's liabilities or obligations for vacation pay, sick pay, holiday pay, salary, bonuses or other payments or liabilities of any kind to any employee of Seller or current or former employee of a Seller, including any liabilities or obligations arising prior to the Closing with respect to the exempt or non-exempt status of any employee of Seller;

(H)   any liability or obligation relating to workers' compensation claims which were filed or presented on or before the Closing Date or which are filed or presented after the Closing Date but relate to claims and/or injuries first arising on or before the Closing Date;

(I)   any of Seller's liabilities or obligations (i) arising by reason of any violation or alleged violation of any Law, or (ii) arising by reason of any breach or alleged breach by Seller of any Contract;

(J)   any of Seller's liabilities or obligations relating to any Action, proceeding or claim arising out of or in connection with Seller's conduct of the Business or any other conduct of Seller or Seller's officers, directors, employees, consultants, agents or advisors on or prior to the Closing Date;

5

(K)     any of Seller's liabilities or obligations for indebtedness, including without limitation any funding under the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act");

(L)     any liabilities or obligations in respect of any of the Excluded Assets (including under any Contracts, leases, commitments or understandings related thereto);

(M)     any of Seller's liabilities or obligations which Purchaser may become liable for as a result of or in connection with the failure by Purchaser or any Seller to comply with any bulk sales or bulk transfers laws or as a result of any "defacto merger" or "successor-in-interest" (or similar) theories of liability;

(N)     any intercompany liabilities of Seller; and

(O)     the liabilities described on Schedule 1.4(O).

For purposes of this Section 1.4, "Seller" shall be deemed to include any predecessors to a Seller and any Person with respect to which a Seller is a successor-in-interest (including by operation of law, merger, liquidation, consolidation, assignment, assumption or otherwise).   Seller hereby acknowledges that it is retaining the Excluded Liabilities, all of which Excluded Liabilities shall be treated in accordance with the Bankruptcy Code and any relevant orders of the Bankruptcy Court.

1.5     Assignability of Certain Contracts; Effectiveness.   To the extent that the assignment to Purchaser of any Assumed Contract or Assumed Lease pursuant to this Agreement is not permitted without the consent of a third party and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, then the parties will use their commercially reasonable efforts, before the Closing, to obtain such consent, and, if any such consent is not obtained prior to the Closing Date, (A) this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Contract or any right or interest therein unless and until such consent is obtained and (B) Seller and Purchaser will reasonably cooperate with each other in any lawful and feasible arrangement designed to provide Purchaser with the benefits and obligations of any such Contract and Purchaser shall be responsible for performing all obligations under such Contract required to be performed by Seller on or after the Closing Date; provided, however, that, notwithstanding anything to the contrary in this Agreement, the assumption and assignment of any particular Assumed Contract or Assumed Lease, whether pursuant to the Sale Order, related order of the Bankruptcy Court, or this Section 1.5, shall, as permitted by Section 3.2, become effective only upon the Closing to the extent expressly designated as an "Assumed Contract"  or "Assumed Lease" under the Assignment and Assumption Agreement.

## ARTICLE II
## PURCHASE PRICE

2.1     Purchase Price.  The purchase price for the Assets (the "Purchase Price") shall be Eleven Million Eight Hundred Fifty Thousand Dollars ($11,850,000), plus or minus any prorations, payments, adjustments and credits shown on Schedule 2.1; provided, however, that

6

Purchaser reserves the right to increase the Purchase Price and otherwise modify the bid represented by this Agreement as may be permitted by the Bid Procedures Order.

      2.2    <u>Payment of Purchase Price</u>. Seller acknowledges that Purchaser has delivered to Seller's counsel (Casner & Edwards, LLP), in escrow, the sum of Three Hundred Seventy-Five Thousand Dollars ($375,000.00) as an initial deposit (the "<u>Deposit</u>") for the payment of the Purchase Price. The Deposit shall not be invested and shall be held in escrow by Seller's counsel as escrow agent under this Agreement (in such capacity, the "<u>Escrow Agent</u>"), and disbursed by Escrow Agent in accordance with this Agreement and the escrow provisions attached as <u>Schedule 2.2</u> (the "<u>Escrow Provisions</u>").

      2.3    <u>Payment of Balance of the Purchase Price</u>. At the Closing and immediately following Purchaser's payment of the Payment Amount (as defined below), Purchaser shall deposit with Escrow Agent in immediately available funds an amount equal to (A) the Purchase Price less (B) the sum of the Deposit and the Payment Amount and (C) plus or minus, as applicable, the prorations, payments, adjustments and credits contemplated by this Agreement or provided by <u>Schedule 2.1</u>, all as set forth in a closing statement to be executed and delivered by Seller and Purchaser pursuant to <u>Section 4.6(B)</u>. Upon the consummation of Closing, the Escrow Agent shall deliver to Seller the Purchase Price, as adjusted pursuant to the agreed upon closing statement pursuant to <u>Section 4.6(B)</u>.

      2.4    <u>Purchase Price Allocation</u>. The Purchase Price shall be allocated as set forth in <u>Schedule 2.1</u>, which the parties shall agree upon prior to the Closing. The parties shall be bound by such allocation for all purposes and shall file Form 8594 with their respective federal income tax returns in a manner consistent with such allocation.

      2.5    <u>Payment Schedule</u>. At least two (2) Business Days prior to the Closing, the Seller shall deliver to the Purchaser a schedule (the "<u>Payment Schedule</u>") identifying a dollar amount (the "<u>Payment Amount</u>") to be paid on account of Seller's liabilities from proceeds at Closing otherwise due to Seller , and the individuals or entities to receive such Payment Amount or portion thereof. The Payment Amounts shall be comprised of (i) the amount of Cure Costs that constitute Excluded Liabilities under <u>Section 1.4(A)</u>, (ii) the amount of the Transferred Employee Expenses (as defined below) under <u>Section 8.2(B)</u> and (iii) the payment of fees to investment bankers identified on <u>Schedule 5.1(P)</u>. The Payment Schedule shall provide Purchaser with the information necessary to pay the Payment Amount on Seller's behalf. The Purchaser shall pay the Payment Amount at the Closing on Seller's behalf, but shall not be responsible for the payment of any amounts that are omitted from the Payment Schedule or that otherwise should have been included in the Payment Schedule. The Seller acknowledges that the Purchaser is paying the amounts on the Payment Schedule, which constitute Excluded Liabilities and that no amounts contained in the Payment Schedule or any of the types of liabilities included in the Payment Schedule shall constitute or become Assumed Liabilities.

**ARTICLE III**
**TRANSFER AND ASSIGNMENT**

      3.1    <u>Bill of Sale</u>. At the Closing, Seller shall convey or cause to be conveyed all of Seller's right, title and interest in and to the Personal Property to Purchaser by delivery to

7

Purchaser of a bill of sale in the form attached as <u>Schedule 3.1</u> (the "<u>Bill of Sale</u>"), which Bill of Sale shall convey Seller's right, title and interest, free and clear of all Liens, all as and to the extent provided for in the Sale Order (as defined below).

      3.2    <u>Assumption and Assignment Agreement</u>.  At the Closing, Seller shall, subject to <u>Section 6.6</u>, assign or cause to be assigned to Purchaser, and Purchaser shall assume, all of Seller's right, title and interest in and to the Assumed Leases and the Assumed Contracts, through their mutual execution and delivery of an assignment and assumption agreement in the form attached as <u>Schedule 3.2</u> (the "<u>Assignment and Assumption Agreement</u>").  Purchaser may at any time prior to three (3) Business Days prior to the Closing (A) designate any previously designated Assumed Lease or Assumed Contract to be an Excluded Asset, and Purchaser shall have no obligation with respect to, nor assume any liability under, any such lease or contract so designated to be an Excluded Asset and (B) designate a previously undesignated lease or Contract as an Assumed Lease or Assumed Contract, as applicable, in which case Seller shall provide to any counterparty to such newly-designated Assumed Lease or Assumed Contact such notice and opportunity to object as may be provided in the Bid Procedures Order, provided that the Closing shall not be conditioned on or subject to entry of an order approving the assignment and assumption of a lease or contract described in this <u>Section 3.2(B)</u>.

      3.3    <u>PURCHASER ACKNOWLEDGEMENT</u>.  PURCHASER ACKNOWLEDGES AND AGREES THAT THE REPRESENTATIONS AND WARRANTIES MADE BY SELLER IN THIS AGREEMENT, AS QUALIFIED OR SUPPLEMENTED BY THE DISCLOSURE SCHEDULES (THE "<u>SELLER REPRESENTATIONS</u>"), ARE THE EXCLUSIVE REPRESENTATIONS AND WARRANTIES MADE BY SELLER, AND EXCEPT FOR THE SELLER REPRESENTATIONS, IT IS ACQUIRING THE ASSETS ON AN "AS-IS WHERE-IS" BASIS, WITHOUT REPRESENTATION OR WARRANTY (EXPRESS OR IMPLIED) BY SELLER AND IN EACH CASE SUBJECT TO (A) ANY STATE OF FACTS REGARDING ITS PHYSICAL CONDITION OR WHICH AN ACCURATE SURVEY OR AN INSPECTION MIGHT SHOW, (B) ALL APPLICABLE LAWS, (C) VIOLATIONS OF LAWS WHICH MAY EXIST ON THE DATE OF THE ORIGINAL AGREEMENT, AND (D) ANY MATTER CAUSED OR PERMITTED BY PURCHASER OR ANY AGENT, EMPLOYEE OR AFFILIATE OF PURCHASER.  EXCEPT FOR SELLER REPRESENTATIONS, SELLER HAS NOT MADE NOR SHALL BE DEEMED TO HAVE MADE ANY REPRESENTATION OR WARRANTY (EXPRESS OR IMPLIED) OR SHALL BE DEEMED TO HAVE ANY LIABILITY WHATSOEVER AS TO THE VALUE, HABITABILITY, USE, CONDITION, DESIGN, OPERATION, MERCHANTABILITY OR FITNESS FOR USE OF THE ASSETS (OR ANY PART THEREOF), OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE ASSETS (OR ANY PART THEREOF). PURCHASER HAS PRIOR TO THE DATE HEREOF BEEN AFFORDED THE OPPORTUNITY TO INSPECT THE ASSETS AND THE IMPROVEMENTS THEREON (IF ANY).

**ARTICLE IV**
**CLOSING**

      4.1    <u>Date and Place</u>.  Subject to the terms and conditions of this Agreement (including the satisfaction or waiver of the conditions set forth in Article VII, the closing (the "<u>Closing</u>") of

8

the transactions contemplated herein shall be held virtually by the exchange of documents via PDF on the day that is five Business Days following the satisfaction or waiver of the conditions set forth in <u>Article VII</u> or at such other date as determined by the parties hereto. The date on which the Closing actually occurs is referred to in this Agreement as the "<u>Closing Date</u>". The Closing shall be deemed to be effective as of 12:01 a.m. on the Closing Date.  Notwithstanding the foregoing, the parties may mutually agree to a different Closing Date.

4.2     <u>Required Governmental Consents</u>.  Subject to <u>Section 6.3</u>, it shall be a condition precedent to Purchaser's obligation to close that Purchaser shall have made all necessary filings with governmental or regulatory authorities and shall have received all necessary governmental permits, licenses, and other approvals (which approvals shall include determinations of no action) as set forth on <u>Schedule 4.2</u>, including, without limitation, licensure approval by the Department of Early Education and Care of the Commonwealth of Massachusetts.

4.3     <u>Seller's Documents</u>.  At the Closing, Seller will deliver or cause to be delivered to Purchaser the following documents:

(A)     The Bill of Sale in favor of Purchaser in the condition required by <u>Section 3.1</u> hereof.

(B)     The Assignment and Assumption Agreement in the condition required by <u>Section 3.2</u> hereof.

(C)     A transition services agreement in substantially the form attached hereto as <u>Schedule 4.3(C)</u> (the "<u>Transition Services Agreement</u>"), duly executed by Seller and Community Intervention Services, Inc., a Delaware corporation.

(D)     Certified resolutions of Seller authorizing the transactions under this Agreement.

(E)     Originals of all certificates of occupancy, licenses, permits, authorizations, and approvals issued by governmental authorities having jurisdiction, if available or in existence.

(F)     An affidavit sworn to by an officer of Seller to the effect that Seller is not a "foreign person", as that term is defined in Section 1445(f)(3) of the Code, which affidavit shall be in the form prescribed by federal regulations.

(G)     A certified copy of the Sale Order, which shall have become final and non-appealable.

(H)     All Client Records in existing form and format.

(I)     Reports and supporting documentation necessary to validate compliance with the receipt and utilization by Seller of CARES Act funding (including such funding provided under the Provider Relief Fund), including, but not limited to, evidence of Seller's compliance with the reporting of required information and related filing deadlines.

9

All of the documents and instruments to be delivered by Seller hereunder shall be in form and substance reasonably satisfactory to counsel for Purchaser.

      4.4    <u>Purchaser's Documents</u>.  At the Closing, Purchaser will deliver the following to Seller:

      (A)    The Purchase Price, as adjusted pursuant to the agreed upon closing statement pursuant to <u>Section 4.6(B)</u>.

      (B)    The Assignment and Assumption Agreement, in the condition required by <u>Section 3.2</u> hereof.

      (C)    The Transition Services Agreement, duly executed by Purchaser.

      (D)    Certified resolutions of Purchaser authorizing the transactions under this Agreement.

All of the documents and instruments to be delivered by Purchaser hereunder shall be in form and substance reasonably satisfactory to counsel for Seller.

      4.5    <u>General</u>.  At any time and from time to time after the Closing, at the request of one of the parties hereto and without additional consideration, the other party hereto shall execute and deliver such other documents and take such action as one of the parties may reasonably request to more effectively consummate the actions contemplated by this Agreement, provided the requested matter can be undertaken and achieved without material cost to the other party.

      4.6    <u>Joint Documents</u>.  On the Closing Date, Purchaser and Seller shall exchange the following:

      (A)    Any and all certificates, statements and declarations as may be required by federal, state, county or local law, regulation or ordinance including without limitation certificates, statements, and declarations regarding taxes assessed on or with respect to transfer of the Business, all of which such taxes, if any, shall be payable by Seller.

      (B)    A closing statement by and between Seller and Purchaser reflecting Purchaser's payment of the net Purchase Price after accounting for the Deposit and Payment Amount and any prorations, payments, adjustments, and credits set forth on <u>Schedule 2.1</u>.

      4.7    <u>Possession</u>.  Possession of the Facilities shall be delivered to Purchaser on the Closing Date. All tangible Personal Property and all books, files, records, Contracts, leases, third party warranties, regulatory materials and other assets constituting intangible Personal Property shall be located at the Facilities on the Closing Date and possession thereof delivered to Purchaser on such date; provided that Seller shall have the right, at Seller's sole cost and expense, to review and make copies of all books and records delivered to Purchaser in accordance with <u>Section 8.1</u>.

10

# ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE PARTIES

5.1     <u>Representations and Warranties of Seller</u>.  Subject to disclosures made in the disclosure schedules delivered by Seller to Purchaser concurrently with the execution of this Agreement (the "<u>Disclosure Schedules</u>"), Seller hereby represents and warrants to Purchaser as of the date of the Original Agreement and as of the Closing as follows:

(A)     <u>Due Organization</u>.  Seller is a limited liability company, duly organized and validly existing under the laws of the Commonwealth of Massachusetts.  Seller is duly qualified to do business and is in good standing in the Commonwealth of Massachusetts and in each jurisdiction where the operation of the Business requires such qualification.  Seller has the requisite limited liability company power and authority to enter into this Agreement and to perform its obligations hereunder.

(B)     <u>Power and Authority; Enforceability; Consents</u>.  Subject to the Sale Order, the execution, delivery and performance of this Agreement by Seller and all other agreements referenced in or ancillary hereto to which Seller is a party and the consummation of the transactions contemplated herein by Seller:

(i)     is within its company powers and are not in contravention of the terms of its certificate of organization, operating agreement or any amendments thereto and have been duly authorized by all appropriate company action.

(ii)     will not violate any judgment of any court or Governmental Entity applicable to Seller or the Assets.

(iii)     will not require the approval, consent or authorization of, waiver from, or declaration, filing or registration with, any other Person or Governmental Entity, except as set forth in <u>Schedule 5.1(B)(iii)</u>.

(iv)     will neither conflict with nor result in any breach or contravention of any other Contract to which Seller is a party or by which it or the Assets is bound, except as set forth in <u>Schedule 5.1(B)(iv)</u>.

(C)     <u>Binding Agreement</u>.  Subject to the Sale Order, this Agreement and all agreements to which Seller will become a party hereunder are and will constitute the valid and legally binding obligations of Seller, and are and will be enforceable against Seller in accordance with the respective terms hereof and thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

(D)     <u>Assets</u>.  Except as set forth in <u>Schedule 5.1(D)</u>, the Assets constitute all of the assets, properties and rights necessary for the operation of the Business as it is currently conducted. Seller has good and valid title to, or a valid leasehold interest in or license to, the Assets, and upon entry of the Sale Order such Assets shall be free and clear of all Liens, except for Permitted Liens.

11

(E)   Financial Statements.   Schedule 5.1(E) sets forth true, complete and correct copies of (1) an unaudited balance sheet of the Business as of October 31, 2020 and (2) an unaudited income statement of the Business for the ten months ended October 31, 2020 (collectively, the "Financial Statements").  The Financial Statements (x) were prepared in good faith, (y) are based upon, and accurately reflect in all material respects, the books and records of Seller and the Business, and (z) fairly present, in all material respects, the financial position of the Business as of the dates thereof and the results of operations for the periods referred to therein, in each case in accordance with GAAP applied on a consistent basis throughout.

(F)   Leases.

(i)   True, correct, and complete copies of all of Seller's leases for the Facilities (including any amendments, extensions, renewals, guaranties, and other agreements with respect thereto) have been uploaded to the Data Room, and have been provided to Purchaser through Purchaser's access to the Data Room.  Neither Seller nor any other party to any of the Assumed Leases are in material default of its obligations under the Assumed Leases except to the extent set forth in Schedule 5.1(F)(i) in any manner that will not be cured prior to the Closing Date. No event has occurred that (with or without notice, lapse of time or both) would constitute a material breach or default by Seller or any other party under the Assumed Leases in any manner that will not be cured prior to the Closing Date. Each of the Assumed Leases is in full force and effect and constitutes a valid and legally binding obligation of Seller and each other party thereto, enforceable against Seller and, to Seller's Knowledge, each other party thereto, in each case in accordance with the express terms thereof.

(ii)   Except to the extent set forth in Schedule 5.1(F)(ii), Seller has performed all material obligations required to be performed by it under each of the Assumed Leases to which it is a party, and none of the Assumed Leases is currently subject to cancellation or any other material modification by the other party thereto or is presently subject to any penalty, right of set-off or other charge by the other party thereto for late performance or delivery in any manner that will not be cured prior to the Closing Date.

(iii)   Seller does not own any real property.

(iv)   Except as may be set forth in Schedule 5.1(F)(iv), the transactions contemplated by this Agreement do not require the consent of any other party to an Assumed Lease, will not result in a breach of or default under any Assumed Lease, or otherwise cause an Assumed Lease to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing in any manner that will not be cured prior to the Closing Date.

(v)   Seller's occupancy, use and operation of each of the Facilities complies in all material respects with all applicable Laws, there are no material deficiencies or defects in the Facilities, and Seller has access to utilities in sufficient capacities for the operation of the Business at each of the Facilities in the ordinary course of business.

(vi)    To Seller's Knowledge, there are no pending or threatened appropriation, condemnation, eminent domain or like proceedings relating to the Facilities or the real property on which each of the Facilities is situated.

(vii)    The Facilities comprise all of the real property used by Seller in, or otherwise related to, the Business.

(G)    <u>Material Contracts</u>.  For the purposes herein, a "Material Contract" shall be defined as any Contract with a value of more than, or which provides for the payment to or by Seller of more than, $10,000 annually (a "<u>Material Contract</u>").  Except as set forth in <u>Schedule 5.1(G)</u>, Seller is not a party to or bound by any Material Contract.

(H)    <u>Enforceability and Performance under Assumed Contracts</u>.  True, correct, and complete copies of all of the Assumed Contracts and the Material Contracts set forth or required to be set forth in <u>Schedule 5.1(G)</u> have been uploaded to the Data Room and have been provided to Purchaser through Purchaser's access to the Data Room.  Neither Seller nor any other party to any of the Assumed Contracts are in material default of its obligations under the Assumed Contracts except to the extent set forth in <u>Schedule 5.1(H)</u>. No event has occurred that (with or without notice, lapse of time or both) would constitute a material breach or default by Seller or any other party under the Assumed Contracts.  Each of the Assumed Contracts is in full force and effect and constitutes a valid and legally binding obligation of Seller and, to Seller's Knowledge, each other party thereto, enforceable against Seller and, to Seller's Knowledge, each other party thereto, in each case in accordance with the express terms thereof.

(I)    <u>Employee Benefits</u>.

(i)    Each "employee benefit plan" as defined in Section 3(3) of ERISA and each material bonus, deferred compensation, stock purchase, stock option, severance plan, salary continuation, vacation, paid-time-off, sick leave, fringe benefit, cafeteria, incentive, insurance, welfare or similar arrangement that is in each case sponsored or maintained Seller or to which Seller contributes or has any liability (each, an "<u>Employee Benefit Plan</u>") is listed in <u>Schedule 5.1(I)(i)</u>.  No Employee Benefit Plan, and no party in interest to, disqualified person of, or fiduciary of, any Employee Benefit Plan, has engaged in any non-exempt "prohibited transaction" as defined in ERISA or the Code.

(ii)    Except as set forth in <u>Schedule 5.1(I)(ii)</u>, neither Seller nor any affiliate of Seller as determined under Code Sections 414(b), (c), (m) or (o) ("<u>ERISA Affiliate</u>") or any of their respective predecessors maintains, contributes to, has any obligation to contribute to (or has any other liability, including contingent liability or current or potential withdrawal liability, with respect to) or has, ever, contributed to or been obligated to contribute to (1) any "multiemployer plan" (as that term is defined in Section 3(37) of ERISA), (2) any "employee pension benefit plan" (within the meaning of Section 302 of ERISA) that is subject to Section 412 of the Code, Section 302 of ERISA or Title IV of ERISA, (3) any "multiple employer plan" (within the meaning of Section 413 of the Code), or (4) any "multiple employer welfare arrangement" (within the meaning of Section 3(40) of ERISA), in each case, whether or not terminated.

13

(J)    Employees.

(i)    Seller is and for the past three years has been in compliance in all material respects with all applicable Laws, contracts, policies, plans, and programs applicable to it respecting labor, employment and employment practices in the jurisdictions within which it operates, including, without limitation, all applicable Laws respecting hiring, terms and conditions of employment, health and safety, compensation, wages and hours (including the classification of independent contractors and exempt and non-exempt employees), immigration (including the verification of I-9s for all employees), employment discrimination, disability rights or benefits, equal opportunity, termination of employment, plant closures and layoffs (including the WARN Act), workers' compensation, labor relations, employee leave and sick pay, accommodation of employees, harassment, paid time off, use of background checks and reports, use of selection procedures and tests, the provision of required meal and rest breaks, affirmative action, child labor, workers compensation, labor relations, collective bargaining, unemployment insurance and other insurance coverage, and the payment of social security and other employment-related taxes.    Seller has properly classified all current and former employees, directors, individual consultants, temporary employees, leased employees, or any agents for tax purposes and for participation in any Employee Benefit Plans, and complied in all material respects with all applicable Laws relating to the classification of employees and independent contractors and payment of wages, has not made deductions from the pay of exempt employees which might result in loss of exempt status, and has, within the time and in the manner prescribed by applicable Laws, withheld and paid over to the proper tax authority all amounts required to be so withheld and paid over under applicable Laws.

(ii)    There are no material obligations relating to employment with respect to which Seller may have any liability, including but not limited to any accrued but unpaid compensation, wages, vacation, salaries, wage premiums, commissions, bonuses, fees, and other compensation or benefits to its current or former employees or independent contractors under applicable Laws, Contract or policy; or  any fines, taxes, interest, or other penalties for any failure to pay or delinquency in paying such compensation.  As of the date hereof, all compensation, including wages, commissions, bonuses, vacation and other paid time off, and other direct compensation for any service performed for the Business payable to current or former employees, independent contractors or consultants of Seller for services or work performed on or prior to the date hereof have been paid in full (or accrued in full).  Seller is not subject to any pending claim for overdue overtime or other compensation due to any current or former employee or independent contractor and, no such claim has been threatened.

(iii)    Seller is not a party to or bound by any collective bargaining agreement, project labor agreement, or other Contract, commitment, arrangement or bargaining relationship with any labor organization, trade organization, or other representative of any of the employees of Seller, and no employee of Seller is represented by a labor union or other labor organization and there is no such contract, commitment or arrangement presently being negotiated by Seller.   There is no labor strike, work stoppage, lockout, grievance, labor arbitration, walkout, picket, slowdown, work stoppage, or other material labor dispute pending or threatened against or affecting the Business.  No labor union, organization, or other collective bargaining unit represents, claims to represent or is currently seeking to organize or represent the employees of the Business, and there have not been any union organizing activities or efforts

14

among the employees of the Business within the past three years.  There is presently no union campaign being conducted to solicit cards from employees to authorize a union to request a National Labor Relations Board certification election, and no question concerning representation exists or has existed respecting such employees; and there is no unfair labor practice charge or complaint pending or threatened against Seller. No labor union, labor organization, or group of employees has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or threatened in writing to be brought or filed with the National Labor Relations Board or any other labor relations Governmental Entity. Seller has not committed any unfair labor practices.

(iv)    To Seller's Knowledge, no Business Employee is in material violation of any term of any employment agreement, nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, noncompetition agreement, restrictive covenant or other obligation:  (1) to Seller, or (2) with respect to any current employee or independent contractor of Business, to any third party with respect to such person's right to be employed or engaged by a Seller or to the knowledge or use of trade secrets or proprietary information.

(v)    Schedule 5.1(J)(v) sets forth a true, correct, and complete list of (1) all employees (including any employee who is on a leave of absence or on furlough status, as specified), employed or engaged by Seller (the "Business Employees") and (2) for each Business Employee, each such individual's location of employment, date of hire, classification as exempt or non-exempt (as applicable), W-2 compensation for 2019 (including bonus and incentive payments), year-to-date compensation for 2020 (including bonus and incentive payments), current hourly rate or annual base salary, and any annual bonus opportunity, job titles or offices, notice period, whether such individual is on leave or furlough status, and the reason for leave of absence or furlough status and the anticipated date of return to full service, if known.  Schedule 5.1(J)(v) also sets forth individuals classified as an independent contractor (excluding contingent workers engaged through a third-party temporary employment agency) in the past three years and for each individual identified as an independent contractor, each such individual's location, date of engagement, 1099 compensation for 2019, and year-to-date compensation for 2020.

(vi)    Seller is not a party to, or otherwise bound by, any consent decree with, or citation by, any Governmental Entity relating to employees or employment practices. No action, proceeding, claim, or complaint by or on behalf of any employee, prospective employee, former employee, current or former contractor, labor organization or other representative of the employees of Seller, is pending or, to Seller's Knowledge, threatened, which could bind or in any way affect Purchaser after Closing as the result of the transactions contemplated by this Agreement. None of Seller's employment practices or policies are currently being audited or investigated by any Governmental Entity.   With respect to the Business, there are no pending or, to Seller's Knowledge, threatened: (1) unfair labor practice charges or complaints before the National Labor Relations Board or any other Governmental Entity, (2) complaints, grievances or arbitrations arising out of any collective bargaining agreement or any other complaints, grievances or arbitration procedures; or (3) charges or complaints with respect to or relating to them before the Equal Employment Opportunity

15

Commission or any other Governmental Entity responsible for the prevention of unlawful employment practices.

(K)    <u>Compliance with Law</u>.

(i)    Seller is currently in, and during the past three years has been in, compliance in all material respects with (1) all Laws applicable to it or its business, properties or assets (including, without limitation, all Laws concerning the privacy, security, safeguarding, collection, access, use, disclosure, maintenance, transmittal, and/or confidentiality of Personal Information or other health care data, including, as applicable, HIPAA, 42 C.F.R. Part 2, state data breach Laws, state health information privacy and security Laws, the Telephone Consumer Protection Act, the CAN-SPAM Act, and state consumer protection Laws), and (2) any orders of any Governmental Entity applicable to it or the Business.  Seller is not under investigation by any Governmental Entity with respect to any violation of any Laws applicable to it or its business, properties or assets.

(ii)    In the past three years, Seller has not received any written notice, order, inquiry, investigation, complaint or other written communication by any Governmental Entity alleging any violation by it under any Laws applicable to it or its business, employees (in their capacity as such), properties or assets.

(iii)    No employee, including temporary employees, or independent contractors (whether an individual or entity) of the Business has been excluded from participating in any Federal Health Care Program and has not been and is not currently included on the OIG List of Excluded Individuals and Entities (LEIE), or the General Services Administration's Excluded Parties List System (EPLS) or System for Award Management (SAM), except as set forth in <u>Schedule 5.1(K)(iii)</u>. None of the officers, directors, agents or managing employees (as such term is defined in 42 U.S.C. §1320a-5(b)) of the Business has been excluded, suspended, or debarred from any Federal Health Care Program or been subject to sanction, charged or been convicted of a crime in connection with any Federal Health Care Program.

(iv)    There is no, and there has not been for the past three years any, actual, or threatened (in writing) breach, compromise, or security incident affecting Personal Information in the Business's possession or control that would, if confirmed, constitute a breach or security incident for which notification to individuals, organizations, contractual counterparties, media, credit reporting agencies, and/or Governmental Entities is required under any applicable Laws or under any Contracts to which Seller is a party.

(L)    <u>No Proceedings</u>.  Except as disclosed in <u>Schedule 5.1(L)(i)</u>, there are no Actions, administrative proceedings, or other legal actions of any kind pending or, to Seller's Knowledge, threatened, against Seller, or otherwise relating to or affecting the Business or the Assets or any portion thereof.  There are no Actions pending or, to Seller's Knowledge, threatened, seeking to restrain, prohibit, or obtain damages in connection with this Agreement or the transactions contemplated hereby.  Except as set forth in <u>Schedule 5.1(L)(ii)</u>, Seller is not subject to any settlement, award or order involving any Governmental Entity or other Person.

16

(M)    <u>Absence of Certain Changes</u>.  From October 31, 2020 to the date of this Agreement, (i) no change, development, circumstance, effect or event has occurred or arisen that, individually or in combination with any other change, development, circumstance, effect or event, has had or would reasonably be expected to have a Material Adverse Effect and (ii) the Business has been conducted in all material respects in the ordinary course of business.  Except as set forth in <u>Schedule 5.1(M)</u>, since October 31, 2020, Seller has not:

(i)    entered into, amended or terminated any Material Contract, entered into any other material transaction in excess of $100,000, changed in any significant respect any business practice (in anticipation of the transactions contemplated hereby or otherwise);

(ii)    sold, assigned, transferred, leased or licensed any of its material tangible assets, except in the ordinary course of business;

(iii)    sold, disposed of, assigned, licensed, sublicensed, covenanted not to sue with respect to, or otherwise transferred any Intellectual Property (other than non-exclusive licensing or sublicensing of Intellectual Property in the ordinary course of business), or abandoned or permitted to lapse or expire any Intellectual Property;

(iv)    made or granted any bonus or any compensation or salary increase to any former or current employee or group of former or current employees (except in the ordinary course of business);

(v)    implemented any facility closing or other layoff of employees that could implicate the WARN Act;

(vi)    suffered any material damage, destruction or other casualty loss with respect to material property owned by Seller or waived any rights of material value;

(vii)    delayed capital expenditures, repairs or maintenance;

(viii)    failed to maintain in full force and effect any insurance policy in effect, except for any policy replaced by a new or successor policy of substantially similar coverage;

(ix)    terminated, amended, failed to renew or preserve or failed to maintain in full force and effect any Permit; or

(x)    agreed, whether orally or in writing, to do any of the foregoing.

(N)    <u>Permits</u>.

(i)    Seller possesses all Permits necessary to operate the Business, or that are necessary for the lawful ownership of their properties and assets or operation of the Business, and <u>Schedule 5.1(N)(i)</u> sets forth a true, complete and correct list of such Permits. Except as set forth in <u>Schedule 5.1(N)(i)</u>, Seller is and for the past three years has been in material compliance with all such Permits, and all such Permits are in full force and effect. There is not now pending or threatened in writing any action to revoke, cancel, rescind, modify

17

or refuse to renew any of such Permits.  During the past three years, Seller has not received written notice of any petition, objection or other pleading with any Governmental Entity alleging the failure to hold any of the foregoing or any violations in respect thereof.

(ii)     Except as set forth in Schedule 5.1(N)(ii), all individuals providing professional services for on behalf of the Business, hold, and maintain in good standing, all licenses, registrations, credentials, education and training required to perform such services in all jurisdictions where such services are performed on behalf of the Business.

(O)     Intellectual Property.

(i)     Schedule 5.1(O)(i) contains a true, complete and correct list of all registered Intellectual Property that relate to, or are used or held for use in connection with, the Business (the "Business Intellectual Property"). All material registration, maintenance and renewal fees due in connection with such Business Intellectual Property have been paid and all documents, recordations and certificates in connection with such Business Intellectual Property required to be filed have been filed with the relevant patent, copyright, trademark or other authorities for the purposes of prosecuting and maintaining such Business Intellectual Property and recording the Seller's ownership interests therein.

(ii)     Schedule 5.1(O)(ii) contains a complete and correct list of all agreements to which Seller is a party and under which: (1) Seller is granted a license to use any Intellectual Property owned by a third party the use of which is material to the Business (excluding any such agreement for commercially available software); and (2) Seller has granted to a third party a license to use any Business Intellectual Property.

(iii)     Except as set forth in Schedule 5.1(O)(iii), Seller owns the Intellectual Property, free and clear of all Liens (other than Permitted Liens), and Seller has a valid and enforceable written license to use all other material Intellectual Property used in connection with the Business, in each case free and clear of all Liens (other than Permitted Liens).  The transactions contemplated by this Agreement and the consummation thereof will not impair any right, title or interest of Seller in or to any Business Intellectual Property.

(iv)     Except as set forth in Schedule 5.1(O)(iv), Seller has not received any written communication in the last three years alleging that Seller has infringed, misappropriated, or violated any Intellectual Property of any Person. To Seller's Knowledge, the Business, as currently provided or conducted by Seller, does not infringe, misappropriate or violate any Intellectual Property owned by any third party.  Except as set forth in Schedule 5.1(O)(iv), to Seller's Knowledge, no Person currently is infringing, misappropriating or violating any of the Business Intellectual Property.

(P)     Brokerage.  Except as set forth in Schedule 5.1(P), no agent, broker, Person or firm acting on behalf of Seller is, or shall be, entitled to any broker's fees, finder's fees or commissions from Seller in connection with this Agreement or any of the transactions contemplated hereby.

(Q)     Taxes.  Seller has timely filed all tax returns that were required to be filed (taking into account any applicable extension of time within which to file).  All such tax returns

18

were correct, true and complete in all material respects and were prepared in substantial compliance with all applicable Laws and regulations.  All taxes of Seller that are due and payable on or prior to the Closing Date have been paid on or prior to the Closing Date (whether or not shown on any tax return).  There are no Liens for taxes upon any of the Assets.

(R)     Payors.  Schedule 5.1(R) sets forth the top 10 payors for the year ended December 31, 2019 and for the ten-month period ended October 31, 2020 (each, a "Major Payor").  Except as set forth in Schedule 5.1(R), in the past 12 months, no Major Payor (i) has canceled, suspended or otherwise terminated its relationship with the Business, or (ii) has advised Seller of its intention to (1) cancel, suspend or otherwise terminate its relationship with the Business, or (2) materially and adversely change the terms upon which it pays for goods or services from, or provided by, the Business.

5.2     Representations and Warranties of Purchaser.  Purchaser hereby represents and warrants to Seller as follows:

(A)     Due Organization.     Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware.  Purchaser has the requisite limited liability company power and authority to enter into this Agreement, perform its obligations hereunder and to conduct its business or operations as now being conducted.

(B)     Power and Authority; Enforceability; Consents.  The execution, delivery and performance of this Agreement by Purchaser and all other agreements referenced in or ancillary hereto to which it is a party and the consummation of the transactions contemplated herein by Purchaser (except as would not have a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement):

(i)     are within its powers and are not in contravention of the terms of its articles of organization or any amendments thereto and have been duly authorized by all requisite limited liability company action.

(ii)     will neither conflict with nor result in any breach or contravention of, or the creation of any lien under, any indenture, agreement, lease, instrument or understanding to which Purchaser is a party or by which Purchaser is bound.

(iii)     will not violate any judgment of any court or Governmental Entity applicable to Purchaser.

(iv)     will not require the approval or consent of any other party or authority.

(C)     Binding Agreement.  This Agreement and all other agreements to which Purchaser will become a party hereunder are and will constitute the valid and legally binding obligations of Purchaser and are and will be enforceable against it in accordance with the respective terms hereof and thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

(D)    <u>Purchaser's Due Diligence</u>.  Purchaser acknowledges that it has inspected and/or evaluated the Assets, the Facilities, and the Business, has made its own independent analysis of this transaction, and has not relied upon and is not relying upon any information provided or representations made by Seller with respect to the Assets, the Facilities, or the Business, other than the Seller Representations, in deciding to pursue its acquisition of the Assets pursuant to this Agreement.

(E)    <u>Financing</u>.  Purchaser has or at the Closing will have the funds sufficient to pay the Purchase Price and perform its obligations under this Agreement.

**ARTICLE VI**
**COVENANTS PRIOR TO THE CLOSING**

6.1    <u>Seller Operations</u>.  Between the date of the Original Agreement and the earlier of the date of the termination of this Agreement and the Closing Date, Seller will operate the Business in the ordinary course of business and, without limiting the foregoing, will use its commercially reasonable efforts to:

(A)    take or cause to be taken all actions necessary and appropriate to consummate the transactions contemplated by this Agreement, including without limitation those necessary to enable Seller to make the deliveries set forth in <u>Section 4.3</u>.

(B)    keep in full force and effect present insurance policies or other comparable insurance.

(C)    continue to employ the employees listed on Schedule 6.1(C) (individually, a "<u>Key Employee</u>", and collectively, the "<u>Key Employees</u>").  For the purposes of this Section 6.1(C), "commercially reasonable efforts" shall mean that Seller shall (i) not terminate a Key Employee without cause, (ii) not encourage or facilitate a Key Employee to seek employment elsewhere, and (iii) promptly notify Buyer if Seller becomes aware that a Key Employee intends to terminate such Key Employee's employment and reasonably cooperate with Buyer to attempt to retain such Key Employee, unless Buyer otherwise directs in writing.

6.2    <u>Seller Negative Covenants</u>.  Between the date of the Original Agreement and the earlier of the date of the termination of this Agreement and the Closing Date, Seller will not, without the prior written consent of Purchaser or as set forth on <u>Schedule 6.2</u>, take, propose to take, or omit to take, directly or indirectly, any action that, if taken (or omitted to be taken) between October 31, 2020 and the date of the Original Agreement, would have required disclosure on <u>Schedule 5.1(M)</u>.

6.3    <u>Governmental Approvals</u>.

(A)    Upon Bankruptcy Court approval of this Agreement pursuant to <u>Section 6.4</u>, Purchaser shall use its commercially reasonable efforts to obtain as soon as reasonably possible at its own expense, and Seller shall use its commercially reasonable efforts to assist and cooperate with Purchaser and its representatives and counsel in so obtaining, all governmental consents, approvals, certificates of exemption and licenses which are necessary or appropriate, and in the preparation of any document or other material which may be required by any

20

Governmental Entity as a condition precedent to or result of the transactions contemplated herein.

(B)     Without limiting Section 6.3(A), upon Bankruptcy Court approval of this Agreement pursuant to Section 6.4, the parties shall make, or cause to be made, all necessary filings with Governmental Entities as set forth on Schedule 4.2.  To the extent that such filings require information relating to Seller or known only to Seller, Seller shall promptly provide timely assistance to Purchaser in completing such filings.

6.4     Bankruptcy Court Approval.  Seller's entry into this Agreement will not become effective and binding on Seller until the Bankruptcy Court has entered an appropriate order approving Seller's entry into this Agreement and the sale of the Business and the Assets pursuant to this Agreement, which order shall authorize, approve and provide for the sale of the Assets to Purchaser free and clear of all Liens (other than Permitted Liens) and shall otherwise be in form and substance reasonably agreeable to Seller, Purchaser and Capital One, National Association (successor by merger to Healthcare Financial Solutions, LLC), as successor to General Electric Capital Corporation, as Agent ("Agent") under that certain Credit Agreement, dated as of July 16, 2015 (as amended, amended and restated, supplemented or otherwise modified from time to time), among, without limitation, Agent and Seller (in the form entered by the Bankruptcy Court, the "Sale Order").  Seller shall pursue entry of the Sale Order in keeping with the Seller's motion for such relief filed at joint Docket No. 10.  From and after the date of the Original Agreement until the Closing Date, Seller shall deliver to Purchaser and Agent copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers that are filed by Seller in the Bankruptcy Case that relate, in whole or in part, to this Agreement or Purchaser.

6.5     Alternative Transaction.

Following the date of the entry of the Sale Order approving this Agreement and until the earlier of (i) the Closing and (ii) such time as this Agreement has been terminated in accordance with its express terms, and provided that Purchaser is not in material default of its obligations under this Agreement, Seller shall not, nor shall it authorize or permit any other Person to, (1) directly or indirectly solicit, initiate or encourage the submission of any offer or proposal concerning any Alternative Transaction not authorized by the Sale Order or (2) directly or indirectly participate in any discussions or negotiations regarding, or furnish to any person any information with respect to, or take any other action to facilitate the making of, any proposal or expression of interest that constitutes or is reasonably likely to lead to an Alternative Transaction not authorized by the Sale Order.  The term "Alternative Transaction" means one or more agreements to sell, transfer, or otherwise dispose of all or any portion of the Assets in a transaction or series of transactions with one or more Persons, other than Purchaser, who have submitted a Qualified Bid (as such term is defined in the Sale Procedures Order) in connection with the Auction.

6.6     Assumed Leases and Assumed Contracts; Cure Amounts.

21

(A)     Seller shall take all commercially reasonable actions required to assume the Assumed Leases and Assumed Contracts and to assign them to Purchaser, including taking all actions (i) reasonably requested by Purchaser to facilitate any negotiations with the counterparties to such Assumed Leases and Assumed Contracts and (ii) to obtain an order (which may be the Sale Order) containing a finding that the proposed assumption and assignment of the Assumed Leases and Assumed Contracts to Purchaser satisfies all applicable requirements of Section 365 of the Bankruptcy Code.  In connection with the foregoing and as the case may be, Purchaser covenants to provide adequate assurance of performance and represent and warrant that it is capable of providing adequate assurance of future performance.

(B)     Schedules 1.1(A) and 1.1(D)(iv) shall each include Seller's good-faith estimate of the Cure Costs (if any) associated with each Assumed Lease and Assumed Contract. At the Closing, upon Purchaser's final designation of the Assumed Leases and Assumed Contracts to be assigned, (i) Seller pursuant to the Assignment and Assumption Agreement shall assume and assign to Purchaser each of the Assumed Leases and Assumed Contracts that is capable of being assumed and assigned and pay promptly any Cure Costs associated therewith, and (ii) Purchaser pursuant to the Assignment and Assumption Agreement shall assume and perform and discharge the Assumed Obligations under the Assumed Leases and Assumed Contracts; provided that Purchaser and Seller shall cooperate and use best commercial efforts to minimize any and all Cure Costs; provided, further, that nothing in this Section 6.6(B) shall require Purchaser to increase the Purchase Price or pay any Cure Cost or pay any other amounts or agree to be subject to any liabilities or obligations not in the ordinary course of business or that are not required pursuant to the terms of the Assumed Leases or Assumed Contracts following the Closing  Purchaser's assumption of such Assumed Leases or Assumed Contracts.

(C)     Purchaser may request, in its reasonable business judgment, certain modifications and amendments to any lease or contract of a Seller as a condition to such lease or contract becoming an Assumed Lease or Assumed Contract, as applicable, and Seller shall use commercially reasonable efforts to obtain such modifications or amendments. If Seller is unable to obtain such modifications or amendments, Purchaser may, in its sole discretion, designate the relevant lease or contract as an Excluded Asset.

(D)     If, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, the consent of the non-Seller party to any Assumed Lease or Assumed Contract is required but not obtained, Seller shall, at Purchaser's sole cost and expense, cooperate with Purchaser in any reasonable arrangement proposed by Purchaser, including Purchaser's provision of credit support, designed to provide Purchaser the benefits and obligations of or under any such Assumed Lease or Assumed Contract; provided, however, that nothing in this Section 6.6 shall (i) require Seller to make any expenditure or incur any obligation on its own or on Purchaser's behalf or (ii) prohibit Seller from ceasing operations or winding up its affairs following the Closing.  Any assignment to Purchaser of the Assumed Leases and the Assumed Contracts that, notwithstanding the Sale Order (or other Bankruptcy Court order approving the assumption and assignment of such lease or contract), requires the consent of any third party for such assignment to be effective shall be made subject to such consent being obtained.  If Purchaser determines that such consent cannot be obtained on terms

22

reasonably satisfactory to Purchaser within 30 days after the Closing, Purchaser may on notice to Seller reclassify each such Assumed Lease or Assumed Contract as an Excluded Asset.

6.7    Closing Conditions.  Between the date of the Original Agreement and the earlier of the termination of this Agreement and the Closing Date, Seller and Purchaser will use their respective commercially reasonable efforts to cause the conditions specified in this Agreement over which they have control to be satisfied as soon as reasonably practicable, but in all events before the Closing Date.

6.8    Tax Returns. All income, sales, franchise and payroll tax returns and reports required by law to be filed by Seller prior to the Closing will be timely filed (subject to Seller's right to timely extend the filing thereof) and will accurately reflect the tax position of Seller, and all taxes respectively due under such tax returns will be paid by Seller.  Purchaser is not assuming under this Agreement any (i) tax liabilities owed by Seller or any other tax liabilities as a result of the operation of the Business prior to the Closing Date, (ii) any liability for taxes deferred by Seller under IRS Notice 2020-65, or (iii) liability for any taxes deferred under the CARES Act.

6.9    Transfer Taxes.  All transfer, documentary, sales, use, stamp, registration and other substantially similar taxes (including any real property transfer or similar tax) incurred in connection with this Agreement and the consummation of the transactions contemplated hereby (collectively, "Transfer Taxes"), if any, and that are not exempt under Section 1146(a) of the Bankruptcy Code, shall be borne 100% by the Seller and shall be paid by Seller when due. Seller will, at the Sellers' own expense, timely file all necessary tax returns and other documentation with respect to all such Transfer Taxes that are required by applicable Law.

6.10    Reporting Requirements.  Purchaser and the Seller agree to utilize, and to cause their respective affiliates to utilize, any permissible method set forth in IRS Rev. Proc. 2004-53 with respect to wage reporting as determined by Purchaser.

6.11    Intentionally Omitted.

6.12    Sale Order.   The Sale Order shall be in form and substance satisfactory to Purchaser, Seller and Agent.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code; (y) including a determination in the Sale Order that Purchaser has not engaged in any conduct that would result in avoidance of the transactions contemplated by this Agreement under Section 363(n) of the Bankruptcy Code, and (z) establishing adequate assurance of future performance in connection with the Assumed Leases and Assumed Contracts within the meaning of Section 365 of the Bankruptcy Code.  The Sale Order shall, without limitation:

(A)    approve, pursuant to Sections 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement; (ii) the sale of the Assets to Purchaser on the terms set forth herein and free and clear of all Liens, claims, and interests (other

23

than Permitted Liens), and (iii) the performance by Seller of its obligations under this Agreement;

        (B)     find that Purchaser is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code;

        (C)     find that Purchaser and Seller have engaged in no conduct that would result in the avoidance of the transactions contemplated under this Agreement pursuant to Section 363(n) of the Bankruptcy Code;

        (D)     find that Purchaser is not a successor to Seller and contain substantially the language set forth in <u>Section 9.18</u> of this Agreement; and

        (E)     find that Purchaser shall have no liability for any obligation of Seller that is not an Assumed Obligation.

    6.13   <u>Client Records</u>.  Following the Closing, Seller shall refrain from the modification or destruction of Client Records until Purchaser confirms to Seller that the Client Records function in a production environment. Following the Closing, (i) Purchaser shall maintain the Client Records in such a manner as to protect their integrity, ensure their confidentiality and proper use, and ensure their accessibility and availability to Seller and Seller's clients or their authorized representatives as required by Law, and (ii) Purchaser shall make the Client Records available for inspection or copying, or both, to Seller for billing purposes or to respond to or defend any malpractice claim or third-party audit or investigation, each as permitted by applicable Law.

## ARTICLE VII
## CONDITIONS PRECEDENT TO CLOSING

    7.1   <u>Conditions Precedent to Seller's Obligations</u>.  Notwithstanding anything herein to the contrary, the obligations of Seller to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Seller at or prior to Closing:

        (A)     (i) The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects (except that the representations and warranties that are qualified as to "materiality" shall be true and correct in all respects without qualifications) when made and as of the Closing Date as though such representations and warranties had been made on and as of such Closing Date; (ii) each and all of the terms, covenants and conditions of this Agreement to be complied with or performed by Purchaser on or before the Closing Date pursuant to the terms hereof shall have been materially complied with and performed; and (iii) Purchaser shall deliver to Seller a certification to the foregoing effect.

        (B)     Purchaser shall have, at or prior to the Closing, delivered to Seller the documents required to be delivered by it pursuant to <u>Section 4.4</u>.

(C)    The Bankruptcy Court shall have entered the Sale Order (in form and substance acceptable to Purchaser), which shall have become final and non-appealable.

7.2    <u>Conditions Precedent to Purchaser's Obligations</u>.    Notwithstanding anything herein to the contrary, the obligations of Purchaser to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Purchaser at or prior to Closing:

(A)    (i) the Fundamental Representations shall be true and correct in all respects when made and as of the Closing Date, as though such Fundamental Representations had been made on and as of the Closing Date (except for those Fundamental Representations that address matters only as of a particular date, which shall have been true and correct as of such particular date); (ii) the representations and warranties of Seller contained in this Agreement (other than the Fundamental Representations) shall be true and correct in all respects when made and as of the Closing Date, as though such representations and warranties had been made on and as of such Closing Date (except for those representations and warranties that address matters only as of a particular date, which shall have been true as of such particular date) disregarding in each case any "materiality" or similar qualifier (except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect); (iii) each and all of the terms, covenants and conditions of this Agreement to be complied with or performed by Seller on or before the Closing Date pursuant to the terms hereof shall have been materially complied with and performed; and (iv) Seller shall deliver to Purchaser a certification to the foregoing effect.

(B)    During the period from the date of the Original Agreement through the Closing Date, no Material Adverse Effect shall have occurred.

(C)    On or prior to the Closing Date, Purchaser shall have obtained documentation or other evidence reasonably satisfactory to Purchaser that Purchaser has:

(i)    received written confirmation from all applicable licensure agencies that upon Closing all licenses required by law to operate the Business as currently operated will be transferred to, or issued or reissued in the name of, Purchaser; and

(ii)    obtained reasonable assurances that insurance provider certification of the Facilities for its operation by Purchaser will be effective as of Closing and that Purchaser may participate in and receive reimbursement from such programs effective as of Closing.

(D)    No Action before a court or any other Governmental Entity shall have been instituted seeking to restrain or prohibit the transactions herein contemplated.

(E)    All consents, approvals, permits, waivers and estoppels of third parties that are listed on <u>Schedule 7.2(E)</u> shall have been obtained on terms reasonably satisfactory to Purchaser.

(F)    Seller shall have, at or prior to the Closing, delivered to Purchaser the documents required to be delivered by it pursuant to <u>Section 4.3</u>.

(G)     The Bankruptcy Court shall have entered the Sale Order, which shall have become final and non-appealable.

## ARTICLE VIII
## ADDITIONAL AGREEMENTS

8.1     <u>Books and Records</u>.  For purposes of this Agreement, the term "<u>Retention Period</u>" shall mean the period ending six years after the Closing.  Until the conclusion of the Retention Period, (A) Purchaser will maintain all books and records of Seller constituting a part of the Assets which are delivered to Purchaser at Closing and which relate to the pre-Closing Business in a manner reasonably consistent with Purchaser's record retention policies or practices and (B) subject to applicable Law and solely as reasonably necessary in connection with the preparation and filing of tax returns by Seller or other proper purpose including the administration of the Bankruptcy Case, upon reasonable advance written notice from Seller to Purchaser, afford Seller reasonable access to such records during normal business hours; <u>provided</u>, that the foregoing shall not require Purchaser or any of its Affiliates (i) to provide access to any books, records or other information to the extent such books, records or other information do not pertain to the Business (and Purchaser shall be entitled to withhold access to or redact any portion of such books and records or other information that does not pertain to the Business), (ii) to permit any inspection, or to disclose any information, that in the reasonable judgment of Purchaser would violate applicable Law, fiduciary duty, or binding agreement entered into prior to the Closing Date, or (iii) to take any action that would cause unreasonable disruption to the business of Purchaser or the Business.

8.2     <u>Employee Related Matters</u>.

(A)     <u>Transferred Employees</u>.  As of the Closing Date, Purchaser shall offer employment to only those employees of the Business as Purchaser shall determine in its sole discretion and such offers of employment shall contain terms and conditions of employment that Purchaser shall determine in its sole discretion. Seller shall make available to Purchaser a correct and complete list of all the current employees of the Business and such employee information as Purchaser reasonably deems necessary for Purchaser to complete its new employee onboarding processes (all in a form reasonably acceptable to Purchaser) as of 10 Business Days prior to the Closing Date, and Purchaser shall provide Seller with a list of the Business's employees to whom Purchaser intends to offer employment at least five days prior to the Closing Date.  On the Closing Date, Seller shall take all steps necessary to terminate the employment of each employee of the Seller who is offered employment by Purchaser as set forth in the immediately preceding sentence. The employees of the Seller who accept Purchaser's offer of employment and who become employed by Purchaser shall be referred to herein as "<u>Transferred Employees</u>." Nothing in this Agreement shall confer upon any Transferred Employee any right with respect to continued employment with Purchaser, nor shall anything herein limit or interfere with Purchaser's right to terminate the employment of any Transferred Employee at any time (subject to applicable Law), with or without cause or notice, or restrict Purchaser in the exercise of independent business judgment in modifying any terms or conditions of employment of the Transferred Employees on and after the Closing Date.

26

(B)   <u>Pre-Closing Obligations to Transferred Employees</u>. Subject to <u>Section 2.5</u> herein, Seller shall be responsible for all liabilities, obligations and commitments relating to Seller's employment of the Transferred Employees, including any severance compensation that may be owed by Seller to any Transferred Employee as a result of this transactions contemplated by this Agreement in accordance with the applicable severance agreement, and bonus payments payable to any Transferred Employees in accordance with applicable bonus arrangements entered into prior to the Closing Date (collectively, the "<u>Transferred Employee Expenses</u>").

(C)   <u>Employee Information</u>. Seller shall use commercially reasonable efforts to provide promptly to Purchaser, at Purchaser's request, any information or copies of personnel records (including addresses, dates of birth, date of hire and dependent information) relating to the Transferred Employees or relating to the service of Transferred Employees with Seller (and predecessors of Seller, as applicable) prior to the Closing Date; provided that Purchaser shall not request any information, or use any disclosed information in any manner that may violate applicable Laws, including but not limited to salary history, equal pay, discrimination and leave laws.  Seller and Purchaser shall each cooperate with the other and shall provide to the other such documentation, information and assistance as is reasonably necessary to effect the provisions of this <u>Section 8.2</u>.

## ARTICLE IX
## MISCELLANEOUS

9.1   <u>Exhibits and Schedules and Other Instruments</u>.  Each Exhibit and Schedule to this Agreement shall be considered a part hereof as if set forth herein in full.  Any disclosure made in a Disclosure Schedule to this Agreement shall be deemed a disclosure for all purposes under this Agreement to the extent that the relevance of such disclosure is reasonably apparent from the text of such disclosure in the Disclosure Schedules.

9.2   <u>Additional Assurances</u>.  The provisions of this Agreement shall be self-operative and shall not require further agreement by the parties except as may be herein specifically provided to the contrary; provided, however, at the reasonable request of a party, the other party shall execute such additional instruments and take such additional actions as the requesting party may deem necessary to effectuate this Agreement.  Seller shall, at any time and from time to time at and after the Closing, upon the reasonable request of Purchaser and at Purchaser's sole expense, take any and all steps necessary to place Purchaser in possession and operating control of the Assets to be transferred hereunder and will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may reasonably be required or requested to more effectively transfer and confirm to Purchaser or to its successors or assigns, or to reduce to possession, any or all of the Assets and to carry out the purposes and intent of this Agreement, provided however, that Purchaser shall bear all costs associated with such acts.

9.3   <u>Choice of Law</u>.

27

(A)     The parties agree that this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to principles of conflicts of laws, but subject as necessary or appropriate to the Bankruptcy Code.

(B)     The Bankruptcy Court will have jurisdiction over any and all disputes between or among the parties, whether at law or in equity, arising out of or relating to this Agreement; provided, however, that if the Bankruptcy Court is unwilling or unable to hear any such dispute, each of the parties submits to the exclusive jurisdiction of the United States District Court for the District of Delaware and of any Delaware State Court in any Action arising out of or relating to this Agreement or the transactions contemplated herein or therein and agrees that all claims in respect of such Action may be heard and determined in any such court. Each of the parties waives any defense of inconvenient forum to the maintenance of any Action so brought and waives any bond, surety or other security that might be required of any other party with respect thereto.

(C)     Each of the parties hereby waives, to the fullest extent permitted by Law, any right to trial by jury of any claim, demand, Action, or cause of action (i) arising under this Agreement or (ii) in any way connected with or related or incidental to the dealings of the parties in respect of this Agreement or any of the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity, or otherwise.

9.4     Benefit/Assignment.  Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors and assigns; provided, however, that no party may assign this Agreement without the prior written consent of the other party and any such attempted assignment shall be null and void.  This Agreement is intended solely for the benefit of the parties hereto and is not intended to, and shall not, create any enforceable third party beneficiary rights.  Notwithstanding the foregoing:

(A)     Purchaser may, without the written consent of Seller, assign, in whole or in part, its rights and obligations pursuant to this Agreement to one or more of its Affiliates, provided that Purchaser will nonetheless remain liable for all of Purchaser's obligations hereunder;

(B)     Purchaser may, without the written consent of Seller, collaterally assign its rights under this Agreement for security purposes to any lender providing financing to Purchaser or any of its Affiliates, and any such lender may exercise all of the rights and remedies of Purchaser hereunder; and

(C)     Following the Closing, Purchaser may, without the written consent of Seller, assign its rights under this Agreement, in whole or in part, to any subsequent third party purchaser of Purchaser or all or substantially all of its assets (whether such sale is structured as a sale of stock, a sale of assets, a merger, or otherwise).

Notwithstanding anything to the contrary in this Agreement, the Agent shall be a third party beneficiary of all provisions of this Agreement that expressly relate to the Agent.

28

9.5    Cost of Transactions.  Whether or not the transactions contemplated hereby shall be consummated, the parties agree as follows: except as otherwise expressly provided in this Agreement (i) Seller will pay the fees, expenses, and disbursements of Seller and its agents, representatives, accountants, and counsel incurred in connection with the subject matter hereof and any amendments hereto, and (ii) Purchaser shall pay the fees, expenses and disbursements of Purchaser and its agents, representatives, accountants and counsel incurred in connection with the subject matter hereof and any amendments hereto.

9.6    Confidentiality.  Notwithstanding anything to the contrary set forth herein, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms until the Closing, at which time it shall terminate and be of no further force or effect.  From and after the Closing, Seller shall, and shall cause its Affiliates to, keep confidential and not use any written, oral, or other information relating to the Business or the Assets obtained by virtue of Seller's ownership of the Business and the Assets prior to the Closing ("Confidential Information"), except (i) to the extent disclosure is required by applicable Law (in which case, unless prohibited by Law, the disclosing party shall promptly notify the other party in writing of the same, and such disclosing party shall reasonably cooperate with the non-disclosing party (at the disclosing party's sole cost and expense) to preserve the confidentiality of such information consistent with applicable Law), (ii) to the extent such information has been made public through no fault of the applicable party, and (iii) each of Purchaser and Seller may disclose such information to such Person's equityholders or Affiliates, and their respective representatives and financing sources (provided that such equityholders, Affiliates, representatives or financing sources are instructed to keep such Confidential Information confidential, and Purchaser and/or Seller (as applicable) shall be responsible for any breach of this Section 9.6 by their respective equityholders, Affiliates, representatives or financing sources as if they were a party hereto).

9.7    Public Announcements.  Seller and Purchaser mutually agree that no party hereto shall release, publish or otherwise make available to the public in any manner whatsoever any information or announcement regarding the transactions herein contemplated without the prior written consent of the other party, except for information and filings reasonably necessary to obtain Bankruptcy Court approval of this Agreement or required by any Governmental Entity, or by Purchaser or its Affiliates after the Closing if made in the ordinary course.

9.8    Waiver of Breach.  The waiver by any party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or any other provision hereof.

9.9    Notice.  Any notice, demand or communication required, permitted or desired to be given hereunder shall be in writing and shall be delivered in person, by electronic mail (e-mail), by overnight delivery service such as Federal Express or Express Mail, or by certified mail, return receipt requested, with postage prepaid, to the parties at the following addresses (or such other or further addresses as the parties may hereafter designate by written notice):

    (a)    If to Seller:

        Futures Behavior Therapy Center, LLC
        c/o Community Intervention Services

29

Attention:  Andrew R. Calkins, CEO
200 Friberg Parkway, Suite 2000
Westborough, MA 01581
E-mail:  acalkins@communityinterventionservices.com

With a copy to (which shall not constitute notice):
Casner & Edwards, LLP
Attention:  Michael J. Goldberg, Esq.
303 Congress Street, #201
Boston, MA 02210
E-mail:  Goldberg@casneredwards.com

    (b)   If to Purchaser:

FBTC Transitional Sub, LLC
c/o National Mentor Holdings, LLC
Attention: Nate Lewis, VP, Mergers and Acquisitions; Gina Martin, Chief
Legal Officer
313 Congress Street, 5th Floor
Boston, MA 02210
Email: Nate.Lewis@TheMentorNetwork.com;
        Gina.Martin@TheMentorNetwork.com

With a copy to (which shall not constitute notice):
Quarles & Brady LLP
Attention: Ryan P. Haas
411 E. Wisconsin Avenue, Suite 2400
Milwaukee, WI 53202
E-mail: ryan.haas@quarles.com

    (c)   If to Escrow Agent:

Casner & Edwards, LLP
Attention:  Michael J. Goldberg, Esq.
303 Congress Street, #201
Boston, MA 02210
E-mail:  Goldberg@casneredwards.com

All notices given in accordance with the foregoing shall be deemed to have been duly given and to be effective when delivered and received.

    9.10   Interpretation

    (A)   Whenever the context of this Agreement requires, the gender of all words herein shall include the masculine, feminine and neuter, and the number of all words herein shall include the singular and plural.

(B)     The words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(C)     Wherever the word "include," "includes," or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation."

(D)     The word "or" shall be inclusive and not exclusive.

(E)     Each reference herein to "days" shall be to calendar days unless "Business Days" are otherwise specified.

(F)     Each reference herein to any Contract shall be to such Contract as amended, supplemented, waived or otherwise modified from time to time.

(G)     Each reference herein to a Law is to such Law as it may be amended from time to time.

(H)     The phrase "made available to Purchaser" and phrases of similar import when used in this Agreement will mean uploaded to the Data Room on or prior to the date that is one Business Day prior to the date of the Original Agreement (and remains available to Purchaser therein through the Closing); and

(I)     The phrase "ordinary course of business" and phrases of similar import when used in this Agreement will mean the ordinary course of business consistent with past practice.

9.11    <u>Divisions and Headings</u>.   The divisions of this Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

9.12    <u>Entire Agreement</u>.   This Agreement, together with all other agreements and documents to be delivered hereunder, constitutes the entire agreement of Seller and Purchaser and supersedes all prior agreements and understandings, both oral and written, between them concerning the subject matter hereof.   This Agreement amends and restates the Original Agreement in its entirety.

9.13    <u>Counterparts</u>.   This Agreement may be executed in several counterparts by one or more of the undersigned and all such counterparts so executed shall together be deemed and constitute one final agreement, as if one document had been signed by all parties hereto; and each such counterpart shall be deemed an original, binding the parties subscribed hereto and multiple signature pages affixed to a single copy of this Agreement shall be deemed to be a fully executed original Agreement. Signatures delivered by facsimile or by e-mail in PDF format shall be deemed to be effective as original signatures.

9.14    <u>Proration</u>.   The operation of the Business and the income and normal operating expenses attributable thereto through the date preceding the Closing Date shall be for the account of Seller and thereafter for the account of Purchaser, and, if any income or expense is properly

31

allocable or credited, then it shall be allocated, charged or prorated accordingly. Expenses for goods or services received both before and after the Closing Date, such as power and utilities charges and rents and similar prepaid and deferred items shall be prorated between Seller and Purchaser as of the Closing Date in accordance with GAAP. All special assessments and similar charges or Liens imposed against the Assets in respect of any period of time through the Closing Date, whether payable in installments or otherwise, shall be the responsibility of Seller, and amounts payable with respect to such special assessments, charges or liens in respect of any period of time after the Closing Date shall be the responsibility of Purchaser, and such charges shall be adjusted as required hereunder. To the extent that any of the foregoing prorations and adjustments cannot be determined as of the Closing Date, Purchaser and Seller shall conduct a final accounting and make any further payments, as required on a date mutually agreed upon, within 90 days after the Closing.

9.15    Termination of Agreement.

(A)    Termination. This Agreement may be terminated prior to Closing:

(i)    by the mutual written consent of Seller and Purchaser;

(ii)    as provided in Sections 9.15(B) and (C);

(iii)    by Seller or Purchaser upon the closing of an Alternative Transaction;

(iv)    by Purchaser if (a) any person files a motion seeking to have the Bankruptcy Court enter an Order (1) dismissing the Bankruptcy Case or either one of them; (2) converting the Bankruptcy Case or either one of them from Chapter 11 to Chapter 7 of the Bankruptcy Code; (3) appointing a trustee in the Bankruptcy Case or either one of them; and/or (4) appointing in the Bankruptcy Case or in either of them a responsible officer or an examiner with enlarged powers relating to the operation of the Business (beyond those powers set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), or (b) an order granting any of the relief described in the preceding clause (iii)(a) is entered for any reason and is not vacated within 14 days after entry thereof;

(v)    Intentionally omitted;

(vi)    Intentionally omitted;

(vii)    by written notice from Purchaser if (a) the Bankruptcy Court has not held a hearing on the Sale Motion on or prior to the first Business Day after the date that is 120 days after the Petition Date; (b) the Bankruptcy Court has not entered the Sale Order on or prior to the first Business Day after the date that is 122 days following the Petition Date; (c) the Sale Order shall not have become final and non-appealable on the 15th day after its entry; or (d) following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed, vacated, reversed, modified, supplemented or amended in any respect without the prior written consent of Purchaser;

(viii)   by Purchaser or, prior to entry of the Sale Order, by Seller, if (a) Seller enters into an asset purchase agreement or other definitive agreement with respect to an Alternative Transaction other than with the Back-Up Bidder (as such term is defined in the Sale Procedures Order) or (b) the Bankruptcy Court declines to enter the Sale Order in a form reasonably acceptable to Purchaser;

(ix)   by Seller or Purchaser, if an order is entered by a court, tribunal, or other adjudicatory body of competent jurisdiction having valid enforcement authority permanently restraining, prohibiting or enjoining either party from consummating the transactions described in this Agreement and such order shall have become final and non-appealable or shall not have been vacated prior to the Outside Date; or

(x)   by Seller or Purchaser if Closing has not occurred on or before 5:00 p.m. Eastern time on the date that is 120 days from the date of the Original Agreement (the "Outside Date");

provided, however, that the right to terminate this Agreement under this Section 9.15(A) shall not be available to any party if the action of such party or any of its Affiliates has been a principal cause of or resulted in the failure of the Closing to occur on or before such date, and such action or failure to act constitutes a breach of any of such party's representations, warranties, covenants or obligations under this Agreement.   Upon a termination of this Agreement pursuant to this Section 9.15(A), and except as otherwise provided by Sections 9.15(B), 9.15(C), and 9.15(D), the Deposit shall be returned by the Escrow Agent to Purchaser and the parties hereto shall have no further obligations under this Agreement except as shall expressly survive the termination hereof.

(B)   Seller's Default. Notwithstanding anything to the contrary contained herein, if, prior to or at the Closing, there has been a violation or breach by (i) Seller of any representation or warranty set forth in Section 5.1 (or any such representation or warranty shall have become untrue in any material respect after the date of the Original Agreement) or (ii) Seller of any covenant or agreement contained in this Agreement which, in the case of either clause (i) or (ii), would prevent the satisfaction of or result in the failure of any condition to the obligations of Purchaser at the Closing and such violation or breach has not been waived by Purchaser or, in the case of a breach of any covenant or agreement under this Agreement that is curable, has not been cured by Seller (as applicable) prior to the earlier to occur of (a) 10 days after receipt by Seller, as applicable, of written notice of such breach from Purchaser and (b) the Outside Date, then Purchaser may elect to (1) terminate this Agreement by written notice to Seller, in which case the Deposit shall be promptly refunded to Purchaser by Escrow Agent, or (2) seek specific performance of Seller's obligations that are to be performed on or prior to Closing, including without limitation Seller's delivery obligations under Section 4.3 of this Agreement, unless such obligations cannot reasonably be performed by Seller for reasons beyond Seller's reasonable control.

(C)   Purchaser's Default. Notwithstanding anything to the contrary contained herein, if, prior to or at the Closing, there has been a violation or breach by (i) Purchaser of any representation or warranty set forth in Section 5.2 (or any such representation or warranty shall have become untrue in any material respect after the date of the Original Agreement) or (ii)

33

Purchaser of any covenant or agreement contained in this Agreement which, in the case of either clause (i) or (ii), would prevent the satisfaction of or result in the failure of any condition to the obligations of Seller at the Closing and such violation or breach has not been waived by Seller or, in the case of a breach of any covenant or agreement under this Agreement that is curable, has not been cured by Purchaser (as applicable) prior to the earlier to occur of (a) 10 days after receipt by Purchaser, as applicable, of written notice of such breach from Seller and (b) the Outside Date, then Seller may elect to (1) terminate this Agreement by written notice to Purchaser, in which case the Deposit shall be promptly delivered by Escrow Agent to Seller as Seller's liquidated damages, in which case such liquidated damages shall be the sole remedy of Seller for Purchaser's default and Seller shall not be entitled to any additional legal or equitable relief against Purchaser, or (2) seek (a) specific performance of Purchaser's obligations to be performed on or prior to Closing, including without limitation Purchaser's delivery obligations under Section 4.4 of this Agreement, and (b) such other remedies available to Seller at law or in equity.

(D)     Alternative Transaction.  If this Agreement is terminated by Purchaser, under circumstances where it is entitled to do so pursuant to Section 9.15(A)(viii), (i) the Deposit shall be promptly refunded to Purchaser by Escrow Agent, and (ii) Purchaser shall be entitled to payment of, and Seller shall pay or cause to be paid, the Break-Up Fee (as such term is defined in the Sale Procedures Order) from the proceeds received by Seller upon the closing of an Alternative Transaction, subject, however, to any filings and/or hearings required by the Bankruptcy Court.

(E)     Liability Limitation.  Notwithstanding anything to the contrary in this Agreement, the maximum aggregate liability of Purchaser for  money damages in respect of any losses, damages, costs or expenses of Seller relating to the failure of the transactions contemplated hereby to be consummated or a breach of this Agreement by Purchaser in the absence of a Closing shall be limited to the Deposit (the "Liability Limitation"), and in no event shall the Seller or any of their Affiliates seek any amount in excess of the Liability Limitation in connection with this Agreement or the transactions contemplated hereby or in respect of any other document or theory of law or equity or in respect of any oral representations made or alleged to be made in connection herewith, whether at law or in equity, whether in contract, tort or otherwise.

9.16     Amendments.   Except as otherwise expressly provided herein, neither this Agreement nor any term or provision hereof may be changed, waived, discharged or terminated except by the mutual written agreement of the parties (and, in the case of any amendment extending the Outside Date or that would reasonably be expected to materially diminish the amount paid to Agent at the Closing, the Agent).

9.17     Construction.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any of the parties hereto, and this Agreement shall be deemed to have been prepared jointly by the parties, and thus shall not necessarily be construed against any of the parties as the drafter hereof.

9.18    No Successor Liability.  The parties intend that, to the fullest extent permitted by applicable Law (including under Section 363 of the Bankruptcy Code), upon the Closing, Purchaser shall not be deemed to: (A) be the successor of Seller, (B) have, de facto, or otherwise, merged with or into Seller, (C) be a continuation or substantial continuation of Seller or the enterprise(s) of Seller or (D) be liable for any acts or omissions of Seller in the conduct of the Business or arising under or related to the Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the parties intend that Purchaser shall not be liable for any Lien (other than Assumed Liabilities and Permitted Liens) against Seller or any of Seller's predecessors or Affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Assets or any liabilities of Seller arising prior to the Closing Date. The Parties agree that the provisions substantially in the form of this Section 9.18 shall be reflected in the Sale Order.

9.19    Equitable Relief.  The parties hereto agree that if any of the provisions of this Agreement were not to be performed as required by their specific terms or were to be otherwise breached, irreparable damage will occur, no adequate remedy at Law would exist and damages would be difficult to determine, and that each party shall be entitled to an injunction or injunctions to prevent breaches, and to specific performance of the terms, of this Agreement (including causing the transactions contemplated hereby to be consummated on the terms and subject to the conditions thereto set forth in this Agreement) without posting any bond and without proving that monetary damages would be inadequate, in addition to any other remedy at Law or equity.  None of the parties shall oppose, argue, contend or otherwise be permitted to raise as a defense that an adequate remedy at law exists or that specific performance or equitable or injunctive relief is inappropriate or unavailable.

9.20    Certain Definitions.  When used in this Agreement, the following terms have the meanings set forth below:

"Action" means any claim, charge, audit, complaint, order, decree, ruling, eminent domain action, judgment, injunction, inspection, condemnation, notice of violation, citation, penalty or administrative action or proceeding, whether private or by or before any Governmental Entity.

"Affiliate" means, with respect to any subject Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such subject Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made.  For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"Business Day" means any day other than a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in Boston, Massachusetts.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means that certain Project Plymouth Non-Disclosure Agreement, dated as of May 21, 2020, executed by Duff Phelps Securities LLC, on behalf of Seller, and National Mentor Holdings, Inc.

"Contracts" means all agreements, contracts, leases and subleases, arrangements, letters of credit, guarantees and binding commitments, whether written or oral.

"Data Room" means the "Project Backpack" virtual data room hosted by "dealroom.net" created by Seller for the transaction governed by this Agreement.

"Dollars" or "$" means the lawful currency of the United States of America.

"ERISA" means the Employment Retirement Income Security Act of 1974, as amended.

"Federal Health Care Programs" means any health care program administered or funded, in whole or in part, by the government of the United States of America, including the Medicare, Medicaid and TRICARE programs.

"Fundamental Representations" means the representations and warranties of Seller set forth in Sections 5.1(A) (Due Organization), (B) (Power and Authority; Enforceability; Consents), (C) (Binding Agreement), (D) (Assets), and (P) (Brokerage).

"GAAP" means United States generally accepted accounting principles, consistently applied during the periods involved.

"Governmental Entity" means any United States or foreign federal, state, provincial or local government or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as amended (Pub. L. No. 104-191) and the Health Information Technology for Economic and Clinical Health Act (Pub. L. No. 111-5), any implementing regulations, and any state privacy or medical information Laws applicable to the Business.

"Law" means any constitution, law, common law, statute, ordinance, rule, regulation, regulatory requirement, code, order, judgment, injunction or decree enacted, issued, promulgated, enforced or entered by a Governmental Entity or securities exchange.

"Lien" means any charge, mortgage, pledge, security interest, lien, preference, license, covenant, claim, easement, encroachment or other similar encumbrance.

"Material Adverse Effect" means any change, event, occurrence, fact, state of facts, development or effect that (a) prevents, materially delays or materially impairs the ability of Seller to consummate the transactions contemplated by this Agreement or the other Transaction

Documents or (b) has, or would reasonably be expected to have, a material adverse effect upon the condition (financial or otherwise), business, assets or results of operations of the Business, taken as a whole; provided, however, that, in the case of clause (b), any adverse change, event, occurrence, fact, state of facts, development or effect arising from or related to (i) conditions affecting the economy generally, (ii) pandemic (including without limitation changes caused by the COVID 19 virus or any other epidemic, pandemic or disease outbreak), any act of terrorism, similar calamity or war (whether or not declared) or any escalation or worsening of any of the foregoing or any natural disaster, (iii) financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index), or (iv) changes in any Laws, policies or other binding directives issued by any Governmental Entity, will not be taken into account in determining whether a "Material Adverse Effect" has occurred; provided that, with respect to a matter described in any of the foregoing clauses, such matter will only be excluded so long as such matter does not have a disproportionate effect on the Business relative to other comparable businesses operating in the industry in which the Business operates.

"Permits" means all licenses, permits, certificates, grants, franchises, waivers, consents, expirations of waiting periods, and other similar authorizations or approvals issued by or obtained from a Governmental Entity or any securities exchange.

"Permitted Liens" means (i) zoning, entitlement, building and other land use and similar laws or regulations imposed by any Governmental Entity having jurisdiction over such parcel which are not violated by the current use and operation thereof; (ii) non-exclusive licenses to Intellectual Property granted in the ordinary course of business; and (iii) easements, covenants, conditions, restrictions and other similar matters of record which would not materially impair the use or occupancy of such parcel in the operation of the Business.

"Person" means an individual, a corporation, a partnership, an association, a limited liability company, a Governmental Entity, a trust or other entity or organization.

"Personal Information" means any information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular individual or household, including without limitation Protected Health Information as the term is defined in the Health Insurance Portability and Accountability Act of 1996, and any other information subject to protection, regulation, or safeguarding as set forth in any applicable Law governing privacy, information security or health information.

"Seller's Knowledge" or any similar knowledge qualification with respect to Seller, means the actual knowledge, after reasonable inquiry, of any of the following individuals: Andrew Calkins and Matthew Lesniewski.

"WARN Act" means the Worker Adjustment Retaining and Notification Act of 1988, as amended, or any similar state or local law.

IN WITNESS WHEREOF, Seller and Purchaser have executed this Agreement, and Escrow Agent has executed this Agreement for purposes of Sections 2.2, 2.3, 6.6, and 9.16, as of the day and year first above written.

"SELLER"                                             "PURCHASER"

FUTURES BEHAVIOR THERAPY                   FBTC TRANSITIONAL SUB, LLC, a
CENTER, LLC, a Massachusetts                   Delaware limited liability company
limited liability company

                                                     By: _____
                                                     Its: _____
By: _____
      Andrew Calkins, President

"ESCROW AGENT"

CASNER & EDWARDS, LLP

By:_____
      Michael J. Goldberg, Esq.

IN WITNESS WHEREOF, Seller and Purchaser have executed this Agreement, and Escrow Agent has executed this Agreement for purposes of Sections 2.2, 2.3, 6.6, and 9.16, as of the day and year first above written.

"SELLER"                                      "PURCHASER"

FUTURES BEHAVIOR THERAPY          FBTC  TRANSITIONAL  SUB,  LLC,  a
CENTER, LLC, a Massachusetts          Delaware limited liability company
limited liability company

By:_____          By:_____
   Andrew Calkins, President              Its:  ___Chief Executive Officer___

"ESCROW AGENT"

CASNER & EDWARDS, LLP

By:_____
   Michael J. Goldberg, Esq.

IN WITNESS WHEREOF, Seller and Purchaser have executed this Agreement, and Escrow Agent has executed this Agreement for purposes of Sections 2.2, 2.3, 6.6, and 9.16, as of the day and year first above written.

"SELLER"

FUTURES BEHAVIOR THERAPY
CENTER, LLC, a Massachusetts
limited liability company

By:_____
    Andrew Calkins, President

"PURCHASER"

FBTC TRANSITIONAL SUB, LLC, a
Delaware limited liability company

By: _____
Its: _____

"ESCROW AGENT"

CASNER & EDWARDS, LLP

By:_____
    Michael J. Goldberg, Esq.

## LIST OF EXHIBITS AND SCHEDULES

Exhibit A—Facility Locations

Schedule 1.1(A)—Assumed Leases

Schedule 1.1(C)—Deposits

Schedule 1.1(D)(i)—Licenses and Permits

Schedule 1.1(D)(iv)—Assumed Contracts

Schedule 1.2(I)—Other Excluded Assets

Schedule 1.3(B)—Other Assumed Obligations

Schedule 1.4(O)—Other Excluded Liabilities

Schedule 2.1—Purchase Price Adjustments and Allocation

Schedule 2.2—Escrow Provisions

Schedule 3.1—Bill of Sale

Schedule 3.2—Assumption and Assignment Agreement

Schedule 4.2—Required Governmental Consents

Schedule 4.3(C)—Transition Services Agreement

Schedule 5.1(B)—Seller Required Approvals

Schedule 5.1(D)—Title to Assets

Schedule 5.1(E)—Financial Statements

Schedule 5.1(F)—Leases

Schedule 5.1(G)—Material Contracts

Schedule 5.1(H)—Enforceability

Schedule 5.1(I)—Employee Benefits

Schedule 5.1(J)—Employees

Schedule 5.1(K)—Compliance with Law

Schedule 5.1(L)—No Proceedings

Schedule 5.1(M)—Absence of Certain Changes

Schedule 5.1(N)—Permits

Schedule 5.1(O)—Intellectual Property

Schedule 5.1(P)—Brokerage

Schedule 5.1(R)—Payors

Schedule 5.2(B)—Purchaser Required Approvals

Schedule 6.1(C)—Seller Key Employees

Schedule 6.2—Seller Negative Covenants

Schedule 7.2(E)—Required Third Party Consents

**EXHIBIT A**

**Seller Facility Locations**

1. 55 Tozer Road, Beverly, MA
2. 216 West Boylston Street, West Boylston, MA

## **Exhibit B**

[Winning Bidder APA—Marked Changes From Stalking Horse APA]

## **WINNING BIDDER ASSET PURCHASE AGREEMENT**

This Winning Bidder Asset Purchase Agreement (this "Agreement") is entered into and made effective as of the ~~5~~10th day of ~~January~~February, 2021, by and between Futures Behavior Therapy Center, LLC, a Massachusetts limited liability company ("Seller"), and FBTC Transitional Sub, LLC, a Delaware limited liability company ("Purchaser").

### **Recitals**

A.    Seller provides community-based, school-based and outpatient behavioral health and autism services primarily to adolescents in Massachusetts (the "Business") at the locations listed on Exhibit A (each location individually a "Facility" and, collectively, the "Facilities").

B.    Purchaser wishes to purchase from Seller, and Seller is willing to sell to Purchaser, substantially all of the assets of the Business, including without limitation Seller's leases of the real properties at which the Facilities are located, and Seller's agreements with clients and providers underlying the Business and its revenues, all on the terms and conditions hereinafter set forth.

C.    ~~Seller desires to effectuate the contemplated sale of the Business to Purchaser through a sale conducted under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and to that end Seller intends to file presently (such filing date, the "Petition Date"), in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"), voluntary petitions for relief under chapter 11 of the Bankruptcy Code commencing Seller's bankruptcy case (together, the "Bankruptcy Case"), and to seek the Bankruptcy Court's approval of the contemplated sale pursuant to sections 105, 363 and 365 of the Bankruptcy Code.~~Purchaser and Seller entered into that certain Asset Purchase Agreement dated January 5, 2021 (the "Original Agreement") setting forth the terms and conditions respecting the Purchaser's acquisition of the assets of the Business from Seller and by this Agreement Purchaser and Seller hereby amend and restate the Original Agreement.

D.    On January 5, 2021 (the "Petition Date"), Seller filed a voluntary chapter 11 petition (the "Petition") in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"), commencing a chapter 11 bankruptcy case that is jointly administered under Case No. 21-40002-EDK, and, pursuant to Sections 1107 and 1108 of title 11, United States Code (the "Bankruptcy Code"), is managing its properties and operating its businesses as a debtor in possession.

E.    Pursuant to the Bankruptcy Court's Order (A) Approving Procedures Governing Debtor's Proposed Sale of Substantially All Assets of Futures Behavior Therapy Center, LLC, Including Certain Unexpired Leases and Executory Contracts, Pursuant to Sections 363 and 365 of the Bankruptcy Code, Free and Clear of Liens, Claims, and Interests; (B) Approving Form and Manner of Notice of Sale; (C) Approving Debtor's Assumption of Asset Purchase Agreement Pursuant to Section 365 of the Bankruptcy Code; and (D) Granting Related Relief dated January 15, 2021 [Doc. No. 81] (the "Sale Procedures Order"), Seller, in connection with obtaining the Bankruptcy Court's authorization to consummate the transactions provided in the Original

Agreement, solicited higher and better offers for the assets of the Business, including the conduct of an auction on February 10, 2021 (the "Auction").

F.      At the conclusion of the Auction, it was determined that Purchaser submitted the highest and best offer for the assets of the Business, and Purchaser and Seller are entering into this Agreement in order to memorialize the outcome of the Auction and the designation of Purchaser as the "Winning Bidder" pursuant to the Sale Procedures Order.

**Agreement**

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, Purchaser and Seller agree as follows:

**ARTICLE I**

**SALE OF ASSETS**

1.1     Purchased Assets.  Subject to the terms, provisions and conditions contained in this Agreement, Purchaser shall purchase from Seller, and Seller shall sell, convey or cause to be conveyed to Purchaser, free and clear of all Liens: all of Seller's right, title, and interest in and to all assets real, personal and mixed, tangible and intangible, which relate to, or are used or held for use in connection with, the Business, including but not limited to the assets described in Sections 1.1(A) through (D), other than the Excluded Assets (as defined in Section 1.2 below) (collectively, the "Assets"):

(A)     the leases, subleases, licenses or other agreements to occupy all or any part of the real property at which the Facilities are located as set forth on Schedule 1.1(A) hereto (collectively, the "Assumed Leases");

(B)     all furniture, equipment, fixtures, furnishings, medical apparatuses, motor vehicles, marketing and promotional materials and brochures, stationery, policy manuals, operating manuals, kitchen equipment, supplies and inventories, and other tangible personal property;

(C)     all rights to lease deposits made under Assumed Leases, including those set forth on Schedule 1.1(C) attached hereto;

(D)     all intangible property, including, but not limited to:

(i)     all licenses, Permits, certifications (including determinations of need and pending determination of need applications), provider numbers, accreditations and authorizations issued by any Governmental Entity, including but not limited to such property described on Schedule 1.1(D)(i) attached hereto;

2

(ii)     all business records, including, but not limited to, financial books and records, payroll records, personnel records and manuals;

(iii)     all current and historical client records maintained by or for Seller, including without limitation, billing, medical, and clinical notes, and the entire "designated record set" as that term is defined by HIPAA (collectively, "Client Records");

(iv)     those existing commitments, Contracts, equipment or other personal property leases, purchase orders and agreements, as listed on Schedule 1.1(D)(iv) (the "Assumed Contracts");

(v)     the right to use the current name of each of the Facilities;

(vi)     all third-party warranties to the extent transferable;

(vii)     all proceeds under insurance policies and rights of recovery relating thereto that arise after the date hereofof the Original Agreement and are pending as of the Closing, in each case, solely with respect to any tangible Assets or with respect to any insurance claims that affect the Business and the Assets; and

(viii)  (1) all patents and patent applications for inventions and discoveries, (2) all copyrights, copyright registrations and applications, and all related rights in mask works and works of authorship, including moral rights, (3) all registered and common law trademarks, trademark registrations and applications therefor, trade dress rights, trade names, registered and common law service marks, service mark registrations and applications therefor, (4) all corporate names, (5) all domain name registrations, IP addresses, network addresses and the like and the applications therefor in respect of internet domain names, (6) all email accounts, telephone numbers and fax numbers, (7) all ideas, concepts, discoveries, inventions, developments, technologies, works of authorship, trade secrets, software, firmware, tools, processes, techniques, know-how, methodologies, data, plans, devices, apparatuses, specifications, designs, circuits, layouts, mask works, algorithms, programs, code, documentation and other material and information, tangible or intangible, whether or not it may be patented, copyrighted or otherwise protected (including all versions, modifications, enhancements and derivative works thereof), (8) any and all patent rights, copyright rights, mask work rights, trade secret rights, sui generis database rights and all other intellectual and industrial property rights of any sort throughout the world (including any application therefor) and (9) any rights to any of the foregoing pursuant to a license or other agreement (collectively, "Intellectual Property").

The Assets described in Section 1.1(B), (C), and (D) are collectively referred to herein as the "Personal Property".   Subject to the terms of this Agreement, Seller and Purchaser may supplement or amend the Schedules of specific Personal Property at any time prior to Closing and the Schedules as so amended and supplemented as of the Closing Date shall operate to delineate those particular Assets identified in such Schedules to be acquired by Purchaser at Closing.

1.2     Excluded Assets.  Notwithstanding Section 1.1 above, the following shall be excluded from the assets sold by Seller to Purchaser hereunder (the "Excluded Assets"):

3

(A)    the accounts receivable, prepaid expenses, cash on hand, and other cash equivalents of the Business, and all rights and interests in and to bank accounts;

(B)    Seller's leases subleases, licenses or other agreements to occupy all or any part of the real property, in each case that are not Assumed Leases;

(C)    Seller's Contracts that are not Assumed Contracts;

(D)    Seller's corporate records and securities, including stock in affiliated entities;

(E)    Seller's insurance policies and Employee Benefit Plans;

(F)    Seller's claims and causes of action, including without limitation causes of action arising under Chapter 5 of the Bankruptcy Code;

(G)    Seller's interest in and rights under this Agreement and any other agreement between Purchaser and Seller executed in connection with this Agreement;

(H)    all intercompany claims between Seller and its Affiliates;

(I)    such other assets as may be described in Schedule 1.2(I);

(J)    all claims, refunds, credits, causes of action, choices in action, rights of recovery and rights of set-off of any kind, and all proceeds under insurance policies and rights of recovery relating thereto, other than as provided in in Section 1.1(D)(vii);

(K)    all obligations with respect to client deposits and trust funds;

(L)    claims and causes of action arising under Assumed Leases and Assumed Contracts;  and

(M)    all claims for and rights to receive tax refunds with respect to taxable periods (or portions thereof) ending on or prior to the Closing Date.

1.3    Assumed Obligations.  On the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely pay, perform and discharge in accordance with their respective terms, only the following liabilities of Seller, other than any that are Excluded Liabilities (as defined in Section 1.4 below) (collectively, the "Assumed Obligations"):

(A)    all liabilities and obligations of Seller under the Assumed Leases and the Assumed Contracts, but only to the extent (i) such liabilities or obligations arise after the Closing Date and (ii) such Assumed Leases and Assumed Contracts are assigned to Purchaser or Purchaser otherwise receives the rights and benefits of such Assumed Leases and Assumed Contracts pursuant to Section 1.5, and, in any case, specifically excluding any liability or obligation relating to or arising out of such Assumed Leases or Assumed Contracts as a result of (1) any breach of such Assumed Leases or Assumed Contracts occurring on or prior to the Closing Date, (2) any

4

QB\66067564.6

violation of applicable Law, breach of warranty, tort or infringement occurring on or prior to the Closing Date, or (3) any Action occurring on or prior to the Closing Date; and

(B)    the liabilities or obligations, if any, expressly described on Schedule 1.3(B).

1.4    Excluded Liabilities.  Notwithstanding anything herein to the contrary, Purchaser shall not assume or incur any liability or obligation for any other liabilities or obligations of Seller other than the Assumed Obligations (collectively, the "Excluded Liabilities"), including, but not limited to, the following:

(A)    subject to Section 2.5 herein, any amounts ("Cure Costs") that must be paid and obligations that must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption by Seller and assignment to Purchaser of Assumed Leases and Assumed Contracts;

(B)    any of Seller's liabilities or obligations under this Agreement or any other agreements entered into by a Seller in connection with the transactions contemplated by this Agreement;

(C)    any of Seller's liabilities or obligations for expenses or fees incident to or arising out of the negotiation, preparation, approval or authorization of this Agreement or the consummation (or preparation for the consummation) of the transactions contemplated hereby (including all attorneys' and accountants' fees and brokerage fees) and transfer taxes;

(D)    any liability or obligation of any Seller or any of its Affiliates for taxes for any period;

(E)    any liability or obligation under or with respect to any Employee Benefit Plan or any other employee benefit plan, program, policy or arrangement presently or formerly maintained or contributed to by a Seller or its ERISA Affiliates, or with respect to which a Seller or any such ERISA Affiliate has any liability;

(F)    any liability or obligation with respect to any products or services that were marketed or sold prior to the Closing, including product liability, malpractice, tort liability, infringement claims and any related claims and Actions;

(G)    any of Seller's liabilities or obligations for vacation pay, sick pay, holiday pay, salary, bonuses or other payments or liabilities of any kind to any employee of Seller or current or former employee of a Seller, including any liabilities or obligations arising prior to the Closing with respect to the exempt or non-exempt status of any employee of Seller;

(H)    any liability or obligation relating to workers' compensation claims which were filed or presented on or before the Closing Date or which are filed or presented after the Closing Date but relate to claims and/or injuries first arising on or before the Closing Date;

5

QB\66067564.6

(I)      any of Seller's liabilities or obligations (i) arising by reason of any violation or alleged violation of any Law, or (ii) arising by reason of any breach or alleged breach by Seller of any Contract;

(J)      any of Seller's liabilities or obligations relating to any Action, proceeding or claim arising out of or in connection with Seller's conduct of the Business or any other conduct of Seller or Seller's officers, directors, employees, consultants, agents or advisors on or prior to the Closing Date;

(K)      any of Seller's liabilities or obligations for indebtedness, including without limitation any funding under the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act");

(L)      any liabilities or obligations in respect of any of the Excluded Assets (including under any Contracts, leases, commitments or understandings related thereto);

(M)      any of Seller's liabilities or obligations which Purchaser may become liable for as a result of or in connection with the failure by Purchaser or any Seller to comply with any bulk sales or bulk transfers laws or as a result of any "defacto merger" or "successor-in-interest" (or similar) theories of liability;

(N)      any intercompany liabilities of Seller; and

(O)      the liabilities described on Schedule 1.4(O).

For purposes of this Section 1.4, "Seller" shall be deemed to include any predecessors to a Seller and any Person with respect to which a Seller is a successor-in-interest (including by operation of law, merger, liquidation, consolidation, assignment, assumption or otherwise).   Seller hereby acknowledges that it is retaining the Excluded Liabilities, all of which Excluded Liabilities shall be treated in accordance with the Bankruptcy Code and any relevant orders of the Bankruptcy Court.

    1.5    Assignability of Certain Contracts; Effectiveness.    To the extent that the assignment to Purchaser of any Assumed Contract or Assumed Lease pursuant to this Agreement is not permitted without the consent of a third party and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, then the parties will use their commercially reasonable efforts, before the Closing, to obtain such consent, and, if any such consent is not obtained prior to the Closing Date, (A) this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Contract or any right or interest therein unless and until such consent is obtained and (B) Seller and Purchaser will reasonably cooperate with each other in any lawful and feasible arrangement designed to provide Purchaser with the benefits and obligations of any such Contract and Purchaser shall be responsible for performing all obligations under such Contract required to be performed by Seller on or after the Closing Date; provided, however, that, notwithstanding anything to the contrary in this Agreement, the assumption and assignment of any particular Assumed Contract or Assumed Lease, whether pursuant to the Sale Order, related order of the Bankruptcy Court, or this Section 1.5, shall, as permitted by Section 3.2, become effective only upon the Closing to the extent

6

QB\66067564.6

expressly designated as an "Assumed Contract" or "Assumed Lease" under the Assignment and Assumption Agreement.

## ARTICLE II
## PURCHASE PRICE

2.1    Purchase Price. The purchase price for the Assets (the "Purchase Price") shall be SevenEleven Million FiveEight Hundred Fifty Thousand Dollars ($7,500,00011,850,000), plus or minus any prorations, payments, adjustments and credits shown on Schedule 2.1; provided, however, that Purchaser reserves the right to increase the Purchase Price and otherwise modify the bid represented by this Agreement as may be permitted by the Bid Procedures Order.

2.2    Payment of Purchase Price. Purchaser will deliver within three Business Days after the date of this AgreementSeller acknowledges that Purchaser has delivered to Seller's counsel (Casner & Edwards, LLP), in escrow, the sum of Three Hundred Seventy-Five Thousand Dollars ($375,000.00) as an initial deposit (the "Deposit") for the payment of the Purchase Price. The Deposit shall not be invested and shall be held in escrow by Seller's counsel as escrow agent under this Agreement (in such capacity, the "Escrow Agent"), and disbursed by Escrow Agent in accordance with this Agreement and the escrow provisions attached as Schedule 2.2 (the "Escrow Provisions").

2.3    Payment of Balance of the Purchase Price. At the Closing and immediately following Purchaser's payment of the Payment Amount (as defined below), Purchaser shall deposit with Escrow Agent in immediately available funds an amount equal to (A) the Purchase Price less (B) the sum of the Deposit and the Payment Amount and (C) plus or minus, as applicable, the prorations, payments, adjustments and credits contemplated by this Agreement or provided by Schedule 2.1, all as set forth in a closing statement to be executed and delivered by Seller and Purchaser pursuant to Section 4.6(B). Upon the consummation of Closing, the Escrow Agent shall deliver to Seller the Purchase Price, as adjusted pursuant to the agreed upon closing statement pursuant to Section 4.6(B).

2.4    Purchase Price Allocation. The Purchase Price shall be allocated as set forth in Schedule 2.1, which the parties shall agree upon prior to the Closing. The parties shall be bound by such allocation for all purposes and shall file Form 8594 with their respective federal income tax returns in a manner consistent with such allocation.

2.5    Payment Schedule. At least two (2) Business Days prior to the Closing, the Seller shall deliver to the Purchaser a schedule (the "Payment Schedule") identifying a dollar amount (the "Payment Amount") to be paid on account of Seller's liabilities from proceeds at Closing otherwise due to Seller , and the individuals or entities to receive such Payment Amount or portion thereof. The Payment Amounts shall be comprised of (i) the amount of Cure Costs that constitute Excluded Liabilities under Section 1.4(A), (ii) the amount of the Transferred Employee Expenses (as defined below) under Section 8.2(B) and (iii) the payment of fees to investment bankers identified on Schedule 5.1(P). The Payment Schedule shall provide Purchaser with the information necessary to pay the Payment Amount on Seller's behalf. The Purchaser shall pay the Payment Amount at the Closing on Seller's behalf, but shall not be responsible for the payment of any amounts that are omitted from the Payment Schedule or that otherwise should have been

7

included in the Payment Schedule. The Seller acknowledges that the Purchaser is paying the amounts on the Payment Schedule, which constitute Excluded Liabilities and that no amounts contained in the Payment Schedule or any of the types of liabilities included in the Payment Schedule shall constitute or become Assumed Liabilities.

## ARTICLE III
## TRANSFER AND ASSIGNMENT

3.1     Bill of Sale. At the Closing, Seller shall convey or cause to be conveyed all of Seller's right, title and interest in and to the Personal Property to Purchaser by delivery to Purchaser of a bill of sale in the form attached as Schedule 3.1 (the "Bill of Sale"), which Bill of Sale shall convey Seller's right, title and interest, free and clear of all Liens, all as and to the extent provided for in the Sale Order (as defined below).

3.2     Assumption and Assignment Agreement. At the Closing, Seller shall, subject to Section 6.6, assign or cause to be assigned to Purchaser, and Purchaser shall assume, all of Seller's right, title and interest in and to the Assumed Leases and the Assumed Contracts, through their mutual execution and delivery of an assignment and assumption agreement in the form attached as Schedule 3.2 (the "Assignment and Assumption Agreement"). Purchaser may at any time prior to three (3) Business Days prior to the Closing (A) designate any previously designated Assumed Lease or Assumed Contract to be an Excluded Asset, and Purchaser shall have no obligation with respect to, nor assume any liability under, any such lease or contract so designated to be an Excluded Asset and (B) designate a previously undesignated lease or Contract as an Assumed Lease or Assumed Contract, as applicable, in which case Seller shall provide to any counterparty to such newly-designated Assumed Lease or Assumed Contact such notice and opportunity to object as may be provided in the Bid Procedures Order, provided that the Closing shall not be conditioned on or subject to entry of an order approving the assignment and assumption of a lease or contract described in this Section 3.2(B).

3.3     PURCHASER ACKNOWLEDGEMENT. PURCHASER ACKNOWLEDGES AND AGREES THAT THE REPRESENTATIONS AND WARRANTIES MADE BY SELLER IN THIS AGREEMENT, AS QUALIFIED OR SUPPLEMENTED BY THE DISCLOSURE SCHEDULES (THE "SELLER REPRESENTATIONS"), ARE THE EXCLUSIVE REPRESENTATIONS AND WARRANTIES MADE BY SELLER, AND EXCEPT FOR THE SELLER REPRESENTATIONS, IT IS ACQUIRING THE ASSETS ON AN "AS-IS WHERE-IS" BASIS, WITHOUT REPRESENTATION OR WARRANTY (EXPRESS OR IMPLIED) BY SELLER AND IN EACH CASE SUBJECT TO (A) ANY STATE OF FACTS REGARDING ITS PHYSICAL CONDITION OR WHICH AN ACCURATE SURVEY OR AN INSPECTION MIGHT SHOW, (B) ALL APPLICABLE LAWS, (C) VIOLATIONS OF LAWS WHICH MAY EXIST ON THE DATE HEREOFOF THE ORIGINAL AGREEMENT, AND (D) ANY MATTER CAUSED OR PERMITTED BY PURCHASER OR ANY AGENT, EMPLOYEE OR AFFILIATE OF PURCHASER. EXCEPT FOR SELLER REPRESENTATIONS, SELLER HAS NOT MADE NOR SHALL BE DEEMED TO HAVE MADE ANY REPRESENTATION OR WARRANTY (EXPRESS OR IMPLIED) OR SHALL BE DEEMED TO HAVE ANY LIABILITY WHATSOEVER AS TO THE VALUE, HABITABILITY, USE, CONDITION, DESIGN, OPERATION, MERCHANTABILITY OR FITNESS FOR USE OF THE ASSETS (OR ANY PART THEREOF), OR ANY OTHER

8

REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE ASSETS (OR ANY PART THEREOF). PURCHASER HAS PRIOR TO THE DATE HEREOF BEEN AFFORDED THE OPPORTUNITY TO INSPECT THE ASSETS AND THE IMPROVEMENTS THEREON (IF ANY).

## ARTICLE IV
## CLOSING

4.1    Date and Place.  Subject to the terms and conditions of this Agreement (including the satisfaction or waiver of the conditions set forth in Article VII, the closing (the "Closing") of the transactions contemplated herein shall be held virtually by the exchange of documents via PDF on the day that is five Business Days following the satisfaction or waiver of the conditions set forth in Article VII or at such other date as determined by the parties hereto. The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date". The Closing shall be deemed to be effective as of 12:01 a.m. on the Closing Date.  Notwithstanding the foregoing, the parties may mutually agree to a different Closing Date.

4.2    Required Governmental Consents.  Subject to Section 6.3, it shall be a condition precedent to Purchaser's obligation to close that Purchaser shall have made all necessary filings with governmental or regulatory authorities and shall have received all necessary governmental permits, licenses, and other approvals (which approvals shall include determinations of no action) as set forth on Schedule 4.2, including, without limitation, licensure approval by the Department of Early Education and Care of the Commonwealth of Massachusetts.

4.3    Seller's Documents.  At the Closing, Seller will deliver or cause to be delivered to Purchaser the following documents:

(A)    The Bill of Sale in favor of Purchaser in the condition required by Section 3.1 hereof.

(B)    The Assignment and Assumption Agreement in the condition required by Section 3.2 hereof.

(C)    A transition services agreement in substantially the form attached hereto as Schedule 4.3(C) (the "Transition Services Agreement"), duly executed by Seller and Community Intervention Services, Inc., a Delaware corporation.

(D)    Certified resolutions of Seller authorizing the transactions under this Agreement.

(E)    Originals of all certificates of occupancy, licenses, permits, authorizations, and approvals issued by governmental authorities having jurisdiction, if available or in existence.

(F)    An affidavit sworn to by an officer of Seller to the effect that Seller is not a "foreign person", as that term is defined in Section 1445(f)(3) of the Code, which affidavit shall be in the form prescribed by federal regulations.

9

(G)    A certified copy of the Sale Order, which shall have become final and non-appealable.

(H)    All Client Records in existing form and format.

(I)    Reports and supporting documentation necessary to validate compliance with the receipt and utilization by Seller of CARES Act funding (including such funding provided under the Provider Relief Fund), including, but not limited to, evidence of Seller's compliance with the reporting of required information and related filing deadlines.

All of the documents and instruments to be delivered by Seller hereunder shall be in form and substance reasonably satisfactory to counsel for Purchaser.

4.4    <u>Purchaser's Documents</u>.  At the Closing, Purchaser will deliver the following to Seller:

(A)    The Purchase Price, as adjusted pursuant to the agreed upon closing statement pursuant to <u>Section 4.6(B)</u>.

(B)    The Assignment and Assumption Agreement, in the condition required by <u>Section 3.2</u> hereof.

(C)    The Transition Services Agreement, duly executed by Purchaser.

(D)    Certified resolutions of Purchaser authorizing the transactions under this Agreement.

All of the documents and instruments to be delivered by Purchaser hereunder shall be in form and substance reasonably satisfactory to counsel for Seller.

4.5    <u>General</u>.  At any time and from time to time after the Closing, at the request of one of the parties hereto and without additional consideration, the other party hereto shall execute and deliver such other documents and take such action as one of the parties may reasonably request to more effectively consummate the actions contemplated by this Agreement, provided the requested matter can be undertaken and achieved without material cost to the other party.

4.6    <u>Joint Documents</u>.  On the Closing Date, Purchaser and Seller shall exchange the following:

(A)    Any and all certificates, statements and declarations as may be required by federal, state, county or local law, regulation or ordinance including without limitation certificates, statements, and declarations regarding taxes assessed on or with respect to transfer of the Business, all of which such taxes, if any, shall be payable by Seller.

(B)    A closing statement by and between Seller and Purchaser reflecting Purchaser's payment of the net Purchase Price after accounting for the Deposit and Payment Amount and any prorations, payments, adjustments, and credits set forth on <u>Schedule 2.1</u>.

QB\66067564.6

4.7     Possession.  Possession of the Facilities shall be delivered to Purchaser on the Closing Date. All tangible Personal Property and all books, files, records, Contracts, leases, third party warranties, regulatory materials and other assets constituting intangible Personal Property shall be located at the Facilities on the Closing Date and possession thereof delivered to Purchaser on such date; provided that Seller shall have the right, at Seller's sole cost and expense, to review and make copies of all books and records delivered to Purchaser in accordance with Section 8.1.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE PARTIES

5.1     Representations and Warranties of Seller.  Subject to disclosures made in the disclosure schedules delivered by Seller to Purchaser concurrently with the execution of this Agreement (the "Disclosure Schedules"), Seller hereby represents and warrants to Purchaser as of the date of ~~this~~the Original Agreement and as of the Closing as follows:

(A)     Due Organization.  Seller is a limited liability company, duly organized and validly existing under the laws of the Commonwealth of Massachusetts.  Seller is duly qualified to do business and is in good standing in the Commonwealth of Massachusetts and in each jurisdiction where the operation of the Business requires such qualification.  Seller has the requisite limited liability company power and authority to enter into this Agreement and to perform its obligations hereunder.

(B)     Power and Authority; Enforceability; Consents.  Subject to the Sale Order, the execution, delivery and performance of this Agreement by Seller and all other agreements referenced in or ancillary hereto to which Seller is a party and the consummation of the transactions contemplated herein by Seller:

(i)     is within its company powers and are not in contravention of the terms of its certificate of organization, operating agreement or any amendments thereto and have been duly authorized by all appropriate company action.

(ii)     will not violate any judgment of any court or Governmental Entity applicable to Seller or the Assets.

(iii)     will not require the approval, consent or authorization of, waiver from, or declaration, filing or registration with, any other Person or Governmental Entity, except as set forth in Schedule 5.1(B)(iii).

(iv)     will neither conflict with nor result in any breach or contravention of any other Contract to which Seller is a party or by which it or the Assets is bound, except as set forth in Schedule 5.1(B)(iv).

(C)     Binding Agreement.  Subject to the Sale Order, this Agreement and all agreements to which Seller will become a party hereunder are and will constitute the valid and legally binding obligations of Seller, and are and will be enforceable against Seller in accordance with the respective terms hereof and thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

11

(D)    Assets.  Except as set forth in Schedule 5.1(D), the Assets constitute all of the assets, properties and rights necessary for the operation of the Business as it is currently conducted. Seller has good and valid title to, or a valid leasehold interest in or license to, the Assets, and upon entry of the Sale Order such Assets shall be free and clear of all Liens, except for Permitted Liens.

(E)    Financial Statements.  Schedule 5.1(E) sets forth true, complete and correct copies of (1) an unaudited balance sheet of the Business as of October 31, 2020 and (2) an unaudited income statement of the Business for the ten months ended October 31, 2020 (collectively, the "Financial Statements").  The Financial Statements (x) were prepared in good faith, (y) are based upon, and accurately reflect in all material respects, the books and records of Seller and the Business, and (z) fairly present, in all material respects, the financial position of the Business as of the dates thereof and the results of operations for the periods referred to therein, in each case in accordance with GAAP applied on a consistent basis throughout.

(F)    Leases.

(i)    True, correct, and complete copies of all of Seller's leases for the Facilities (including any amendments, extensions, renewals, guaranties, and other agreements with respect thereto) have been uploaded to the Data Room, and have been provided to Purchaser through Purchaser's access to the Data Room.  Neither Seller nor any other party to any of the Assumed Leases are in material default of its obligations under the Assumed Leases except to the extent set forth in Schedule 5.1(F)(i) in any manner that will not be cured prior to the Closing Date. No event has occurred that (with or without notice, lapse of time or both) would constitute a material breach or default by Seller or any other party under the Assumed Leases in any manner that will not be cured prior to the Closing Date. Each of the Assumed Leases is in full force and effect and constitutes a valid and legally binding obligation of Seller and each other party thereto, enforceable against Seller and, to Seller's Knowledge, each other party thereto, in each case in accordance with the express terms thereof.

(ii)    Except to the extent set forth in Schedule 5.1(F)(ii), Seller has performed all material obligations required to be performed by it under each of the Assumed Leases to which it is a party, and none of the Assumed Leases is currently subject to cancellation or any other material modification by the other party thereto or is presently subject to any penalty, right of set-off or other charge by the other party thereto for late performance or delivery in any manner that will not be cured prior to the Closing Date.

(iii)    Seller does not own any real property.

(iv)    Except as may be set forth in Schedule 5.1(F)(iv), the transactions contemplated by this Agreement do not require the consent of any other party to an Assumed Lease, will not result in a breach of or default under any Assumed Lease, or otherwise cause an Assumed Lease to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing in any manner that will not be cured prior to the Closing Date.

12

QB\66067564.6

(v)     Seller's occupancy, use and operation of each of the Facilities complies in all material respects with all applicable Laws, there are no material deficiencies or defects in the Facilities, and Seller has access to utilities in sufficient capacities for the operation of the Business at each of the Facilities in the ordinary course of business.

(vi)     To Seller's Knowledge, there are no pending or threatened appropriation, condemnation, eminent domain or like proceedings relating to the Facilities or the real property on which each of the Facilities is situated.

(vii)     The Facilities comprise all of the real property used by Seller in, or otherwise related to, the Business.

(G)     Material Contracts.  For the purposes herein, a "Material Contract" shall be defined as any Contract with a value of more than, or which provides for the payment to or by Seller of more than, $10,000 annually (a "Material Contract").  Except as set forth in Schedule 5.1(G), Seller is not a party to or bound by any Material Contract.

(H)     Enforceability and Performance under Assumed Contracts.  True, correct, and complete copies of all of the Assumed Contracts and the Material Contracts set forth or required to be set forth in Schedule 5.1(G) have been uploaded to the Data Room and have been provided to Purchaser through Purchaser's access to the Data Room.  Neither Seller nor any other party to any of the Assumed Contracts are in material default of its obligations under the Assumed Contracts except to the extent set forth in Schedule 5.1(H).  No event has occurred that (with or without notice, lapse of time or both) would constitute a material breach or default by Seller or any other party under the Assumed Contracts.  Each of the Assumed Contracts is in full force and effect and constitutes a valid and legally binding obligation of Seller and, to Seller's Knowledge, each other party thereto, enforceable against Seller and, to Seller's Knowledge, each other party thereto, in each case in accordance with the express terms thereof.

(I)     Employee Benefits.

(i)     Each "employee benefit plan" as defined in Section 3(3) of ERISA and each material bonus, deferred compensation, stock purchase, stock option, severance plan, salary continuation, vacation, paid-time-off, sick leave, fringe benefit, cafeteria, incentive, insurance, welfare or similar arrangement that is in each case sponsored or maintained Seller or to which Seller contributes or has any liability (each, an "Employee Benefit Plan") is listed in Schedule 5.1(I)(i).  No Employee Benefit Plan, and no party in interest to, disqualified person of, or fiduciary of, any Employee Benefit Plan, has engaged in any non-exempt "prohibited transaction" as defined in ERISA or the Code.

(ii)     Except as set forth in Schedule 5.1(I)(ii), neither Seller nor any affiliate of Seller as determined under Code Sections 414(b), (c), (m) or (o) ("ERISA Affiliate") or any of their respective predecessors maintains, contributes to, has any obligation to contribute to (or has any other liability, including contingent liability or current or potential withdrawal liability, with respect to) or has, ever, contributed to or been obligated to contribute to (1) any "multiemployer plan" (as that term is defined in Section 3(37) of ERISA), (2) any "employee pension benefit plan" (within the meaning of Section 302 of ERISA) that is subject to Section 412

13

QB\66067564.6

of the Code, Section 302 of ERISA or Title IV of ERISA, (3) any "multiple employer plan" (within the meaning of Section 413 of the Code), or (4) any "multiple employer welfare arrangement" (within the meaning of Section 3(40) of ERISA), in each case, whether or not terminated.

       (J)    <u>Employees</u>.

       (i)    Seller is and for the past three years has been in compliance in all material respects with all applicable Laws, contracts, policies, plans, and programs applicable to it respecting labor, employment and employment practices in the jurisdictions within which it operates, including, without limitation, all applicable Laws respecting hiring, terms and conditions of employment, health and safety, compensation, wages and hours (including the classification of independent contractors and exempt and non-exempt employees), immigration (including the verification of I-9s for all employees), employment discrimination, disability rights or benefits, equal opportunity, termination of employment, plant closures and layoffs (including the WARN Act), workers' compensation, labor relations, employee leave and sick pay, accommodation of employees, harassment, paid time off, use of background checks and reports, use of selection procedures and tests, the provision of required meal and rest breaks, affirmative action, child labor, workers compensation, labor relations, collective bargaining, unemployment insurance and other insurance coverage, and the payment of social security and other employment-related taxes. Seller has properly classified all current and former employees, directors, individual consultants, temporary employees, leased employees, or any agents for tax purposes and for participation in any Employee Benefit Plans, and complied in all material respects with all applicable Laws relating to the classification of employees and independent contractors and payment of wages, has not made deductions from the pay of exempt employees which might result in loss of exempt status, and has, within the time and in the manner prescribed by applicable Laws, withheld and paid over to the proper tax authority all amounts required to be so withheld and paid over under applicable Laws.

       (ii)    There are no material obligations relating to employment with respect to which Seller may have any liability, including but not limited to any accrued but unpaid compensation, wages, vacation, salaries, wage premiums, commissions, bonuses, fees, and other compensation or benefits to its current or former employees or independent contractors under applicable Laws, Contract or policy; or any fines, taxes, interest, or other penalties for any failure to pay or delinquency in paying such compensation. As of the date hereof, all compensation, including wages, commissions, bonuses, vacation and other paid time off, and other direct compensation for any service performed for the Business payable to current or former employees, independent contractors or consultants of Seller for services or work performed on or prior to the date hereof have been paid in full (or accrued in full). Seller is not subject to any pending claim for overdue overtime or other compensation due to any current or former employee or independent contractor and, no such claim has been threatened.

       (iii)    Seller is not a party to or bound by any collective bargaining agreement, project labor agreement, or other Contract, commitment, arrangement or bargaining relationship with any labor organization, trade organization, or other representative of any of the employees of Seller, and no employee of Seller is represented by a labor union or other labor organization and there is no such contract, commitment or arrangement presently being

14

negotiated by Seller.   There is no labor strike, work stoppage, lockout, grievance, labor arbitration, walkout, picket, slowdown, work stoppage, or other material labor dispute pending or threatened against or affecting the Business.  No labor union, organization, or other collective bargaining unit represents, claims to represent or is currently seeking to organize or represent the employees of the Business, and there have not been any union organizing activities or efforts among the employees of the Business within the past three years.  There is presently no union campaign being conducted to solicit cards from employees to authorize a union to request a National Labor Relations Board certification election, and no question concerning representation exists or has existed respecting such employees; and there is no unfair labor practice charge or complaint pending or threatened against Seller. No labor union, labor organization, or group of employees has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or threatened in writing to be brought or filed with the National Labor Relations Board or any other labor relations Governmental Entity. Seller has not committed any unfair labor practices.

(iv)    To Seller's Knowledge, no Business Employee is in material violation of any term of any employment agreement, nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, noncompetition agreement, restrictive covenant or other obligation:  (1) to Seller, or (2) with respect to any current employee or independent contractor of Business, to any third party with respect to such person's right to be employed or engaged by a Seller or to the knowledge or use of trade secrets or proprietary information.

(v)    Schedule 5.1(J)(v) sets forth a true, correct, and complete list of (1) all employees (including any employee who is on a leave of absence or on furlough status, as specified), employed or engaged by Seller (the "Business Employees") and (2) for each Business Employee, each such individual's location of employment, date of hire, classification as exempt or non-exempt (as applicable), W-2 compensation for 2019 (including bonus and incentive payments), year-to-date compensation for 2020 (including bonus and incentive payments), current hourly rate or annual base salary, and any annual bonus opportunity, job titles or offices, notice period, whether such individual is on leave or furlough status, and the reason for leave of absence or furlough status and the anticipated date of return to full service, if known.  Schedule 5.1(J)(v) also sets forth individuals classified as an independent contractor (excluding contingent workers engaged through a third-party temporary employment agency) in the past three years and for each individual identified as an independent contractor, each such individual's location, date of engagement, 1099 compensation for 2019, and year-to-date compensation for 2020.

(vi)    Seller is not a party to, or otherwise bound by, any consent decree with, or citation by, any Governmental Entity relating to employees or employment practices. No action, proceeding, claim, or complaint by or on behalf of any employee, prospective employee, former employee, current or former contractor, labor organization or other representative of the employees of Seller, is pending or, to Seller's Knowledge, threatened, which could bind or in any way affect Purchaser after Closing as the result of the transactions contemplated by this Agreement. None of Seller's employment practices or policies are currently being audited or investigated by any Governmental Entity.  With respect to the Business, there are no pending or, to Seller's Knowledge, threatened: (1) unfair labor practice charges or complaints before the National Labor Relations Board or any other Governmental Entity, (2) complaints, grievances or

QB\66067564.6

arbitrations arising out of any collective bargaining agreement or any other complaints, grievances or arbitration procedures; or (3) charges or complaints with respect to or relating to them before the Equal Employment Opportunity Commission or any other Governmental Entity responsible for the prevention of unlawful employment practices.

(K)    <u>Compliance with Law</u>.

(i)    Seller is currently in, and during the past three years has been in, compliance in all material respects with (1) all Laws applicable to it or its business, properties or assets (including, without limitation, all Laws concerning the privacy, security, safeguarding, collection, access, use, disclosure, maintenance, transmittal, and/or confidentiality of Personal Information or other health care data, including, as applicable, HIPAA, 42 C.F.R. Part 2, state data breach Laws, state health information privacy and security Laws, the Telephone Consumer Protection Act, the CAN-SPAM Act, and state consumer protection Laws), and (2) any orders of any Governmental Entity applicable to it or the Business. Seller is not under investigation by any Governmental Entity with respect to any violation of any Laws applicable to it or its business, properties or assets.

(ii)    In the past three years, Seller has not received any written notice, order, inquiry, investigation, complaint or other written communication by any Governmental Entity alleging any violation by it under any Laws applicable to it or its business, employees (in their capacity as such), properties or assets.

(iii)    No employee, including temporary employees, or independent contractors (whether an individual or entity) of the Business has been excluded from participating in any Federal Health Care Program and has not been and is not currently included on the OIG List of Excluded Individuals and Entities (LEIE), or the General Services Administration's Excluded Parties List System (EPLS) or System for Award Management (SAM), except as set forth in <u>Schedule 5.1(K)(iii)</u>. None of the officers, directors, agents or managing employees (as such term is defined in 42 U.S.C. §1320a-5(b)) of the Business has been excluded, suspended, or debarred from any Federal Health Care Program or been subject to sanction, charged or been convicted of a crime in connection with any Federal Health Care Program.

(iv)    There is no, and there has not been for the past three years any, actual, or threatened (in writing) breach, compromise, or security incident affecting Personal Information in the Business's possession or control that would, if confirmed, constitute a breach or security incident for which notification to individuals, organizations, contractual counterparties, media, credit reporting agencies, and/or Governmental Entities is required under any applicable Laws or under any Contracts to which Seller is a party.

(L)    <u>No Proceedings</u>.  Except as disclosed in <u>Schedule 5.1(L)(i)</u>, there are no Actions, administrative proceedings, or other legal actions of any kind pending or, to Seller's Knowledge, threatened, against Seller, or otherwise relating to or affecting the Business or the Assets or any portion thereof.  There are no Actions pending or, to Seller's Knowledge, threatened, seeking to restrain, prohibit, or obtain damages in connection with this Agreement or the transactions contemplated hereby.  Except as set forth in <u>Schedule 5.1(L)(ii)</u>, Seller is not subject to any settlement, award or order involving any Governmental Entity or other Person.

16

(M)   <u>Absence of Certain Changes</u>.  From October 31, 2020 to the date of this Agreement, (i) no change, development, circumstance, effect or event has occurred or arisen that, individually or in combination with any other change, development, circumstance, effect or event, has had or would reasonably be expected to have a Material Adverse Effect and (ii) the Business has been conducted in all material respects in the ordinary course of business.  Except as set forth in <u>Schedule 5.1(M)</u>, since October 31, 2020, Seller has not:

(i)     entered into, amended or terminated any Material Contract, entered into any other material transaction in excess of $100,000, changed in any significant respect any business practice (in anticipation of the transactions contemplated hereby or otherwise);

(ii)     sold, assigned, transferred, leased or licensed any of its material tangible assets, except in the ordinary course of business;

(iii)     sold, disposed of, assigned, licensed, sublicensed, covenanted not to sue with respect to, or otherwise transferred any Intellectual Property (other than non-exclusive licensing or sublicensing of Intellectual Property in the ordinary course of business), or abandoned or permitted to lapse or expire any Intellectual Property;

(iv)     made or granted any bonus or any compensation or salary increase to any former or current employee or group of former or current employees (except in the ordinary course of business);

(v)     implemented any facility closing or other layoff of employees that could implicate the WARN Act;

(vi)     suffered any material damage, destruction or other casualty loss with respect to material property owned by Seller or waived any rights of material value;

(vii)     delayed capital expenditures, repairs or maintenance;

(viii)     failed to maintain in full force and effect any insurance policy in effect, except for any policy replaced by a new or successor policy of substantially similar coverage;

(ix)     terminated, amended, failed to renew or preserve or failed to maintain in full force and effect any Permit; or

(x)     agreed, whether orally or in writing, to do any of the foregoing.

(N)   <u>Permits</u>.

(i)     Seller possesses all Permits necessary to operate the Business, or that are necessary for the lawful ownership of their properties and assets or operation of the Business, and <u>Schedule 5.1(N)(i)</u> sets forth a true, complete and correct list of such Permits. Except as set forth in <u>Schedule 5.1(N)(i)</u>, Seller is and for the past three years has been in material compliance with all such Permits, and all such Permits are in full force and effect.  There is not now pending or threatened in writing any action to revoke, cancel, rescind, modify or refuse to

17

renew any of such Permits.  During the past three years, Seller has not received written notice of any petition, objection or other pleading with any Governmental Entity alleging the failure to hold any of the foregoing or any violations in respect thereof.

(ii)     Except as set forth in Schedule 5.1(N)(ii), all individuals providing professional services for on behalf of the Business, hold, and maintain in good standing, all licenses, registrations, credentials, education and training required to perform such services in all jurisdictions where such services are performed on behalf of the Business.

(O)     Intellectual Property.

(i)     Schedule 5.1(O)(i) contains a true, complete and correct list of all registered Intellectual Property that relate to, or are used or held for use in connection with, the Business (the "Business Intellectual Property"). All material registration, maintenance and renewal fees due in connection with such Business Intellectual Property have been paid and all documents, recordations and certificates in connection with such Business Intellectual Property required to be filed have been filed with the relevant patent, copyright, trademark or other authorities for the purposes of prosecuting and maintaining such Business Intellectual Property and recording the Seller's ownership interests therein.

(ii)     Schedule 5.1(O)(ii) contains a complete and correct list of all agreements to which Seller is a party and under which: (1) Seller is granted a license to use any Intellectual Property owned by a third party the use of which is material to the Business (excluding any such agreement for commercially available software); and (2) Seller has granted to a third party a license to use any Business Intellectual Property.

(iii)     Except as set forth in Schedule 5.1(O)(iii), Seller owns the Intellectual Property, free and clear of all Liens (other than Permitted Liens), and Seller has a valid and enforceable written license to use all other material Intellectual Property used in connection with the Business, in each case free and clear of all Liens (other than Permitted Liens). The transactions contemplated by this Agreement and the consummation thereof will not impair any right, title or interest of Seller in or to any Business Intellectual Property.

(iv)     Except as set forth in Schedule 5.1(O)(iv), Seller has not received any written communication in the last three years alleging that Seller has infringed, misappropriated, or violated any Intellectual Property of any Person. To Seller's Knowledge, the Business, as currently provided or conducted by Seller, does not infringe, misappropriate or violate any Intellectual Property owned by any third party.  Except as set forth in Schedule 5.1(O)(iv), to Seller's Knowledge, no Person currently is infringing, misappropriating or violating any of the Business Intellectual Property.

(P)     Brokerage.  Except as set forth in Schedule 5.1(P), no agent, broker, Person or firm acting on behalf of Seller is, or shall be, entitled to any broker's fees, finder's fees or commissions from Seller in connection with this Agreement or any of the transactions contemplated hereby.

(Q)     Taxes.  Seller has timely filed all tax returns that were required to be filed (taking into account any applicable extension of time within which to file).  All such tax returns

18

were correct, true and complete in all material respects and were prepared in substantial compliance with all applicable Laws and regulations.  All taxes of Seller that are due and payable on or prior to the Closing Date have been paid on or prior to the Closing Date (whether or not shown on any tax return).  There are no Liens for taxes upon any of the Assets.

(R)    Payors.  Schedule 5.1(R) sets forth the top 10 payors for the year ended December 31, 2019 and for the ten-month period ended October 31, 2020 (each, a "Major Payor").  Except as set forth in Schedule 5.1(R), in the past 12 months, no Major Payor (i) has canceled, suspended or otherwise terminated its relationship with the Business, or (ii) has advised Seller of its intention to (1) cancel, suspend or otherwise terminate its relationship with the Business, or (2) materially and adversely change the terms upon which it pays for goods or services from, or provided by, the Business.

5.2    Representations and Warranties of Purchaser.  Purchaser hereby represents and warrants to Seller as follows:

(A)    Due Organization.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware.  Purchaser has the requisite limited liability company power and authority to enter into this Agreement, perform its obligations hereunder and to conduct its business or operations as now being conducted.

(B)    Power and Authority; Enforceability; Consents.  The execution, delivery and performance of this Agreement by Purchaser and all other agreements referenced in or ancillary hereto to which it is a party and the consummation of the transactions contemplated herein by Purchaser (except as would not have a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement):

(i)    are within its powers and are not in contravention of the terms of its articles of organization or any amendments thereto and have been duly authorized by all requisite limited liability company action.

(ii)    will neither conflict with nor result in any breach or contravention of, or the creation of any lien under, any indenture, agreement, lease, instrument or understanding to which Purchaser is a party or by which Purchaser is bound.

(iii)    will not violate any judgment of any court or Governmental Entity applicable to Purchaser.

(iv)    will not require the approval or consent of any other party or authority.

(C)    Binding Agreement.  This Agreement and all other agreements to which Purchaser will become a party hereunder are and will constitute the valid and legally binding obligations of Purchaser and are and will be enforceable against it in accordance with the respective terms hereof and thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

19

(D)    <u>Purchaser's Due Diligence</u>.  Purchaser acknowledges that it has inspected and/or evaluated the Assets, the Facilities, and the Business, has made its own independent analysis of this transaction, and has not relied upon and is not relying upon any information provided or representations made by Seller with respect to the Assets, the Facilities, or the Business, other than the Seller Representations, in deciding to pursue its acquisition of the Assets pursuant to this Agreement.

(E)    <u>Financing</u>.  Purchaser has or at the Closing will have the funds sufficient to pay the Purchase Price and perform its obligations under this Agreement.

**ARTICLE VI**
**COVENANTS PRIOR TO THE CLOSING**

6.1    <u>Seller Operations</u>.  Between the date of ~~this~~<u>the Original</u> Agreement and the earlier of the date of the termination of this Agreement and the Closing Date, Seller will operate the Business in the ordinary course of business and, without limiting the foregoing, will use its commercially reasonable efforts to:

(A)    take or cause to be taken all actions necessary and appropriate to consummate the transactions contemplated by this Agreement, including without limitation those necessary to enable Seller to make the deliveries set forth in <u>Section 4.3</u>.

(B)    keep in full force and effect present insurance policies or other comparable insurance.

(C)    continue to employ the employees listed on Schedule 6.1(C) (individually, a "<u>Key Employee</u>", and collectively, the "<u>Key Employees</u>").  For the purposes of this Section 6.1(C), "commercially reasonable efforts" shall mean that Seller shall (i) not terminate a Key Employee without cause, (ii) not encourage or facilitate a Key Employee to seek employment elsewhere, and (iii) promptly notify Buyer if Seller becomes aware that a Key Employee intends to terminate such Key Employee's employment and reasonably cooperate with Buyer to attempt to retain such Key Employee, unless Buyer otherwise directs in writing.

6.2    <u>Seller Negative Covenants</u>.  Between the date of ~~this~~<u>the Original</u> Agreement and the earlier of the date of the termination of this Agreement and the Closing Date, Seller will not, without the prior written consent of Purchaser or as set forth on <u>Schedule 6.2</u>, take, propose to take, or omit to take, directly or indirectly, any action that, if taken (or omitted to be taken) between October 31, 2020 and the date of ~~this~~<u>the Original</u> Agreement, would have required disclosure on <u>Schedule 5.1(M)</u>.

6.3    <u>Governmental Approvals</u>.

(A)    Upon Bankruptcy Court approval of this Agreement pursuant to <u>Section 6.4</u>, Purchaser shall use its commercially reasonable efforts to obtain as soon as reasonably possible at its own expense, and Seller shall use its commercially reasonable efforts to assist and cooperate with Purchaser and its representatives and counsel in so obtaining, all governmental consents, approvals, certificates of exemption and licenses which are necessary or appropriate, and

20

in the preparation of any document or other material which may be required by any Governmental Entity as a condition precedent to or result of the transactions contemplated herein.

(B)    Without limiting Section 6.3(A), upon Bankruptcy Court approval of this Agreement pursuant to Section 6.4, the parties shall make, or cause to be made, all necessary filings with Governmental Entities as set forth on Schedule 4.2. To the extent that such filings require information relating to Seller or known only to Seller, Seller shall promptly provide timely assistance to Purchaser in completing such filings.

6.4    Bankruptcy Court Approval. Seller's entry into this Agreement will not become effective and binding on Seller until the Bankruptcy Court has entered an appropriate order approving Seller's entry into this Agreement and the sale of the Business and the Assets pursuant to this Agreement, which order shall authorize, approve and provide for the sale of the Assets to Purchaser free and clear of all Liens (other than Permitted Liens) and shall otherwise be in form and substance reasonably agreeable to Seller, Purchaser and Capital One, National Association (successor by merger to Healthcare Financial Solutions, LLC), as successor to General Electric Capital Corporation, as Agent ("Agent") under that certain Credit Agreement, dated as of July 16, 2015 (as amended, amended and restated, supplemented or otherwise modified from time to time), among, without limitation, Agent and Seller (in the form entered by the Bankruptcy Court, the "Sale Order"). ~~Upon execution and delivery of this Agreement by both Seller and Purchaser, and upon Seller's commencement of the Bankruptcy Case, Seller shall, subject to Section 6.5, promptly undertake, to obtain entry of the Bid Procedures Order (as hereinafter defined) and the Sale Order pursuant to one or more customary and appropriate sale and sale procedures motions (singly or together, the "Sale Motion"). From and after the date hereof~~Seller shall pursue entry of the Sale Order in keeping with the Seller's motion for such relief filed at joint Docket No. 10. From and after the date of the Original Agreement until the Closing Date, Seller shall deliver to Purchaser and Agent copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers that are filed by Seller in the Bankruptcy Case that relate, in whole or in part, to this Agreement or Purchaser.

6.5    Alternative Transaction.

~~(A)    For purposes of this Agreement:~~

~~(i)    The term "Alternative Transaction" means one or more agreements to sell, transfer, or otherwise dispose of all or any portion of the Assets in a transaction or series of transactions with one or more Persons, other than Purchaser.~~

~~(ii)    The term "Break-Up Fee" means the sum of Three Hundred Fifty Thousand Dollars ($350,000.00).~~

~~(B)    This Agreement is subject to approval by the Bankruptcy Court. Purchaser acknowledges that, in connection with obtaining such approval, Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or best price for the Assets, including giving notice thereof to Seller's creditors and other interested parties, providing information about the Assets to prospective bidders, entertaining higher or better qualified offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Assets,~~

21

conducting an auction, all in accordance with an order of the Bankruptcy Court governing the procedures for the solicitation of competing offers which shall be in form and substance reasonably satisfactory to Seller, Purchaser and Agent (in the form entered by the Court, the "Bid Procedures Order").  In connection with the solicitation of competing bids, from the date hereof (and any prior time) and until Seller's designation of a winning bid at the conclusion of any competitive bidding process described in the Bid Procedures Order, Seller is permitted to cause its representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser) in connection with any sale or other disposition of all or any part of the Business and the Assets, alone or in connection with the sale or other disposition of any other asset of Seller; provided, however, that such solicitation must be consistent with the requirements of the Bid Procedures Order.  In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Business and the Assets and perform any and all other acts related thereto which are required by any order of the Bankruptcy Court, the Bankruptcy Code, applicable procedural rules, or other applicable law, including, without limitation, supplying information relating to the Business and the Assets to prospective purchasers.

(C)    Seller shall use commercially reasonable efforts to promptly provide, or identify and make available to Purchaser, any non-public information concerning Seller, the Assets or the Business provided to any other Person after the date hereof which was not previously provided to Purchaser.

(D)    Following the date of the entry of the Sale Order approving this Agreement and until the earlier of (i) the Closing and (ii) such time as this Agreement has been terminated in accordance with its express terms, and provided that Purchaser is not in material default of its obligations under this Agreement, Seller shall not, nor shall it authorize or permit any other Person to, (1) directly or indirectly solicit, initiate or encourage the submission of any offer or proposal concerning any Alternative Transaction not authorized by the Sale Order or (2) directly or indirectly participate in any discussions or negotiations regarding, or furnish to any person any information with respect to, or take any other action to facilitate the making of, any proposal or expression of interest that constitutes or is reasonably likely to lead to an Alternative Transaction not authorized by the Sale Order.  The term "Alternative Transaction" means one or more agreements to sell, transfer, or otherwise dispose of all or any portion of the Assets in a transaction or series of transactions with one or more Persons, other than Purchaser, who have submitted a Qualified Bid (as such term is defined in the Sale Procedures Order) in connection with the Auction.

6.6    Assumed Leases and Assumed Contracts; Cure Amounts.

(A)    Seller shall take all commercially reasonable actions required to assume the Assumed Leases and Assumed Contracts and to assign them to Purchaser, including taking all actions (i) reasonably requested by Purchaser to facilitate any negotiations with the counterparties to such Assumed Leases and Assumed Contracts and (ii) to obtain an order (which may be the Sale Order) containing a finding that the proposed assumption and assignment of the Assumed Leases and Assumed Contracts to Purchaser satisfies all applicable requirements of Section 365 of the

22

Bankruptcy Code.  In connection with the foregoing and as the case may be, Purchaser covenants to provide adequate assurance of performance and represent and warrant that it is capable of providing adequate assurance of future performance.

(B)   Schedules 1.1(A) and 1.1(D)(iv) shall each include Seller's good-faith estimate of the Cure Costs (if any) associated with each Assumed Lease and Assumed Contract. At the Closing, upon Purchaser's final designation of the Assumed Leases and Assumed Contracts to be assigned, (i) Seller pursuant to the Assignment and Assumption Agreement shall assume and assign to Purchaser each of the Assumed Leases and Assumed Contracts that is capable of being assumed and assigned and pay promptly any Cure Costs associated therewith, and (ii) Purchaser pursuant to the Assignment and Assumption Agreement shall assume and perform and discharge the Assumed Obligations under the Assumed Leases and Assumed Contracts; provided that Purchaser and Seller shall cooperate and use best commercial efforts to minimize any and all Cure Costs; provided, further, that nothing in this Section 6.6(B) shall require Purchaser to increase the Purchase Price or pay any Cure Cost or pay any other amounts or agree to be subject to any liabilities or obligations not in the ordinary course of business or that are not required pursuant to the terms of the Assumed Leases or Assumed Contracts following the Closing and Purchaser's assumption of such Assumed Leases or Assumed Contracts.

(C)   Purchaser may request, in its reasonable business judgment, certain modifications and amendments to any lease or contract of a Seller as a condition to such lease or contract becoming an Assumed Lease or Assumed Contract, as applicable, and Seller shall use commercially reasonable efforts to obtain such modifications or amendments. If Seller is unable to obtain such modifications or amendments, Purchaser may, in its sole discretion, designate the relevant lease or contract as an Excluded Asset.

(D)   If, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, the consent of the non-Seller party to any Assumed Lease or Assumed Contract is required but not obtained, Seller shall, at Purchaser's sole cost and expense, cooperate with Purchaser in any reasonable arrangement proposed by Purchaser, including Purchaser's provision of credit support, designed to provide Purchaser the benefits and obligations of or under any such Assumed Lease or Assumed Contract; provided, however, that nothing in this Section 6.6 shall (i) require Seller to make any expenditure or incur any obligation on its own or on Purchaser's behalf or (ii) prohibit Seller from ceasing operations or winding up its affairs following the Closing.  Any assignment to Purchaser of the Assumed Leases and the Assumed Contracts that, notwithstanding the Sale Order (or other Bankruptcy Court order approving the assumption and assignment of such lease or contract), requires the consent of any third party for such assignment to be effective shall be made subject to such consent being obtained.  If Purchaser determines that such consent cannot be obtained on terms reasonably satisfactory to Purchaser within 30 days after the Closing, Purchaser may on notice to Seller reclassify each such Assumed Lease or Assumed Contract as an Excluded Asset.

6.7   Closing Conditions.  Between the date of ~~this~~the Original Agreement and the earlier of the termination of this Agreement and the Closing Date, Seller and Purchaser will use their respective commercially reasonable efforts to cause the conditions specified in this Agreement over which they have control to be satisfied as soon as reasonably practicable, but in all events before the Closing Date.

23

6.8     Tax Returns. All income, sales, franchise and payroll tax returns and reports required by law to be filed by Seller prior to the Closing will be timely filed (subject to Seller's right to timely extend the filing thereof) and will accurately reflect the tax position of Seller, and all taxes respectively due under such tax returns will be paid by Seller.  Purchaser is not assuming under this Agreement any (i) tax liabilities owed by Seller or any other tax liabilities as a result of the operation of the Business prior to the Closing Date, (ii) any liability for taxes deferred by Seller under IRS Notice 2020-65, or (iii) liability for any taxes deferred under the CARES Act.

6.9     Transfer Taxes.  All transfer, documentary, sales, use, stamp, registration and other substantially similar taxes (including any real property transfer or similar tax) incurred in connection with this Agreement and the consummation of the transactions contemplated hereby (collectively, "Transfer Taxes"), if any, and that are not exempt under Section 1146(a) of the Bankruptcy Code, shall be borne 100% by the Seller and shall be paid by Seller when due.  Seller will, at the Sellers' own expense, timely file all necessary tax returns and other documentation with respect to all such Transfer Taxes that are required by applicable Law.

6.10     Reporting Requirements.  Purchaser and the Seller agree to utilize, and to cause their respective affiliates to utilize, any permissible method set forth in IRS Rev. Proc. 2004-53 with respect to wage reporting as determined by Purchaser.

6.11     ~~Bid Procedures Order.  The Bid Procedures Order shall be in form and substance satisfactory to Seller, Purchaser and Agent.  The Bid Procedures Order shall, without limitation:~~ Intentionally Omitted.

~~(A)     set dates for (i) the hearing on entry of the Sale Order; (ii) the deadline for the filing of objections to entry of the Sale Order, and (iii) an auction sale of the Assets (the "Auction");~~

~~(B)     define the components of a qualified bid for the Assets (a "Qualified Bid"); provided that only bidders who have submitted a Qualified Bid (each a "Qualified Bidder") or who are otherwise qualified and identified by Seller pursuant to the Bid Procedures Order may participate at the Auction, and provide that this Agreement constitutes a Qualified Bid and that Purchaser is a Qualified Bidder who may, but is not required to, bid at the Auction;~~

~~(C)     (i) set a deadline for the submission of bids for the Assets that is no later than 14 days after the entry of the Bid Procedures Order and (ii) provide that, if there are no Qualified Bids other than this Agreement submitted by such deadline, Seller shall seek approval of a sale of the Assets to Purchaser;~~

~~(D)     provide that a Qualified Bid must (i) be in writing; (ii) be for substantially all of the Assets; (iii) provide for total consideration of at least Seven Million Nine Hundred Fifty Thousand Dollars ($7,950,000.00); (iv) include an executed asset purchase agreement that uses this Agreement as a form and is accompanied by a redlined or blacklined version of this Agreement showing all changes made to this Agreement; (v) not contain any financing or due diligence contingencies, and (vi) be accompanied by an earnest money deposit in immediately available funds of no less than the Deposit provided by Purchaser;~~

(E)    provide that (i) the Seller shall designate the highest or best Qualified Bid received by Seller as the starting bid at the Auction, and (ii) each successive higher bid for the Assets made at the Auction must be in an amount at least One Hundred Thousand Dollars ($100,000.00) more than the immediately preceding bid(s);

(F)    approve the payment of the Break-Up Fee from the proceeds received by Seller upon the closing of an Alternative Transaction as an actual and necessary cost of preserving the Seller's bankruptcy estates that is entitled to administrative priority under Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code; and

(G)    approve the assumption of this Agreement by Seller pursuant to Section 365 of the Bankruptcy Code, provided that Purchaser's remedies arising from any default by Seller shall be limited to those set forth in Section 9.15 of this Agreement, including, for the avoidance of doubt, the payment of the Break-Up Fee to Purchaser.

6.12    Sale Order.  The Sale Order shall be in form and substance satisfactory to Purchaser, Seller and Agent.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code; (y) including a determination in the Sale Order that Purchaser has not engaged in any conduct that would result in avoidance of the transactions contemplated by this Agreement under Section 363(n) of the Bankruptcy Code, and (z) establishing adequate assurance of future performance in connection with the Assumed Leases and Assumed Contracts within the meaning of Section 365 of the Bankruptcy Code.  The Sale Order shall, without limitation:

(A)    approve, pursuant to Sections 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement; (ii) the sale of the Assets to Purchaser on the terms set forth herein and free and clear of all Liens, claims, and interests (other than Permitted Liens), and (iii) the performance by Seller of its obligations under this Agreement;

(B)    find that Purchaser is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code;

(C)    find that Purchaser and Seller have engaged in no conduct that would result in the avoidance of the transactions contemplated under this Agreement pursuant to Section 363(n) of the Bankruptcy Code;

(D)    find that Purchaser is not a successor to Seller and contain substantially the language set forth in Section 9.18 of this Agreement; and

(E)    find that Purchaser shall have no liability for any obligation of Seller that is not an Assumed Obligation.

6.13    Client Records.  Following the Closing, Seller shall refrain from the modification or destruction of Client Records until Purchaser confirms to Seller that the Client Records function

in a production environment. Following the Closing, (i) Purchaser shall maintain the Client Records in such a manner as to protect their integrity, ensure their confidentiality and proper use, and ensure their accessibility and availability to Seller and Seller's clients or their authorized representatives as required by Law, and (ii) Purchaser shall make the Client Records available for inspection or copying, or both, to Seller for billing purposes or to respond to or defend any malpractice claim or third-party audit or investigation, each as permitted by applicable Law.

## ARTICLE VII
## CONDITIONS PRECEDENT TO CLOSING

7.1     <u>Conditions Precedent to Seller's Obligations</u>.  Notwithstanding anything herein to the contrary, the obligations of Seller to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Seller at or prior to Closing:

(A)     (i) The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects (except that the representations and warranties that are qualified as to "materiality" shall be true and correct in all respects without qualifications) when made and as of the Closing Date as though such representations and warranties had been made on and as of such Closing Date; (ii) each and all of the terms, covenants and conditions of this Agreement to be complied with or performed by Purchaser on or before the Closing Date pursuant to the terms hereof shall have been materially complied with and performed; and (iii) Purchaser shall deliver to Seller a certification to the foregoing effect.

(B)     Purchaser shall have, at or prior to the Closing, delivered to Seller the documents required to be delivered by it pursuant to <u>Section 4.4</u>.

(C)     The Bankruptcy Court shall have entered the Sale Order (in form and substance acceptable to Purchaser), which shall have become final and non-appealable.

7.2     <u>Conditions Precedent to Purchaser's Obligations</u>.  Notwithstanding anything herein to the contrary, the obligations of Purchaser to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Purchaser at or prior to Closing:

(A)     (i) the Fundamental Representations shall be true and correct in all respects when made and as of the Closing Date, as though such Fundamental Representations had been made on and as of the Closing Date (except for those Fundamental Representations that address matters only as of a particular date, which shall have been true and correct as of such particular date); (ii) the representations and warranties of Seller contained in this Agreement (other than the Fundamental Representations) shall be true and correct in all respects when made and as of the Closing Date, as though such representations and warranties had been made on and as of such Closing Date (except for those representations and warranties that address matters only as of a particular date, which shall have been true as of such particular date) disregarding in each case any "materiality" or similar qualifier (except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect); (iii) each and all of the terms, covenants and conditions of this Agreement to be complied with or performed by Seller on or

QB\66067564.6

before the Closing Date pursuant to the terms hereof shall have been materially complied with and performed; and (iv) Seller shall deliver to Purchaser a certification to the foregoing effect.

(B)    During the period from the date of ~~this~~the Original Agreement through the Closing Date, no Material Adverse Effect shall have occurred.

(C)    On or prior to the Closing Date, Purchaser shall have obtained documentation or other evidence reasonably satisfactory to Purchaser that Purchaser has:

(i)    received written confirmation from all applicable licensure agencies that upon Closing all licenses required by law to operate the Business as currently operated will be transferred to, or issued or reissued in the name of, Purchaser; and

(ii)    obtained reasonable assurances that insurance provider certification of the Facilities for its operation by Purchaser will be effective as of Closing and that Purchaser may participate in and receive reimbursement from such programs effective as of Closing.

(D)    No Action before a court or any other Governmental Entity shall have been instituted seeking to restrain or prohibit the transactions herein contemplated.

(E)    All consents, approvals, permits, waivers and estoppels of third parties that are listed on Schedule 7.2(E) shall have been obtained on terms reasonably satisfactory to Purchaser.

(F)    Seller shall have, at or prior to the Closing, delivered to Purchaser the documents required to be delivered by it pursuant to Section 4.3.

(G)    The Bankruptcy Court shall have entered the Sale Order, which shall have become final and non-appealable.

**ARTICLE VIII**
**ADDITIONAL AGREEMENTS**

8.1    <u>Books and Records</u>.  For purposes of this Agreement, the term "<u>Retention Period</u>" shall mean the period ending six years after the Closing.  Until the conclusion of the Retention Period, (A) Purchaser will maintain all books and records of Seller constituting a part of the Assets which are delivered to Purchaser at Closing and which relate to the pre-Closing Business in a manner reasonably consistent with Purchaser's record retention policies or practices and (B) subject to applicable Law and solely as reasonably necessary in connection with the preparation and filing of tax returns by Seller or other proper purpose including the administration of the Bankruptcy Case, upon reasonable advance written notice from Seller to Purchaser, afford Seller reasonable access to such records during normal business hours; provided, that the foregoing shall not require Purchaser or any of its Affiliates (i) to provide access to any books, records or other information to the extent such books, records or other information do not pertain to the Business (and Purchaser shall be entitled to withhold access to or redact any portion of such books and records or other information that does not pertain to the Business), (ii) to permit any inspection, or to disclose any information, that in the reasonable judgment of Purchaser would violate applicable

27

Law, fiduciary duty, or binding agreement entered into prior to the Closing Date, or (iii) to take any action that would cause unreasonable disruption to the business of Purchaser or the Business.

8.2    Employee Related Matters.

(A)    Transferred Employees.    As of the Closing Date, Purchaser shall offer employment to only those employees of the Business as Purchaser shall determine in its sole discretion and such offers of employment shall contain terms and conditions of employment that Purchaser shall determine in its sole discretion. Seller shall make available to Purchaser a correct and complete list of all the current employees of the Business and such employee information as Purchaser reasonably deems necessary for Purchaser to complete its new employee onboarding processes (all in a form reasonably acceptable to Purchaser) as of 10 Business Days prior to the Closing Date, and Purchaser shall provide Seller with a list of the Business's employees to whom Purchaser intends to offer employment at least five days prior to the Closing Date.  On the Closing Date, Seller shall take all steps necessary to terminate the employment of each employee of the Seller who is offered employment by Purchaser as set forth in the immediately preceding sentence. The employees of the Seller who accept Purchaser's offer of employment and who become employed by Purchaser shall be referred to herein as "Transferred Employees." Nothing in this Agreement shall confer upon any Transferred Employee any right with respect to continued employment with Purchaser, nor shall anything herein limit or interfere with Purchaser's right to terminate the employment of any Transferred Employee at any time (subject to applicable Law), with or without cause or notice, or restrict Purchaser in the exercise of independent business judgment in modifying any terms or conditions of employment of the Transferred Employees on and after the Closing Date.

(B)    Pre-Closing Obligations to Transferred Employees. Subject to Section 2.5 herein, Seller shall be responsible for all liabilities, obligations and commitments relating to Seller's employment of the Transferred Employees, including any severance compensation that may be owed by Seller to any Transferred Employee as a result of this transactions contemplated by this Agreement in accordance with the applicable severance agreement, and bonus payments payable to any Transferred Employees in accordance with applicable bonus arrangements entered into prior to the Closing Date (collectively, the "Transferred Employee Expenses").

(C)    Employee Information. Seller shall use commercially reasonable efforts to provide promptly to Purchaser, at Purchaser's request, any information or copies of personnel records (including addresses, dates of birth, date of hire and dependent information) relating to the Transferred Employees or relating to the service of Transferred Employees with Seller (and predecessors of Seller, as applicable) prior to the Closing Date; provided that Purchaser shall not request any information, or use any disclosed information in any manner that may violate applicable Laws, including but not limited to salary history, equal pay, discrimination and leave laws.  Seller and Purchaser shall each cooperate with the other and shall provide to the other such documentation, information and assistance as is reasonably necessary to effect the provisions of this Section 8.2.

28

**ARTICLE IX**
**MISCELLANEOUS**

9.1     <u>Exhibits and Schedules and Other Instruments</u>.  Each Exhibit and Schedule to this Agreement shall be considered a part hereof as if set forth herein in full.  Any disclosure made in a Disclosure Schedule to this Agreement shall be deemed a disclosure for all purposes under this Agreement to the extent that the relevance of such disclosure is reasonably apparent from the text of such disclosure in the Disclosure Schedules.

9.2     <u>Additional Assurances</u>.  The provisions of this Agreement shall be self-operative and shall not require further agreement by the parties except as may be herein specifically provided to the contrary; provided, however, at the reasonable request of a party, the other party shall execute such additional instruments and take such additional actions as the requesting party may deem necessary to effectuate this Agreement.  Seller shall, at any time and from time to time at and after the Closing, upon the reasonable request of Purchaser and at Purchaser's sole expense, take any and all steps necessary to place Purchaser in possession and operating control of the Assets to be transferred hereunder and will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may reasonably be required or requested to more effectively transfer and confirm to Purchaser or to its successors or assigns, or to reduce to possession, any or all of the Assets and to carry out the purposes and intent of this Agreement, provided however, that Purchaser shall bear all costs associated with such acts.

9.3     <u>Choice of Law</u>.

(A)     The parties agree that this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to principles of conflicts of laws, but subject as necessary or appropriate to the Bankruptcy Code.

(B)     The Bankruptcy Court will have jurisdiction over any and all disputes between or among the parties, whether at law or in equity, arising out of or relating to this Agreement; provided, however, that if the Bankruptcy Court is unwilling or unable to hear any such dispute, each of the parties submits to the exclusive jurisdiction of the United States District Court for the District of Delaware and of any Delaware State Court in any Action arising out of or relating to this Agreement or the transactions contemplated herein or therein and agrees that all claims in respect of such Action may be heard and determined in any such court.  Each of the parties waives any defense of inconvenient forum to the maintenance of any Action so brought and waives any bond, surety or other security that might be required of any other party with respect thereto.

(C)     Each of the parties hereby waives, to the fullest extent permitted by Law, any right to trial by jury of any claim, demand, Action, or cause of action (i) arising under this Agreement or (ii) in any way connected with or related or incidental to the dealings of the parties in respect of this Agreement or any of the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity, or otherwise.

QB\66067564.6

9.4     Benefit/Assignment.  Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors and assigns; provided, however, that no party may assign this Agreement without the prior written consent of the other party and any such attempted assignment shall be null and void.  This Agreement is intended solely for the benefit of the parties hereto and is not intended to, and shall not, create any enforceable third party beneficiary rights. Notwithstanding the foregoing:

(A)     Purchaser may, without the written consent of Seller, assign, in whole or in part, its rights and obligations pursuant to this Agreement to one or more of its Affiliates, provided that Purchaser will nonetheless remain liable for all of Purchaser's obligations hereunder;

(B)     Purchaser may, without the written consent of Seller, collaterally assign its rights under this Agreement for security purposes to any lender providing financing to Purchaser or any of its Affiliates, and any such lender may exercise all of the rights and remedies of Purchaser hereunder; and

(C)     Following the Closing, Purchaser may, without the written consent of Seller, assign its rights under this Agreement, in whole or in part, to any subsequent third party purchaser of Purchaser or all or substantially all of its assets (whether such sale is structured as a sale of stock, a sale of assets, a merger, or otherwise).

Notwithstanding anything to the contrary in this Agreement, the Agent shall be a third party beneficiary of all provisions of this Agreement that expressly relate to the Agent.

9.5     Cost of Transactions.  Whether or not the transactions contemplated hereby shall be consummated, the parties agree as follows: except as otherwise expressly provided in this Agreement (i) Seller will pay the fees, expenses, and disbursements of Seller and its agents, representatives, accountants, and counsel incurred in connection with the subject matter hereof and any amendments hereto, and (ii) Purchaser shall pay the fees, expenses and disbursements of Purchaser and its agents, representatives, accountants and counsel incurred in connection with the subject matter hereof and any amendments hereto.

9.6     Confidentiality.  Notwithstanding anything to the contrary set forth herein, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms until the Closing, at which time it shall terminate and be of no further force or effect.  From and after the Closing, Seller shall, and shall cause its Affiliates to, keep confidential and not use any written, oral, or other information relating to the Business or the Assets obtained by virtue of Seller's ownership of the Business and the Assets prior to the Closing ("Confidential Information"), except (i) to the extent disclosure is required by applicable Law (in which case, unless prohibited by Law, the disclosing party shall promptly notify the other party in writing of the same, and such disclosing party shall reasonably cooperate with the non-disclosing party (at the disclosing party's sole cost and expense) to preserve the confidentiality of such information consistent with applicable Law), (ii) to the extent such information has been made public through no fault of the applicable party, and (iii) each of Purchaser and Seller may disclose such information to such Person's equityholders or Affiliates, and their respective representatives and financing sources (provided that such equityholders, Affiliates, representatives or financing sources are instructed to

30

keep such Confidential Information confidential, and Purchaser and/or Seller (as applicable) shall be responsible for any breach of this <u>Section 9.6</u> by their respective equityholders, Affiliates, representatives or financing sources as if they were a party hereto).

9.7   <u>Public Announcements</u>.  Seller and Purchaser mutually agree that no party hereto shall release, publish or otherwise make available to the public in any manner whatsoever any information or announcement regarding the transactions herein contemplated without the prior written consent of the other party, except for information and filings reasonably necessary to obtain Bankruptcy Court approval of this Agreement or required by any Governmental Entity, or by Purchaser or its Affiliates after the Closing if made in the ordinary course.

9.8   <u>Waiver of Breach</u>.  The waiver by any party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or any other provision hereof.

9.9   <u>Notice</u>.  Any notice, demand or communication required, permitted or desired to be given hereunder shall be in writing and shall be delivered in person, by electronic mail (e-mail), by overnight delivery service such as Federal Express or Express Mail, or by certified mail, return receipt requested, with postage prepaid, to the parties at the following addresses (or such other or further addresses as the parties may hereafter designate by written notice):

(a)   <u>If to Seller</u>:

Futures Behavior Therapy Center, LLC
c/o Community Intervention Services
Attention:  Andrew R. Calkins, CEO
200 Friberg Parkway, Suite 2000
Westborough, MA 01581
E-mail:  acalkins@communityinterventionservices.com

With a copy to (which shall not constitute notice):
Casner & Edwards, LLP
Attention:  Michael J. Goldberg, Esq.
303 Congress Street, #201
Boston, MA 02210
E-mail:  Goldberg@casneredwards.com

(b)   <u>If to Purchaser</u>:

FBTC Transitional Sub, LLC
c/o National Mentor Holdings, LLC
Attention: Nate Lewis, VP, Mergers and Acquisitions; Gina Martin, Chief Legal Officer
313 Congress Street, 5th Floor
Boston, MA 02210
Email: Nate.Lewis@TheMentorNetwork.com;
     Gina.Martin@TheMentorNetwork.com

31

With a copy to (which shall not constitute notice):
Quarles & Brady LLP
Attention: Ryan P. Haas
411 E. Wisconsin Avenue, Suite 2400
Milwaukee, WI 53202
E-mail: ryan.haas@quarles.com

(c)    If to Escrow Agent:

Casner & Edwards, LLP
Attention:  Michael J. Goldberg, Esq.
303 Congress Street, #201
Boston, MA 02210
E-mail:  Goldberg@casneredwards.com

All notices given in accordance with the foregoing shall be deemed to have been duly given and to be effective when delivered and received.

9.10    Interpretation

(A)    Whenever the context of this Agreement requires, the gender of all words herein shall include the masculine, feminine and neuter, and the number of all words herein shall include the singular and plural.

(B)    The words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(C)    Wherever the word "include," "includes," or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation."

(D)    The word "or" shall be inclusive and not exclusive.

(E)    Each reference herein to "days" shall be to calendar days unless "Business Days" are otherwise specified.

(F)    Each reference herein to any Contract shall be to such Contract as amended, supplemented, waived or otherwise modified from time to time.

(G)    Each reference herein to a Law is to such Law as it may be amended from time to time.

(H)    The phrase "made available to Purchaser" and phrases of similar import when used in this Agreement will mean uploaded to the Data Room on or prior to the date that is one Business Day prior to the date ~~hereof~~ of the Original Agreement (and remains available to Purchaser therein through the Closing); and

32

QB\66067564.6

(I)    The phrase "ordinary course of business" and phrases of similar import when used in this Agreement will mean the ordinary course of business consistent with past practice.

9.11    <u>Divisions and Headings</u>.  The divisions of this Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

9.12    <u>Entire Agreement</u>.  This Agreement, together with all other agreements and documents to be delivered hereunder, constitutes the entire agreement of Seller and Purchaser and supersedes all prior agreements and understandings, both oral and written, between them concerning the subject matter hereof.  This Agreement amends and restates the Original Agreement in its entirety.

9.13    <u>Counterparts</u>.  This Agreement may be executed in several counterparts by one or more of the undersigned and all such counterparts so executed shall together be deemed and constitute one final agreement, as if one document had been signed by all parties hereto; and each such counterpart shall be deemed an original, binding the parties subscribed hereto and multiple signature pages affixed to a single copy of this Agreement shall be deemed to be a fully executed original Agreement. Signatures delivered by facsimile or by e-mail in PDF format shall be deemed to be effective as original signatures.

9.14    <u>Proration</u>.  The operation of the Business and the income and normal operating expenses attributable thereto through the date preceding the Closing Date shall be for the account of Seller and thereafter for the account of Purchaser, and, if any income or expense is properly allocable or credited, then it shall be allocated, charged or prorated accordingly.  Expenses for goods or services received both before and after the Closing Date, such as power and utilities charges and rents and similar prepaid and deferred items shall be prorated between Seller and Purchaser as of the Closing Date in accordance with GAAP.  All special assessments and similar charges or Liens imposed against the Assets in respect of any period of time through the Closing Date, whether payable in installments or otherwise, shall be the responsibility of Seller, and amounts payable with respect to such special assessments, charges or liens in respect of any period of time after the Closing Date shall be the responsibility of Purchaser, and such charges shall be adjusted as required hereunder.  To the extent that any of the foregoing prorations and adjustments cannot be determined as of the Closing Date, Purchaser and Seller shall conduct a final accounting and make any further payments, as required on a date mutually agreed upon, within 90 days after the Closing.

9.15    <u>Termination of Agreement</u>.

(A)    <u>Termination</u>.  This Agreement may be terminated prior to Closing:

(i)    by the mutual written consent of Seller and Purchaser;

(ii)    as provided in <u>Sections 9.15(B)</u> and <u>(C)</u>;

(iii)    by Seller or Purchaser upon the closing of an Alternative Transaction;

33

QB\66067564.6

(iv)     by Purchaser if (a) any person files a motion seeking to have the Bankruptcy Court enter an Order (1) dismissing the Bankruptcy Case or either one of them; (2) converting the Bankruptcy Case or either one of them from Chapter 11 to Chapter 7 of the Bankruptcy Code; (3) appointing a trustee in the Bankruptcy Case or either one of them; and/or (4) appointing in the Bankruptcy Case or in either of them a responsible officer or an examiner with enlarged powers relating to the operation of the Business (beyond those powers set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), or (b) an order granting any of the relief described in the preceding clause (iii)(a) is entered for any reason and is not vacated within 14 days after entry thereof;

(v)     ~~by written notice from the Purchaser, if the Petition Date has not occurred on or before the date this is seven days after the date of this Agreement as set forth in the preamble to this Agreement;~~ Intentionally omitted;

(vi)     ~~by written notice from Purchaser, if (a) the Bid Procedures Order shall not have been approved by the Bankruptcy Court by the close of business on the date that is 25 days after the Petition Date, or (b) following its entry, the Bid Procedures Order shall fail to be in full force and effect or shall have been stayed, reversed, modified, supplemented or amended in any respect without the prior written consent of Purchaser;~~ Intentionally omitted;

(vii)     by written notice from Purchaser if (a) the Bankruptcy Court has not held a hearing on the Sale Motion on or prior to the first Business Day after the date that is 120 days after the Petition Date; (b) the Bankruptcy Court has not entered the Sale Order on or prior to the first Business Day after the date that is 122 days following the Petition Date; (c) the Sale Order shall not have become final and non-appealable on the 15th day after its entry; or (d) following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed, vacated, reversed, modified, supplemented or amended in any respect without the prior written consent of Purchaser;

(viii)     by Purchaser or, prior to entry of the Sale Order, by Seller, if~~:~~ (a) Seller ~~or either one of them~~ enters into an asset purchase agreement or other definitive agreement with respect to an Alternative Transaction~~;~~ other than with the Back-Up Bidder (as such term is defined in the Sale Procedures Order) or (b) the Bankruptcy Court ~~enters an order approving an Alternative Transaction; or (c) Purchaser is not the successful bidder at the Auction; provided, however, that, if Purchaser is designated as the back-up bidder at the Auction, then Purchaser shall not be permitted to terminate this Agreement pursuant to this clause (vii) until the earlier of (1) the closing of an Alternative Transaction or (2) the Outside Date;~~ declines to enter the Sale Order in a form reasonably acceptable to Purchaser;

(ix)     by Seller or Purchaser, if an order is entered by a court, tribunal, or other adjudicatory body of competent jurisdiction having valid enforcement authority permanently restraining, prohibiting or enjoining either party from consummating the transactions described in this Agreement and such order shall have become final and non-appealable or shall not have been vacated prior to the Outside Date; or

34

(x)    by Seller or Purchaser if Closing has not occurred on or before 5:00 p.m. Eastern time on the date that is 120 days from the date ~~hereof~~of the Original Agreement (the "Outside Date");

provided, however, that the right to terminate this Agreement under this Section 9.15(A) shall not be available to any party if the action of such party or any of its Affiliates has been a principal cause of or resulted in the failure of the Closing to occur on or before such date, and such action or failure to act constitutes a breach of any of such party's representations, warranties, covenants or obligations under this Agreement.  Upon a termination of this Agreement pursuant to this Section 9.15(A), and except as otherwise provided by Sections 9.15(B), 9.15(C), and 9.15(D), the Deposit shall be returned by the Escrow Agent to Purchaser and the parties hereto shall have no further obligations under this Agreement except as shall expressly survive the termination hereof.

(B)    Seller's Default. Notwithstanding anything to the contrary contained herein, if, prior to or at the Closing, there has been a violation or breach by (i) Seller of any representation or warranty set forth in Section 5.1 (or any such representation or warranty shall have become untrue in any material respect after the date of ~~this~~the Original Agreement) or (ii) Seller of any covenant or agreement contained in this Agreement which, in the case of either clause (i) or (ii), would prevent the satisfaction of or result in the failure of any condition to the obligations of Purchaser at the Closing and such violation or breach has not been waived by Purchaser or, in the case of a breach of any covenant or agreement under this Agreement that is curable, has not been cured by Seller (as applicable) prior to the earlier to occur of (a) 10 days after receipt by Seller, as applicable, of written notice of such breach from Purchaser and (b) the Outside Date, then Purchaser may elect to (1) terminate this Agreement by written notice to Seller, in which case the Deposit shall be promptly refunded to Purchaser by Escrow Agent, or (2) seek specific performance of Seller's obligations that are to be performed on or prior to Closing, including without limitation Seller's delivery obligations under Section 4.3 of this Agreement, unless such obligations cannot reasonably be performed by Seller for reasons beyond Seller's reasonable control.

(C)    Purchaser's Default. Notwithstanding anything to the contrary contained herein, if, prior to or at the Closing, there has been a violation or breach by (i) Purchaser of any representation or warranty set forth in Section 5.2 (or any such representation or warranty shall have become untrue in any material respect after the date of ~~this~~the Original Agreement) or (ii) Purchaser of any covenant or agreement contained in this Agreement which, in the case of either clause (i) or (ii), would prevent the satisfaction of or result in the failure of any condition to the obligations of Seller at the Closing and such violation or breach has not been waived by Seller or, in the case of a breach of any covenant or agreement under this Agreement that is curable, has not been cured by Purchaser (as applicable) prior to the earlier to occur of (a) 10 days after receipt by Purchaser, as applicable, of written notice of such breach from Seller and (b) the Outside Date, then Seller may elect to (1) terminate this Agreement by written notice to Purchaser, in which case the Deposit shall be promptly delivered by Escrow Agent to Seller as Seller's liquidated damages, in which case such liquidated damages shall be the sole remedy of Seller for Purchaser's default and Seller shall not be entitled to any additional legal or equitable relief against Purchaser, or (2) seek (a) specific performance of Purchaser's obligations to be performed on or prior to Closing, including without limitation Purchaser's delivery obligations under Section 4.4 of this Agreement, and (b) such other remedies available to Seller at law or in equity.

35

(D)    <u>Alternative Transaction</u>.  If this Agreement is terminated ~~without breach~~ by Purchaser, under circumstances where it is entitled to do so pursuant to <u>Section 9.15(A)</u>(~~vii~~viii), (i) the Deposit shall be promptly refunded to Purchaser by Escrow Agent, and (ii) Purchaser shall be entitled to payment of, and Seller shall pay or cause to be paid, the Break-Up Fee (as such term is defined in the Sale Procedures Order) from the proceeds received by Seller upon the closing of an Alternative Transaction, subject, however, to any filings and/or hearings required by the Bankruptcy Court.

(E)    <u>Liability Limitation</u>.  Notwithstanding anything to the contrary in this Agreement, the maximum aggregate liability of Purchaser for money damages in respect of any losses, damages, costs or expenses of Seller relating to the failure of the transactions contemplated hereby to be consummated or a breach of this Agreement by Purchaser in the absence of a Closing shall be limited to the Deposit (the "<u>Liability Limitation</u>"), and in no event shall the Seller or any of their Affiliates seek any amount in excess of the Liability Limitation in connection with this Agreement or the transactions contemplated hereby or in respect of any other document or theory of law or equity or in respect of any oral representations made or alleged to be made in connection herewith, whether at law or in equity, whether in contract, tort or otherwise.

9.16    <u>Amendments</u>.    Except as otherwise expressly provided herein, neither this Agreement nor any term or provision hereof may be changed, waived, discharged or terminated except by the mutual written agreement of the parties (and, in the case of any amendment extending the Outside Date or that would reasonably be expected to materially diminish the amount paid to Agent at the Closing, the Agent).

9.17    <u>Construction</u>.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any of the parties hereto, and this Agreement shall be deemed to have been prepared jointly by the parties, and thus shall not necessarily be construed against any of the parties as the drafter hereof.

9.18    <u>No Successor Liability</u>.  The parties intend that, to the fullest extent permitted by applicable Law (including under Section 363 of the Bankruptcy Code), upon the Closing, Purchaser shall not be deemed to: (A) be the successor of Seller, (B) have, de facto, or otherwise, merged with or into Seller, (C) be a mere continuation or substantial continuation of Seller or the enterprise(s) of Seller or (D) be liable for any acts or omissions of Seller in the conduct of the Business or arising under or related to the Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the parties intend that Purchaser shall not be liable for any Lien (other than Assumed Liabilities and Permitted Liens) against Seller or any of Seller's predecessors or Affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Assets or any liabilities of Seller arising prior to the Closing Date. The Parties agree that the provisions substantially in the form of this <u>Section 9.18</u> shall be reflected in the Sale Order.

9.19    <u>Equitable Relief</u>.  The parties hereto agree that if any of the provisions of this Agreement were not to be performed as required by their specific terms or were to be otherwise

breached, irreparable damage will occur, no adequate remedy at Law would exist and damages would be difficult to determine, and that each party shall be entitled to an injunction or injunctions to prevent breaches, and to specific performance of the terms, of this Agreement (including causing the transactions contemplated hereby to be consummated on the terms and subject to the conditions thereto set forth in this Agreement) without posting any bond and without proving that monetary damages would be inadequate, in addition to any other remedy at Law or equity. None of the parties shall oppose, argue, contend or otherwise be permitted to raise as a defense that an adequate remedy at law exists or that specific performance or equitable or injunctive relief is inappropriate or unavailable.

9.20   <u>Certain Definitions</u>.   When used in this Agreement, the following terms have the meanings set forth below:

"<u>Action</u>" means any claim, charge, audit, complaint, order, decree, ruling, eminent domain action, judgment, injunction, inspection, condemnation, notice of violation, citation, penalty or administrative action or proceeding, whether private or by or before any Governmental Entity.

"<u>Affiliate</u>" means, with respect to any subject Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such subject Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"<u>Business Day</u>" means any day other than a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in Boston, Massachusetts.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Confidentiality Agreement</u>" means that certain Project Plymouth Non-Disclosure Agreement, dated as of May 21, 2020, executed by Duff Phelps Securities LLC, on behalf of Seller, and National Mentor Holdings, Inc.

"<u>Contracts</u>" means all agreements, contracts, leases and subleases, arrangements, letters of credit, guarantees and binding commitments, whether written or oral.

"<u>Data Room</u>" means the "Project Backpack" virtual data room hosted by "dealroom.net" created by Seller for the transaction governed by this Agreement.

"<u>Dollars</u>" or "<u>$</u>" means the lawful currency of the United States of America.

"<u>ERISA</u>" means the Employment Retirement Income Security Act of 1974, as amended.

"<u>Federal Health Care Programs</u>" means any health care program administered or funded, in whole or in part, by the government of the United States of America, including the Medicare, Medicaid and TRICARE programs.

QB\66067564.6

"<u>Fundamental Representations</u>" means the representations and warranties of Seller set forth in <u>Sections 5.1(A)</u> (Due Organization), <u>(B)</u> (Power and Authority; Enforceability; Consents), <u>(C)</u> (Binding Agreement), <u>(D)</u> (Assets), and <u>(P)</u> (Brokerage).

"<u>GAAP</u>" means United States generally accepted accounting principles, consistently applied during the periods involved.

"<u>Governmental Entity</u>" means any United States or foreign federal, state, provincial or local government or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"<u>HIPAA</u>" means the Health Insurance Portability and Accountability Act of 1996, as amended (Pub. L. No. 104-191) and the Health Information Technology for Economic and Clinical Health Act (Pub. L. No. 111-5), any implementing regulations, and any state privacy or medical information Laws applicable to the Business.

"<u>Law</u>" means any constitution, law, common law, statute, ordinance, rule, regulation, regulatory requirement, code, order, judgment, injunction or decree enacted, issued, promulgated, enforced or entered by a Governmental Entity or securities exchange.

"<u>Lien</u>" means any charge, mortgage, pledge, security interest, lien, preference, license, covenant, claim, easement, encroachment or other similar encumbrance.

"<u>Material Adverse Effect</u>" means any change, event, occurrence, fact, state of facts, development or effect that (a) prevents, materially delays or materially impairs the ability of Seller to consummate the transactions contemplated by this Agreement or the other Transaction Documents or (b) has, or would reasonably be expected to have, a material adverse effect upon the condition (financial or otherwise), business, assets or results of operations of the Business, taken as a whole; <u>provided</u>, <u>however</u>, that, in the case of clause (b), any adverse change, event, occurrence, fact, state of facts, development or effect arising from or related to (i) conditions affecting the economy generally, (ii) pandemic (including without limitation changes caused by the COVID 19 virus or any other epidemic, pandemic or disease outbreak), any act of terrorism, similar calamity or war (whether or not declared) or any escalation or worsening of any of the foregoing or any natural disaster, (iii) financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index), or (iv) changes in any Laws, policies or other binding directives issued by any Governmental Entity, will not be taken into account in determining whether a "Material Adverse Effect" has occurred; <u>provided</u> that, with respect to a matter described in any of the foregoing clauses, such matter will only be excluded so long as such matter does not have a disproportionate effect on the Business relative to other comparable businesses operating in the industry in which the Business operates.

"<u>Permits</u>" means all licenses, permits, certificates, grants, franchises, waivers, consents, expirations of waiting periods, and other similar authorizations or approvals issued by or obtained from a Governmental Entity or any securities exchange.

QB\66067564.6

"<u>Permitted Liens</u>" means (i) zoning, entitlement, building and other land use and similar laws or regulations imposed by any Governmental Entity having jurisdiction over such parcel which are not violated by the current use and operation thereof; (ii) non-exclusive licenses to Intellectual Property granted in the ordinary course of business; and (iii) easements, covenants, conditions, restrictions and other similar matters of record which would not materially impair the use or occupancy of such parcel in the operation of the Business.

"<u>Person</u>" means an individual, a corporation, a partnership, an association, a limited liability company, a Governmental Entity, a trust or other entity or organization.

"<u>Personal Information</u>" means any information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular individual or household, including without limitation Protected Health Information as the term is defined in the Health Insurance Portability and Accountability Act of 1996, and any other information subject to protection, regulation, or safeguarding as set forth in any applicable Law governing privacy, information security or health information.

"<u>Seller's Knowledge</u>" or any similar knowledge qualification with respect to Seller, means the actual knowledge, after reasonable inquiry, of any of the following individuals: Andrew Calkins and Matthew Lesniewski.

"<u>WARN Act</u>" means the Worker Adjustment Retaining and Notification Act of 1988, as amended, or any similar state or local law.

QB\66067564.6

IN WITNESS WHEREOF, Seller and Purchaser have executed this Agreement, and Escrow Agent has executed this Agreement for purposes of Sections 2.2, 2.3, 6.6, and 9.16, as of the day and year first above written.

"SELLER"                                    "PURCHASER"

FUTURES BEHAVIOR THERAPY            FBTC   TRANSITIONAL   SUB,   LLC,   a
CENTER, LLC, a Massachusetts        Delaware limited liability company
limited liability company

                                    By: _____
By: _____     Its: _____
     Andrew Calkins, President




"ESCROW AGENT"


CASNER & EDWARDS, LLP



By: _____
     Michael J. Goldberg, Esq.


40

QB\66067564.6

## LIST OF EXHIBITS AND SCHEDULES

Exhibit A—Facility Locations

Schedule 1.1(A)—Assumed Leases

Schedule 1.1(C)—Deposits

Schedule 1.1(D)(i)—Licenses and Permits

Schedule 1.1(D)(iv)—Assumed Contracts

Schedule 1.2(I)—Other Excluded Assets

Schedule 1.3(B)—Other Assumed Obligations

Schedule 1.4(O)—Other Excluded Liabilities

Schedule 2.1—Purchase Price Adjustments and Allocation

Schedule 2.2—Escrow Provisions

Schedule 3.1—Bill of Sale

Schedule 3.2—Assumption and Assignment Agreement

Schedule 4.2—Required Governmental Consents

Schedule 4.3(C)—Transition Services Agreement

Schedule 5.1(B)—Seller Required Approvals

Schedule 5.1(D)—Title to Assets

Schedule 5.1(E)—Financial Statements

Schedule 5.1(F)—Leases

Schedule 5.1(G)—Material Contracts

Schedule 5.1(H)—Enforceability

Schedule 5.1(I)—Employee Benefits

Schedule 5.1(J)—Employees

Schedule 5.1(K)—Compliance with Law

Schedule 5.1(L)—No Proceedings

Schedule 5.1(M)—Absence of Certain Changes

Schedule 5.1(N)—Permits

Schedule 5.1(O)—Intellectual Property

Schedule 5.1(P)—Brokerage

Schedule 5.1(R)—Payors

Schedule 5.2(B)—Purchaser Required Approvals

Schedule 6.1(C)—Seller Key Employees

Schedule 6.2—Seller Negative Covenants

Schedule 7.2(E)—Required Third Party Consents

## EXHIBIT A

## Seller Facility Locations

1. 55 Tozer Road, Beverly, MA
2. 216 West Boylston Street, West Boylston, MA

Document comparison by Workshare 9.5 on Friday, February 12, 2021 12:19:45 PM

| Input: | |
|---|---|
| Docum ent 1 ID | file://C:\Users\ciechanowski\AppData\Local\Microsoft\Windows\INetCach e\Content.Outlook\487D14L1\Mentor - Futures - Asset Purchase Agreement (CE Final 01 04 21)_v2.docx |
| Descri ption | Mentor - Futures - Asset Purchase Agreement (CE Final 01 04 21)_v2 |
| Docum ent 2 ID | H:\Documents\Assignments\CIS\Case No. 21-40003-EDK\Mentor - Futures - Asset Purchase Agreement (EXECUTION DRAFT 2.12).docx |
| Descri ption | H:\Documents\Assignments\CIS\Case No. 21-40003-EDK\Mentor - Futures - Asset Purchase Agreement (EXECUTION DRAFT 2.12).docx |
| Render ing set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 45 |
| Deletions | 55 |
| Moved from | 6 |
| Moved to | 6 |

| Style change | 0 |
|---|---|
| Format changed | 0 |
| Total changes | 112 |

## CERTIFICATE OF SERVICE

I, A. Davis Whitesell, hereby certify that on this 12th day of February, 2021, I caused the foregoing ***Notice of Auction Results and of Winning Bidder Asset Purchase Agreement*** to be served by email through the Court's CM/ECF system on all registered users thereof in this case.


Dated:  February 12, 2021

*/s/ A. Davis Whitesell*
A. Davis Whitesell, BBO# 551462
Casner & Edwards, LLP
303 Congress Street
Boston, MA 02210
Tel: 617-426-5900
Email: whitesell@casneredwards.com