UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| | |
|---|---|
| In re: | |
| | Chapter 11 |
| COMMUNITY INTERVENTION SERVICES, INC., COMMUNITY INTERVENTION SERVICES HOLDINGS, INC., SOUTH BAY MENTAL HEALTH CENTER, INC., and FUTURES BEHAVIOR THERAPY CENTER, LLC | Case No. 21-40002-EDK |
| | (Jointly Administered) |
| Debtors. | |

**ORDER APPROVING DEBTOR'S SALE OF SUBSTANTIALLY
ALL ASSETS OF FUTURES BEHAVIOR THERAPY CENTER, LLC, INCLUDING
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE,
FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS**

Upon consideration of the *Motion For Authority to Sell Substantially All Assets of Futures Behavior Therapy Center, LLC, Including Certain Executory Contracts and Unexpired Leases, Pursuant to Sections 363 and 365 of the Bankruptcy Code, Free and Clear of Liens, Claims, and Interests* dated January 5, 2021 [Docket No. 10] (the "Sale Motion"; capitalized terms used but not otherwise defined herein have the meanings given to them in the Sale Motion, the Sale Procedures Motion, or the APA (as defined below), as applicable), pursuant to which Debtor Futures Behavior Therapy Center, LLC (the "Debtor") requested that this Court authorize the Debtor's sale (the "Sale") of substantially all of the Debtor's assets utilized by the Debtor in operating its business (collectively, the "Assets"), including without limitation (i) the Debtor's rights under two leases of real property at which the Debtor operates its business (the "Leases"), (ii) certain personal property, including equipment, furniture and inventory, (iii) certain

executory contracts with third parties (together with the Leases, the "Assumed Contracts"), (iv) certain permits and licenses authorizing the provision of certain services to the Debtor's clients (to the extent transferable), and (v) certain other miscellaneous, specified assets as set forth in that certain Asset Purchase Agreement dated as of January 5, 2021 between the Debtor and FBTC Transitional Sub, LLC, a Delaware limited liability company ("FBTS"), that was amended and restated through that certain Winning Bidder Asset Purchase Agreement dated as of February 10, 2021 between such parties, including, without limitation, the right to use the Debtor's trade names and other intellectual property, to FBTS, or its eligible designee, or to such other entity that submits the highest or otherwise best offer to acquire the Assets as determined through the sale procedures governing the Sale approved by, and constituting Exhibit A to (the "Sale Procedures"), the Court's order entered on January 15, 2021 [Doc. No. 83] (the "Sale Procedures Order"); and the Court having conducted a hearing on the Sale Motion on February 16, 2021 (the "Sale Hearing"); the Court having reviewed the Sale Motion, the Declaration of Eric Coburn in support of the Sale filed on February 12, 2021 [Docket No. 167] (the "Coburn Declaration"), the limited objections to the relief sought in the Sale Motion filed by Oracle Credit Corporation and Oracle America, Inc., successor in interest to NetSuite, Inc. ("Oracle") [Doc. No. 168] (the "Oracle Limited Objection") and by the United States Trustee [Doc. No. 169] (the "UST Limited Objection"); and the Court having considered the representations and arguments of counsel and the matters addressed at such hearing, including the Debtor's disclosure of pending efforts to reconcile the proper "Cure Amount" for certain Assumed Contracts; and the Court having found and determined that the relief sought in the Sale Motion is in the best interests of the Debtor, its estate, and the creditors thereof, and all parties in interest

and that the legal and factual bases set forth in the Sale Motion establish good cause for the relief

granted herein; and after due deliberation and sufficient cause appearing therefor:

**IT IS HEREBY FOUND AND DETERMINED, pursuant to Fed. R. Bankr. P. 7052,**

**that:**

## General

A.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28

U.S.C. §§ 157 and 1134.  Venue of the Debtors' Chapter 11 cases in this District is proper

pursuant to 28 U.S.C. §§ 1408(a) and 1409(a).  Determination of the Sale Motion is a core

proceeding under 28 U.S.C. §157(b)(2), and the Court may enter a final order consistent with

Article III of the United States Constitution.  The statutory predicates for the relief requested in

the Sale Motion are Sections 105, 363 and 365 of the Bankruptcy Code and Rules 2002, 6004

and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Compliance with Sale Procedures

B.      The Debtor has complied with the notice provisions of the Sale Procedures Order

by providing the notices approved under the Sale Procedures Order to (i) counsel for the United

States Trustee, (ii) counsel to the Agent,[1] (iii) any entities known to hold a lien or security

interest in any of the Assets, (iv) all parties that have filed and served a request for notice in the

Debtors' Chapter 11 cases, (v) the Internal Revenue Service, (vi) the United States Attorney for

the District of Massachusetts, (vii) each of the Debtor's federal and state taxing authorities, and

any federal, state or local governmental agency that has or exercises any licensing, registration or

permitting authority over the Debtor or any of the Assets, including the Massachusetts

Department of Early Education and Care, (viii) all non-Debtor parties to the Assumed Contracts,

---

[1] Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Sale Motion, Sale
Procedures, Sale Procedures, Order, or APA (as defined below), as appropriate.

(ix) all relevant environmental regulatory agencies, and (x) all other known non-employee creditors of the Debtor. The notice of the Sale Hearing and of the relief sought by the Sale Motion, as reflected by the affidavits or certificates of service on file with the Court, was proper, timely, adequate and sufficient and meets the requirements of Sections 102(1), 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006, was reasonably calculated to give actual notice of the relief contemplated by the Sale Motion, is appropriate and sufficient under the circumstances, and no other or further notice of the Sale, the Sale Procedures, the Auction, the Sale Motion, the Sale Hearing, or the entry of this Order need be provided to any entity.

C.      Service of the Assumed Contracts Notice was good, sufficient and appropriate under the circumstances, in compliance with the Sale Procedures Order, and no other or further notice need be given to any entity in respect of establishing the Cure Amounts for the Assumed Contracts. Non-Debtor counterparties to the Assumed Contracts have had an opportunity to object to the Cure Amounts.

D.      The Debtor has demonstrated good, sound and sufficient business purpose and justification, and it is a reasonable exercise of the Debtor's business judgment, (i) to sell the Assets on the terms and conditions set forth in the APA (as defined below), (ii) to assume and assign the Assumed Contracts to the Winning Bidder, and (iii) to consummate all transactions contemplated by the APA (as defined below). The sale of the Assets and the assumption and assignment of the Assumed Contracts is in the best interest of the Debtor, its estate, its creditors, and other parties in interest.

**Highest or Best Offer**

E.     The Debtor and Duff & Phelps Securities, LLC ("D&P") marketed the Assets diligently, in good faith and in a commercially reasonable manner, to secure the highest and best offers for the Assets, including through the efforts of D&P to contact and make available offering and due diligence materials to potential purchasers and otherwise to make sale-related information about the Debtor, the Assets, and the Sale Procedures available to prospective purchasers of the Assets.

F.     The Debtor and D&P have marketed the Assets and solicited bids for the Assets in compliance with the Sale Procedures Motion and the Sale Procedures Order, and creditors, parties in interest and other entities have been afforded a full, fair and reasonable opportunity to submit offers to purchase the Assets.

G.     The Debtor, D&P, and the Debtor's other representatives have complied in all material respects with the Sale Procedures and the Sale Procedures Order.  The Debtor has complied with the provisions of Sections 363 and 365 of the Bankruptcy Code as regards the sale of the Assets and the assumption and assignment of the Assumed Contracts.

H.     At the conclusion of the Auction, the Debtor, in consultation with its professional advisors and the Agent, designated the bid of FBTC Transitional Sub, LLC (the "Winning Bidder") as the highest or otherwise best offer to purchase the Assets (the "Winning Bid"), which Winning Bid is embodied in that certain Asset Purchase Agreement between the Debtor and the Winning Bidder dated as of February 10, 2021 and filed with the Court [Doc No. 166, at pp. 4 – 46] including the schedules thereto [Doc. No. 10-1, at pp. 45 – 110] (the "APA", a copy of which is attached hereto as Exhibit A).  Pursuant to the APA, the Winning Bidder has agreed, in consideration of the Debtor's sale of the Assets to the Winning Bidder, to pay the cash

purchase price to the Debtor in the amount of $11,850,000, and to assume the Assumed Contracts and the Assumed Obligations (as defined in the APA), all as specified in the APA, subject only to satisfaction of the conditions to closing of the Sale as set forth in the APA.

I.      The Debtor, in consultation with its professional advisors and the Agent, also designated the bid of Little Leaves Early Learning Therapy and Program, Inc. (the "Back-Up Bidder") as the second best offer to acquire the Assets (the "Back-Up Bid"), which Back-Up Bid is embodied in Back-Up Bidder's pre-Auction asset purchase agreement constituting its initial Qualified Bid as deemed modified to reflect the Back-Up Bidder's last Auction bid of $12,100,000 (the "Back-Up Bidder APA").  The Back-Up Bid is on essentially the same terms as the Winning Bid except that it provides for a $100,000 lower recovery to the estate, after accounting for the $350,000 Break-Up Fee that would  otherwise be payable to FBTS out of funds set aside (subject to and pending Court approval of the Break-Up Fee) from sale proceeds generated through a sale to a purchaser other than FBTS, as provided for by the Sale Procedures Order.

J.      If for any reason the sale of the Assets to the Winning Bidder does not close, and the Debtor proceeds to close the sale of the Assets to the Back-Up Bidder pursuant to the Back-Up Bidder APA, then, upon the closing of such sale to the Back-Up Bidder, the Back-Up Bidder shall be deemed to have been approved as the Winning Bidder by this Order and to constitute the "Winning Bidder" for purposes of this Order, and references in this Order to the Winning Bid, the Winning Bidder, and the APA shall be deemed to encompass the Back-Up Bid, the Back-Up Bidder, and the Back-Up Bidder APA, respectively.  In addition, for purposes of this Order, the term "Winning Bidder" shall encompass any permitted assignee or nominee of the Winning Bidder under the APA.

K.      The consideration provided by the Winning Bidder pursuant to the APA (i) is fair and reasonable, (b) is the highest or otherwise best offer for the Assets, and (c) constitutes reasonably equivalent value for the Assets.

### Sale Free and Clear

L.      The Debtor may sell the Assets free and clear of all liens, claims, interests, rights of setoff, recoupment, netting and deductions, any successor or successor-in-interest liability theory, and other encumbrances of any kind or nature whatsoever (collectively, the "Encumbrances") (except for the Assumed Obligations and the Permitted Liens), because, in each case, one or more of the standards set forth in Section 363(f)(1) – (5) of the Bankruptcy Code has been satisfied.  Those holders of Encumbrances who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code.  Those holders of Encumbrances who did object fall within one or more of the other subsections of Section 363(f) and are adequately protected by having their Encumbrances, if any, attach to the net cash proceeds of the Sale attributable to the Assets in which such holder alleges an Encumbrance, in the same order of priority, with the same validity, force and effect that such Encumbrance had prior to the Sale, subject to any claims and defenses the Debtor and its estate may possess with respect thereto.

M.      The Winning Bidder is not, and shall not be considered, a successor to the Debtor or its estate, and there is no continuity of enterprise between the Winning Bidder and the Debtor. The Winning Bidder (i) has not, *de facto* or otherwise, merged with or into the Debtor, (ii) is not a continuation or substantial continuation, and is not holding itself out as a mere continuation, of the Debtor or its estate, business or operations, or any enterprise of the Debtor, and (iii) does not have a common identity of incorporators, directors or equity holders with the Debtor.

N.     The Winning Bidder would not have entered into the APA and would not consummate the transactions contemplated thereunder if the sale of the Assets to the Winning Bidder, and the assumption and assignment of the Assumed Contracts to the Winning Bidder, were not, except as otherwise provided in the APA, free and clear of all Encumbrances or if the Winning Bidder would, or in the future could (except and only to the extent expressly provided in the APA and with respect to the Assumed Obligations and the Permitted Liens), be liable for any of such Encumbrances.

**<u>Assumption and Assignment of Assumed Contracts</u>**

O.     The executory contracts and unexpired leases that the Debtor is authorized to assume and assign to the Winning Bidder pursuant to the APA and Section 365 of the Bankruptcy Code are identified on attached <u>Exhibit B</u> (such executory contracts and unexpired leases are hereinafter referred to, collectively, as the "<u>Assumed Contracts</u>").   Each of the Assumed Contracts is valid and binding, in full force and effect, and enforceable in accordance with its terms, and is property of the Debtor's estate pursuant to Section 541(a) of the Bankruptcy Code.

P.     The assumption and assignment of the Assumed Contracts pursuant to the terms of this Order is integral to the APA and is in the best interests of the Debtor and its estate, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtor.

Q.     The Debtor has provided adequate assurance, within the meaning of Section 365(b)(1) of the Bankruptcy Code, of the Debtor's cure of all defaults, obligations and liabilities under the Assumed Contracts, through the Debtor's undertaking to pay the cure amount for each of the Assumed Contracts as set forth on attached <u>Exhibit B</u> (the "<u>Cure Amounts</u>").   For each

Assumed Contract that is assumed and assigned at the closing of the Sale under the APA (the "Closing"), the Debtor shall pay the Cure Amount specified for such Assumed Contract in cash at the Closing or as otherwise directed by separate order of the Court.  For any Assumed Contract for which the Cure Amount is specified to be "TBD", the Cure Amount shall be the amount determined by agreement between the Debtor and the non-Debtor party of such Assumed Contract or by order of the Court entered pursuant to Paragraph 14 of this Order, below.

R.      To the extent that any non-Debtor party to any Assumed Contract objects, asserts or claims some greater amount is owed to it other than the Cure Amount with respect to the Debtor's obligations under the relevant Assumed Contract, such objection, assertion and/or claim is expressly overruled, unless it has been properly preserved for future resolution pursuant to the Sale Procedures Order and this Order.

S.      The Winning Bidder has provided adequate assurance of its future performance under the Assumed Contracts within the meaning of Section 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

T.      The Winning Bidder may in accordance with the APA designate additional executory contracts to be additional Assumed Contracts, and the Debtor in accordance with the APA may seek this Court's further order authorizing the Debtor's assumption and assignment to the Winning Bidder of such additional Assumed Contracts.  The Winning Bidder may in accordance with the APA elect not to accept assignment of any one or more of the Assumed Contracts, and nothing in this Order requires the Winning Bidder to take assignment of any particular Assumed Contract.

U.      The Debtor shall continue to perform its post-petition obligations under the Assumed Contracts through the Closing or, as to any particular Assumed Contract, such earlier

time as the Winning Bidder notifies the Debtor that the Winning Bidder has elected not to take assignment of such Assumed Contract and the Debtor has notified the non-Debtor contract party that such Assumed Contract will not be assumed and assigned.

## Compelling Circumstances for an Immediate Sale

V.    It is essential that the Sale of the Assets occur within the time constraints set forth in the APA.  Time is of the essence in consummating the Sale.

W.    The Sale does not constitute a *de facto* or *sub rosa* plan of reorganization or liquidation because it does not propose to (i) impair or restructure existing debt of, or equity interests in, the Debtor, (ii) impair or circumvent voting rights with respect to any plan proposed by the Debtor, (iii) circumvent Chapter 11 safeguards, including those set forth in Sections 1125 and 1129 of the Bankruptcy Code, or (iv) classify claims or equity interests.

X.    The consummation of the Sale is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, Sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the Sale.

## Good Faith Purchaser

Y.    The Winning Bidder is not an "insider" of the Debtor, as that term is defined in Section 101(31) of the Bankruptcy Code, and is not otherwise affiliated with the Debtor.

Z.    The Winning Bidder has proceeded in good faith and without collusion in all respects in connection with the sale process, in that: (i) the Winning Bidder, in proposing and proceeding with the Sale in accordance with the APA, recognized that the Debtor was free to deal with other interested parties; (ii) the Winning Bidder agreed to provisions in the APA that would enable the Debtor to accept a higher and better offer; (iii) the Winning Bidder complied

with all of the provisions in the Sale Procedures Order applicable to the Winning Bidder; (iv) all payments to be made by the Winning Bidder and other agreements entered into or to be entered into between the Winning Bidder and the Debtor in connection with the Sale have been disclosed; (v) the negotiation and execution of the APA and related documents were conducted in good faith and constituted an arm's length transaction; (vi) the Winning Bidder did not induce or cause the Chapter 11 filing by the Debtor; and (vii) the APA was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtor.  The Winning Bidder is therefore entitled to all of the benefits and protections provided to a good-faith purchaser under Section 363(m) of the Bankruptcy Code.

AA.      Neither the Debtor, nor the Winning Bidder, nor their respective representatives engaged in any conduct that would cause or permit the APA, any of the other documents executed in connection with the APA, or the Sale to be avoided, or that would permit the recovery of excess value or the imposition of punitive damages, under Section 363(n) of the Bankruptcy Code.

BB.      In the absence of a stay pending appeal, the Winning Bidder may close the transactions contemplated by the APA at any time after entry of this Order, and cause has been shown as to why this Order should not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

### No Fraudulent Transfer

CC.      The consideration provided by the Winning Bidder pursuant to the APA (a) is fair and reasonable, (b) is the highest or otherwise best offer for the Assets, and (c) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent

Transfer Act, the Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act, and Section 548 of the Bankruptcy Code).

<u>**Sale Proceeds**</u>

DD.    The compensation arrangements between the Debtor and D&P with respect to the Sale, as set forth in the engagement letter agreement between the Debtor and D&P dated December 22, 2020 (the "<u>D&P Fee</u>") and approved by this Court [Docket No. 162] (the "<u>D&P Employment Order</u>"), call for payment of the D&P Fee upon the closing of the Sale.  From the proceeds of the Sale, an amount equal to the D&P Fee shall be deposited in escrow (the "D&P Fee Escrow"), and held by the Debtors for payment of the D&P Fee upon the filing and this Court's approval of a fee application respecting D&P's services in connection with the Sale, as required under the D&P Employment Order.

EE.    Based on the record as it relates to the senior secured claim of the Agent and the Prepetition Secured Parties (both as defined in this Court's final order approving the Debtors' use of cash collateral entered on February 4, 2021 [Doc. No. 158] (the "<u>Final Cash Collateral Order</u>")), which includes, without limitation, that certain Claim No. 2 filed by Agent, on behalf of the Prepetition Secured Parties, against the Debtor ("<u>Agent's Proof of Claim</u>"), which no party has objected to as of the date hereof, and those certain stipulations of the Debtor contained in the Final Cash Collateral Order, and which claim as of the commencement of the Debtor's chapter 11 case totaled at least $48,708,644.51, there exists no reason to delay payment to the Agent on account of such claim at the Closing of the remaining sale proceeds following payment of (i) the Payment Amount (as defined in the APA), (ii) the D&P Fee Escrow or, if and to the extent approved by this Court, the D&P Fee, and (iii) if required and if approved by this Court, the Break-Up Fee.

## Miscellaneous

FF.     It is necessary and appropriate, in order to ensure the validity of the sale of the Assets to the Winning Bidder and to ensure compliance with this Order, for this Court to retain jurisdiction to: (a) interpret and enforce the provisions of the APA, the Assumed Contracts, the Sale Motion, and this Order; (b) protect the Winning Bidder and any of the Assets against any asserted Encumbrances; (c) resolve any disputes arising under or relating to the APA, the Assumed Contracts, the Sale Motion, and this Order; and (d) determine the validity, extent and priority of asserted Encumbrances in, on, or to the Assets.

**WHEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

## General Provisions

1.     The findings of fact entered above and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.  To the extent that any finding of fact shall later be determined to be a conclusion of law, it shall be so deemed, and to the extent that any conclusion of law shall later be determined to be a finding of fact, it shall be so deemed. Any findings of fact or conclusions of law stated by the Court on the record at the Sale Hearing are hereby incorporated, to the extent they are not inconsistent herewith.  This Court's findings of fact and conclusions of law, set forth in the Sale Procedures Order, are incorporated herein by reference.

2.     The Sale Motion is GRANTED, and the Sale contemplated thereby is approved as set forth in this Order.

3.     Subject to the provisions of paragraph 25 of this Order, all objections to the Sale

Motion or the relief requested therein that have not been withdrawn, waived or settled, including without limitation the Oracle Limited Objection and the UST Limited Objection,  and including all reservations of rights included therein that are not otherwise provided for by this Order, are overruled on the merits with prejudice.

### Approval of APA and Sale Transaction

4.        The Sale to the Winning Bidder pursuant to the APA is authorized under Section 363(b) of the Bankruptcy Code.  The APA and all ancillary documents, and all of the terms and conditions thereof, are approved, and the Debtor is authorized to consummate the transactions contemplated thereby.

5.        Pursuant to Section 363(b) of the Bankruptcy Code, the Debtor is authorized and empowered to take any and all actions necessary or appropriate to (i) consummate the Sale of the Assets to the Winning Bidder pursuant to and in accordance with the terms and conditions of the APA, (ii) close the Sale as contemplated in the APA and this Order, and (iii) execute and deliver, perform under, consummate, implement and close the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and the Sale, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the APA and such ancillary documents.

6.        The APA and any related agreements, documents, or other instruments may be modified, amended or supplemented by the parties thereto in accordance of the terms thereof without further order of the Court, provided that any such modification, amendment or supplement is not material and does not materially change the economic substance of the transactions contemplated thereby.

**Sale Free and Clear**

7.        Pursuant to Sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Debtor is authorized to transfer the Assets at the Closing.  The Assets (including the Assumed Contracts) shall be transferred to the Winning Bidder upon and as of the Closing and such transfer shall constitute a legal, valid, binding and effective transfer of such Assets and, upon the Debtor's receipt of the Purchase Price, shall be free and clear of all Encumbrances, except for the Assumed Obligations and Permitted Liens under the APA.  Upon the Closing, the Winning Bidder shall take title to and possession of the Assets subject only to the Assumed Obligations and Permitted Liens; provided, however, that the Winning Bidder shall not be relieved of liability with respect to the Assumed Obligations and Permitted Liens, including any obligations accruing under the Assumed Contracts from and after the Closing.    All Encumbrances shall attach solely to the net proceeds of the Sale with the same validity, priority, force and effect that they now have as against the Assets, subject to any claims and defenses the Debtor and its estate may possess with respect thereto.

8.        Upon the Closing Date, and except as otherwise provided herein or in the APA, the Winning Bidder shall not bear liability for any liability or other obligation of the Debtor arising under or related to any of the Assets.  Without limiting the generality of the foregoing, and except as otherwise expressly provided herein or in the APA, the Winning Bidder shall not be liable for any Encumbrances on, in, or against the Debtor or any of its predecessors or affiliates, its estate, or the Assets, and the Winning Bidder shall have no successor or vicarious liabilities of any kind or character, including, without limitation, under any theory of antitrust, environmental, successor, or transferee liability, labor law, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing Date, now existing, or

hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, without limitation, liabilities on account of warranties, intercompany loans, receivables among the Debtor and its affiliates, environmental liabilities, workers' compensation "experience rating," unemployment tax "contribution rating" rule or regulation, or any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Assets prior to the Closing Date.

9.     Except as otherwise permitted by the APA or this Order, all persons and entities, including, without limitation, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding Encumbrances of any kind or nature whatsoever on, in, or against the Debtor, its estate, or all or any portion of the Assets, arising under, out of, in connection with, or in any way relating to, the Debtor, the Assets, the operation of the Debtor's businesses prior to the Closing Date, or the transfer of the Assets to the Winning Bidder, are hereby forever barred, estopped, and permanently enjoined from asserting against the Winning Bidder, or any of its affiliates, successors, or assigns, or their property or the Assets, such Encumbrances, including, without limitation, by taking any of the following actions against the Winning Bidder or its affiliates, or their successors, assets, or properties, to the extent any such actions arise under, out of, in connection with, or in any way relate to, the Debtor, the Assets, the operation of the Debtor's business prior to the Closing Date, or the transfer of the Assets to the Winning Bidder:  (a) commencing or continuing in any manner any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or other order; (c) creating, perfecting, or enforcing any lien or other claim; (d) asserting any set off, right of subrogation, or recoupment of any kind; (e) commencing or continuing any action, in any

16

manner or place, that does not comply or is inconsistent with the provisions of this Order or any

other order of this Court, or the APA or actions contemplated or taken in respect thereof, or (f)

revoking, terminating, or failing or refusing to transfer or renew any license, permit, or

authorization relating to the Assets solely on the ground that (i) the Debtor is a debtor under the

Bankruptcy Code or (ii) the Winning Bidder is a purchaser at a sale pursuant to Section 363 of

the Bankruptcy Code.

10.     If any person or entity that has filed statements or other documents or agreements

evidencing Encumbrances on all or any portion of the Assets shall not have delivered to the

Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties,

termination statements, instruments of satisfaction, releases of liens and easements, and any

other documents necessary or desirable to the Winning Bidder for the purpose of documenting

the release of all Encumbrances that the person or entity has or may assert with respect to all or

any portion of the Assets, the Debtor is hereby authorized, and the Winning Bidder is hereby

authorized, to execute and file such statements, instruments, releases and other documents on

behalf of such person or entity with respect to the Assets.

11.     This Order is deemed to operate as an unconditional release, discharge and

termination, effective as of the Closing, of all Encumbrances in, on, or to the Assets.  If the

Closing does not occur, then such Encumbrances shall remain in effect.

12.     This Order is binding on filing agents and officers, all government departments

and units, whether federal, state, local or of a foreign state (or subdivision thereof), who may be

required by operation of law, or the duties of office or of contract, to accept, file, register or

otherwise record or release any documents or instruments or who may be required to report or

insure any title or state of title in or to any of the Assets (all such entities being "Recording

Officers"); provided, however, that nothing in this Order shall require Recording Officers to accept for filing any transfer document or instrument not accompanied by payment of any required conveyance tax or recording fee.  Each and every federal, state and local governmental agency or department is hereby required and directed (i) to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA, and (ii) to issue any certificate, including without limitation a certificate of good standing, necessary to effect or evidence removal of a lien, claim, or interest for corporate or other income taxes from the Assets.

13.      This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system maintained by any Recording Officer.  If any entity that has filed a financing statement or other document or agreement evidencing a lien, claim, or interest in, on, or to any of the Assets shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate individuals, termination statements, instruments of satisfaction, release of all liens, claims, or interests that the entity has with respect to any particular Assets conveyed pursuant to the APA, then the Debtor and the Winning Bidder are each hereby authorized to file, register or otherwise record a certified copy of this Order (or a Confirmatory Order (as defined herein)), which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release and discharge of such entity's liens, claims, or interests in such Assets.

**Assumption and Assignment of Assumed Contracts**

14.      Subject to and conditioned on the Closing, the Debtor is authorized pursuant to Section 365(a) of the Bankruptcy Code to assume and assign the Assumed Contracts to the Winning Bidder.  All requirements and conditions under Sections 363 and 365 of the

Bankruptcy Code for the assumption by the Debtor and assignment to the Winning Bidder of each Assumed Contract have been satisfied and, upon Closing, the Winning Bidder shall be fully and irrevocably vested in all right, title and interest of each Assumed Contracts, and each Assumed Contract shall remain valid and binding and in full force and effect for the benefit of the Winning Bidder in accordance with its terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in Sections 365(b)(2), (e)(1), and (f)(1) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer.  The Cure Amounts constitute all of the amounts that are required to be paid under Section 365(b)(1) of the Bankruptcy Code in connection with the assumption and assignment of the Assumed Contracts. The non-Debtor parties to the Assumed Contracts are hereby deemed to have waived any and all prepetition claims other than the Cure Amounts. Pursuant to Section 363(k) of the Bankruptcy Code, other than as provided for in the APA, upon the assignment of the Assumed Contracts to the Winning Bidder, the Debtor shall have no further liability or obligations with respect thereto.  For any Assumed Contract for which the Cure Amount is specified to be "TBD", the Cure Amount shall be the amount determined by agreement between the Debtor and the non-Debtor party to such Assumed Contract or by separate order of the Court entered upon the motion of the Debtor or such non-Debtor party, and upon such determination of such Cure Amount, such Cure Amount shall supersede the currently specified "TBD" for such Assumed Contract for purposes of this Order.

15.     The Debtor shall continue to perform its post-petition obligations under the Assumed Contracts through the Closing or, as to any particular Assumed Contract, such earlier time as the Winning Bidder notifies the Debtor that the Winning Bidder has elected not to take assignment of such Assumed Contract and the Debtor has notified the non-Debtor contract party

that such Assumed Contract will not be assumed and assigned.  Any dispute regarding payment

or performance of the Debtor's post-petition, pre-Closing obligations under an Assumed

Contract prior to its assignment to the Winning Bidder (whether prior to, at, or after the Closing)

shall be determined by this Court upon appropriate motion of the Debtor or the non-Debtor party

to the Assumed Contract, but shall not affect the validity of the assumption and assignment of

such Assumed Contract pursuant to this Order.

16.     The Debtor and the Winning Bidder are hereby deemed to have provided

adequate assurance of the Debtor's cure of prepetition defaults under, and of the Winning

Bidder's future performance of, the Assumed Contracts in accordance with Sections

365(b)(1)(B) and (C) and 365(f)(2)(B) of the Bankruptcy Code.

**Sale Proceeds**

17.     The proceeds of the Sale shall be paid on the Closing Date for distribution as

follows: (i) first, the Winning Bidder shall pay the Payment Amount (as defined in the APA) to

those certain individual or entities identified on the Payment Schedule (as defined in the APA),

(ii) second, the Winning Bidder shall pay the D&P Escrow Amount (or, if and to the extent

approved by this Court prior to the Closing Date, the D&P Fee), and (iii) third, the remaining

proceeds from the Sale shall be remitted at the Closing to Agent in partial satisfaction of the

Prepetition Secured Parties' secured claims, which are described more fully in the Final Cash

Collateral Order and Agent's Proof of Claim (the "Secured Parties' Payment"); provided that the

Qualifying MIP Expenses with respect to the Sale shall be paid by the Agent from the Secured

Parties' Payment to the respective recipients as a carve-out from the proceeds of the Sale

otherwise payable to the Prepetition Secured Parties; provided, further that $350,001.00 with

respect to the Sale shall be paid by Agent from the Secured Parties' Payment to BSP Agency,

20

LLC, as Subordinated Agent (as defined in the Final Cash Collateral Order) on behalf of the Subordinated Creditors (as defined in the Final Cash Collateral Order), pursuant to that certain LSTA Distressed Trade Confirmation dated as of January 28, 2021, as a carve-out from the proceeds of the Sale otherwise payable to the Prepetition Secured Parties; and provided, further that if FBTS is not the buyer with respect to the Sale and is entitled to payment of the Break-Up Fee (as defined in the Sale Procedures Order) on the Closing Date (e.g., if the Back-Up Bidder becomes the replacement Winning Bidder pursuant to this Order, this Court approves the Break-Up Fee, and FBTS is entitled to payment of the Break-Up Fee under its APA), then the Debtor shall cause the Break-Up Fee to be paid to FBTS at Closing from the replacement Winning Bidder's Purchase Price proceeds prior to the making of the Secured Parties' Payment (provided, however, that if this Court's approval of the Break-Up Fee is pending at the time of Closing, the amount of the Break-Up Fee shall be paid to the Debtors to hold in escrow pending this Court's approval).

## Miscellaneous

18.     The terms and provisions of the APA, together with the terms and conditions of this Order, shall be binding in all respects upon all entities, including, without limitation, the Debtor (including its employees, officers and directors), its estate, all creditors and equity interest holders of the Debtor, the Winning Bidder, the Back-Up Bidder, and their respective affiliates, successors and assigns, agents and any affected third parties, including, but not limited to, all persons asserting a claim against or interest in any of the Assets to be sold, conveyed or assigned to the Winning Bidder pursuant to the APA.

19.     The transactions contemplated by the APA are undertaken by the Winning Bidder without collusion and in good faith, as that term is defined in Section 363(m) of the Bankruptcy

Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Assumed Contracts), unless such authorization and such Sale are duly stayed pending such appeal. The Winning Bidder is a good faith buyer within the meaning of Section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of Section 363(m) of the Bankruptcy Code.

20.     The provisions of this Order shall be binding upon any Chapter 11 trustee or Chapter 7 trustee appointed in the Debtors' bankruptcy cases and shall survive and be binding in the event of any dismissal of such bankruptcy cases.

21.     Nothing contained in any Chapter 11 plan confirmed in the Debtors' cases or the order of confirmation confirming any such plan shall conflict with or derogate from the terms of this Order.

22.     The Debtor and the Winning Bidder may request, and upon reasonable request this Court shall enter, an order (a "Confirmatory Order"), confirming the authorized sale of any specified Assets to the Winning Bidder pursuant to the APA and this Order, or otherwise clarifying or confirming with particularity any matter addressed by this Order, including without limitation as may be reasonably necessary or desired for purposes of establishing or recording evidence of title to specific Assets.

23.     No bulk sales law or similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the APA, the Sale Motion, and this Order.

24.     This is a final order and is enforceable upon entry and to the extent necessary under Bankruptcy Rules 5003, 9014, 9021, and 9022. This Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment

as set forth herein and the stays imposed by Bankruptcy Rules 6004(h), 6006(d), and 7062 are hereby modified and shall not apply to this Order or to the transactions contemplated by the APA.

25.      Nothing in this Order shall constitute authorization for the assumption by Community Intervention Services, Inc. ("CIS"), or the assignment to the Winning Bidder, or any party, of any Oracle or NetSuite agreement with CIS, including but not limited to the Oracle NetSuite Cloud Services and Support Agreement and  its Terms and Conditions,  and Payment Schedule No. 121644 and the Payment Plan Agreement by and between CIS and Oracle Credit Corporation (collectively the "Oracle Agreements"). CIS, in performing its obligations under the Transition Services Agreement (the "TSA"), shall not (i) provide access to the Winning Bidder or any party to utilize the software and/or support licensed to CIS pursuant to the Oracle Agreements, nor (ii) provide services under the Oracle Agreements to the Winning Bidder or any party under the TSA beyond the later to occur of (A) the closing of the sale of the assets of the debtor South Bay Mental Health Center, Inc. and CIS, or (B) the date that is sixty (60) days after the closing of the sale of the assets of the Debtor pursuant to this Order. CIS shall keep all payment obligations to NetSuite/Oracle current during the TSA period.

26.      This Court retains jurisdiction to:

a.      Interpret, implement and enforce the terms and provisions of this Order, the APA, and the assumption and assignment of the Assumed Contracts, including without limitation the sale free and clear and limitation of liability provisions;

b.      Protect the Winning Bidder and any of the Assets against any liens, claims, or interests;

c.      Resolve any disputes arising under or relating to the APA, the assumption and assignment of the Assumed Contracts, the Sale Motion, or this Order; and

    d.      Adjudicate all issues concerning asserted pre-Closing liens, claims or interests in, on, or to the Assets.

Dated: February 17, 2021

_____
Honorable Elizabeth D. Katz
United States Bankruptcy Judge

## **Exhibit A**

[FBTS Winning Bidder APA]

**EXECUTION**

## WINNING BIDDER ASSET PURCHASE AGREEMENT

This Winning Bidder Asset Purchase Agreement (this "Agreement") is entered into and made effective as of the 10th day of February, 2021, by and between Futures Behavior Therapy Center, LLC, a Massachusetts limited liability company ("Seller"), and FBTC Transitional Sub, LLC, a Delaware limited liability company ("Purchaser").

## Recitals

A.      Seller provides community-based, school-based and outpatient behavioral health and autism services primarily to adolescents in Massachusetts (the "Business") at the locations listed on Exhibit A (each location individually a "Facility" and, collectively, the "Facilities").

B.      Purchaser wishes to purchase from Seller, and Seller is willing to sell to Purchaser, substantially all of the assets of the Business, including without limitation Seller's leases of the real properties at which the Facilities are located, and Seller's agreements with clients and providers underlying the Business and its revenues, all on the terms and conditions hereinafter set forth.

C.      Purchaser and Seller entered into that certain Asset Purchase Agreement dated January 5, 2021 (the "Original Agreement") setting forth the terms and conditions respecting the Purchaser's acquisition of the assets of the Business from Seller and by this Agreement Purchaser and Seller hereby amend and restate the Original Agreement.

D.      On January 5, 2021 (the "Petition Date"), Seller filed a voluntary chapter 11 petition (the "Petition") in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"), commencing a chapter 11 bankruptcy case that is jointly administered under Case No. 21-40002-EDK, and, pursuant to Sections 1107 and 1108 of title 11, United States Code (the "Bankruptcy Code"), is managing its properties and operating its businesses as a debtor in possession.

E.      Pursuant to the Bankruptcy Court's Order (A) Approving Procedures Governing Debtor's Proposed Sale of Substantially All Assets of Futures Behavior Therapy Center, LLC, Including Certain Unexpired Leases and Executory Contracts, Pursuant to Sections 363 and 365 of the Bankruptcy Code, Free and Clear of Liens, Claims, and Interests; (B) Approving Form and Manner of Notice of Sale; (C) Approving Debtor's Assumption of Asset Purchase Agreement Pursuant to Section 365 of the Bankruptcy Code; and (D) Granting Related Relief dated January 15, 2021 [Doc. No. 81] (the "Sale Procedures Order"), Seller, in connection with obtaining the Bankruptcy Court's authorization to consummate the transactions provided in the Original Agreement, solicited higher and better offers for the assets of the Business, including the conduct of an auction on February 10, 2021 (the "Auction").

F.      At the conclusion of the Auction, it was determined that Purchaser submitted the highest and best offer for the assets of the Business, and Purchaser and Seller are entering into this Agreement in order to memorialize the outcome of the Auction and the designation of Purchaser as the "Winning Bidder" pursuant to the Sale Procedures Order.

**Agreement**

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, Purchaser and Seller agree as follows:

## ARTICLE I

## SALE OF ASSETS

1.1    Purchased Assets.  Subject to the terms, provisions and conditions contained in this Agreement, Purchaser shall purchase from Seller, and Seller shall sell, convey or cause to be conveyed to Purchaser, free and clear of all Liens: all of Seller's right, title, and interest in and to all assets real, personal and mixed, tangible and intangible, which relate to, or are used or held for use in connection with, the Business, including but not limited to the assets described in Sections 1.1(A) through (D), other than the Excluded Assets (as defined in Section 1.2 below) (collectively, the "Assets"):

(A)    the leases, subleases, licenses or other agreements to occupy all or any part of the real property at which the Facilities are located as set forth on Schedule 1.1(A) hereto (collectively, the "Assumed Leases");

(B)    all furniture, equipment, fixtures, furnishings, medical apparatuses, motor vehicles, marketing and promotional materials and brochures, stationery, policy manuals, operating manuals, kitchen equipment, supplies and inventories, and other tangible personal property;

(C)    all rights to lease deposits made under Assumed Leases, including those set forth on Schedule 1.1(C) attached hereto;

(D)    all intangible property, including, but not limited to:

(i)    all licenses, Permits, certifications (including determinations of need and pending determination of need applications), provider numbers, accreditations and authorizations issued by any Governmental Entity, including but not limited to such property described on Schedule 1.1(D)(i) attached hereto;

(ii)    all business records, including, but not limited to, financial books and records, payroll records, personnel records and manuals;

(iii)    all current and historical client records maintained by or for Seller, including without limitation, billing, medical, and clinical notes, and the entire "designated record set" as that term is defined by HIPAA (collectively, "Client Records");

2

(iv)    those existing commitments, Contracts, equipment or other personal property leases, purchase orders and agreements, as listed on Schedule 1.1(D)(iv) (the "Assumed Contracts");

(v)    the right to use the current name of each of the Facilities;

(vi)    all third-party warranties to the extent transferable;

(vii)    all proceeds under insurance policies and rights of recovery relating thereto that arise after the date of the Original Agreement and are pending as of the Closing, in each case, solely with respect to any tangible Assets or with respect to any insurance claims that affect the Business and the Assets; and

(viii)    (1) all patents and patent applications for inventions and discoveries, (2) all copyrights, copyright registrations and applications, and all related rights in mask works and works of authorship, including moral rights, (3) all registered and common law trademarks, trademark registrations and applications therefor, trade dress rights, trade names, registered and common law service marks, service mark registrations and applications therefor, (4) all corporate names, (5) all domain name registrations, IP addresses, network addresses and the like and the applications therefor in respect of internet domain names, (6) all email accounts, telephone numbers and fax numbers, (7) all ideas, concepts, discoveries, inventions, developments, technologies, works of authorship, trade secrets, software, firmware, tools, processes, techniques, know-how, methodologies, data, plans, devices, apparatuses, specifications, designs, circuits, layouts, mask works, algorithms, programs, code, documentation and other material and information, tangible or intangible, whether or not it may be patented, copyrighted or otherwise protected (including all versions, modifications, enhancements and derivative works thereof), (8) any and all patent rights, copyright rights, mask work rights, trade secret rights, sui generis database rights and all other intellectual and industrial property rights of any sort throughout the world (including any application therefor) and (9) any rights to any of the foregoing pursuant to a license or other agreement (collectively, "Intellectual Property").

The Assets described in Section 1.1(B), (C), and (D) are collectively referred to herein as the "Personal Property".   Subject to the terms of this Agreement, Seller and Purchaser may supplement or amend the Schedules of specific Personal Property at any time prior to Closing and the Schedules as so amended and supplemented as of the Closing Date shall operate to delineate those particular Assets identified in such Schedules to be acquired by Purchaser at Closing.

1.2    Excluded Assets.  Notwithstanding Section 1.1 above, the following shall be excluded from the assets sold by Seller to Purchaser hereunder (the "Excluded Assets"):

(A)    the accounts receivable, prepaid expenses, cash on hand, and other cash equivalents of the Business, and all rights and interests in and to bank accounts;

(B)    Seller's leases subleases, licenses or other agreements to occupy all or any part of the real property, in each case that are not Assumed Leases;

3

(C)     Seller's Contracts that are not Assumed Contracts;

(D)     Seller's corporate records and securities, including stock in affiliated entities;

(E)     Seller's insurance policies and Employee Benefit Plans;

(F)     Seller's claims and causes of action, including without limitation causes of action arising under Chapter 5 of the Bankruptcy Code;

(G)     Seller's interest in and rights under this Agreement and any other agreement between Purchaser and Seller executed in connection with this Agreement;

(H)     all intercompany claims between Seller and its Affiliates;

(I)     such other assets as may be described in Schedule 1.2(I);

(J)     all claims, refunds, credits, causes of action, choices in action, rights of recovery and rights of set-off of any kind, and all proceeds under insurance policies and rights of recovery relating thereto, other than as provided in in Section 1.1(D)(vii);

(K)     all obligations with respect to client deposits and trust funds;

(L)     claims and causes of action arising under Assumed Leases and Assumed Contracts;  and

(M)     all claims for and rights to receive tax refunds with respect to taxable periods (or portions thereof) ending on or prior to the Closing Date.

1.3     Assumed Obligations.  On the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely pay, perform and discharge in accordance with their respective terms, only the following liabilities of Seller, other than any that are Excluded Liabilities (as defined in Section 1.4 below) (collectively, the "Assumed Obligations"):

(A)     all liabilities and obligations of Seller under the Assumed Leases and the Assumed Contracts, but only to the extent (i) such liabilities or obligations arise after the Closing Date and (ii) such Assumed Leases and Assumed Contracts are assigned to Purchaser or Purchaser otherwise receives the rights and benefits of such Assumed Leases and Assumed Contracts pursuant to Section 1.5, and, in any case, specifically excluding any liability or obligation relating to or arising out of such Assumed Leases or Assumed Contracts as a result of (1) any breach of such Assumed Leases or Assumed Contracts occurring on or prior to the Closing Date, (2) any violation of applicable Law, breach of warranty, tort or infringement occurring on or prior to the Closing Date, or (3) any Action occurring on or prior to the Closing Date; and

(B)     the liabilities or obligations, if any, expressly described on Schedule 1.3(B).

4

1.4   <u>Excluded Liabilities</u>.  Notwithstanding anything herein to the contrary, Purchaser shall not assume or incur any liability or obligation for any other liabilities or obligations of Seller other than the Assumed Obligations (collectively, the "<u>Excluded Liabilities</u>"), including, but not limited to, the following:

(A)   subject to <u>Section 2.5</u> herein, any amounts ("<u>Cure Costs</u>") that must be paid and obligations that must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption by Seller and assignment to Purchaser of Assumed Leases and Assumed Contracts;

(B)   any of Seller's liabilities or obligations under this Agreement or any other agreements entered into by a Seller in connection with the transactions contemplated by this Agreement;

(C)   any of Seller's liabilities or obligations for expenses or fees incident to or arising out of the negotiation, preparation, approval or authorization of this Agreement or the consummation (or preparation for the consummation) of the transactions contemplated hereby (including all attorneys' and accountants' fees and brokerage fees) and transfer taxes;

(D)   any liability or obligation of any Seller or any of its Affiliates for taxes for any period;

(E)   any liability or obligation under or with respect to any Employee Benefit Plan or any other employee benefit plan, program, policy or arrangement presently or formerly maintained or contributed to by a Seller or its ERISA Affiliates, or with respect to which a Seller or any such ERISA Affiliate has any liability;

(F)   any liability or obligation with respect to any products or services that were marketed or sold prior to the Closing, including product liability, malpractice, tort liability, infringement claims and any related claims and Actions;

(G)   any of Seller's liabilities or obligations for vacation pay, sick pay, holiday pay, salary, bonuses or other payments or liabilities of any kind to any employee of Seller or current or former employee of a Seller, including any liabilities or obligations arising prior to the Closing with respect to the exempt or non-exempt status of any employee of Seller;

(H)   any liability or obligation relating to workers' compensation claims which were filed or presented on or before the Closing Date or which are filed or presented after the Closing Date but relate to claims and/or injuries first arising on or before the Closing Date;

(I)   any of Seller's liabilities or obligations (i) arising by reason of any violation or alleged violation of any Law, or (ii) arising by reason of any breach or alleged breach by Seller of any Contract;

(J)   any of Seller's liabilities or obligations relating to any Action, proceeding or claim arising out of or in connection with Seller's conduct of the Business or any other conduct of Seller or Seller's officers, directors, employees, consultants, agents or advisors on or prior to the Closing Date;

(K)     any of Seller's liabilities or obligations for indebtedness, including without limitation any funding under the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act");

(L)     any liabilities or obligations in respect of any of the Excluded Assets (including under any Contracts, leases, commitments or understandings related thereto);

(M)     any of Seller's liabilities or obligations which Purchaser may become liable for as a result of or in connection with the failure by Purchaser or any Seller to comply with any bulk sales or bulk transfers laws or as a result of any "defacto merger" or "successor-in-interest" (or similar) theories of liability;

(N)     any intercompany liabilities of Seller; and

(O)     the liabilities described on Schedule 1.4(O).

For purposes of this Section 1.4, "Seller" shall be deemed to include any predecessors to a Seller and any Person with respect to which a Seller is a successor-in-interest (including by operation of law, merger, liquidation, consolidation, assignment, assumption or otherwise).   Seller hereby acknowledges that it is retaining the Excluded Liabilities, all of which Excluded Liabilities shall be treated in accordance with the Bankruptcy Code and any relevant orders of the Bankruptcy Court.

1.5     Assignability of Certain Contracts; Effectiveness.   To the extent that the assignment to Purchaser of any Assumed Contract or Assumed Lease pursuant to this Agreement is not permitted without the consent of a third party and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, then the parties will use their commercially reasonable efforts, before the Closing, to obtain such consent, and, if any such consent is not obtained prior to the Closing Date, (A) this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Contract or any right or interest therein unless and until such consent is obtained and (B) Seller and Purchaser will reasonably cooperate with each other in any lawful and feasible arrangement designed to provide Purchaser with the benefits and obligations of any such Contract and Purchaser shall be responsible for performing all obligations under such Contract required to be performed by Seller on or after the Closing Date; provided, however, that, notwithstanding anything to the contrary in this Agreement, the assumption and assignment of any particular Assumed Contract or Assumed Lease, whether pursuant to the Sale Order, related order of the Bankruptcy Court, or this Section 1.5, shall, as permitted by Section 3.2, become effective only upon the Closing to the extent expressly designated as an "Assumed Contract"  or "Assumed Lease" under the Assignment and Assumption Agreement.

## ARTICLE II
## PURCHASE PRICE

2.1     Purchase Price.   The purchase price for the Assets (the "Purchase Price") shall be Eleven Million Eight Hundred Fifty Thousand Dollars ($11,850,000), plus or minus any prorations, payments, adjustments and credits shown on Schedule 2.1; provided, however, that

6

Purchaser reserves the right to increase the Purchase Price and otherwise modify the bid represented by this Agreement as may be permitted by the Bid Procedures Order.

2.2     <u>Payment of Purchase Price</u>. Seller acknowledges that Purchaser has delivered to Seller's counsel (Casner & Edwards, LLP), in escrow, the sum of Three Hundred Seventy-Five Thousand Dollars ($375,000.00) as an initial deposit (the "<u>Deposit</u>") for the payment of the Purchase Price. The Deposit shall not be invested and shall be held in escrow by Seller's counsel as escrow agent under this Agreement (in such capacity, the "<u>Escrow Agent</u>"), and disbursed by Escrow Agent in accordance with this Agreement and the escrow provisions attached as <u>Schedule 2.2</u> (the "<u>Escrow Provisions</u>").

2.3     <u>Payment of Balance of the Purchase Price</u>. At the Closing and immediately following Purchaser's payment of the Payment Amount (as defined below), Purchaser shall deposit with Escrow Agent in immediately available funds an amount equal to (A) the Purchase Price less (B) the sum of the Deposit and the Payment Amount and (C) plus or minus, as applicable, the prorations, payments, adjustments and credits contemplated by this Agreement or provided by <u>Schedule 2.1</u>, all as set forth in a closing statement to be executed and delivered by Seller and Purchaser pursuant to <u>Section 4.6(B)</u>. Upon the consummation of Closing, the Escrow Agent shall deliver to Seller the Purchase Price, as adjusted pursuant to the agreed upon closing statement pursuant to <u>Section 4.6(B)</u>.

2.4     <u>Purchase Price Allocation</u>. The Purchase Price shall be allocated as set forth in <u>Schedule 2.1</u>, which the parties shall agree upon prior to the Closing. The parties shall be bound by such allocation for all purposes and shall file Form 8594 with their respective federal income tax returns in a manner consistent with such allocation.

2.5     <u>Payment Schedule</u>. At least two (2) Business Days prior to the Closing, the Seller shall deliver to the Purchaser a schedule (the "<u>Payment Schedule</u>") identifying a dollar amount (the "<u>Payment Amount</u>") to be paid on account of Seller's liabilities from proceeds at Closing otherwise due to Seller , and the individuals or entities to receive such Payment Amount or portion thereof. The Payment Amounts shall be comprised of (i) the amount of Cure Costs that constitute Excluded Liabilities under <u>Section 1.4(A)</u>, (ii) the amount of the Transferred Employee Expenses (as defined below) under <u>Section 8.2(B)</u> and (iii) the payment of fees to investment bankers identified on <u>Schedule 5.1(P)</u>. The Payment Schedule shall provide Purchaser with the information necessary to pay the Payment Amount on Seller's behalf. The Purchaser shall pay the Payment Amount at the Closing on Seller's behalf, but shall not be responsible for the payment of any amounts that are omitted from the Payment Schedule or that otherwise should have been included in the Payment Schedule. The Seller acknowledges that the Purchaser is paying the amounts on the Payment Schedule, which constitute Excluded Liabilities and that no amounts contained in the Payment Schedule or any of the types of liabilities included in the Payment Schedule shall constitute or become Assumed Liabilities.

## ARTICLE III
## TRANSFER AND ASSIGNMENT

3.1     <u>Bill of Sale</u>. At the Closing, Seller shall convey or cause to be conveyed all of Seller's right, title and interest in and to the Personal Property to Purchaser by delivery to

Purchaser of a bill of sale in the form attached as <u>Schedule 3.1</u> (the "<u>Bill of Sale</u>"), which Bill of Sale shall convey Seller's right, title and interest, free and clear of all Liens, all as and to the extent provided for in the Sale Order (as defined below).

      3.2   <u>Assumption and Assignment Agreement</u>.  At the Closing, Seller shall, subject to <u>Section 6.6</u>, assign or cause to be assigned to Purchaser, and Purchaser shall assume, all of Seller's right, title and interest in and to the Assumed Leases and the Assumed Contracts, through their mutual execution and delivery of an assignment and assumption agreement in the form attached as <u>Schedule 3.2</u> (the "<u>Assignment and Assumption Agreement</u>").  Purchaser may at any time prior to three (3) Business Days prior to the Closing (A) designate any previously designated Assumed Lease or Assumed Contract to be an Excluded Asset, and Purchaser shall have no obligation with respect to, nor assume any liability under, any such lease or contract so designated to be an Excluded Asset and (B) designate a previously undesignated lease or Contract as an Assumed Lease or Assumed Contract, as applicable, in which case Seller shall provide to any counterparty to such newly-designated Assumed Lease or Assumed Contact such notice and opportunity to object as may be provided in the Bid Procedures Order, provided that the Closing shall not be conditioned on or subject to entry of an order approving the assignment and assumption of a lease or contract described in this <u>Section 3.2(B)</u>.

      3.3   <u>PURCHASER ACKNOWLEDGEMENT</u>.  PURCHASER ACKNOWLEDGES AND AGREES THAT THE REPRESENTATIONS AND WARRANTIES MADE BY SELLER IN THIS AGREEMENT, AS QUALIFIED OR SUPPLEMENTED BY THE DISCLOSURE SCHEDULES (THE "<u>SELLER REPRESENTATIONS</u>"), ARE THE EXCLUSIVE REPRESENTATIONS AND WARRANTIES MADE BY SELLER, AND EXCEPT FOR THE SELLER REPRESENTATIONS, IT IS ACQUIRING THE ASSETS ON AN "AS-IS WHERE-IS" BASIS, WITHOUT REPRESENTATION OR WARRANTY (EXPRESS OR IMPLIED) BY SELLER AND IN EACH CASE SUBJECT TO (A) ANY STATE OF FACTS REGARDING ITS PHYSICAL CONDITION OR WHICH AN ACCURATE SURVEY OR AN INSPECTION MIGHT SHOW, (B) ALL APPLICABLE LAWS, (C) VIOLATIONS OF LAWS WHICH MAY EXIST ON THE DATE OF THE ORIGINAL AGREEMENT, AND (D) ANY MATTER CAUSED OR PERMITTED BY PURCHASER OR ANY AGENT, EMPLOYEE OR AFFILIATE OF PURCHASER.  EXCEPT FOR SELLER REPRESENTATIONS, SELLER HAS NOT MADE NOR SHALL BE DEEMED TO HAVE MADE ANY REPRESENTATION OR WARRANTY (EXPRESS OR IMPLIED) OR SHALL BE DEEMED TO HAVE ANY LIABILITY WHATSOEVER AS TO THE VALUE, HABITABILITY, USE, CONDITION, DESIGN, OPERATION, MERCHANTABILITY OR FITNESS FOR USE OF THE ASSETS (OR ANY PART THEREOF), OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE ASSETS (OR ANY PART THEREOF). PURCHASER HAS PRIOR TO THE DATE HEREOF BEEN AFFORDED THE OPPORTUNITY TO INSPECT THE ASSETS AND THE IMPROVEMENTS THEREON (IF ANY).

**ARTICLE IV**
**CLOSING**

      4.1   <u>Date and Place</u>.  Subject to the terms and conditions of this Agreement (including the satisfaction or waiver of the conditions set forth in Article VII, the closing (the "<u>Closing</u>") of

8

the transactions contemplated herein shall be held virtually by the exchange of documents via PDF on the day that is five Business Days following the satisfaction or waiver of the conditions set forth in Article VII or at such other date as determined by the parties hereto. The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date". The Closing shall be deemed to be effective as of 12:01 a.m. on the Closing Date. Notwithstanding the foregoing, the parties may mutually agree to a different Closing Date.

4.2     Required Governmental Consents. Subject to Section 6.3, it shall be a condition precedent to Purchaser's obligation to close that Purchaser shall have made all necessary filings with governmental or regulatory authorities and shall have received all necessary governmental permits, licenses, and other approvals (which approvals shall include determinations of no action) as set forth on Schedule 4.2, including, without limitation, licensure approval by the Department of Early Education and Care of the Commonwealth of Massachusetts.

4.3     Seller's Documents. At the Closing, Seller will deliver or cause to be delivered to Purchaser the following documents:

(A)     The Bill of Sale in favor of Purchaser in the condition required by Section 3.1 hereof.

(B)     The Assignment and Assumption Agreement in the condition required by Section 3.2 hereof.

(C)     A transition services agreement in substantially the form attached hereto as Schedule 4.3(C) (the "Transition Services Agreement"), duly executed by Seller and Community Intervention Services, Inc., a Delaware corporation.

(D)     Certified resolutions of Seller authorizing the transactions under this Agreement.

(E)     Originals of all certificates of occupancy, licenses, permits, authorizations, and approvals issued by governmental authorities having jurisdiction, if available or in existence.

(F)     An affidavit sworn to by an officer of Seller to the effect that Seller is not a "foreign person", as that term is defined in Section 1445(f)(3) of the Code, which affidavit shall be in the form prescribed by federal regulations.

(G)     A certified copy of the Sale Order, which shall have become final and non-appealable.

(H)     All Client Records in existing form and format.

(I)     Reports and supporting documentation necessary to validate compliance with the receipt and utilization by Seller of CARES Act funding (including such funding provided under the Provider Relief Fund), including, but not limited to, evidence of Seller's compliance with the reporting of required information and related filing deadlines.

9

All of the documents and instruments to be delivered by Seller hereunder shall be in form and substance reasonably satisfactory to counsel for Purchaser.

4.4     Purchaser's Documents.  At the Closing, Purchaser will deliver the following to Seller:

(A)     The Purchase Price, as adjusted pursuant to the agreed upon closing statement pursuant to Section 4.6(B).

(B)     The Assignment and Assumption Agreement, in the condition required by Section 3.2 hereof.

(C)     The Transition Services Agreement, duly executed by Purchaser.

(D)     Certified resolutions of Purchaser authorizing the transactions under this Agreement.

All of the documents and instruments to be delivered by Purchaser hereunder shall be in form and substance reasonably satisfactory to counsel for Seller.

4.5     General.  At any time and from time to time after the Closing, at the request of one of the parties hereto and without additional consideration, the other party hereto shall execute and deliver such other documents and take such action as one of the parties may reasonably request to more effectively consummate the actions contemplated by this Agreement, provided the requested matter can be undertaken and achieved without material cost to the other party.

4.6     Joint Documents.  On the Closing Date, Purchaser and Seller shall exchange the following:

(A)     Any and all certificates, statements and declarations as may be required by federal, state, county or local law, regulation or ordinance including without limitation certificates, statements, and declarations regarding taxes assessed on or with respect to transfer of the Business, all of which such taxes, if any, shall be payable by Seller.

(B)     A closing statement by and between Seller and Purchaser reflecting Purchaser's payment of the net Purchase Price after accounting for the Deposit and Payment Amount and any prorations, payments, adjustments, and credits set forth on Schedule 2.1.

4.7     Possession.  Possession of the Facilities shall be delivered to Purchaser on the Closing Date. All tangible Personal Property and all books, files, records, Contracts, leases, third party warranties, regulatory materials and other assets constituting intangible Personal Property shall be located at the Facilities on the Closing Date and possession thereof delivered to Purchaser on such date; provided that Seller shall have the right, at Seller's sole cost and expense, to review and make copies of all books and records delivered to Purchaser in accordance with Section 8.1.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE PARTIES

5.1    <u>Representations and Warranties of Seller</u>.  Subject to disclosures made in the disclosure schedules delivered by Seller to Purchaser concurrently with the execution of this Agreement (the "<u>Disclosure Schedules</u>"), Seller hereby represents and warrants to Purchaser as of the date of the Original Agreement and as of the Closing as follows:

(A)    <u>Due Organization</u>.  Seller is a limited liability company, duly organized and validly existing under the laws of the Commonwealth of Massachusetts.  Seller is duly qualified to do business and is in good standing in the Commonwealth of Massachusetts and in each jurisdiction where the operation of the Business requires such qualification.  Seller has the requisite limited liability company power and authority to enter into this Agreement and to perform its obligations hereunder.

(B)    <u>Power and Authority; Enforceability; Consents</u>.  Subject to the Sale Order, the execution, delivery and performance of this Agreement by Seller and all other agreements referenced in or ancillary hereto to which Seller is a party and the consummation of the transactions contemplated herein by Seller:

(i)    is within its company powers and are not in contravention of the terms of its certificate of organization, operating agreement or any amendments thereto and have been duly authorized by all appropriate company action.

(ii)    will not violate any judgment of any court or Governmental Entity applicable to Seller or the Assets.

(iii)    will not require the approval, consent or authorization of, waiver from, or declaration, filing or registration with, any other Person or Governmental Entity, except as set forth in <u>Schedule 5.1(B)(iii)</u>.

(iv)    will neither conflict with nor result in any breach or contravention of any other Contract to which Seller is a party or by which it or the Assets is bound, except as set forth in <u>Schedule 5.1(B)(iv)</u>.

(C)    <u>Binding Agreement</u>.  Subject to the Sale Order, this Agreement and all agreements to which Seller will become a party hereunder are and will constitute the valid and legally binding obligations of Seller, and are and will be enforceable against Seller in accordance with the respective terms hereof and thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

(D)    <u>Assets</u>.  Except as set forth in <u>Schedule 5.1(D)</u>, the Assets constitute all of the assets, properties and rights necessary for the operation of the Business as it is currently conducted. Seller has good and valid title to, or a valid leasehold interest in or license to, the Assets, and upon entry of the Sale Order such Assets shall be free and clear of all Liens, except for Permitted Liens.

11

(E)     _Financial Statements_.     Schedule 5.1(E) sets forth true, complete and correct copies of (1) an unaudited balance sheet of the Business as of October 31, 2020 and (2) an unaudited income statement of the Business for the ten months ended October 31, 2020 (collectively, the "_Financial Statements_").  The Financial Statements (x) were prepared in good faith, (y) are based upon, and accurately reflect in all material respects, the books and records of Seller and the Business, and (z) fairly present, in all material respects, the financial position of the Business as of the dates thereof and the results of operations for the periods referred to therein, in each case in accordance with GAAP applied on a consistent basis throughout.

(F)     _Leases_.

(i)     True, correct, and complete copies of all of Seller's leases for the Facilities (including any amendments, extensions, renewals, guaranties, and other agreements with respect thereto) have been uploaded to the Data Room, and have been provided to Purchaser through Purchaser's access to the Data Room.  Neither Seller nor any other party to any of the Assumed Leases are in material default of its obligations under the Assumed Leases except to the extent set forth in Schedule 5.1(F)(i) in any manner that will not be cured prior to the Closing Date. No event has occurred that (with or without notice, lapse of time or both) would constitute a material breach or default by Seller or any other party under the Assumed Leases in any manner that will not be cured prior to the Closing Date. Each of the Assumed Leases is in full force and effect and constitutes a valid and legally binding obligation of Seller and each other party thereto, enforceable against Seller and, to Seller's Knowledge, each other party thereto, in each case in accordance with the express terms thereof.

(ii)     Except to the extent set forth in Schedule 5.1(F)(ii), Seller has performed all material obligations required to be performed by it under each of the Assumed Leases to which it is a party, and none of the Assumed Leases is currently subject to cancellation or any other material modification by the other party thereto or is presently subject to any penalty, right of set-off or other charge by the other party thereto for late performance or delivery in any manner that will not be cured prior to the Closing Date.

(iii)     Seller does not own any real property.

(iv)     Except as may be set forth in Schedule 5.1(F)(iv), the transactions contemplated by this Agreement do not require the consent of any other party to an Assumed Lease, will not result in a breach of or default under any Assumed Lease, or otherwise cause an Assumed Lease to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing in any manner that will not be cured prior to the Closing Date.

(v)     Seller's occupancy, use and operation of each of the Facilities complies in all material respects with all applicable Laws, there are no material deficiencies or defects in the Facilities, and Seller has access to utilities in sufficient capacities for the operation of the Business at each of the Facilities in the ordinary course of business.

12

(vi)    To Seller's Knowledge, there are no pending or threatened appropriation, condemnation, eminent domain or like proceedings relating to the Facilities or the real property on which each of the Facilities is situated.

(vii)    The Facilities comprise all of the real property used by Seller in, or otherwise related to, the Business.

(G)    <u>Material Contracts</u>.  For the purposes herein, a "Material Contract" shall be defined as any Contract with a value of more than, or which provides for the payment to or by Seller of more than, $10,000 annually (a "<u>Material Contract</u>").  Except as set forth in <u>Schedule 5.1(G)</u>, Seller is not a party to or bound by any Material Contract.

(H)    <u>Enforceability and Performance under Assumed Contracts</u>.  True, correct, and complete copies of all of the Assumed Contracts and the Material Contracts set forth or required to be set forth in <u>Schedule 5.1(G)</u> have been uploaded to the Data Room and have been provided to Purchaser through Purchaser's access to the Data Room.  Neither Seller nor any other party to any of the Assumed Contracts are in material default of its obligations under the Assumed Contracts except to the extent set forth in <u>Schedule 5.1(H)</u>. No event has occurred that (with or without notice, lapse of time or both) would constitute a material breach or default by Seller or any other party under the Assumed Contracts.  Each of the Assumed Contracts is in full force and effect and constitutes a valid and legally binding obligation of Seller and, to Seller's Knowledge, each other party thereto, enforceable against Seller and, to Seller's Knowledge, each other party thereto, in each case in accordance with the express terms thereof.

(I)    <u>Employee Benefits</u>.

(i)    Each "employee benefit plan" as defined in Section 3(3) of ERISA and each material bonus, deferred compensation, stock purchase, stock option, severance plan, salary continuation, vacation, paid-time-off, sick leave, fringe benefit, cafeteria, incentive, insurance, welfare or similar arrangement that is in each case sponsored or maintained Seller or to which Seller contributes or has any liability (each, an "<u>Employee Benefit Plan</u>") is listed in <u>Schedule 5.1(I)(i)</u>.  No Employee Benefit Plan, and no party in interest to, disqualified person of, or fiduciary of, any Employee Benefit Plan, has engaged in any non-exempt "prohibited transaction" as defined in ERISA or the Code.

(ii)    Except as set forth in <u>Schedule 5.1(I)(ii)</u>, neither Seller nor any affiliate of Seller as determined under Code Sections 414(b), (c), (m) or (o) ("<u>ERISA Affiliate</u>") or any of their respective predecessors maintains, contributes to, has any obligation to contribute to (or has any other liability, including contingent liability or current or potential withdrawal liability, with respect to) or has, ever, contributed to or been obligated to contribute to (1) any "multiemployer plan" (as that term is defined in Section 3(37) of ERISA), (2) any "employee pension benefit plan" (within the meaning of Section 302 of ERISA) that is subject to Section 412 of the Code, Section 302 of ERISA or Title IV of ERISA, (3) any "multiple employer plan" (within the meaning of Section 413 of the Code), or (4) any "multiple employer welfare arrangement" (within the meaning of Section 3(40) of ERISA), in each case, whether or not terminated.

13

(J)    Employees.

(i)    Seller is and for the past three years has been in compliance in all material respects with all applicable Laws, contracts, policies, plans, and programs applicable to it respecting labor, employment and employment practices in the jurisdictions within which it operates, including, without limitation, all applicable Laws respecting hiring, terms and conditions of employment, health and safety, compensation, wages and hours (including the classification of independent contractors and exempt and non-exempt employees), immigration (including the verification of I-9s for all employees), employment discrimination, disability rights or benefits, equal opportunity, termination of employment, plant closures and layoffs (including the WARN Act), workers' compensation, labor relations, employee leave and sick pay, accommodation of employees, harassment, paid time off, use of background checks and reports, use of selection procedures and tests, the provision of required meal and rest breaks, affirmative action, child labor, workers compensation, labor relations, collective bargaining, unemployment insurance and other insurance coverage, and the payment of social security and other employment-related taxes. Seller has properly classified all current and former employees, directors, individual consultants, temporary employees, leased employees, or any agents for tax purposes and for participation in any Employee Benefit Plans, and complied in all material respects with all applicable Laws relating to the classification of employees and independent contractors and payment of wages, has not made deductions from the pay of exempt employees which might result in loss of exempt status, and has, within the time and in the manner prescribed by applicable Laws, withheld and paid over to the proper tax authority all amounts required to be so withheld and paid over under applicable Laws.

(ii)    There are no material obligations relating to employment with respect to which Seller may have any liability, including but not limited to any accrued but unpaid compensation, wages, vacation, salaries, wage premiums, commissions, bonuses, fees, and other compensation or benefits to its current or former employees or independent contractors under applicable Laws, Contract or policy; or any fines, taxes, interest, or other penalties for any failure to pay or delinquency in paying such compensation. As of the date hereof, all compensation, including wages, commissions, bonuses, vacation and other paid time off, and other direct compensation for any service performed for the Business payable to current or former employees, independent contractors or consultants of Seller for services or work performed on or prior to the date hereof have been paid in full (or accrued in full). Seller is not subject to any pending claim for overdue overtime or other compensation due to any current or former employee or independent contractor and, no such claim has been threatened.

(iii)    Seller is not a party to or bound by any collective bargaining agreement, project labor agreement, or other Contract, commitment, arrangement or bargaining relationship with any labor organization, trade organization, or other representative of any of the employees of Seller, and no employee of Seller is represented by a labor union or other labor organization and there is no such contract, commitment or arrangement presently being negotiated by Seller. There is no labor strike, work stoppage, lockout, grievance, labor arbitration, walkout, picket, slowdown, work stoppage, or other material labor dispute pending or threatened against or affecting the Business. No labor union, organization, or other collective bargaining unit represents, claims to represent or is currently seeking to organize or represent the employees of the Business, and there have not been any union organizing activities or efforts

14

among the employees of the Business within the past three years. There is presently no union campaign being conducted to solicit cards from employees to authorize a union to request a National Labor Relations Board certification election, and no question concerning representation exists or has existed respecting such employees; and there is no unfair labor practice charge or complaint pending or threatened against Seller. No labor union, labor organization, or group of employees has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or threatened in writing to be brought or filed with the National Labor Relations Board or any other labor relations Governmental Entity. Seller has not committed any unfair labor practices.

(iv) To Seller's Knowledge, no Business Employee is in material violation of any term of any employment agreement, nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, noncompetition agreement, restrictive covenant or other obligation: (1) to Seller, or (2) with respect to any current employee or independent contractor of Business, to any third party with respect to such person's right to be employed or engaged by a Seller or to the knowledge or use of trade secrets or proprietary information.

(v) Schedule 5.1(J)(v) sets forth a true, correct, and complete list of (1) all employees (including any employee who is on a leave of absence or on furlough status, as specified), employed or engaged by Seller (the "Business Employees") and (2) for each Business Employee, each such individual's location of employment, date of hire, classification as exempt or non-exempt (as applicable), W-2 compensation for 2019 (including bonus and incentive payments), year-to-date compensation for 2020 (including bonus and incentive payments), current hourly rate or annual base salary, and any annual bonus opportunity, job titles or offices, notice period, whether such individual is on leave or furlough status, and the reason for leave of absence or furlough status and the anticipated date of return to full service, if known. Schedule 5.1(J)(v) also sets forth individuals classified as an independent contractor (excluding contingent workers engaged through a third-party temporary employment agency) in the past three years and for each individual identified as an independent contractor, each such individual's location, date of engagement, 1099 compensation for 2019, and year-to-date compensation for 2020.

(vi) Seller is not a party to, or otherwise bound by, any consent decree with, or citation by, any Governmental Entity relating to employees or employment practices. No action, proceeding, claim, or complaint by or on behalf of any employee, prospective employee, former employee, current or former contractor, labor organization or other representative of the employees of Seller, is pending or, to Seller's Knowledge, threatened, which could bind or in any way affect Purchaser after Closing as the result of the transactions contemplated by this Agreement. None of Seller's employment practices or policies are currently being audited or investigated by any Governmental Entity. With respect to the Business, there are no pending or, to Seller's Knowledge, threatened: (1) unfair labor practice charges or complaints before the National Labor Relations Board or any other Governmental Entity, (2) complaints, grievances or arbitrations arising out of any collective bargaining agreement or any other complaints, grievances or arbitration procedures; or (3) charges or complaints with respect to or relating to them before the Equal Employment Opportunity

Commission or any other Governmental Entity responsible for the prevention of unlawful employment practices.

(K)    Compliance with Law.

(i)    Seller is currently in, and during the past three years has been in, compliance in all material respects with (1) all Laws applicable to it or its business, properties or assets (including, without limitation, all Laws concerning the privacy, security, safeguarding, collection, access, use, disclosure, maintenance, transmittal, and/or confidentiality of Personal Information or other health care data, including, as applicable, HIPAA, 42 C.F.R. Part 2, state data breach Laws, state health information privacy and security Laws, the Telephone Consumer Protection Act, the CAN-SPAM Act, and state consumer protection Laws), and (2) any orders of any Governmental Entity applicable to it or the Business.  Seller is not under investigation by any Governmental Entity with respect to any violation of any Laws applicable to it or its business, properties or assets.

(ii)    In the past three years, Seller has not received any written notice, order, inquiry, investigation, complaint or other written communication by any Governmental Entity alleging any violation by it under any Laws applicable to it or its business, employees (in their capacity as such), properties or assets.

(iii)    No employee, including temporary employees, or independent contractors (whether an individual or entity) of the Business has been excluded from participating in any Federal Health Care Program and has not been and is not currently included on the OIG List of Excluded Individuals and Entities (LEIE), or the General Services Administration's Excluded Parties List System (EPLS) or System for Award Management (SAM), except as set forth in Schedule 5.1(K)(iii). None of the officers, directors, agents or managing employees (as such term is defined in 42 U.S.C. §1320a-5(b)) of the Business has been excluded, suspended, or debarred from any Federal Health Care Program or been subject to sanction, charged or been convicted of a crime in connection with any Federal Health Care Program.

(iv)    There is no, and there has not been for the past three years any, actual, or threatened (in writing) breach, compromise, or security incident affecting Personal Information in the Business's possession or control that would, if confirmed, constitute a breach or security incident for which notification to individuals, organizations, contractual counterparties, media, credit reporting agencies, and/or Governmental Entities is required under any applicable Laws or under any Contracts to which Seller is a party.

(L)    No Proceedings.  Except as disclosed in Schedule 5.1(L)(i), there are no Actions, administrative proceedings, or other legal actions of any kind pending or, to Seller's Knowledge, threatened, against Seller, or otherwise relating to or affecting the Business or the Assets or any portion thereof.  There are no Actions pending or, to Seller's Knowledge, threatened, seeking to restrain, prohibit, or obtain damages in connection with this Agreement or the transactions contemplated hereby.  Except as set forth in Schedule 5.1(L)(ii), Seller is not subject to any settlement, award or order involving any Governmental Entity or other Person.

16

(M)   <u>Absence of Certain Changes</u>.  From October 31, 2020 to the date of this Agreement, (i) no change, development, circumstance, effect or event has occurred or arisen that, individually or in combination with any other change, development, circumstance, effect or event, has had or would reasonably be expected to have a Material Adverse Effect and (ii) the Business has been conducted in all material respects in the ordinary course of business.  Except as set forth in <u>Schedule 5.1(M)</u>, since October 31, 2020, Seller has not:

(i)     entered into, amended or terminated any Material Contract, entered into any other material transaction in excess of $100,000, changed in any significant respect any business practice (in anticipation of the transactions contemplated hereby or otherwise);

(ii)    sold, assigned, transferred, leased or licensed any of its material tangible assets, except in the ordinary course of business;

(iii)   sold, disposed of, assigned, licensed, sublicensed, covenanted not to sue with respect to, or otherwise transferred any Intellectual Property (other than non-exclusive licensing or sublicensing of Intellectual Property in the ordinary course of business), or abandoned or permitted to lapse or expire any Intellectual Property;

(iv)    made or granted any bonus or any compensation or salary increase to any former or current employee or group of former or current employees (except in the ordinary course of business);

(v)     implemented any facility closing or other layoff of employees that could implicate the WARN Act;

(vi)    suffered any material damage, destruction or other casualty loss with respect to material property owned by Seller or waived any rights of material value;

(vii)   delayed capital expenditures, repairs or maintenance;

(viii)  failed to maintain in full force and effect any insurance policy in effect, except for any policy replaced by a new or successor policy of substantially similar coverage;

(ix)    terminated, amended, failed to renew or preserve or failed to maintain in full force and effect any Permit; or

(x)     agreed, whether orally or in writing, to do any of the foregoing.

(N)   <u>Permits</u>.

(i)     Seller possesses all Permits necessary to operate the Business, or that are necessary for the lawful ownership of their properties and assets or operation of the Business, and <u>Schedule 5.1(N)(i)</u> sets forth a true, complete and correct list of such Permits. Except as set forth in <u>Schedule 5.1(N)(i)</u>, Seller is and for the past three years has been in material compliance with all such Permits, and all such Permits are in full force and effect. There is not now pending or threatened in writing any action to revoke, cancel, rescind, modify

17

or refuse to renew any of such Permits. During the past three years, Seller has not received written notice of any petition, objection or other pleading with any Governmental Entity alleging the failure to hold any of the foregoing or any violations in respect thereof.

(ii)     Except as set forth in Schedule 5.1(N)(ii), all individuals providing professional services for on behalf of the Business, hold, and maintain in good standing, all licenses, registrations, credentials, education and training required to perform such services in all jurisdictions where such services are performed on behalf of the Business.

(O)     Intellectual Property.

(i)     Schedule 5.1(O)(i) contains a true, complete and correct list of all registered Intellectual Property that relate to, or are used or held for use in connection with, the Business (the "Business Intellectual Property"). All material registration, maintenance and renewal fees due in connection with such Business Intellectual Property have been paid and all documents, recordations and certificates in connection with such Business Intellectual Property required to be filed have been filed with the relevant patent, copyright, trademark or other authorities for the purposes of prosecuting and maintaining such Business Intellectual Property and recording the Seller's ownership interests therein.

(ii)     Schedule 5.1(O)(ii) contains a complete and correct list of all agreements to which Seller is a party and under which: (1) Seller is granted a license to use any Intellectual Property owned by a third party the use of which is material to the Business (excluding any such agreement for commercially available software); and (2) Seller has granted to a third party a license to use any Business Intellectual Property.

(iii)    Except as set forth in Schedule 5.1(O)(iii), Seller owns the Intellectual Property, free and clear of all Liens (other than Permitted Liens), and Seller has a valid and enforceable written license to use all other material Intellectual Property used in connection with the Business, in each case free and clear of all Liens (other than Permitted Liens). The transactions contemplated by this Agreement and the consummation thereof will not impair any right, title or interest of Seller in or to any Business Intellectual Property.

(iv)    Except as set forth in Schedule 5.1(O)(iv), Seller has not received any written communication in the last three years alleging that Seller has infringed, misappropriated, or violated any Intellectual Property of any Person. To Seller's Knowledge, the Business, as currently provided or conducted by Seller, does not infringe, misappropriate or violate any Intellectual Property owned by any third party. Except as set forth in Schedule 5.1(O)(iv), to Seller's Knowledge, no Person currently is infringing, misappropriating or violating any of the Business Intellectual Property.

(P)     Brokerage. Except as set forth in Schedule 5.1(P), no agent, broker, Person or firm acting on behalf of Seller is, or shall be, entitled to any broker's fees, finder's fees or commissions from Seller in connection with this Agreement or any of the transactions contemplated hereby.

(Q)     Taxes. Seller has timely filed all tax returns that were required to be filed (taking into account any applicable extension of time within which to file). All such tax returns

18

were correct, true and complete in all material respects and were prepared in substantial compliance with all applicable Laws and regulations.  All taxes of Seller that are due and payable on or prior to the Closing Date have been paid on or prior to the Closing Date (whether or not shown on any tax return).  There are no Liens for taxes upon any of the Assets.

(R)     Payors.  Schedule 5.1(R) sets forth the top 10 payors for the year ended December 31, 2019 and for the ten-month period ended October 31, 2020 (each, a "Major Payor").  Except as set forth in Schedule 5.1(R), in the past 12 months, no Major Payor (i) has canceled, suspended or otherwise terminated its relationship with the Business, or (ii) has advised Seller of its intention to (1) cancel, suspend or otherwise terminate its relationship with the Business, or (2) materially and adversely change the terms upon which it pays for goods or services from, or provided by, the Business.

5.2     Representations and Warranties of Purchaser.  Purchaser hereby represents and warrants to Seller as follows:

(A)     Due Organization.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware.  Purchaser has the requisite limited liability company power and authority to enter into this Agreement, perform its obligations hereunder and to conduct its business or operations as now being conducted.

(B)     Power and Authority; Enforceability; Consents.  The execution, delivery and performance of this Agreement by Purchaser and all other agreements referenced in or ancillary hereto to which it is a party and the consummation of the transactions contemplated herein by Purchaser (except as would not have a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement):

(i)     are within its powers and are not in contravention of the terms of its articles of organization or any amendments thereto and have been duly authorized by all requisite limited liability company action.

(ii)     will neither conflict with nor result in any breach or contravention of, or the creation of any lien under, any indenture, agreement, lease, instrument or understanding to which Purchaser is a party or by which Purchaser is bound.

(iii)     will not violate any judgment of any court or Governmental Entity applicable to Purchaser.

(iv)     will not require the approval or consent of any other party or authority.

(C)     Binding Agreement.  This Agreement and all other agreements to which Purchaser will become a party hereunder are and will constitute the valid and legally binding obligations of Purchaser and are and will be enforceable against it in accordance with the respective terms hereof and thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

(D)    Purchaser's Due Diligence.  Purchaser acknowledges that it has inspected and/or evaluated the Assets, the Facilities, and the Business, has made its own independent analysis of this transaction, and has not relied upon and is not relying upon any information provided or representations made by Seller with respect to the Assets, the Facilities, or the Business, other than the Seller Representations, in deciding to pursue its acquisition of the Assets pursuant to this Agreement.

(E)    Financing.  Purchaser has or at the Closing will have the funds sufficient to pay the Purchase Price and perform its obligations under this Agreement.

### ARTICLE VI
### COVENANTS PRIOR TO THE CLOSING

6.1    Seller Operations.  Between the date of the Original Agreement and the earlier of the date of the termination of this Agreement and the Closing Date, Seller will operate the Business in the ordinary course of business and, without limiting the foregoing, will use its commercially reasonable efforts to:

(A)    take or cause to be taken all actions necessary and appropriate to consummate the transactions contemplated by this Agreement, including without limitation those necessary to enable Seller to make the deliveries set forth in Section 4.3.

(B)    keep in full force and effect present insurance policies or other comparable insurance.

(C)    continue to employ the employees listed on Schedule 6.1(C) (individually, a "Key Employee", and collectively, the "Key Employees").  For the purposes of this Section 6.1(C), "commercially reasonable efforts" shall mean that Seller shall (i) not terminate a Key Employee without cause, (ii) not encourage or facilitate a Key Employee to seek employment elsewhere, and (iii) promptly notify Buyer if Seller becomes aware that a Key Employee intends to terminate such Key Employee's employment and reasonably cooperate with Buyer to attempt to retain such Key Employee, unless Buyer otherwise directs in writing.

6.2    Seller Negative Covenants.  Between the date of the Original Agreement and the earlier of the date of the termination of this Agreement and the Closing Date, Seller will not, without the prior written consent of Purchaser or as set forth on Schedule 6.2, take, propose to take, or omit to take, directly or indirectly, any action that, if taken (or omitted to be taken) between October 31, 2020 and the date of the Original Agreement, would have required disclosure on Schedule 5.1(M).

6.3    Governmental Approvals.

(A)    Upon Bankruptcy Court approval of this Agreement pursuant to Section 6.4, Purchaser shall use its commercially reasonable efforts to obtain as soon as reasonably possible at its own expense, and Seller shall use its commercially reasonable efforts to assist and cooperate with Purchaser and its representatives and counsel in so obtaining, all governmental consents, approvals, certificates of exemption and licenses which are necessary or appropriate, and in the preparation of any document or other material which may be required by any

20

Governmental Entity as a condition precedent to or result of the transactions contemplated herein.

(B)     Without limiting Section 6.3(A), upon Bankruptcy Court approval of this Agreement pursuant to Section 6.4, the parties shall make, or cause to be made, all necessary filings with Governmental Entities as set forth on Schedule 4.2.  To the extent that such filings require information relating to Seller or known only to Seller, Seller shall promptly provide timely assistance to Purchaser in completing such filings.

6.4     Bankruptcy Court Approval.  Seller's entry into this Agreement will not become effective and binding on Seller until the Bankruptcy Court has entered an appropriate order approving Seller's entry into this Agreement and the sale of the Business and the Assets pursuant to this Agreement, which order shall authorize, approve and provide for the sale of the Assets to Purchaser free and clear of all Liens (other than Permitted Liens) and shall otherwise be in form and substance reasonably agreeable to Seller, Purchaser and Capital One, National Association (successor by merger to Healthcare Financial Solutions, LLC), as successor to General Electric Capital Corporation, as Agent ("Agent") under that certain Credit Agreement, dated as of July 16, 2015 (as amended, amended and restated, supplemented or otherwise modified from time to time), among, without limitation, Agent and Seller (in the form entered by the Bankruptcy Court, the "Sale Order").  Seller shall pursue entry of the Sale Order in keeping with the Seller's motion for such relief filed at joint Docket No. 10.  From and after the date of the Original Agreement until the Closing Date, Seller shall deliver to Purchaser and Agent copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers that are filed by Seller in the Bankruptcy Case that relate, in whole or in part, to this Agreement or Purchaser.

6.5     Alternative Transaction.

Following the date of the entry of the Sale Order approving this Agreement and until the earlier of (i) the Closing and (ii) such time as this Agreement has been terminated in accordance with its express terms, and provided that Purchaser is not in material default of its obligations under this Agreement, Seller shall not, nor shall it authorize or permit any other Person to, (1) directly or indirectly solicit, initiate or encourage the submission of any offer or proposal concerning any Alternative Transaction not authorized by the Sale Order or (2) directly or indirectly participate in any discussions or negotiations regarding, or furnish to any person any information with respect to, or take any other action to facilitate the making of, any proposal or expression of interest that constitutes or is reasonably likely to lead to an Alternative Transaction not authorized by the Sale Order.  The term "Alternative Transaction" means one or more agreements to sell, transfer, or otherwise dispose of all or any portion of the Assets in a transaction or series of transactions with one or more Persons, other than Purchaser, who have submitted a Qualified Bid (as such term is defined in the Sale Procedures Order) in connection with the Auction.

6.6     Assumed Leases and Assumed Contracts; Cure Amounts.

(A)    Seller shall take all commercially reasonable actions required to assume the Assumed Leases and Assumed Contracts and to assign them to Purchaser, including taking all actions (i) reasonably requested by Purchaser to facilitate any negotiations with the counterparties to such Assumed Leases and Assumed Contracts and (ii) to obtain an order (which may be the Sale Order) containing a finding that the proposed assumption and assignment of the Assumed Leases and Assumed Contracts to Purchaser satisfies all applicable requirements of Section 365 of the Bankruptcy Code.  In connection with the foregoing and as the case may be, Purchaser covenants to provide adequate assurance of performance and represent and warrant that it is capable of providing adequate assurance of future performance.

(B)    Schedules 1.1(A) and 1.1(D)(iv) shall each include Seller's good-faith estimate of the Cure Costs (if any) associated with each Assumed Lease and Assumed Contract. At the Closing, upon Purchaser's final designation of the Assumed Leases and Assumed Contracts to be assigned, (i) Seller pursuant to the Assignment and Assumption Agreement shall assume and assign to Purchaser each of the Assumed Leases and Assumed Contracts that is capable of being assumed and assigned and pay promptly any Cure Costs associated therewith, and (ii) Purchaser pursuant to the Assignment and Assumption Agreement shall assume and perform and discharge the Assumed Obligations under the Assumed Leases and Assumed Contracts; provided that Purchaser and Seller shall cooperate and use best commercial efforts to minimize any and all Cure Costs; provided, further, that nothing in this Section 6.6(B) shall require Purchaser to increase the Purchase Price or pay any Cure Cost or pay any other amounts or agree to be subject to any liabilities or obligations not in the ordinary course of business or that are not required pursuant to the terms of the Assumed Leases or Assumed Contracts following the Closing and Purchaser's assumption of such Assumed Leases or Assumed Contracts.

(C)    Purchaser may request, in its reasonable business judgment, certain modifications and amendments to any lease or contract of a Seller as a condition to such lease or contract becoming an Assumed Lease or Assumed Contract, as applicable, and Seller shall use commercially reasonable efforts to obtain such modifications or amendments. If Seller is unable to obtain such modifications or amendments, Purchaser may, in its sole discretion, designate the relevant lease or contract as an Excluded Asset.

(D)    If, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, the consent of the non-Seller party to any Assumed Lease or Assumed Contract is required but not obtained, Seller shall, at Purchaser's sole cost and expense, cooperate with Purchaser in any reasonable arrangement proposed by Purchaser, including Purchaser's provision of credit support, designed to provide Purchaser the benefits and obligations of or under any such Assumed Lease or Assumed Contract; provided, however, that nothing in this Section 6.6 shall (i) require Seller to make any expenditure or incur any obligation on its own or on Purchaser's behalf or (ii) prohibit Seller from ceasing operations or winding up its affairs following the Closing.  Any assignment to Purchaser of the Assumed Leases and the Assumed Contracts that, notwithstanding the Sale Order (or other Bankruptcy Court order approving the assumption and assignment of such lease or contract), requires the consent of any third party for such assignment to be effective shall be made subject to such consent being obtained.  If Purchaser determines that such consent cannot be obtained on terms

22

reasonably satisfactory to Purchaser within 30 days after the Closing, Purchaser may on notice to Seller reclassify each such Assumed Lease or Assumed Contract as an Excluded Asset.

6.7    Closing Conditions.  Between the date of the Original Agreement and the earlier of the termination of this Agreement and the Closing Date, Seller and Purchaser will use their respective commercially reasonable efforts to cause the conditions specified in this Agreement over which they have control to be satisfied as soon as reasonably practicable, but in all events before the Closing Date.

6.8    Tax Returns. All income, sales, franchise and payroll tax returns and reports required by law to be filed by Seller prior to the Closing will be timely filed (subject to Seller's right to timely extend the filing thereof) and will accurately reflect the tax position of Seller, and all taxes respectively due under such tax returns will be paid by Seller.  Purchaser is not assuming under this Agreement any (i) tax liabilities owed by Seller or any other tax liabilities as a result of the operation of the Business prior to the Closing Date, (ii) any liability for taxes deferred by Seller under IRS Notice 2020-65, or (iii) liability for any taxes deferred under the CARES Act.

6.9    Transfer Taxes.  All transfer, documentary, sales, use, stamp, registration and other substantially similar taxes (including any real property transfer or similar tax) incurred in connection with this Agreement and the consummation of the transactions contemplated hereby (collectively, "Transfer Taxes"), if any, and that are not exempt under Section 1146(a) of the Bankruptcy Code, shall be borne 100% by the Seller and shall be paid by Seller when due. Seller will, at the Sellers' own expense, timely file all necessary tax returns and other documentation with respect to all such Transfer Taxes that are required by applicable Law.

6.10    Reporting Requirements.  Purchaser and the Seller agree to utilize, and to cause their respective affiliates to utilize, any permissible method set forth in IRS Rev. Proc. 2004-53 with respect to wage reporting as determined by Purchaser.

6.11    Intentionally Omitted.

6.12    Sale Order.  The Sale Order shall be in form and substance satisfactory to Purchaser, Seller and Agent.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code; (y) including a determination in the Sale Order that Purchaser has not engaged in any conduct that would result in avoidance of the transactions contemplated by this Agreement under Section 363(n) of the Bankruptcy Code, and (z) establishing adequate assurance of future performance in connection with the Assumed Leases and Assumed Contracts within the meaning of Section 365 of the Bankruptcy Code.  The Sale Order shall, without limitation:

(A)    approve, pursuant to Sections 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement; (ii) the sale of the Assets to Purchaser on the terms set forth herein and free and clear of all Liens, claims, and interests (other

23

than Permitted Liens), and (iii) the performance by Seller of its obligations under this Agreement;

      (B)    find that Purchaser is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code;

      (C)    find that Purchaser and Seller have engaged in no conduct that would result in the avoidance of the transactions contemplated under this Agreement pursuant to Section 363(n) of the Bankruptcy Code;

      (D)    find that Purchaser is not a successor to Seller and contain substantially the language set forth in <u>Section 9.18</u> of this Agreement; and

      (E)    find that Purchaser shall have no liability for any obligation of Seller that is not an Assumed Obligation.

    6.13   <u>Client Records</u>.  Following the Closing, Seller shall refrain from the modification or destruction of Client Records until Purchaser confirms to Seller that the Client Records function in a production environment. Following the Closing, (i) Purchaser shall maintain the Client Records in such a manner as to protect their integrity, ensure their confidentiality and proper use, and ensure their accessibility and availability to Seller and Seller's clients or their authorized representatives as required by Law, and (ii) Purchaser shall make the Client Records available for inspection or copying, or both, to Seller for billing purposes or to respond to or defend any malpractice claim or third-party audit or investigation, each as permitted by applicable Law.

## ARTICLE VII
## CONDITIONS PRECEDENT TO CLOSING

    7.1   <u>Conditions Precedent to Seller's Obligations</u>.  Notwithstanding anything herein to the contrary, the obligations of Seller to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Seller at or prior to Closing:

      (A)    (i) The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects (except that the representations and warranties that are qualified as to "materiality" shall be true and correct in all respects without qualifications) when made and as of the Closing Date as though such representations and warranties had been made on and as of such Closing Date; (ii) each and all of the terms, covenants and conditions of this Agreement to be complied with or performed by Purchaser on or before the Closing Date pursuant to the terms hereof shall have been materially complied with and performed; and (iii) Purchaser shall deliver to Seller a certification to the foregoing effect.

      (B)    Purchaser shall have, at or prior to the Closing, delivered to Seller the documents required to be delivered by it pursuant to <u>Section 4.4</u>.

(C)    The Bankruptcy Court shall have entered the Sale Order (in form and substance acceptable to Purchaser), which shall have become final and non-appealable.

7.2    <u>Conditions Precedent to Purchaser's Obligations</u>.    Notwithstanding anything herein to the contrary, the obligations of Purchaser to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Purchaser at or prior to Closing:

(A)    (i) the Fundamental Representations shall be true and correct in all respects when made and as of the Closing Date, as though such Fundamental Representations had been made on and as of the Closing Date (except for those Fundamental Representations that address matters only as of a particular date, which shall have been true and correct as of such particular date); (ii) the representations and warranties of Seller contained in this Agreement (other than the Fundamental Representations) shall be true and correct in all respects when made and as of the Closing Date, as though such representations and warranties had been made on and as of such Closing Date (except for those representations and warranties that address matters only as of a particular date, which shall have been true as of such particular date) disregarding in each case any "materiality" or similar qualifier (except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect); (iii) each and all of the terms, covenants and conditions of this Agreement to be complied with or performed by Seller on or before the Closing Date pursuant to the terms hereof shall have been materially complied with and performed; and (iv) Seller shall deliver to Purchaser a certification to the foregoing effect.

(B)    During the period from the date of the Original Agreement through the Closing Date, no Material Adverse Effect shall have occurred.

(C)    On or prior to the Closing Date, Purchaser shall have obtained documentation or other evidence reasonably satisfactory to Purchaser that Purchaser has:

(i)    received written confirmation from all applicable licensure agencies that upon Closing all licenses required by law to operate the Business as currently operated will be transferred to, or issued or reissued in the name of, Purchaser; and

(ii)    obtained reasonable assurances that insurance provider certification of the Facilities for its operation by Purchaser will be effective as of Closing and that Purchaser may participate in and receive reimbursement from such programs effective as of Closing.

(D)    No Action before a court or any other Governmental Entity shall have been instituted seeking to restrain or prohibit the transactions herein contemplated.

(E)    All consents, approvals, permits, waivers and estoppels of third parties that are listed on <u>Schedule 7.2(E)</u> shall have been obtained on terms reasonably satisfactory to Purchaser.

(F)    Seller shall have, at or prior to the Closing, delivered to Purchaser the documents required to be delivered by it pursuant to <u>Section 4.3</u>.

(G)     The Bankruptcy Court shall have entered the Sale Order, which shall have become final and non-appealable.

## ARTICLE VIII
## ADDITIONAL AGREEMENTS

8.1     <u>Books and Records</u>.  For purposes of this Agreement, the term "<u>Retention Period</u>" shall mean the period ending six years after the Closing.  Until the conclusion of the Retention Period, (A) Purchaser will maintain all books and records of Seller constituting a part of the Assets which are delivered to Purchaser at Closing and which relate to the pre-Closing Business in a manner reasonably consistent with Purchaser's record retention policies or practices and (B) subject to applicable Law and solely as reasonably necessary in connection with the preparation and filing of tax returns by Seller or other proper purpose including the administration of the Bankruptcy Case, upon reasonable advance written notice from Seller to Purchaser, afford Seller reasonable access to such records during normal business hours; <u>provided</u>, that the foregoing shall not require Purchaser or any of its Affiliates (i) to provide access to any books, records or other information to the extent such books, records or other information do not pertain to the Business (and Purchaser shall be entitled to withhold access to or redact any portion of such books and records or other information that does not pertain to the Business), (ii) to permit any inspection, or to disclose any information, that in the reasonable judgment of Purchaser would violate applicable Law, fiduciary duty, or binding agreement entered into prior to the Closing Date, or (iii) to take any action that would cause unreasonable disruption to the business of Purchaser or the Business.

8.2     <u>Employee Related Matters</u>.

(A)     <u>Transferred Employees</u>.  As of the Closing Date, Purchaser shall offer employment to only those employees of the Business as Purchaser shall determine in its sole discretion and such offers of employment shall contain terms and conditions of employment that Purchaser shall determine in its sole discretion. Seller shall make available to Purchaser a correct and complete list of all the current employees of the Business and such employee information as Purchaser reasonably deems necessary for Purchaser to complete its new employee onboarding processes (all in a form reasonably acceptable to Purchaser) as of 10 Business Days prior to the Closing Date, and Purchaser shall provide Seller with a list of the Business's employees to whom Purchaser intends to offer employment at least five days prior to the Closing Date.  On the Closing Date, Seller shall take all steps necessary to terminate the employment of each employee of the Seller who is offered employment by Purchaser as set forth in the immediately preceding sentence. The employees of the Seller who accept Purchaser's offer of employment and who become employed by Purchaser shall be referred to herein as "<u>Transferred Employees</u>." Nothing in this Agreement shall confer upon any Transferred Employee any right with respect to continued employment with Purchaser, nor shall anything herein limit or interfere with Purchaser's right to terminate the employment of any Transferred Employee at any time (subject to applicable Law), with or without cause or notice, or restrict Purchaser in the exercise of independent business judgment in modifying any terms or conditions of employment of the Transferred Employees on and after the Closing Date.

(B)     <u>Pre-Closing Obligations to Transferred Employees</u>. Subject to <u>Section 2.5</u> herein, Seller shall be responsible for all liabilities, obligations and commitments relating to Seller's employment of the Transferred Employees, including any severance compensation that may be owed by Seller to any Transferred Employee as a result of this transactions contemplated by this Agreement in accordance with the applicable severance agreement, and bonus payments payable to any Transferred Employees in accordance with applicable bonus arrangements entered into prior to the Closing Date (collectively, the "<u>Transferred Employee Expenses</u>").

(C)     <u>Employee Information</u>. Seller shall use commercially reasonable efforts to provide promptly to Purchaser, at Purchaser's request, any information or copies of personnel records (including addresses, dates of birth, date of hire and dependent information) relating to the Transferred Employees or relating to the service of Transferred Employees with Seller (and predecessors of Seller, as applicable) prior to the Closing Date; provided that Purchaser shall not request any information, or use any disclosed information in any manner that may violate applicable Laws, including but not limited to salary history, equal pay, discrimination and leave laws. Seller and Purchaser shall each cooperate with the other and shall provide to the other such documentation, information and assistance as is reasonably necessary to effect the provisions of this <u>Section 8.2</u>.

## ARTICLE IX
## MISCELLANEOUS

9.1     <u>Exhibits and Schedules and Other Instruments</u>. Each Exhibit and Schedule to this Agreement shall be considered a part hereof as if set forth herein in full. Any disclosure made in a Disclosure Schedule to this Agreement shall be deemed a disclosure for all purposes under this Agreement to the extent that the relevance of such disclosure is reasonably apparent from the text of such disclosure in the Disclosure Schedules.

9.2     <u>Additional Assurances</u>. The provisions of this Agreement shall be self-operative and shall not require further agreement by the parties except as may be herein specifically provided to the contrary; provided, however, at the reasonable request of a party, the other party shall execute such additional instruments and take such additional actions as the requesting party may deem necessary to effectuate this Agreement. Seller shall, at any time and from time to time at and after the Closing, upon the reasonable request of Purchaser and at Purchaser's sole expense, take any and all steps necessary to place Purchaser in possession and operating control of the Assets to be transferred hereunder and will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may reasonably be required or requested to more effectively transfer and confirm to Purchaser or to its successors or assigns, or to reduce to possession, any or all of the Assets and to carry out the purposes and intent of this Agreement, provided however, that Purchaser shall bear all costs associated with such acts.

9.3     <u>Choice of Law</u>.

(A)     The parties agree that this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to principles of conflicts of laws, but subject as necessary or appropriate to the Bankruptcy Code.

(B)     The Bankruptcy Court will have jurisdiction over any and all disputes between or among the parties, whether at law or in equity, arising out of or relating to this Agreement; provided, however, that if the Bankruptcy Court is unwilling or unable to hear any such dispute, each of the parties submits to the exclusive jurisdiction of the United States District Court for the District of Delaware and of any Delaware State Court in any Action arising out of or relating to this Agreement or the transactions contemplated herein or therein and agrees that all claims in respect of such Action may be heard and determined in any such court. Each of the parties waives any defense of inconvenient forum to the maintenance of any Action so brought and waives any bond, surety or other security that might be required of any other party with respect thereto.

(C)     Each of the parties hereby waives, to the fullest extent permitted by Law, any right to trial by jury of any claim, demand, Action, or cause of action (i) arising under this Agreement or (ii) in any way connected with or related or incidental to the dealings of the parties in respect of this Agreement or any of the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity, or otherwise.

9.4     <u>Benefit/Assignment</u>.  Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors and assigns; provided, however, that no party may assign this Agreement without the prior written consent of the other party and any such attempted assignment shall be null and void.  This Agreement is intended solely for the benefit of the parties hereto and is not intended to, and shall not, create any enforceable third party beneficiary rights.  Notwithstanding the foregoing:

(A)     Purchaser may, without the written consent of Seller, assign, in whole or in part, its rights and obligations pursuant to this Agreement to one or more of its Affiliates, provided that Purchaser will nonetheless remain liable for all of Purchaser's obligations hereunder;

(B)     Purchaser may, without the written consent of Seller, collaterally assign its rights under this Agreement for security purposes to any lender providing financing to Purchaser or any of its Affiliates, and any such lender may exercise all of the rights and remedies of Purchaser hereunder; and

(C)     Following the Closing, Purchaser may, without the written consent of Seller, assign its rights under this Agreement, in whole or in part, to any subsequent third party purchaser of Purchaser or all or substantially all of its assets (whether such sale is structured as a sale of stock, a sale of assets, a merger, or otherwise).

Notwithstanding anything to the contrary in this Agreement, the Agent shall be a third party beneficiary of all provisions of this Agreement that expressly relate to the Agent.

9.5     <u>Cost of Transactions</u>.  Whether or not the transactions contemplated hereby shall be consummated, the parties agree as follows: except as otherwise expressly provided in this Agreement (i) Seller will pay the fees, expenses, and disbursements of Seller and its agents, representatives, accountants, and counsel incurred in connection with the subject matter hereof and any amendments hereto, and (ii) Purchaser shall pay the fees, expenses and disbursements of Purchaser and its agents, representatives, accountants and counsel incurred in connection with the subject matter hereof and any amendments hereto.

9.6     <u>Confidentiality</u>.  Notwithstanding anything to the contrary set forth herein, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms until the Closing, at which time it shall terminate and be of no further force or effect.  From and after the Closing, Seller shall, and shall cause its Affiliates to, keep confidential and not use any written, oral, or other information relating to the Business or the Assets obtained by virtue of Seller's ownership of the Business and the Assets prior to the Closing ("<u>Confidential Information</u>"), except (i) to the extent disclosure is required by applicable Law (in which case, unless prohibited by Law, the disclosing party shall promptly notify the other party in writing of the same, and such disclosing party shall reasonably cooperate with the non-disclosing party (at the disclosing party's sole cost and expense) to preserve the confidentiality of such information consistent with applicable Law), (ii) to the extent such information has been made public through no fault of the applicable party, and (iii) each of Purchaser and Seller may disclose such information to such Person's equityholders or Affiliates, and their respective representatives and financing sources (provided that such equityholders, Affiliates, representatives or financing sources are instructed to keep such Confidential Information confidential, and Purchaser and/or Seller (as applicable) shall be responsible for any breach of this <u>Section 9.6</u> by their respective equityholders, Affiliates, representatives or financing sources as if they were a party hereto).

9.7     <u>Public Announcements</u>.  Seller and Purchaser mutually agree that no party hereto shall release, publish or otherwise make available to the public in any manner whatsoever any information or announcement regarding the transactions herein contemplated without the prior written consent of the other party, except for information and filings reasonably necessary to obtain Bankruptcy Court approval of this Agreement or required by any Governmental Entity, or by Purchaser or its Affiliates after the Closing if made in the ordinary course.

9.8     <u>Waiver of Breach</u>.  The waiver by any party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or any other provision hereof.

9.9     <u>Notice</u>.  Any notice, demand or communication required, permitted or desired to be given hereunder shall be in writing and shall be delivered in person, by electronic mail (e-mail), by overnight delivery service such as Federal Express or Express Mail, or by certified mail, return receipt requested, with postage prepaid, to the parties at the following addresses (or such other or further addresses as the parties may hereafter designate by written notice):

(a)     <u>If to Seller</u>:

Futures Behavior Therapy Center, LLC
c/o Community Intervention Services

29

Attention:  Andrew R. Calkins, CEO
200 Friberg Parkway, Suite 2000
Westborough, MA 01581
E-mail:  acalkins@communityinterventionservices.com

With a copy to (which shall not constitute notice):
Casner & Edwards, LLP
Attention:  Michael J. Goldberg, Esq.
303 Congress Street, #201
Boston, MA 02210
E-mail:  Goldberg@casneredwards.com

(b)   If to Purchaser:

FBTC Transitional Sub, LLC
c/o National Mentor Holdings, LLC
Attention: Nate Lewis, VP, Mergers and Acquisitions; Gina Martin, Chief
Legal Officer
313 Congress Street, 5th Floor
Boston, MA 02210
Email: Nate.Lewis@TheMentorNetwork.com;
        Gina.Martin@TheMentorNetwork.com

With a copy to (which shall not constitute notice):
Quarles & Brady LLP
Attention: Ryan P. Haas
411 E. Wisconsin Avenue, Suite 2400
Milwaukee, WI 53202
E-mail: ryan.haas@quarles.com

(c)   If to Escrow Agent:

Casner & Edwards, LLP
Attention:  Michael J. Goldberg, Esq.
303 Congress Street, #201
Boston, MA 02210
E-mail:  Goldberg@casneredwards.com

All notices given in accordance with the foregoing shall be deemed to have been duly given and
to be effective when delivered and received.

9.10   Interpretation

(A)   Whenever the context of this Agreement requires, the gender of all words
herein shall include the masculine, feminine and neuter, and the number of all words herein shall
include the singular and plural.

30

(B)     The words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(C)     Wherever the word "include," "includes," or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation."

(D)     The word "or" shall be inclusive and not exclusive.

(E)     Each reference herein to "days" shall be to calendar days unless "Business Days" are otherwise specified.

(F)     Each reference herein to any Contract shall be to such Contract as amended, supplemented, waived or otherwise modified from time to time.

(G)     Each reference herein to a Law is to such Law as it may be amended from time to time.

(H)     The phrase "made available to Purchaser" and phrases of similar import when used in this Agreement will mean uploaded to the Data Room on or prior to the date that is one Business Day prior to the date of the Original Agreement (and remains available to Purchaser therein through the Closing); and

(I)     The phrase "ordinary course of business" and phrases of similar import when used in this Agreement will mean the ordinary course of business consistent with past practice.

9.11    <u>Divisions and Headings</u>.   The divisions of this Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

9.12    <u>Entire Agreement</u>.   This Agreement, together with all other agreements and documents to be delivered hereunder, constitutes the entire agreement of Seller and Purchaser and supersedes all prior agreements and understandings, both oral and written, between them concerning the subject matter hereof.   This Agreement amends and restates the Original Agreement in its entirety.

9.13    <u>Counterparts</u>.   This Agreement may be executed in several counterparts by one or more of the undersigned and all such counterparts so executed shall together be deemed and constitute one final agreement, as if one document had been signed by all parties hereto; and each such counterpart shall be deemed an original, binding the parties subscribed hereto and multiple signature pages affixed to a single copy of this Agreement shall be deemed to be a fully executed original Agreement. Signatures delivered by facsimile or by e-mail in PDF format shall be deemed to be effective as original signatures.

9.14    <u>Proration</u>.   The operation of the Business and the income and normal operating expenses attributable thereto through the date preceding the Closing Date shall be for the account of Seller and thereafter for the account of Purchaser, and, if any income or expense is properly

allocable or credited, then it shall be allocated, charged or prorated accordingly. Expenses for goods or services received both before and after the Closing Date, such as power and utilities charges and rents and similar prepaid and deferred items shall be prorated between Seller and Purchaser as of the Closing Date in accordance with GAAP. All special assessments and similar charges or Liens imposed against the Assets in respect of any period of time through the Closing Date, whether payable in installments or otherwise, shall be the responsibility of Seller, and amounts payable with respect to such special assessments, charges or liens in respect of any period of time after the Closing Date shall be the responsibility of Purchaser, and such charges shall be adjusted as required hereunder. To the extent that any of the foregoing prorations and adjustments cannot be determined as of the Closing Date, Purchaser and Seller shall conduct a final accounting and make any further payments, as required on a date mutually agreed upon, within 90 days after the Closing.

9.15    Termination of Agreement.

(A)    Termination.  This Agreement may be terminated prior to Closing:

(i)    by the mutual written consent of Seller and Purchaser;

(ii)    as provided in Sections 9.15(B) and (C);

(iii)    by Seller or Purchaser upon the closing of an Alternative Transaction;

(iv)    by Purchaser if (a) any person files a motion seeking to have the Bankruptcy Court enter an Order (1) dismissing the Bankruptcy Case or either one of them; (2) converting the Bankruptcy Case or either one of them from Chapter 11 to Chapter 7 of the Bankruptcy Code; (3) appointing a trustee in the Bankruptcy Case or either one of them; and/or (4) appointing in the Bankruptcy Case or in either of them a responsible officer or an examiner with enlarged powers relating to the operation of the Business (beyond those powers set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), or (b) an order granting any of the relief described in the preceding clause (iii)(a) is entered for any reason and is not vacated within 14 days after entry thereof;

(v)    Intentionally omitted;

(vi)    Intentionally omitted;

(vii)    by written notice from Purchaser if (a) the Bankruptcy Court has not held a hearing on the Sale Motion on or prior to the first Business Day after the date that is 120 days after the Petition Date; (b) the Bankruptcy Court has not entered the Sale Order on or prior to the first Business Day after the date that is 122 days following the Petition Date; (c) the Sale Order shall not have become final and non-appealable on the 15th day after its entry; or (d) following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed, vacated, reversed, modified, supplemented or amended in any respect without the prior written consent of Purchaser;

32

(viii)   by Purchaser or, prior to entry of the Sale Order, by Seller, if (a) Seller enters into an asset purchase agreement or other definitive agreement with respect to an Alternative Transaction other than with the Back-Up Bidder (as such term is defined in the Sale Procedures Order) or (b) the Bankruptcy Court declines to enter the Sale Order in a form reasonably acceptable to Purchaser;

(ix)   by Seller or Purchaser, if an order is entered by a court, tribunal, or other adjudicatory body of competent jurisdiction having valid enforcement authority permanently restraining, prohibiting or enjoining either party from consummating the transactions described in this Agreement and such order shall have become final and non-appealable or shall not have been vacated prior to the Outside Date; or

(x)   by Seller or Purchaser if Closing has not occurred on or before 5:00 p.m. Eastern time on the date that is 120 days from the date of the Original Agreement (the "Outside Date");

provided, however, that the right to terminate this Agreement under this Section 9.15(A) shall not be available to any party if the action of such party or any of its Affiliates has been a principal cause of or resulted in the failure of the Closing to occur on or before such date, and such action or failure to act constitutes a breach of any of such party's representations, warranties, covenants or obligations under this Agreement.   Upon a termination of this Agreement pursuant to this Section 9.15(A), and except as otherwise provided by Sections 9.15(B), 9.15(C), and 9.15(D), the Deposit shall be returned by the Escrow Agent to Purchaser and the parties hereto shall have no further obligations under this Agreement except as shall expressly survive the termination hereof.

(B)   Seller's Default. Notwithstanding anything to the contrary contained herein, if, prior to or at the Closing, there has been a violation or breach by (i) Seller of any representation or warranty set forth in Section 5.1 (or any such representation or warranty shall have become untrue in any material respect after the date of the Original Agreement) or (ii) Seller of any covenant or agreement contained in this Agreement which, in the case of either clause (i) or (ii), would prevent the satisfaction of or result in the failure of any condition to the obligations of Purchaser at the Closing and such violation or breach has not been waived by Purchaser or, in the case of a breach of any covenant or agreement under this Agreement that is curable, has not been cured by Seller (as applicable) prior to the earlier to occur of (a) 10 days after receipt by Seller, as applicable, of written notice of such breach from Purchaser and (b) the Outside Date, then Purchaser may elect to (1) terminate this Agreement by written notice to Seller, in which case the Deposit shall be promptly refunded to Purchaser by Escrow Agent, or (2) seek specific performance of Seller's obligations that are to be performed on or prior to Closing, including without limitation Seller's delivery obligations under Section 4.3 of this Agreement, unless such obligations cannot reasonably be performed by Seller for reasons beyond Seller's reasonable control.

(C)   Purchaser's Default. Notwithstanding anything to the contrary contained herein, if, prior to or at the Closing, there has been a violation or breach by (i) Purchaser of any representation or warranty set forth in Section 5.2 (or any such representation or warranty shall have become untrue in any material respect after the date of the Original Agreement) or (ii)

33

Purchaser of any covenant or agreement contained in this Agreement which, in the case of either clause (i) or (ii), would prevent the satisfaction of or result in the failure of any condition to the obligations of Seller at the Closing and such violation or breach has not been waived by Seller or, in the case of a breach of any covenant or agreement under this Agreement that is curable, has not been cured by Purchaser (as applicable) prior to the earlier to occur of (a) 10 days after receipt by Purchaser, as applicable, of written notice of such breach from Seller and (b) the Outside Date, then Seller may elect to (1) terminate this Agreement by written notice to Purchaser, in which case the Deposit shall be promptly delivered by Escrow Agent to Seller as Seller's liquidated damages, in which case such liquidated damages shall be the sole remedy of Seller for Purchaser's default and Seller shall not be entitled to any additional legal or equitable relief against Purchaser, or (2) seek (a) specific performance of Purchaser's obligations to be performed on or prior to Closing, including without limitation Purchaser's delivery obligations under Section 4.4 of this Agreement, and (b) such other remedies available to Seller at law or in equity.

(D)    Alternative Transaction.  If this Agreement is terminated by Purchaser, under circumstances where it is entitled to do so pursuant to Section 9.15(A)(viii), (i) the Deposit shall be promptly refunded to Purchaser by Escrow Agent, and (ii) Purchaser shall be entitled to payment of, and Seller shall pay or cause to be paid, the Break-Up Fee (as such term is defined in the Sale Procedures Order) from the proceeds received by Seller upon the closing of an Alternative Transaction, subject, however, to any filings and/or hearings required by the Bankruptcy Court.

(E)    Liability Limitation.  Notwithstanding anything to the contrary in this Agreement, the maximum aggregate liability of Purchaser for money damages in respect of any losses, damages, costs or expenses of Seller relating to the failure of the transactions contemplated hereby to be consummated or a breach of this Agreement by Purchaser in the absence of a Closing shall be limited to the Deposit (the "Liability Limitation"), and in no event shall the Seller or any of their Affiliates seek any amount in excess of the Liability Limitation in connection with this Agreement or the transactions contemplated hereby or in respect of any other document or theory of law or equity or in respect of any oral representations made or alleged to be made in connection herewith, whether at law or in equity, whether in contract, tort or otherwise.

9.16    Amendments.    Except as otherwise expressly provided herein, neither this Agreement nor any term or provision hereof may be changed, waived, discharged or terminated except by the mutual written agreement of the parties (and, in the case of any amendment extending the Outside Date or that would reasonably be expected to materially diminish the amount paid to Agent at the Closing, the Agent).

9.17    Construction.    The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any of the parties hereto, and this Agreement shall be deemed to have been prepared jointly by the parties, and thus shall not necessarily be construed against any of the parties as the drafter hereof.

9.18    No Successor Liability.  The parties intend that, to the fullest extent permitted by applicable Law (including under Section 363 of the Bankruptcy Code), upon the Closing, Purchaser shall not be deemed to: (A) be the successor of Seller, (B) have, de facto, or otherwise, merged with or into Seller, (C) be a mere continuation or substantial continuation of Seller or the enterprise(s) of Seller or (D) be liable for any acts or omissions of Seller in the conduct of the Business or arising under or related to the Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the parties intend that Purchaser shall not be liable for any Lien (other than Assumed Liabilities and Permitted Liens) against Seller or any of Seller's predecessors or Affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Assets or any liabilities of Seller arising prior to the Closing Date. The Parties agree that the provisions substantially in the form of this Section 9.18 shall be reflected in the Sale Order.

9.19    Equitable Relief.  The parties hereto agree that if any of the provisions of this Agreement were not to be performed as required by their specific terms or were to be otherwise breached, irreparable damage will occur, no adequate remedy at Law would exist and damages would be difficult to determine, and that each party shall be entitled to an injunction or injunctions to prevent breaches, and to specific performance of the terms, of this Agreement (including causing the transactions contemplated hereby to be consummated on the terms and subject to the conditions thereto set forth in this Agreement) without posting any bond and without proving that monetary damages would be inadequate, in addition to any other remedy at Law or equity.  None of the parties shall oppose, argue, contend or otherwise be permitted to raise as a defense that an adequate remedy at law exists or that specific performance or equitable or injunctive relief is inappropriate or unavailable.

9.20    Certain Definitions.  When used in this Agreement, the following terms have the meanings set forth below:

"Action" means any claim, charge, audit, complaint, order, decree, ruling, eminent domain action, judgment, injunction, inspection, condemnation, notice of violation, citation, penalty or administrative action or proceeding, whether private or by or before any Governmental Entity.

"Affiliate" means, with respect to any subject Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such subject Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made.  For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"Business Day" means any day other than a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in Boston, Massachusetts.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means that certain Project Plymouth Non-Disclosure Agreement, dated as of May 21, 2020, executed by Duff Phelps Securities LLC, on behalf of Seller, and National Mentor Holdings, Inc.

"Contracts" means all agreements, contracts, leases and subleases, arrangements, letters of credit, guarantees and binding commitments, whether written or oral.

"Data Room" means the "Project Backpack" virtual data room hosted by "dealroom.net" created by Seller for the transaction governed by this Agreement.

"Dollars" or "$" means the lawful currency of the United States of America.

"ERISA" means the Employment Retirement Income Security Act of 1974, as amended.

"Federal Health Care Programs" means any health care program administered or funded, in whole or in part, by the government of the United States of America, including the Medicare, Medicaid and TRICARE programs.

"Fundamental Representations" means the representations and warranties of Seller set forth in Sections 5.1(A) (Due Organization), (B) (Power and Authority; Enforceability; Consents), (C) (Binding Agreement), (D) (Assets), and (P) (Brokerage).

"GAAP" means United States generally accepted accounting principles, consistently applied during the periods involved.

"Governmental Entity" means any United States or foreign federal, state, provincial or local government or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as amended (Pub. L. No. 104-191) and the Health Information Technology for Economic and Clinical Health Act (Pub. L. No. 111-5), any implementing regulations, and any state privacy or medical information Laws applicable to the Business.

"Law" means any constitution, law, common law, statute, ordinance, rule, regulation, regulatory requirement, code, order, judgment, injunction or decree enacted, issued, promulgated, enforced or entered by a Governmental Entity or securities exchange.

"Lien" means any charge, mortgage, pledge, security interest, lien, preference, license, covenant, claim, easement, encroachment or other similar encumbrance.

"Material Adverse Effect" means any change, event, occurrence, fact, state of facts, development or effect that (a) prevents, materially delays or materially impairs the ability of Seller to consummate the transactions contemplated by this Agreement or the other Transaction

Documents or (b) has, or would reasonably be expected to have, a material adverse effect upon the condition (financial or otherwise), business, assets or results of operations of the Business, taken as a whole; provided, however, that, in the case of clause (b), any adverse change, event, occurrence, fact, state of facts, development or effect arising from or related to (i) conditions affecting the economy generally, (ii) pandemic (including without limitation changes caused by the COVID 19 virus or any other epidemic, pandemic or disease outbreak), any act of terrorism, similar calamity or war (whether or not declared) or any escalation or worsening of any of the foregoing or any natural disaster, (iii) financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index), or (iv) changes in any Laws, policies or other binding directives issued by any Governmental Entity, will not be taken into account in determining whether a "Material Adverse Effect" has occurred; provided that, with respect to a matter described in any of the foregoing clauses, such matter will only be excluded so long as such matter does not have a disproportionate effect on the Business relative to other comparable businesses operating in the industry in which the Business operates.

"Permits" means all licenses, permits, certificates, grants, franchises, waivers, consents, expirations of waiting periods, and other similar authorizations or approvals issued by or obtained from a Governmental Entity or any securities exchange.

"Permitted Liens" means (i) zoning, entitlement, building and other land use and similar laws or regulations imposed by any Governmental Entity having jurisdiction over such parcel which are not violated by the current use and operation thereof; (ii) non-exclusive licenses to Intellectual Property granted in the ordinary course of business; and (iii) easements, covenants, conditions, restrictions and other similar matters of record which would not materially impair the use or occupancy of such parcel in the operation of the Business.

"Person" means an individual, a corporation, a partnership, an association, a limited liability company, a Governmental Entity, a trust or other entity or organization.

"Personal Information" means any information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular individual or household, including without limitation Protected Health Information as the term is defined in the Health Insurance Portability and Accountability Act of 1996, and any other information subject to protection, regulation, or safeguarding as set forth in any applicable Law governing privacy, information security or health information.

"Seller's Knowledge" or any similar knowledge qualification with respect to Seller, means the actual knowledge, after reasonable inquiry, of any of the following individuals: Andrew Calkins and Matthew Lesniewski.

"WARN Act" means the Worker Adjustment Retaining and Notification Act of 1988, as amended, or any similar state or local law.

IN WITNESS WHEREOF, Seller and Purchaser have executed this Agreement, and Escrow Agent has executed this Agreement for purposes of Sections 2.2, 2.3, 6.6, and 9.16, as of the day and year first above written.

"SELLER"                                          "PURCHASER"

FUTURES BEHAVIOR THERAPY          FBTC   TRANSITIONAL   SUB,   LLC,   a
CENTER, LLC, a Massachusetts           Delaware limited liability company
limited liability company

                                                  By: _____
                                                  Its: _____

By: _____
      Andrew Calkins, President

"ESCROW AGENT"

CASNER & EDWARDS, LLP

By:_____
      Michael J. Goldberg, Esq.

38

IN WITNESS WHEREOF, Seller and Purchaser have executed this Agreement, and Escrow Agent has executed this Agreement for purposes of Sections 2.2, 2.3, 6.6, and 9.16, as of the day and year first above written.

"SELLER"                                    "PURCHASER"

FUTURES BEHAVIOR THERAPY          FBTC  TRANSITIONAL  SUB,  LLC,  a
CENTER, LLC, a Massachusetts          Delaware limited liability company
limited liability company

By:_____          By: _____
    Andrew Calkins, President              Its: _____Chief Executive Officer_____


"ESCROW AGENT"


CASNER & EDWARDS, LLP


By:_____
    Michael J. Goldberg, Esq.

IN WITNESS WHEREOF, Seller and Purchaser have executed this Agreement, and Escrow Agent has executed this Agreement for purposes of Sections 2.2, 2.3, 6.6, and 9.16, as of the day and year first above written.

"SELLER"

FUTURES BEHAVIOR THERAPY CENTER, LLC, a Massachusetts limited liability company

By:_____
   Andrew Calkins, President

"PURCHASER"

FBTC TRANSITIONAL SUB, LLC, a Delaware limited liability company

By: _____
Its: _____

"ESCROW AGENT"

CASNER & EDWARDS, LLP

By:_____
   Michael J. Goldberg, Esq.

## LIST OF EXHIBITS AND SCHEDULES

Exhibit A—Facility Locations

Schedule 1.1(A)—Assumed Leases

Schedule 1.1(C)—Deposits

Schedule 1.1(D)(i)—Licenses and Permits

Schedule 1.1(D)(iv)—Assumed Contracts

Schedule 1.2(I)—Other Excluded Assets

Schedule 1.3(B)—Other Assumed Obligations

Schedule 1.4(O)—Other Excluded Liabilities

Schedule 2.1—Purchase Price Adjustments and Allocation

Schedule 2.2—Escrow Provisions

Schedule 3.1—Bill of Sale

Schedule 3.2—Assumption and Assignment Agreement

Schedule 4.2—Required Governmental Consents

Schedule 4.3(C)—Transition Services Agreement

Schedule 5.1(B)—Seller Required Approvals

Schedule 5.1(D)—Title to Assets

Schedule 5.1(E)—Financial Statements

Schedule 5.1(F)—Leases

Schedule 5.1(G)—Material Contracts

Schedule 5.1(H)—Enforceability

Schedule 5.1(I)—Employee Benefits

Schedule 5.1(J)—Employees

Schedule 5.1(K)—Compliance with Law

Schedule 5.1(L)—No Proceedings

Schedule 5.1(M)—Absence of Certain Changes

Schedule 5.1(N)—Permits

Schedule 5.1(O)—Intellectual Property

Schedule 5.1(P)—Brokerage

Schedule 5.1(R)—Payors

Schedule 5.2(B)—Purchaser Required Approvals

Schedule 6.1(C)—Seller Key Employees

Schedule 6.2—Seller Negative Covenants

Schedule 7.2(E)—Required Third Party Consents

**EXHIBIT A**

**Seller Facility Locations**

1. 55 Tozer Road, Beverly, MA
2. 216 West Boylston Street, West Boylston, MA

## EXHIBIT A

### Seller Facility Locations

1.  55 Tozer Road, Beverly, MA
2.  216 West Boylston Street, West Boylston, MA

*EXECUTION VERSION*

# DISCLOSURE SCHEDULES

## TO

## ASSET PURCHASE AGREEMENT

## BETWEEN

## FUTURES BEHAVIOR THERAPY CENTER, LLC

## AND

## FBTC TRANSITIONAL SUB, LLC

## DATED AS OF

## JANUARY 5, 2021

The following Disclosure Schedules are being furnished by the Seller to the Purchaser pursuant to and as part of that certain Asset Purchase Agreement (the "**Agreement**"), dated as of January 5, 2021, by and between Futures Behavior Therapy Center, LLC, a Massachusetts limited liability company ("**Seller**"), and FBTC Transitional Sub, LLC, a Delaware limited liability company ("**Purchaser**").  Capitalized terms used herein but not otherwise defined herein have the meanings ascribed to such terms in the Agreement.

## Schedule 1.1(A)

## Assumed Leases

1. **55 Tozer Road, Beverly, MA**
   a. *Lease* entered into with Ernest M. Santin dated May 11, 2015.
2. **216 West Boylston Street, West Boylston, MA**
   a. *Agreement of Lease* entered into with Checker Real Estate LLC dated October 12, 2018.

**Cure Costs**:

None.

## Schedule 1.1(C)

## Deposits

| Balance Sheet Reconciliation |
| :---: |
| **Account # 16300 - Security Deposit** |
| **FUTURES** |

| NetSuite GL Location | Type | Date | Address | Vendor Name | Amount | Lease Start | Lease End |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 01-Futures-Beverly | Lease -Security Deposit | 10/1/2016 | 55 Tozer Road, Beverly, MA | V22606 Ernest M. Santin | 27,977.08 | 9/15/2016 | 9/14/2021 |
| 04-Futures West Boylston | Lease -Security Deposit | 10/12/2018 | 216 West Boylston Street, West Boylston, MA | V23387 Checker Real Estate LLC | 26,984.00 | 2/15/2019 | 1/15/2028 |
| 04-Futures West Boylston | Utilities-Electricity-Security Deposit | 8/1/2019 | 216 West Boylston Street, West Boylston, MA | V23943 West Boylston Municipal Lighting Plant | 750.00 | | |
| | | | | **Total-Security Deposits** | **$ 55,711.08** | | |

**Schedule 1.1(D)(i)**

**Licenses and Permits**

1. Regular License to Operate a Large Group and School Age Child Care Program (License No. 9048501), issued by the Department of Early Education and Care of the Commonwealth of Massachusetts to Futures Behavior Therapy Center, for the facility located at 55 Tozer Road Beverly, MA, issued on October 3, 2019 and expiring on October 2, 2021.

2. Regular License to Operate a Large Group and School Age Child Care Program (License No. 9052315), issued by the Department of Early Education and Care of the Commonwealth of Massachusetts to Futures Behavior Therapy Center, for the facility located at 216 West Boylston Street, West Boylston, MA, issued on October 9, 2019 and expiring on October 8, 2021.

3. Certificate of Occupancy B-16-866, issued by the City of Beverly, dated October 13, 2016.

4. Certificate of Occupancy B-18-231, issued by the Town of West Boylston, dated February 21, 2019.

## Schedule 1.1(D)(iv)

## Assumed Contracts

1. *Provider Agreement* entered into with Aetna, Inc. dated November 15, 2017.
2. *Licensed Applied Behavioral Analysts Professional Services Agreement* entered into with Blue Cross and Blue Shield of Massachusetts, Inc. dated June 24, 2016.
3. *Provider Services Agreement* entered into with Beacon Health Strategies, LLC dated May 23, 2011, as amended by that certain Provider Network Amendment to Adjust Rates, dated March 1, 2018.
4. *Participating Provider Agreement* entered into with CIGNA Behavioral Health, Inc. dated July 17, 2018.
5. *Participating Provider Agreement* entered into with Harvard Pilgrim Health Care, Inc. dated January 18, 2008.
6. *Allied Health Services Provider Agreement* entered into with Tufts Associated Health Maintenance Organization, Inc. and Total Health Plan, Inc. dated December 6, 2016.
7. *Provider Agreement* entered into with Tufts Health Public Plans, Inc. dated April 1, 2018.
8. *Group Participating Provider Agreement* entered into with United Behavioral Health, Inc. dated October 15, 2012, as amended by that certain First Amendment, dated February 23, 2018.
9. *Participating Provider Practice Agreement* entered into with AllWays Health Partners (f/k/a Neighborhood Health Plan) dated February 15, 2012.
10. *Group Practice Participation Agreement* entered into with Massachusetts Behavioral Health Partnership dated August 29, 2017.
11. *Qualified Health Plan (QHP) Products (Including all metallic QHP products) Participating Professional Provider Agreement* entered into with Boston Medical Center Health Plan, Inc. d/b/a BMC Healthnet Plan dated March 15, 2018.
12. *MassHealth Participating Professional Provider Agreement* entered into with Boston Medical Center Health Plan, Inc. d/b/a BMC Healthnet Plan dated March 15, 2018.
13. *Contract for Professional Services/Master Agreement* entered into with American Alarm and Communications, Inc. dated March 5, 2019.
14. *Scope of Work* entered into with Obsidian Public Relations dated August 19, 2017.
15. *Proposal for Services* entered into with Madrona Cleaner, Inc.
16. *Business Associate Agreement* entered into with Rethink Autism, Inc. dated March 9, 2017.
17. *HIPAA Business Associate Addendum* entered into with Credible Wireless, Inc. dated December 31, 2013.
18. *Letter of Renewal* entered into with Credible Behavioral Health, Inc. dated December 31, 2019.
19. *Business Associate Agreement* entered into with Zoom Video Communications dated September 17, 2018.
20. *Service Agreement* entered into with Rethink Autism, Inc. dated April 5, 2017.

21. Oracle Netsuite Terms and Conditions and Payment Plan Agreement by and between Community Intervention and Oracle Credit Corporation, dated April 17, 2020.

22. Master Services Agreement for ADP Vantage HCM Services by and between ADP, LLC and Community Intervention Services, Inc., dated October 22, 2014.

23. *Lease* entered into with Ernest M. Santin dated May 11, 2015 for 55 Tozer Road, Beverly, MA.

24. *Agreement of Lease* entered into with Checker Real Estate LLC dated October 12, 2018 for 216 West Boylston Street, West Boylston, MA.

25. *Telehealth Consent Forms* entered into with each of Seller's clients (and parents and/or guardians), as applicable, in connection with Seller's use of telehealth communications.

26. Installation Payment Agreement by and between Community Intervention Services, Inc. and Cisco Systems Capital Corporation, dated April 24, 2020, as amended by that certain Initial Payment Addendum, dated April 24, 2020.

27. G Suite Ordering Document and Consumer Agreement by and between SADA Systems, Inc. and Community Intervention Services, dated August 26, 2020.

28. License Agreement by and between Futures Behavior Therapy Center LLC and Navicure (n/k/a Waystar Zirmed), dated October 11, 2019.

29. Google MDM

30. Allworx Voice Over IP

31. Microsoft Windows and Microsoft Office

**Cure Costs**:

None.

## Schedule 1.2(I)

### Other Excluded Assets

1. CIS's membership in the temporary multiple employer welfare arrangement as further described on Schedule 5.1(I)(ii) of the Disclosure Schedules.
2. Engagement Letter by and between Duff & Phelps Securities, LLC and Community Intervention Services, Inc., dated December 22, 2020 (the "**Duff & Phelps Engagement Letter**").

## Schedule 1.3(B)

### Other Assumed Obligations

None.

## Schedule 1.4(O)

## Other Excluded Liabilities

1. Any liability associated with CIS's membership in the temporary multiple employer welfare arrangement as further described on Schedule 5.1(I)(ii) of the Disclosure Schedules.
2. Any liability associated with the Duffs & Phelps Engagement Letter.

**Schedule 2.1**

**Purchase Price Adjustments and Allocation**

Purchase Price                    $7,500,000

## Schedule 2.2

### Escrow Provisions

## <u>ESCROW AGREEMENT</u>

THIS ESCROW AGREEMENT (this "Agreement"), dated as of December __, 2020, by and among FBTC Transitional Sub, LLC, a Delaware limited liability company (**"Purchaser"**), and Futures Behavior Therapy Center, LLC, a Massachusetts limited liability company (**"Seller"**), and **CASNER & EDWARDS, LLP** ("**Escrow Agent**" or "**Escrowee**").

### W I T N E S E T H :

WHEREAS, Purchaser and Seller entered into that certain Asset Purchase Agreement dated as of December __, 2020 (collectively, the "**Purchase Agreement**");

WHEREAS, Seller intends to file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Massachusetts (the "**Bankruptcy Court**"), and intends, in such case, to seek approval of the Purchase Agreement and the transactions provided for therein;

WHEREAS, all capitalized terms herein shall have the same meaning ascribed to them in the Purchase Agreement, unless otherwise specified herein; and

WHEREAS, Purchaser and Seller have agreed that Escrow Agent shall serve as Escrow Agent for purposes of holding and disbursing the Earnest Money (as defined below) as contemplated under the Purchase Agreement and in accordance with the terms and conditions hereof.

NOW, THEREFORE, for and in consideration of the foregoing, the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      Purchaser and Seller do hereby appoint Escrow Agent to be and act as escrow agent, and Escrow Agent hereby accepts its appointment to hold in an escrow account the Earnest Money upon the terms and conditions as set forth in this Agreement.

2.      Pursuant to the terms of the Purchase Agreement, on the date hereof, Purchaser delivered to Escrow Agent an earnest money deposit in the amount of $375,000 (the "Earnest Money").

3.      Escrow Agent shall deposit the Earnest Money in a non-interest bearing bank account.  The Escrow Agent shall not be responsible for any bank charges or bank service fees, or for any loss, diminution in value or failure to achieve a greater profit as a result of such investment or bank charges or bank service fees.  Also, the Escrow Agent assumes no responsibility for, nor shall said Escrow Agent be

held liable for, any loss occurring which arises from the fact that the amount of the Earnest Money may cause the aggregate amount of any depositor's accounts to exceed $250,000 and that the excess amount is not insured by the Federal Deposit Insurance Corporation.

4.      Escrow Agent shall hold the Earnest Money with the same degree of care as it gives to its own similar property and shall only deliver the Earnest Money (or a portion thereof) to Seller or Purchaser, as the case may be, as follows:

a)      to Seller, concurrent with the Closing under the Purchase Agreement; or

b)      to Seller or Purchaser, as designated by an instruction letter jointly executed by both Seller and Purchaser or upon order of the Bankruptcy Court.

5.      a)      Purchaser and Seller, jointly and severally, hereby agree to indemnify the Escrow Agent and hold it harmless from any and all claims, liabilities, losses, actions, suits or proceedings at law or in equity, or any other expense, fees or charges of any character or nature, which it may incur or with which it may be threatened by reason of its acting as Escrow Agent under this Agreement, including, without limitation, reasonable documented and out-of-pocket attorneys' fees and costs of defending any actions, suit or proceeding or resisting any claim, except any of the foregoing resulting from the Escrow Agent's gross negligence, willful misconduct or breach of this Agreement.

b)      If the parties hereto shall be in disagreement about the interpretation of this Agreement, or about their rights and obligations hereunder, or the propriety of any action contemplated by the Escrow Agent hereunder, any party hereto, including the Escrow Agent if the Escrow Agent has received conflicting instructions from Purchaser and Seller, may, at its discretion, seek an order of the Bankruptcy Court to resolve such disagreement. To the extent provided herein above, the Escrow Agent shall be indemnified, jointly and severally, by Purchaser and Seller for all costs, including reasonable documented and out-of-pocket attorneys' fees, in connection with any such action, and shall be fully protected in suspending all or a part of its activities under this Agreement until a final judgment, order or decree in the action is received.

c)      Other than this Agreement, Escrow Agent shall not be bound by any other agreement whether or not it has knowledge of the existence thereof or of its terms and conditions, and is required only to hold the Earnest Money and to make payment or other disposition thereof in accordance with the terms of this Agreement.

d)      Escrow Agent shall not be liable for any mistakes of fact, or errors of judgment, or for any acts or omission of any kind unless caused by the willful misconduct or gross negligence of Escrow Agent.

e)      Escrow Agent may resign upon ten (10) days' written notice to the parties to their addresses set forth herein. If a successor escrow agent is not appointed

within a fourteen (14) day period following such resignation, Escrow Agent may petition a court of competent jurisdiction to name a successor. The costs of such action shall be paid by Seller, on the one hand, and Purchaser, on other hand, on an equal basis.

f)    Purchaser and Seller acknowledge that Escrow Agent has served as attorney for Seller (its "Client") in this transaction, and as an accommodation to that Client has agreed to perform the duties as Escrow Agent set forth herein. The party who is not the Client agrees that nothing herein shall in any manner limit Escrow Agent in continuing to represent its Client in all matters relating to the Agreement, including without limitation the commencement and prosecution of litigation on behalf of its Client against such party.

6.    Any notice, communication or demand required or permitted to be given under this Agreement shall be in writing (including facsimile and email communications) and shall be sent to the applicable party at the following addresses:

To Purchaser, by addressing the same to:

FBTC Transitional Sub, LLC
c/o National Mentor Holdings, LLC
Attention: Nate Lewis, VP, Mergers and Acquisitions;
Gina Martin, Chief Legal Officer
313 Congress Street, 5th Floor
Boston, MA 02210
Email: Nate.Lewis@TheMentorNetwork.com;
Gina.Martin@TheMentorNetwork.com

With a copy to (which shall not constitute notice):

Quarles & Brady LLP
Attention: Ryan P. Haas
411 E. Wisconsin Avenue, Suite 2400
Milwaukee, WI 53202
E-mail: ryan.haas@quarles.com

To Seller, by addressing the same to:

Futures Behavior Therapy Center, LLC
Attention:  Andrew R. Calkins, CEO
200 Friberg Parkway, Suite 2000
Westborough, MA 01581
E-mail:  acalkins@communityinterventionservices.com

With a copy to (which shall not constitute notice):

Casner & Edwards, LLP
303 Congress Street, #201
Boston, MA 02210
Attention:  Michael J. Goldberg
Facsimile No. 617-426-8810
Email: goldberg@casneredwards.com

To Escrow Agent, by addressing the same to:

Casner & Edwards, LLP
303 Congress Street, #201
Boston, MA 02210
Attention:  Michael J. Goldberg
Facsimile No. 617-426-8810
Email: goldberg@casneredwards.com

7.      This Agreement may not be amended or modified except by an instrument in writing signed by, or on behalf of, Seller, Purchaser and Escrow Agent.

8.      This Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware without regard to its principles of conflicts of law.

9.      This Agreement may be executed in several counterparts, as long as each party to this Agreement executes at least one such counterpart.  Each of such counterparts shall be an original but all of the counterparts, when taken together, shall constitute one and the same instrument and shall become effective when each party hereto has executed at least one such counterpart.  The parties hereto agree that a signature transmitted by facsimile or email in portable document format (.pdf) shall constitute an original signature hereunder.

10.     Purchaser and Seller hereby agree to execute and deliver joint written instructions to Escrow Agent to effect any release that Purchaser and Seller, acting in good faith, believe in their respective reasonable discretion is required by the Purchase Agreement. In the event of a conflict between the provisions of this Agreement and the provisions of the Purchase Agreement, the Purchase Agreement shall govern.

11.     Time is of the essence with respect to all time periods in this Agreement.

[signatures begin on next page]

IN WITNESS WHEREOF, the parties hereby have caused this Agreement to be executed by their duly authorized officers on the day and year first above written.

PURCHASER:

FBTC TRANSITIONAL SUB, LLC,
a Delaware limited liability company


By: _____
Name:
Title:

SELLER:

FUTURES BEHAVIOR THERAPY CENTER, LLC,
a Massachusetts limited liability company


By: _____
Name: Toby Shea
Title: Chief Restructuring Officer


ESCROW AGENT:

**CASNER & EDWARDS, LLP**


By:_____
Name:  Michael J. Goldberg
Title: Partner

**Schedule 3.1**

**Bill of Sale**

THIS BILL OF SALE (this "Bill of Sale") is entered into and effective as of [●], 2021 by Futures Behavior Therapy Center, LLC, a Massachusetts limited liability company ("Seller").

**RECITALS**

WHEREAS, Seller and FBTC Transitional Sub, LLC, a Delaware limited liability company ("Purchaser"), have entered into an Asset Purchase Agreement, dated [●], 2020 (the "Purchase Agreement");

WHEREAS, the execution and delivery of this Bill of Sale is contemplated by Section 3.1 of the Purchase Agreement; and

WHEREAS, capitalized terms used herein and not otherwise defined herein have the meanings given to such terms in the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Purchase Agreement, Seller, intending to be legally bound, hereby agrees as follows:

1.      Sale of Personal Property.  For true and lawful consideration paid to it by Purchaser, Seller hereby sells, conveys, transfers, assigns and delivers to Purchaser all right, title and interest in and to the Personal Property, free and clear of all Liens, in accordance with the Purchase Agreement.

2.      Further Assurances.  Seller shall take, or cause to be taken, such actions, or execute and deliver, or cause to be executed and delivered, to Purchaser such other agreements or instruments, in each case as Purchaser may reasonably request, as reasonably necessary to more effectively consummate, confirm or evidence the sale, conveyance, transfer, assignment and delivery to Purchaser of the Personal Property as contemplated under the Purchase Agreement.

3.      Conflict with the Purchase Agreement.  In the event of a conflict or inconsistency between the terms and conditions of this Bill of Sale and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.  Notwithstanding anything to the contrary in this Bill of Sale, nothing herein is intended to, nor shall it, extend, amplify, or otherwise alter the representations, warranties, covenants and obligations of the parties contained in the Purchase Agreement or the survival thereof.

4.      Enforceability.  If any provision of this Bill of Sale or the application of any such provision to any Person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not impede any other provision hereof.

5.      <u>Governing Law</u>.  This Bill of Sale shall be governed by and construed in accordance with the internal Laws of the State of Delaware, without regard to the Laws of any other jurisdiction that might be applied because of the conflicts of Laws principles of the State of Delaware.

6.      <u>No Third Party Beneficiaries</u>.  This Bill of Sale shall be binding upon and inure solely to the benefit of Seller and Purchaser and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Bill of Sale.

*[Remainder of page intentionally left blank; signature page follows]*

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be duly executed as of the day and year first above written.

**SELLER:**

FUTURES BEHAVIOR THERAPY CENTER, LLC

By: _____

Name:

Its:

**Schedule 3.2**

**Assumption and Assignment Agreement**

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment and Assumption Agreement") is made and entered into as of [●], 2021, by and between FBTC Transitional Sub, LLC, a Delaware limited liability company ("Purchaser"), and Futures Behavior Therapy Center, LLC, a Massachusetts limited liability company ("Seller").

RECITALS:

WHEREAS, Seller and Purchaser have entered into an Asset Purchase Agreement, dated [●], 2020 (the "Purchase Agreement");

WHEREAS, the execution and delivery of this Assignment and Assumption Agreement is contemplated by Section 3.2 of the Purchase Agreement; and

WHEREAS, capitalized terms used herein and not otherwise defined herein have the meanings given to such terms in the Purchase Agreement.

NOW, THEREFORE, in consideration of the Recitals and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser, intending to be legally bound, agree as follows:

1.      Assignment.  Seller does hereby sell, transfer, assign, convey and deliver to Purchaser all of Seller's legal, beneficial and other right, title and interest in and to the Assumed Leases and Assumed Contracts (collectively, the "Assignment").

2.      Assumption.  Purchaser hereby confirms and accepts the Assignment and agrees to timely pay, discharge and otherwise perform when due the related Assumed Obligations in accordance with the terms of the Purchase Agreement.  Purchaser does not assume, and shall have no responsibility for, or any liability with respect to, any of the Excluded Liabilities.

3.      Conflict with the Purchase Agreement.  In the event of a conflict or inconsistency between the terms and conditions of this Assignment and Assumption Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.  Notwithstanding anything to the contrary in this Assignment and Assumption Agreement, nothing herein is intended to, nor shall it, extend, amplify, or otherwise alter the representations, warranties, covenants and obligations of the parties contained in the Purchase Agreement or the survival thereof.

4.      Further Assurances.  The parties hereto shall execute and deliver all such other and further documents and perform all further acts that may be reasonably necessary or appropriate to effectuate the terms and provisions of this Assignment and Assumption Agreement.

5.      Governing Law. This Assignment and Assumption Agreement shall be governed by and construed in accordance with the internal Laws of the State of Delaware, without regard

to the Laws of any other jurisdiction that might be applied because of the conflicts of Laws principles of the State of Delaware.

6.    <u>Headings</u>.  The headings used in this Assignment and Assumption Agreement are for purposes of convenience only and shall not be used in construing the provisions hereof.

7.    <u>No Third Party Beneficiaries</u>.  This Assignment and Assumption Agreement shall be binding upon and inure solely to the benefit of Seller and Purchaser and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Assignment and Assumption Agreement.

8.    <u>Counterparts; Facsimile Signature</u>.  This Assignment and Assumption Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one agreement, and the signature of any party to any counterpart shall be deemed to be a signature to, and may be appended to, any other counterpart.  Facsimile, telecopied, portable document format (PDF) or electronic signatures may be relied upon as originals.

*[Remainder of page intentionally left blank; signature page follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Assumption Agreement to be executed by their duly authorized representatives as of the day and year first written above.

**SELLER:**

FUTURES BEHAVIOR THERAPY CENTER, LLC

By: _____
Name:
Its:

**PURCHASER:**

FBTC TRANSITIONAL SUB, LLC

By: _____
Name:
Its:

**Schedule 4.2**

**Required Governmental Consents**

1. Regular License to Operate a Large Group and School Age Child Care Program (License No. 9048501), issued by the Department of Early Education and Care of the Commonwealth of Massachusetts to Futures Behavior Therapy Center, for the facility located at 55 Tozer Road Beverly, MA, issued on October 3, 2019 and expiring on October 2, 2021.

2. Regular License to Operate a Large Group and School Age Child Care Program (License No. 9052315), issued by the Department of Early Education and Care of the Commonwealth of Massachusetts to Futures Behavior Therapy Center, for the facility located at 216 West Boylston Street, West Boylston, MA, issued on October 9, 2019 and expiring on October 8, 2021.

**Schedule 4.3(C)**

**Transition Services Agreement**

This Transition Services Agreement (this "<u>Services **Agreement**</u>"), dated as of _____ __, 2020 (the "<u>Effective Date</u>"), is entered into by and among Futures Behavior Therapy Center, LLC, a Massachusetts limited liability company ("<u>Futures</u>"), Community Intervention Services, Inc., a Delaware corporation ("<u>CIS</u>" and, together with Futures, "<u>Seller</u>"), and FBTC Transitional Sub, LLC, a Delaware limited liability company (the "<u>Company</u>"). Each of Seller and the Company may be referred to herein as a "<u>Party</u>" and collectively, as the "<u>Parties</u>".

## RECITALS

WHEREAS, the Company and Futures entered into that certain Asset Purchase Agreement dated as of _____ __, 2020 (the "<u>Sale Agreement</u>"), pursuant to which the Company agreed to purchase all of Futures' rights, title and interests in and to the Assets; and

WHEREAS, in connection with the consummation of the transactions contemplated by the Sale Agreement, the Parties desire to enter into this Services Agreement, pursuant to which, from and after the Closing, Seller will provide, or cause its Affiliates to provide, the Company with certain Services (as defined below), in each case on a transitional basis subject to the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the above premises, the mutual covenants and agreements contained in this Services Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

# ARTICLE I
## Definitions

For the purposes of this Services Agreement, and except as otherwise defined in this Services Agreement, all terms, the first letters of which are capitalized, shall have the meanings defined in the Sale Agreement.

# ARTICLE II
## PROVISION OF SERVICES BY SELLER TO COMPANY

2.1 **Services**.  Seller agrees to provide, or to cause its Affiliates to provide, to the Company the services (the "Services") listed and described in the Schedules attached hereto and hereby made a part hereof (as such schedule may be amended or supplemented from time to time by agreement of the Parties pursuant to the terms of this Services Agreement, the "Service Schedule"), for the respective periods and on the other terms and conditions specified in this Services Agreement and on the Service Schedule, which Services shall be performed consistent with the manner in which such Services were generally performed for the Business prior to the Effective Date.  From time to time during the term of this Services Agreement, the Company may identify additional services not originally included in or contemplated by the services set forth in the Service Schedule (a) based on activities performed by Seller or its Affiliates in connection with the Business immediately prior to the Closing and (b) that are necessary for the operation of the Business in the same manner in which the Business was operated immediately prior to the Closing Date or necessary to effectuate an orderly transition of the Business to the Company (collectively, the "Omitted Services").  Seller and the Company shall promptly negotiate in good faith the terms governing such Omitted Services, including terms with respect to (i) the nature and description of such Omitted Services, (ii) the transition period for such Omitted Service, and (iii) the fees payable by the Company for such Omitted Services.

2.2 **Company Acknowledgment**.  The Company acknowledges the transitional nature of the Services to be provided and agrees to use its commercially reasonable efforts to transition each Service to its or its Affiliates' internal organization or to obtain other third-party sources to provide the Services as promptly as reasonably practicable following the execution of this Services Agreement, and Company further agrees to make such transitions in all events not later than the expiration of the Term.

# ARTICLE III
## Payment

3.1 **Fees**.  Seller shall be compensated for Services at the rates set forth on the Service Schedule (the "Service Costs").  Subject to the prior written approval of the Company in each instance, the Company shall reimburse Seller for any reasonable, documented third-party out-of-pocket expenses incurred by Seller in providing the Services; provided, that any one-time

or recurring out-of-pocket expenses exceeding $1,000 must be approved in writing by the Company prior to Seller incurring such expenses (the "Other Costs" and, together with the Service Costs, the "Fees"). Except as otherwise noted on the Service Schedule, Seller shall invoice the Company at the end of each month during the Term for the Fees incurred during such month and payable by the Company (which invoice shall include a reasonably detailed description of the Service Costs and Other Costs, including the hourly timekeeping records of all hourly employees of Seller performing Services to the extent such time is charged to the Company), and, subject to Section 3.02, the Company shall pay such invoice within thirty (30) days after the receipt thereof. Notwithstanding anything to the contrary contained herein, the Company acknowledges that, in connection with providing the Services, Seller will not be required to (a) use its own funds for the payment of any obligation of the Company or (b) incur any third-party service provider costs or expenses, unless otherwise mutually agreed to in writing or as set forth on the Service Schedule.

3.2 **Disputes**. To dispute an invoice, the Company must provide written notice stating in reasonable detail the nature and amount of the dispute to Seller within thirty (30) days following receipt by the Company of the applicable invoice. Seller and the Company agree to work promptly and in good faith to resolve any disputed items within fifteen (15) days following receipt by Seller of a notice of dispute. If such dispute is not resolved within fifteen (15) days, either Party may pursue such other remedies as such Party may have at law or in equity.

3.3 **Prorated Fees**. All Services Costs based on a monthly or other time basis shall be prorated based on the number of actual calendar days elapsed during the period of use or service, as applicable.

## ARTICLE IV
## Manner of Provision of the Services; Warranties

4.1 **Seller Warranties**. The Services shall be (a) performed in a professional and timely manner and consistent with the manner in which such Services were generally performed for the Business prior to the Effective Date, including with respect to timeliness and priority, and (b) of a quality that is substantially the same as the quality of such Services were generally performed for the Business prior to the Effective Date. In addition, Seller represents and warrants that:

(A)     Seller will comply with all Laws that apply to its delivery or performance of the Services, including, but not limited to, the Health Insurance Portability and Accountability Act of 1996, as amended and other Laws related to the regulation, storing and use of personally identifiable information;

(B)     there is no outstanding claim, litigation, arbitrated matter or other dispute to which Seller is a party which Seller reasonably expects could have an adverse effect on Seller's ability to fulfil its obligations under this Services Agreement; and

3

(C)   the provision of the Services does not result in a breach or violation of any license, lease, contract or other agreement to which Seller or any of its Affiliates is a party or any applicable Law.

4.2 **Company Acknowledgment**.  Company acknowledges and agrees that (a) after the Closing, Futures will have no remaining operations or employees, (b) neither Futures nor CIS is a professional provider of the types of Services to be provided hereunder, (c) the employees of CIS providing the Services may have other responsibilities to the business(es) of CIS to which said employees are required to devote substantial time and that such employees are not exclusively available to provide the Services, and (d) Seller makes no representation or warranty of any kind regarding the ability of Seller to retain any employees (or to retain or engage any third-party service providers) who are providing Services.  Notwithstanding the foregoing, Seller shall at all times during the Term use its commercially reasonable efforts to ensure that all Services shall be performed in a timely manner consistent with past practices.

4.3 **Independent Contractors**.  Each of Company and Seller acknowledges and agrees that this Services Agreement is not intended to and does not, and any course of dealing contemplated by providing the Services hereunder will not, create a fiduciary relationship, partnership, joint venture or relationship of trust or agency among or between the Parties and that all Services are being provided to Company by Seller or its Affiliates as independent contractors to Company.  Except as provided in this Services Agreement, this Services Agreement shall not in any manner impose upon any Party any fiduciary duty to any other Party or any of such Party's respective owners, directors, officers, employees, agents, representatives, contractors and subcontractors.  To the fullest extent permitted by applicable law, Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied relating to this Services Agreement by law or in equity, and in doing so, recognizes, acknowledges and agrees that the duties and obligations of Seller with regard to the Services are only as expressly set forth in this Services Agreement.

4.4 **WARRANTY DISCLAIMER**.  EXCEPT AS EXPRESSLY SET FORTH IN THIS SERVICES AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, IMPLIED OR OTHERWISE, WITH RESPECT TO THE SERVICES, AND THE PARTIES ACKNOWLEDGE AND AGREE THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS SERVICES AGREEMENT, THE SERVICES TO BE PROVIDED UNDER THIS SERVICES AGREEMENT ARE FURNISHED AS IS, WHERE IS, WITH ALL FAULTS AND WITHOUT WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, AND SUCH REPRESENTATIONS AND WARRANTIES ARE SPECIFICALLY DISCLAIMED.

## ARTICLE V
### Term of Services

5.1 **Term**. This Services Agreement and the provision of Services under this Services Agreement shall commence on the Effective Date and shall terminate on the earlier to occur of the following: the latest date for any Service to be completed as set forth on the Service Schedule, and (b) mutual written agreement of the Parties (the "Term"). Upon termination of this Services Agreement, all obligations of the Parties shall terminate, except (i) the obligations set forth on the Service Schedule which by their terms are to be performed following expiration of the Term, the confidentiality obligations set forth in Section 8.03 and the other provisions set forth in Article VIII shall survive any such termination and continue in full force and effect in accordance with the terms set forth therein, and (ii) Seller shall be entitled to invoice the Company for all Fees (if any) due in accordance with Section 3.01 for that portion of the Services performed and completed prior to such termination.

## ARTICLE VI
### Force Majeure

6.1 **Force Majeure Event**. The Parties shall not be liable for any interruption of Service, delay or failure to perform or receive Services under this Services Agreement when such interruption, delay or failure results from causes beyond its reasonable control, including, but not limited to, any strikes, lock-outs or other similar labor difficulties, acts of any Governmental Entity, changes in applicable laws, riot, insurrection, invasion, war or other hostilities or civil unrest (including acts of terrorism), embargoes or blockades, fuel or energy shortage, fire, flood, explosion, acts of God, national or regional emergencies, or shortage of adequate utilities, power or transportation facilities (each, a "Force Majeure Event"). Upon the occurrence of a Force Majeure Event, the Parties' obligations hereunder shall be postponed for such time as their respective performance is suspended or delayed on account thereof. Each Party will promptly notify the other, either orally or in writing, upon learning of the occurrence of such Force Majeure Event. Upon the cessation of the Force Majeure Event, each Party will, in a manner consistent with past practice, take all commercially reasonable steps necessary to make up for lost time. The Company shall not be obligated to pay any Fees applicable to the Services that it does not receive during a Force Majeure Event (and the Parties shall negotiate reasonably and in good faith to determine the portion of such Fees applicable to such Services that it does not receive).

6.2 **Replacement Services**. During the occurrence of a Force Majeure Event, or any other period during which the provision of any Service has been interrupted, (a) the Company may replace, at Seller's sole cost and expense, any of the affected Services by providing any of such replacement Services for itself or engaging one or more third parties to provide any such replacement Services and (b) Seller shall reasonably cooperate with such third parties to provide such replacement Services.

## ARTICLE VII
## Indemnification; Liabilities

7.1 **Indemnification by Seller**. Seller hereby agrees to DEFEND, INDEMNIFY AND HOLD HARMLESS Company and its Affiliates and each of their respective officers, managers, directors, employees and agents (each, a "Company Indemnified Party") from any and all threatened or actual claims, demands, causes of action, suits, proceedings, losses, damages, fines, penalties, liabilities, costs and expenses of any nature, including reasonable attorneys' fees and court costs (collectively, "Losses"), incurred by, imposed upon or rendered against one or more of the Company Indemnified Parties, all to the extent that such Losses are in respect of, arise out of, or based upon (i) the gross negligence or willful misconduct of any Seller Indemnified Party in providing (or failing to provide) a Service, (ii) any failure by any Seller Indemnified Party to comply with Laws in connection with the provision of the Services, (iii) any breach, unauthorized use or disclosure of data (including personally identifiable data), (iv) any claim or allegation that the Company's receipt or use of the Services infringes or misappropriates any patent, copyright, trademark, trade secret, privacy, publicity or other intellectual property right of any third party, or (v) any breach by any Seller Indemnified Party of its representations, warranties or obligations contained in this Services Agreement. Notwithstanding anything to the contrary contained herein, as to (v) above, in no event shall Seller be liable to the Company Indemnified Parties for amounts in excess of the consideration received by Seller in accordance herewith.

7.2 **Indemnification by the Company**. The Company hereby agrees to DEFEND, INDEMNIFY AND HOLD HARMLESS Seller and its Affiliates and their respective officers, managers, directors, employees and agents (each, an "Seller Indemnified Party" and, collectively with the Company Indemnified Parties, each an "Indemnified Party") from any and all Losses, incurred by, imposed upon or rendered against one or more of the Seller Indemnified Parties, to the extent that such Losses are in respect of, arise out of, or based upon (i) any failure by the Company or its Affiliates to comply with Laws in the conduct of the Business utilizing the Services, (ii) the gross negligence or willful misconduct of Company or its Affiliates, or (iii) any breach by Company of its representations, warranties or obligations contained in this Services Agreement. Notwithstanding anything to the contrary contained herein, as to (iii) above, in no event shall the Company be liable to the Seller Indemnified Parties for amounts in excess of the consideration received by Seller in accordance herewith.

7.3 **LIMITATION ON LIABILITY**. IN NO EVENT SHALL EITHER PARTY HAVE ANY LIABILITY UNDER ANY PROVISION OF THIS SERVICES AGREEMENT FOR ANY PUNITIVE, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES, INCLUDING LOSS OF FUTURE REVENUE OR INCOME, LOSS OF BUSINESS REPUTATION OR OPPORTUNITY RELATING TO THE BREACH OR ALLEGED BREACH OF THIS SERVICES AGREEMENT, OR DIMINUTION OF VALUE OR ANY DAMAGES BASED ON ANY TYPE OF MULTIPLE, WHETHER BASED ON

6

STATUTE, CONTRACT, TORT OR OTHERWISE, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF THE FORM IN WHICH ANY ACTION IS BROUGHT; PROVIDED, HOWEVER, THAT THIS SECTION 7.03 SHALL NOT LIMIT A PARTY'S RIGHT TO RECOVERY UNDER SECTION 7.01 OR SECTION 7.02 FOR (A) ANY FRAUD, GROSS NEGLIGEINCE OR WILLFUL OR INTENTIONAL MISCONDUCT, OR (B) SUCH DAMAGES TO THE EXTENT SUCH PARTY IS REQUIRED TO PAY SUCH DAMAGES TO A THIRD PARTY IN CONNECTION WITH A MATTER FOR WHICH SUCH PARTY IS OTHERWISE ENTITLED TO INDEMNIFICATION UNDER SECTION 7.01 OR SECTION 7.02.

7.4 **NO DUPLICATE RECOVERY**.   NOTHING IN THIS SERVICES AGREEMENT SHALL LIMIT OR ALTER THE OBLIGATION OF THE SELLER OR COMPANY TO INDEMNIFY ANY INDEMNIFIED PARTY OR OTHER PERSON ENTITLED TO INDEMNIFICATION PURSUANT TO THE TERMS OF THE SALE AGREEMENT; PROVIDED, HOWEVER, THAT SUCH INDEMNIFIED PARTY OR OTHER PERSON SHALL NOT OBTAIN DUPLICATIVE RECOVERIES.

7.5 **ACKNOWLEDGMENT**.  EACH PARTY ACKNOWLEDGES AND AGREES (A) THAT IT HAS A DUTY TO READ THIS SERVICES AGREEMENT AND THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS HEREOF, AND (B) THAT IT HAS IN FACT READ THIS SERVICES AGREEMENT AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS SERVICES AGREEMENT.  EACH PARTY AGREES THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY PROVISIONS OF THIS SERVICES AGREEMENT ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISIONS OR THAT SUCH PROVISIONS ARE NOT "CONSPICUOUS".  The Parties acknowledge and agree that the provisions contained in this Services Agreement that are set out in "ALL CAPS," or bold type, satisfy the requirement of the "express negligence rule" and any other requirement at Law or in equity that provisions contained in a contract be conspicuously marked or highlighted.

### ARTICLE VIII
### Miscellaneous

8.1 **Notices**.   All notices or other communications made in connection with this Services Agreement shall be in writing and given in the same manner indicated in Section 11 of the Sale Agreement.

8.2 **Assignment**.   This Services Agreement shall not be assignable by either Party without the prior written consent of the other Party. Notwithstanding the foregoing: (a) the Company may, without the written consent of any Party, assign, in whole or in part, its rights and obligations pursuant to this Agreement to one or more of its Affiliates, provided that the

Company will nonetheless remain liable for all of the Company's obligations hereunder; (b) the Company may, without the written consent of any Party, collaterally assign its rights under this Agreement for security purposes to any lender providing financing to the Company or any of its Affiliates, and any such lender may exercise all of the rights and remedies of the Company hereunder; and (c) the Company may, without the written consent of any other Party, assign its rights under this Agreement, in whole or in part, to any subsequent third party purchaser of the Company or all or substantially all of its assets (whether such sale is structured as a sale of stock, a sale of assets, a merger, or otherwise).

8.3 **Confidentiality**.  Each of the Parties agrees that any confidential information of the other Party received in the course of performance under this Services Agreement shall be kept strictly confidential by the Parties, except that the Company and Seller may disclose such information solely to the extent necessary to receive and provide, respectively, the Services pursuant to this Services Agreement to any of its respective Affiliates.

8.4 **Severability**.  If any term or provision of this Services Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Services Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties hereto shall negotiate in good faith to modify this Services Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner so that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

8.5 **Entire Agreement**.  This Services Agreement, including the schedules and exhibits hereto, constitutes the sole and entire agreement of the Parties to this Services Agreement with respect to the subject matter contained herein and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event and to the extent that there is a conflict between the provisions of this Services Agreement and the provisions of the Sale Agreement as it relates to the Services hereunder, the provisions of this Services Agreement shall control.

8.6 **No Third Party Beneficiary**.  This Services Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Services Agreement.

8.7 **Amendment and Modification; Waiver**.  This Services Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party hereto. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No failure to exercise, or delay in

8

exercising, any right, remedy, power, or privilege arising from this Services Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

8.8 **Governing Law; Dispute Resolution**.    This Services Agreement shall be governed by the same provisions regarding law and dispute resolution as set forth in Section [ ] of the Sale Agreement and such section is hereby incorporated by reference.

8.9 **Waiver of Jury Trial**.  Each Party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Services Agreement or the transactions contemplated hereby. Each Party to this Services Agreement certifies and acknowledges that (a) no representative of any other Party has represented, expressly or otherwise, that such other Party would not seek to enforce the foregoing waiver in the event of a legal action, (b) such Party has considered the implications of this waiver, (c) such Party makes this waiver voluntarily, and (d) such Party has been induced to enter into this Services Agreement by, among other things, the mutual waivers and certifications in this Section 8.09.

8.10 **Counterparts**.  This Services Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Services Agreement delivered by e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Services Agreement.

*[Signature Pages Follow]*

9

IN WITNESS WHEREOF, the parties hereto have caused this Services Agreement to be effective as of the Effective Date by their respective officers thereunto duly authorized.

**SELLER:**

FUTURES BEHAVIOR THERAPY CENTER, LLC

By: _____
Name:
Title:

COMMUNITY INTERVENTION SERVICES, INC.

By: _____
Name:
Title:

**BUYER:**

FBTC TRANSITIONAL SUB, LLC

By: _____
Name:
Title:

**<u>SERVICE SCHEDULES</u>**

**<u>[To be attached]</u>**

**Schedule 5.1(B)(iii)**

**Required Consents or Filings**

Licenses:

1. Regular License to Operate a Large Group and School Age Child Care Program (License No. 9048501), issued by the Department of Early Education and Care of the Commonwealth of Massachusetts to Futures Behavior Therapy Center, for the facility located at 55 Tozer Road Beverly, MA, issued on October 3, 2019 and expiring on October 2, 2021.
2. Regular License to Operate a Large Group and School Age Child Care Program (License No. 9052315), issued by the Department of Early Education and Care of the Commonwealth of Massachusetts to Futures Behavior Therapy Center, for the facility located at 216 West Boylston Street, West Boylston, MA, issued on October 9, 2019 and expiring on October 8, 2021.

Agreements:

1. *Provider Agreement* entered into with Aetna, Inc. dated November 15, 2017.
2. *Licensed Applied Behavioral Analysts Professional Services Agreement* entered into with Blue Cross and Blue Shield of Massachusetts, Inc. dated June 24, 2016.
3. *Provider Services Agreement* entered into with Beacon Health Strategies, LLC dated May 23, 2011, as amended by that certain Provider Network Amendment to Adjust Rates, dated March 1, 2018.
4. *Participating Provider Agreement* entered into with CIGNA Behavioral Health, Inc. dated July 17, 2018.
5. *Participating Provider Agreement* entered into with Harvard Pilgrim Health Care, Inc. dated January 18, 2008.
6. *Allied Health Services Provider Agreement* entered into with Tufts Associated Health Maintenance Organization, Inc. and Total Health Plan, Inc. dated December 6, 2016.
7. *Provider Agreement* entered into with Tufts Health Public Plans, Inc. dated April 1, 2018.
8. *Group Participating Provider Agreement* entered into with United Behavioral Health, Inc. dated October 15, 2012, as amended by that certain First Amendment, dated February 23, 2018.
9. *Participating Provider Practice Agreement* entered into with AllWays Health Partners (f/k/a Neighborhood Health Plan) dated February 15, 2012.
10. *Group Practice Participation Agreement* entered into with Massachusetts Behavioral Health Partnership dated August 29, 2017.
11. *Qualified Health Plan (QHP) Products (Including all metallic QHP products) Participating Professional Provider Agreement* entered into with BMC Healthnet Plan dated March 15, 2018.

12. *MassHealth Participating Professional Provider Agreement* entered into with BMC Healthnet Plan dated March 15, 2018.
13. *Contract for Professional Services/Master Agreement* entered into with American Alarm and Communications, Inc. dated March 5, 2019.
14. *Lease* entered into with Ernest M. Santin dated May 11, 2015 for 55 Tozer Road, Beverly, MA.
15. *Agreement of Lease* entered into with Checker Real Estate LLC dated October 12, 2018 for 216 West Boylston Street, West Boylston, MA.
16. Installation Payment Agreement by and between Community Intervention Services, Inc. and Cisco Systems Capital Corporation, dated April 24, 2020, as amended by that certain Initial Payment Addendum, dated April 24, 2020.
17. G Suite Ordering Document and Consumer Agreement by and between SADA Systems, Inc. and Community Intervention Services, dated August 26, 2020.
18. License Agreement by and between Futures Behavior Therapy Center LLC and Navicure (n/k/a Waystar Zirmed), dated October 11, 2019.

**Schedule 5.1(B)(iv)**

**Conflict, Contravention, or Breach**

None.

**Schedule 5.1(D)**

**Excluded Necessary Assets**

None.

Schedule 5.1(E)

**Financial Statements**

**Community Intervention Services Holdings, Inc.**
**CIS Holdings : Futures (Consolidated)**
# Balance Sheet
# End of Oct 2020
# Unaudited

| Financial Row | Amount |
|---|---:|
| **ASSETS** | |
| **Current Assets** | |
| **Bank** | |
| 10123 - Cash - Futures 5/3 - Oper Acct | $203,740.76 |
| **Total Bank** | **$203,740.76** |
| **Accounts Receivable** | |
| 12002 - Accounts Receivable III | $632,178.25 |
| 12010 - Accounts Receivable - Charge Lag | ($17,582.78) |
| 13006 - Allowance for Doubtful Accounts II | ($168,932.10) |
| 13100 - Cash Clearing 1 | ($754.88) |
| 13101 - Cash Clearing 2 | ($3,384.19) |
| 13105 - Cash Clearing 6 | ($3,206.63) |
| 13200 - Refund Cash Clearing | $6,804.62 |
| 14000 - Non-Consumer AR | $267,739.21 |
| **Total Accounts Receivable** | **$712,861.50** |
| **Other Current Asset** | |
| **14199 - Prepaid/Other** | |
| 14200 - Prepaid/Other 1 | $1,087.10 |
| **Total - 14199 - Prepaid/Other** | **$1,087.10** |
| 14500 - Payroll Clearing | ($112.70) |
| **Total Other Current Asset** | **$974.40** |
| **Total Current Assets** | **$917,576.66** |
| **Fixed Assets** | |
| 16102 - Fixed Assets - Automobiles 1 | $68,501.76 |
| 16103 - Fixed Assets - Furniture and Fixtures | $77,681.55 |
| 16104 - Fixed Assets - Equipment | $37,338.50 |
| 16105 - Fixed Assets - Leasehold Improvements | $1,283,646.93 |
| 16106 - Fixed Assets - Accumulated Depreciation 1 | ($785,388.49) |
| 16117 - Fixed Assets - Software | $9,842.00 |
| 16121 - Fixed Assets - Computer Equipment 1 | $87,148.17 |
| **Total Fixed Assets** | **$778,770.44** |
| **Other Assets** | |
| **15111 - Inter-Company** | |
| 15112 - Inter-Company FBR/AERI | ($408,167.33) |
| 15113 - Inter-Company CIS/Futures | ($488,724.12) |
| 15114 - Inter-Company SB/Futures | ($6,188,205.90) |
| 15123 - Inter-Company FBR/Futures | $960,500.00 |
| 15125 - Inter-Company Futures/NPS | $100,000.00 |
| 15127 - Inter-Company Futures/AFS | $477,637.50 |
| **Total - 15111 - Inter-Company** | **($5,546,959.85)** |
| 16300 - Security Deposits | $55,711.08 |
| **17000 - Intangible & Goodwill** | |
| **17004 - Intangibles - Referral Network** | |
| 17004 - Intangibles - Referral Network | $2,216,030.00 |
| 17104 - Accum Amort- Referral Network | ($1,172,649.22) |
| **Total - 17004 - Intangibles - Referral Network** | **$1,043,380.78** |

| | |
|---|---|
| **17005 - Intangibles - Trade Name** | |
| 17005 - Intangibles - Trade Name | $348,690.00 |
| 17105 - Accum Amort- Trade Name | ($184,515.12) |
| **Total - 17005 - Intangibles - Trade Name** | **$164,174.88** |
| **17006 - Goodwill** | |
| 17006 - Goodwill | $5,008,670.24 |
| 17106 - Accum Amort - Goodwill | ($918,256.22) |
| **Total - 17006 - Goodwill** | **$4,090,414.02** |
| **Total - 17000 - Intangible & Goodwill** | **$5,297,969.68** |
| **Total Other Assets** | **($193,279.09)** |
| **Total ASSETS** | **$1,503,068.01** |
| **LIABILITIES & EQUITY** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| 21000 - Accounts Payable | $11,567.18 |
| **Total Accounts Payable** | **$11,567.18** |
| **Other Current Liability** | |
| 21210 - Provider Level Balance (PLB) | $1,879.13 |
| 21302 - Current - Deferred Rent | $41,994.73 |
| 21312 - Current - Other 4 | $267,739.21 |
| **21400 - Payroll Accrual** | |
| 21409 - Payroll Accrual 9 | $83,819.43 |
| 21698 - HSA ER Liability | $1,250.00 |
| 21700 - 401K Retirement Accrual | $3,923.82 |
| 21701 - Vacation Accrual | $33,600.09 |
| 21703 - HSA Accrual | $906.68 |
| 21704 - Dental Accrual | ($1,956.57) |
| 21705 - Vision Accrual | ($58.58) |
| 21706 - Short Term Disability Accrual | ($3,244.63) |
| 21707 - Long Term Disability Accrual | $1,302.27 |
| 21708 - Insurance Accrual | $5,852.46 |
| 21723 - Life Insurance Accrual | $318.57 |
| 21734 - Holiday Accrual | $28,162.99 |
| 21736 - Sick Accrual | $7,373.37 |
| **Total - 21400 - Payroll Accrual** | **$161,249.90** |
| **21500 - Payroll Tax Accrual** | |
| 21600 - FICA Accrual 1 | $31,257.50 |
| 21602 - FUTA Accrual 1 | $60.16 |
| 21604 - SUTA Accrual 1 | $713.42 |
| **Total - 21500 - Payroll Tax Accrual** | **$32,031.08** |
| **Total Other Current Liability** | **$504,894.05** |
| **Total Current Liabilities** | **$516,461.23** |
| **Equity** | |
| 31000 - Common Stock 1 | $3.00 |
| 32000 - APIC 1 | $364,596.00 |
| Retained Earnings | $1,499,802.26 |
| Net Income | ($877,794.48) |
| **Total Equity** | **$986,606.78** |
| **Total LIABILITIES & EQUITY** | **$1,503,068.01** |

**Community Intervention Services Holdings, Inc.**
**CIS Holdings : Futures (Consolidated)**
# Income Statement
## From Jan 2020 to Oct 2020
## Unaudited

| | Total YTD 2020 Amount |
|---|---:|
| **Revenue** | |
| 41000 - Direct Billable Service 2 | $6,420,919.33 |
| 42000 - Direct Billable Service - Other | $3,027.43 |
| 44000 - Contractual Adjustments - System | ($2,341,951.24) |
| 45000 - Contractual Adjustments - Manual | ($16,854.62) |
| 46000 - Contractual Adjustment- Charge Lag | $17,957.00 |
| 48000 - Other Revenue | $1,267.54 |
| **Total - Revenue** | **$4,084,365.44** |
| **Total - Revenue** | **$4,084,365.44** |
| **Expense** | |
| **50000 - Direct Expenses** | |
| **51000 - Direct Labor** | |
| 51010 - Direct Care Billable Wages | $2,140,549.26 |
| 51020 - Direct Care Overtime | $10,293.34 |
| 51030 - Direct Care Bonus | $2,246.50 |
| 51031 - Direct Sign-on Bonus | $2,000.00 |
| 51040 - Direct Outside Services | $160.00 |
| 51090 - Direct Vacation Accrual | $90,695.77 |
| 51091 - Direct Sick & Holiday | $74,531.16 |
| **Total - 51000 - Direct Labor** | **$2,320,476.03** |
| **52000 - Direct Payroll Taxes** | |
| 52100 - Direct FUTA | $4,501.59 |
| 52200 - Direct SUTA | $59,600.92 |
| 52300 - Direct FICA | $159,836.02 |
| **Total - 52000 - Direct Payroll Taxes** | **$223,938.53** |
| **53000 - Direct Benefits** | |
| 53100 - Direct Health Insurance | $249,249.82 |
| 53200 - Direct Disability Insurance | $8,598.64 |
| 53400 - Direct Life Insurance | $1,401.32 |
| 53500 - Direct 401k ER Match | $0.00 |
| 53502 - Direct HSA ER Expense | $12,187.50 |
| **Total - 53000 - Direct Benefits** | **$271,437.28** |
| **55000 - Direct Program Expenses** | |
| 55100 - Direct Consumable Supplies | $1,911.59 |
| 55160 - Direct Office Supplies | $10,333.01 |
| 55200 - Direct Clinical Supplies | $4,635.61 |
| 55500 - Direct Training | $1,170.00 |
| **Total - 55000 - Direct Program Expenses** | **$18,050.21** |
| **57000 - Direct Travel and Entertainment** | |
| 57230 - Direct Meals - Entertainment | $175.47 |
| 57240 - Direct Parking & Tolls | $11.00 |
| 57250 - Direct Staff Mileage | $4,423.88 |
| **Total - 57000 - Direct Travel and Entertainment** | **$4,610.35** |
| **Total - 50000 - Direct Expenses** | **$2,838,512.40** |

**60000 - Indirect Expenses**

**61000 - Indirect Labor**

| | |
|---|---:|
| 61010 - Indirect Wages | $398,747.88 |
| 61020 - Indirect Overtime | $760.49 |
| 61040 - Indirect Outside Services | $336.66 |
| 61090 - Indirect Vacation Accrual | $17,484.40 |
| 61091 - Indirect Sick & Holiday | $5,022.17 |
| **Total - 61000 - Indirect Labor** | $422,351.60 |

**62000 - Indirect Payroll Taxes**

| | |
|---|---:|
| 62100 - Indirect FUTA | $180.93 |
| 62200 - Indirect SUTA | ($2,149.33) |
| 62300 - Indirect FICA | $31,069.01 |
| **Total - 62000 - Indirect Payroll Taxes** | $29,100.61 |

**63000 - Indirect Benefits**

| | |
|---|---:|
| 63100 - Indirect Health Insurance | $26,524.78 |
| 63200 - Indirect Disability Insurance | $1,268.54 |
| 63400 - Indirect Life Insurance | $112.78 |
| 63500 - Indirect 401k ER Match | $0.00 |
| 63502 - Indirect HSA ER Expense | $328.79 |
| **Total - 63000 - Indirect Benefits** | $28,234.89 |

**64000 - Indirect Insurance**

| | |
|---|---:|
| 64010 - Indirect General Liability Insurance | $8,212.23 |
| 64200 - Indirect Property Insurance | $5,763.04 |
| 64300 - Indirect Professional Liability | $9,118.17 |
| 64400 - Indirect D&O Insurance | $9,260.69 |
| 64500 - Indirect Worker's Compensation | $23,050.42 |
| 64600 - Indirect Auto Insurance | $7,647.98 |
| 64700 - Indirect Cyber Insurance | $708.44 |
| **Total - 64000 - Indirect Insurance** | $63,760.97 |

**66000 - Indirect Facilities Cost**

| | |
|---|---:|
| 66100 - Indirect Rent | $429,275.27 |
| 66101 - Indirect CAM | $23,550.31 |
| 66110 - Indirect Rent - Equipment | $5,291.39 |
| 66140 - Indirect Trash | $2,468.40 |
| 66150 - Indirect Utilities | $65,947.43 |
| 66160 - Indirect Repairs and Maintenance - Building | $57,517.96 |
| 66170 - Indirect Repairs and Maintenance - IT | $1,585.10 |
| 66180 - Indirect Repairs and Maintenance - Equip | $135.00 |
| 66190 - Indirect Telecommunication Voice/Data | $6,108.16 |
| 66193 - Indirect Computer Software | $116,499.28 |
| 66200 - Indirect Property Tax | $7,982.40 |
| **Total - 66000 - Indirect Facilities Cost** | $716,360.70 |

**67000 - Indirect Travel and Entertainment**

| | |
|---|---:|
| 67230 - Indirect Meals - Entertainment | $502.89 |
| 67240 - Indirect Parking & Tolls | $32.00 |
| 67250 - Indirect Staff Mileage | $2,775.50 |
| 67260 - Indirect Auto Expense | $1,291.31 |
| 67280 - Indirect Gifts | $0.00 |
| **Total - 67000 - Indirect Travel and Entertainment** | $4,601.70 |

**68000 - Indirect All Other**

| | |
|---|---:|
| 68011 - Indirect IT Purchased Services | $343.95 |
| 68012 - Indirect EE Awards | $489.95 |
| 68030 - Indirect Training & Conferences | $494.54 |
| 68040 - Indirect Admin Expenses | $619.99 |
| 68190 - Indirect Purchased Services | $1,067.16 |
| 68330 - Indirect Vehicle - Leasing | ($28.40) |
| 68340 - Indirect Advertising | $13,214.67 |
| 68370 - Indirect Legal | $230.00 |
| 68380 - Indirect Office Supplies | $37,108.48 |
| 68390 - Indirect Payroll Processing Fee | $13,991.36 |
| 68400 - Indirect Donation/ Charitable Contributions | $500.00 |
| 68410 - Indirect Bank Charges | $11,943.92 |
| 68420 - Indirect Dues & Subscription | $13,493.75 |

| | |
|---|---:|
| 68440 - Indirect Postage | $1,223.61 |
| 68450 - Late Fees & Charges | $45.84 |
| **Total - 68000 - Indirect All Other** | **$94,738.82** |
| **69000 - Bad Debt** | |
| 69001 - Deduction Expense - Bad Debt | $27,556.83 |
| **Total - 69000 - Bad Debt** | **$27,556.83** |
| **Total - 60000 - Indirect Expenses** | **$1,386,706.12** |
| **Total - Expense** | **$4,225,218.52** |
| **Net Ordinary Income (EBITDA)** | **($140,853.08)** |
| **Other Income and Expenses** | |
| Other Expense | |
| 70000 - Non Operating Expenses | |
| 70020 - Depreciation | $258,262.37 |
| 70030 - Amortization | $631,115.88 |
| 70050 - Other Income | ($164,028.39) |
| 70060 - Other Expense | $341.54 |
| 70100 - HIG Management Fee | $11,250.00 |
| **Total - 70000 - Non Operating Expenses** | **$736,941.40** |
| **Total - Other Expense** | **$736,941.40** |
| **Net Other Income** | **($736,941.40)** |
| **Net Income** | **($877,794.48)** |

**Schedule 5.1(F)(i)**

**Leases in Material Default**

None.

## Schedule 5.1(F)(ii)

### Seller Defaults Under Assumed Leases and Assumed Contracts

None.

### Schedule 5.1(F)(iv)

### Assumed Leases Requiring Consent

1. *Lease* entered into with Ernest M. Santin dated May 11, 2015 for 55 Tozer Road, Beverly, MA.
2. *Agreement of Lease* entered into with Checker Real Estate LLC dated October 12, 2018 for 216 West Boylston Street, West Boylston, MA.

## Schedule 5.1(G)

## Material Contracts

1. *Provider Agreement* entered into with Aetna, Inc. dated November 15, 2017.
2. *Licensed Applied Behavioral Analysts Professional Services Agreement* entered into with Blue Cross and Blue Shield of Massachusetts, Inc. dated June 24, 2016.
3. *Provider Services Agreement* entered into with Beacon Health Strategies, LLC dated May 23, 2011, as amended by that certain Provider Network Amendment to Adjust Rates, dated March 1, 2018.
4. *Participating Provider Agreement* entered into with CIGNA Behavioral Health, Inc. dated July 17, 2018.
5. *Participating Provider Agreement* entered into with Harvard Pilgrim Health Care, Inc. dated January 18, 2008.
6. *Allied Health Services Provider Agreement* entered into with Tufts Associated Health Maintenance Organization, Inc. and Total Health Plan, Inc. dated December 6, 2016.
7. *Provider Agreement* entered into with Tufts Health Public Plans, Inc. dated April 1, 2018.
8. *Group Participating Provider Agreement* entered into with United Behavioral Health, Inc. dated October 15, 2012, as amended by that certain First Amendment, dated February 23, 2018.
9. *Participating Provider Practice Agreement* entered into with AllWays Health Partners (f/k/a Neighborhood Health Plan) dated February 15, 2012.
10. *Group Practice Participation Agreement* entered into with Massachusetts Behavioral Health Partnership dated August 29, 2017.
11. *Qualified Health Plan (QHP) Products (Including all metallic QHP products) Participating Professional Provider Agreement* entered into with Boston Medical Center Health Plan, Inc. d/b/a BMC Healthnet Plan dated March 15, 2018.
12. *MassHealth Participating Professional Provider Agreement* entered into with Boston Medical Center Health Plan, Inc. d/b/a BMC Healthnet Plan dated March 15, 2018.
13. *Contract for Professional Services/Master Agreement* entered into with American Alarm and Communications, Inc. dated March 5, 2019.
14. *Scope of Work* entered into with Obsidian Public Relations dated August 19, 2017.
15. *Proposal for Services* entered into with Madrona Cleaner, Inc.
16. *Business Associate Agreement* entered into with Rethink Autism, Inc. dated March 9, 2017.
17. *HIPAA Business Associate Addendum* entered into with Credible Wireless, Inc. dated December 31, 2013.
18. *Letter of Renewal* entered into with Credible Behavioral Health, Inc. dated December 31, 2019.
19. *Business Associate Agreement* entered into with Zoom Video Communications dated September 17, 2018.
20. *Service Agreement* entered into with Rethink Autism, Inc. dated April 5, 2017.

21. *Lease* entered into with Ernest M. Santin dated May 11, 2015 for 55 Tozer Road, Beverly, MA.

22. *Agreement of Lease* entered into with Checker Real Estate LLC dated October 12, 2018 for 216 West Boylston Street, West Boylston, MA.

## Schedule 5.1(H)

### Material Contracts in Default

None.

**Schedule 5.1(I)(i)**

**Employee Benefit Plans**

1. 401K Plan with Fidelity Investments, Inc.
2. Vision Insurance Plan with EyeMed Vision Care, LLC
3. Medical Insurance Plan with Blue Cross Blue Shield of Massachusetts
4. Life and Disability Insurance Plan with Cigna
5. Dental Insurance Plan with Blue Cross Blue Shield of Massachusetts

**Schedule 5.1(I)(ii)**

**Multiemployer Benefit Plans**

Community Intervention Services, Inc., the parent company of Seller ("**CIS**"), is a member of a temporary multiple employer welfare arrangement (through 12/31/20) that is not subject to Department of Labor regulations.  CIS and its affiliates do not have any withdrawal liability with respect to this arrangement.

Schedule 5.1(J)(v)

**Business Employees**

LIST OF BUSINESS EMPLOYEES REDACTED.

**Schedule 5.1(K)(iii)**

**Employees Excluded from Federal Health Care Program**

None.

## Schedule 5.1(L)(i)

### Legal Proceedings

None.

**Schedule 5.1(L)(ii)**

**Settlements, Awards, or Orders**

None.

## Schedule 5.1(M)

## Changes Made Since October 31, 2020

(i)

None.

(ii)

None.

(iii)

None.

(iv)

None.

(v)

None.

(vi)

None.

(vii)

None.

(viii)

None.

(ix)

None.

(x)

None.

**Schedule 5.1(N)(i)**

**Seller's Permits**

1. Regular License to Operate a Large Group and School Age Child Care Program (License No. 9048501), issued by the Department of Early Education and Care of the Commonwealth of Massachusetts to Futures Behavior Therapy Center, for the facility located at 55 Tozer Road Beverly, MA, issued on October 3, 2019 and expiring on October 2, 2021.
2. Regular License to Operate a Large Group and School Age Child Care Program (License No. 9052315), issued by the Department of Early Education and Care of the Commonwealth of Massachusetts to Futures Behavior Therapy Center, for the facility located at 216 West Boylston Street, West Boylston, MA, issued on October 9, 2019 and expiring on October 8, 2021.
3. Certificate of Occupancy B-16-866, issued by the City of Beverly, dated October 13, 2016.
4. Certificate of Occupancy B-18-231, issued by the Town of West Boylston, dated February 21, 2019.

## Schedule 5.1(N)(ii)

## Professionals Not in Good Standing

None.

## Schedule 5.1(O)(i)

## Business Intellectual Property

<u>Domain Name</u>

www.futuresbtc.com

**Schedule 5.1(O)(ii)**

**License Agreements for Business Intellectual Property**

(1)

1.    Credible Behavioral Healthcare Software
2.    ADP Vantage HCM Services
3.    Oracle NetSuite
4.    Credible Wireless, Inc.
5.    Zoom Video Communications
6.    ReThink
7.    Cisco Meraki
8.    Google Apps, through SADA, Inc.
9.    Google MDM
10.   Allworx Voice Over IP
11.   Microsoft Windows and Microsoft Office
12.   Waystar ZirMed (f/k/a Navicure)

(2)

None.

## Schedule 5.1(O)(iii)

## Not owned/Unlicensed Intellectual Property

None.

**Schedule 5.1(O)(iv)**

**Claimed Infringement on Intellectual Property**

None.

**Schedule 5.1(P)**

**Seller's Broker's Fees**

1. Fee owed to Duff & Phelps Securities, LLC in connection with the Closing of the transaction contemplated by the Agreement pursuant to the Duffs & Phelps Engagement Letter.

## Schedule 5.1(R)

### Major Payors

| 2019 Revenue | | 2020 YTD Revenue, thru October | |
|---|---|---|---|
| Payor | Revenue | Payor | Revenue |
| BCBS | $2,278,541 | MBHP | $1,018,801 |
| MBHP | $1,429,057 | BCBS | $1,027,637 |
| BMC HealthNet | $1,086,274 | Tufts Network Health | $444,783 |
| Tufts Network Health | $888,690 | BMC HealthNet | $356,923 |
| Tufts/GIC | $604,658 | AllWays Health Partners | $306,617 |
| AllWays Health Partners | $487,319 | Harvard Pilgrim | $233,534 |
| Harvard Pilgrim | $420,158 | Tufts Total Health Plan | $146,949 |
| AETNA | $312,468 | Tufts/GIC | $120,381 |
| United Health Care | $238,099 | Cigna | $71,301 |
| Client Due | $205,029 | United Health Care | $80,680 |

**Schedule 6.1(C)**

**Seller Key Employees**

REDACTED.

**Schedule 6.2**

**Exceptions to Seller Negative Covenants**

None.

## Schedule 7.2(E)

### Required Third-Party Consents

1. *Provider Agreement* entered into with Aetna, Inc. dated November 15, 2017.
2. *Licensed Applied Behavioral Analysts Professional Services Agreement* entered into with Blue Cross and Blue Shield of Massachusetts, Inc. dated June 24, 2016.
3. *Provider Services Agreement* entered into with Beacon Health Strategies, LLC dated May 23, 2011, as amended by that certain Provider Network Amendment to Adjust Rates, dated March 1, 2018.
4. *Participating Provider Agreement* entered into with CIGNA Behavioral Health, Inc. dated July 17, 2018.
5. *Participating Provider Agreement* entered into with Harvard Pilgrim Health Care, Inc. dated January 18, 2008.
6. *Allied Health Services Provider Agreement* entered into with Tufts Associated Health Maintenance Organization, Inc. and Total Health Plan, Inc. dated December 6, 2016.
7. *Provider Agreement* entered into with Tufts Health Public Plans, Inc. dated April 1, 2018.
8. *Group Participating Provider Agreement* entered into with United Behavioral Health, Inc. dated October 15, 2012, as amended by that certain First Amendment, dated February 23, 2018.
9. *Participating Provider Practice Agreement* entered into with AllWays Health Partners (f/k/a Neighborhood Health Plan) dated February 15, 2012.
10. *Group Practice Participation Agreement* entered into with Massachusetts Behavioral Health Partnership dated August 29, 2017.
11. *Qualified Health Plan (QHP) Products (Including all metallic QHP products) Participating Professional Provider Agreement* entered into with BMC Healthnet Plan dated March 15, 2018.
12. *MassHealth Participating Professional Provider Agreement* entered into with BMC Healthnet Plan dated March 15, 2018.
13. *Contract for Professional Services/Master Agreement* entered into with American Alarm and Communications, Inc. dated March 5, 2019.
14. *Lease* entered into with Ernest M. Santin dated May 11, 2015 for 55 Tozer Road, Beverly, MA.
15. *Agreement of Lease* entered into with Checker Real Estate LLC dated October 12, 2018 for 216 West Boylston Street, West Boylston, MA.
16. Installation Payment Agreement by and between Community Intervention Services, Inc. and Cisco Systems Capital Corporation, dated April 24, 2020, as amended by that certain Initial Payment Addendum, dated April 24, 2020.
17. G Suite Ordering Document and Consumer Agreement by and between SADA Systems, Inc. and Community Intervention Services, dated August 26, 2020.
18. License Agreement by and between Futures Behavior Therapy Center LLC and Navicure (n/k/a Waystar Zirmed), dated October 11, 2019.

## **Exhibit B**

[Assumed Contracts and Cure Amounts]

| Contract Party | Contract Name | Date | Type | Cure Amount |
|---|---|---|---|---|
| Aetna, Inc. | Provider Agreement | 11/15/2017 | Payor | TBD |
| American Alarm and Communications, Inc. | Contract for Professional Services/Master Agreement | 3/5/2019 | Operating Contract | $0.00 |
| Beacon Health Strategies, LLC | Provider Services Agreement | 5/23/2011 | Payor | $0.00 |
| Blue Cross and Blue Shield of Massachusetts, Inc. | Licensed Applied Behavioral Analysts Professional Services Agreement | 6/24/2016 | Payor | $0.00 |
| BMC Healthnet Plan | Qualified Health Plan (QHP) Products (Incluing all metallic QHP products) Participating Professional Provider Agreement | 3/15/2018 | Payor | $0.00 |
| BMC Healthnet Plan | MassHealth Participating Professional Provider Agreement | 3/15/2018 | Payor | $0.00 |
| Checker Real Estate LLC | Agreement of Lease at 216 West Boylston St., West Boylston, MA | 10/12/2018 | Lease | $0.00 |
| CIGNA Behavioral Health, Inc. | Participating Provider Agreement | 7/17/2018 | Payor | $0.00 |
| Credible Behavioral Health, Inc. | Letter of Renewal | 12/31/2018 | Operating Contract | $0.00 |
| Credible Wireless, Inc. | HIPAA Business Associate Addendum | 12/31/2013 | Operating Contract | $0.00 |
| Ernest M. Santin | Lease at 55 Tozer Road, Beverly, MA | 5/11/2015 | Lease | $0.00 |

1

| Harvard Pilgrim Health Care, Inc. | Participating Provider Agreement | 1/18/2008 | Payor | $0.00 |
|---|---|---|---|---|
| Madrona Cleaner Inc. | Proposal for Services | - | Operating Contract | $3,650.00 |
| Massachusetts Behavioral Health Partnership | Group Practice Participation Agreement | 8/29/2017 | Payor | $0.00 |
| Neighborhood Health Plan | Participating Provider Practice Agreement | 2/15/2012 | Payor | $0.00 |
| Obsidian Public Relations | Scope of Work | Aug-19 | Operating Contract | $0.00 |
| Rethink Autism, Inc. | Business Associate Agreement | 3/9/2017 | Operating Contract | $0.00 |
| Rethink Autism, Inc. | Service Agreement | 4/5/2017 | Operating Contract | $0.00 |
| SADA Systems, Inc. | G Suite Ordering Document and Consumer Agreement | 8/26/2020 | Software License Agreement | $9,500.88 |
| Tufts Associated Health Maintenance Organization, Inc. / Total Health Plan, Inc. | Allied Health Services Provider Agreement | 12/6/2016 | Payor | $0.00 |
| Tufts Health Public Plans, Inc. | Provider Agreement | 4/1/2018 | Payor | $0.00 |
| United Behavioral Health, Inc. | Group Participating Provider Agreement | 10/15/2012 | Payor | $0.00 |
| Zoom Video Communications | Business Associate Agreement | 9/17/2018 | Operating Contract | $0.00 |