UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

_____
                                        )
In re:                                  )
                                        )    Chapter 11
COMMUNITY INTERVENTION SERVICES, INC.,  )
COMMUNITY INTERVENTION SERVICES         )
HOLDINGS, INC., SOUTH BAY MENTAL HEALTH )    Case No. 21-40002-EDK
CENTER, INC., and FUTURES BEHAVIOR      )
THERAPY CENTER, LLC                     )
                                        )    (Jointly Administered)
                            Debtors.    )
_____ )

**ORDER APPROVING DEBTORS' SALE OF SUBSTANTIALLY
ALL ASSETS OF SOUTH BAY MENTAL HEALTH CENTER, INC. AND CERTAIN
ASSETS OF COMMUNITY INTERVENTION SERVICES, INC., INCLUDING
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE,
<u>FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS</u>**

Upon consideration of the *Motion For Authority to Sell Substantially All Assets of South Bay Mental Health Center, Inc. and Certain Assets of Community Intervention Services, Inc., Including Certain Executory Contracts and Unexpired Leases, Pursuant to Sections 363 and 365 of the Bankruptcy Code, Free and Clear of Liens, Claims, and Interests* dated January 5, 2021 [Docket No. 9] (the "<u>Sale Motion</u>"; capitalized terms used but not otherwise defined herein have the meanings given to them in the Sale Motion, the Sale Procedures Motion, or the APA (as defined below), as applicable), pursuant to which Debtors Community Intervention Services, Inc. ("<u>CIS</u>") and South Bay Mental Health Center, Inc. ("<u>South Bay</u>" and, with CIS, the "<u>Debtors</u>") requested that this Court authorize the Debtors' sale (the "<u>Sale</u>") of: (A) substantially all of South Bay's assets utilized by South Bay in operating its business, including without limitation (i) South Bay's rights under leases of real property at which South Bay operates its clinics

(collectively, the "Leases"), (ii) certain personal property, including equipment, furniture and inventory, (iii) certain contracts with third parties (together with the Leases, the "SB Assumed Contracts"), (iv) certain permits and licenses authorizing the provision of certain services to South Bay clients and patients (to the extent transferable), and (v) certain other miscellaneous, specified assets as set forth in that certain Asset Purchase Agreement dated as of January 5, 2021 between the Debtors and SB Transitional Sub, LLC, a Delaware limited liability company ("SBTS"), including, without limitation, the right to use South Bay's trade names and other intellectual property (collectively, the "SB Assets"); and (B) certain assets of CIS integral to the operation of the South Bay business enterprise (the "CIS Assets" and, together with the SB Assets, the "Assets"), including certain executory contracts (the "CIS Assumed Contracts" and, together with the SB Assumed Contracts, the "Assumed Contracts"), to SBTS, or its eligible designee (the "Purchaser"), or to such other entity that submits the highest or otherwise best offer to acquire the Assets as determined through the sale procedures governing the Sale (the "Sale Procedures") approved by, and constituting Exhibit A to, the Court's order entered on January 16, 2021 [Doc. No.81] (the "Sale Procedures Order"); and the Court having conducted a hearing on the Sale Motion on March 4, 2021 (the "Sale Hearing"); and the Court having reviewed the Sale Motion and considered the arguments of counsel and the matters addressed at such hearing, including the Declaration of Eric Coburn in support of the Sale filed on March 2, 2021 [Docket No. 187] (the "Coburn Declaration"), and the objections to the relief sought in the Sale Motion filed by Ford Motor Credit Company LLC ("FMCC") [Doc. No. 165] (the "FMCC Objection"), 80 Erdman Way LLC ("Leominster Landlord") [Doc. No. 177] (the "Leominster Objection"), Victory Human Services, Inc. ("Brockton Landlord") [Doc. No. 183] (the "Brockton Objection"), and Oracle Credit Corporation and Oracle America, Inc., successor in interest to

2

NetSuite, Inc. ("Oracle") [Doc. Nos. 181, 182] (the "Oracle Objection" and, together with the FMCC Objection, the Leominster Objection, and the Brockton Objection, the "Objections"); and the Court having considered the representations and arguments of counsel and the matters addressed at such hearing, including the Debtor's disclosure respecting the resolution of the Objections and reconciliation of the proper "Cure Amount" for certain Assumed Contracts; and the Court having found and determined that the relief sought in the Sale Motion is in the best interests of the Debtors, their estates, and the creditors thereof, and all parties in interest and that the legal and factual bases set forth in the Sale Motion establish good cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor:

**IT IS HEREBY FOUND AND DETERMINED, pursuant to Fed. R. Bankr. P. 7052, that:**

## General

A.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1134.  Venue of the Debtors' Chapter 11 cases in this District is proper pursuant to 28 U.S.C. §§ 1408(a) and 1409(a).  Determination of the Sale Motion is a core proceeding under 28 U.S.C. §157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  The statutory predicates for the relief requested in the Sale Motion are Sections 105, 363 and 365 of the Bankruptcy Code and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Compliance with Sale Procedures

B.      The Debtors have complied with the notice provisions of the Sale Procedures Order by providing the notices approved under the Sale Procedures Order to (i) counsel for the

United States Trustee, (ii) counsel to the Agent,[1] (iii) any entities known to hold a lien or security interest in any of the Assets, (iv) all parties that have filed and served a request for notice in the Debtors' Chapter 11 cases, (v) the Internal Revenue Service, (vi) the United States Attorney for the District of Massachusetts, (vii) each of the Debtors' federal and state taxing authorities, and any federal, state or local governmental agency that has or exercises any licensing, registration or permitting authority over the Debtors or any of the Assets, including the Commonwealth of Massachusetts Department of Public Health, (viii) all non-Debtor parties to the Assumed Contracts, (ix) all relevant environmental regulatory agencies, (x) all parties to the Specified Litigation (as defined in the APA, as defined below), and (xi) all other known non-employee creditors of the Debtors.  The notice of the Sale Hearing and of the relief sought by the Sale Motion, as reflected by the affidavits or certificates of service on file with the Court, was proper, timely, adequate and sufficient and meets the requirements of Sections 102(1), 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006, was reasonably calculated to give actual notice of the relief contemplated by the Sale Motion, is appropriate and sufficient under the circumstances, and no other or further notice of the Sale, the Sale Procedures, the Auction, the Sale Motion, the Sale Hearing, or the entry of this Order need be provided to any entity.

C.      Service of the Assumed Contracts Notice was good, sufficient and appropriate under the circumstances, in compliance with the Sale Procedures Order, and no other or further notice need be given to any entity in respect of establishing the Cure Amounts for the Assumed Contracts.  Non-Debtor counterparties to the Assumed Contracts have had an opportunity to object to the Cure Amounts.

---

[1] Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Sale Motion, Sale Procedures Motion, Sale Procedures Order or APA (as defined below), as appropriate.

D.       The Debtors have demonstrated good, sound and sufficient business purpose and justification, and it is a reasonable exercise of the Debtors' business judgment, (i) to sell the Assets on the terms and conditions set forth in the APA (as defined below), (ii) to assume and assign the Assumed Contracts to the Purchaser, and (iii) to consummate all transactions contemplated by the APA (as defined below).  The sale of the Assets and the assumption and assignment of the Assumed Contracts is in the best interest of the Debtors, their estates, their creditors, and other parties in interest.

**Highest or Best Offer**

E.       The Debtors and Duff & Phelps Securities, LLC ("D&P") marketed the Assets diligently, in good faith and in a commercially reasonable manner, to secure the highest and best offers for the Assets, including through the efforts of D&P to contact and make available offering and due diligence materials to potential purchasers and otherwise to make sale-related information about the Debtors, the Assets, and the Sale Procedures available to prospective purchasers of the Assets.

F.       The Debtors and D&P have marketed the Assets and solicited bids for the Assets in compliance with the Sale Procedures Motion and the Sale Procedures Order, and creditors, parties in interest and other entities have been afforded a full, fair and reasonable opportunity to submit offers to purchase the Assets.

G.       The Debtors, D&P, and the Debtors' other representatives have complied in all material respects with the Sale Procedures and the Sale Procedures Order.  The Debtors have complied with the provisions of Sections 363 and 365 of the Bankruptcy Code as regards the sale of the Assets and the assumption and assignment of the Assumed Contracts.

H.     The Debtors, having received no Qualified Bids, canceled the Auction and, in consultation with their professional advisors and the Agent, designated the bid of the Purchaser as the highest or otherwise best offer to purchase the Assets, which offer is embodied in that certain Asset Purchase Agreement between the Debtors and the Purchaser dated as of January 5, 2021 and filed with the Court [Doc. No. 9-1] (the "APA", a copy of which is attached hereto as Exhibit A).  Pursuant to the APA, the Purchaser has agreed, in consideration of the Debtors' sale of the Assets to the Purchaser, to pay the cash purchase price to the Debtors in the amount of $32,000,000 (the "Cash Purchase Price"), and to assume the Assumed Contracts and the Assumed Obligations (as defined in the APA), all as specified in the APA, subject only to satisfaction of the conditions to closing of the Sale as set forth in the APA.

I.     The consideration provided by the Purchaser pursuant to the APA (i) is fair and reasonable, (b) is the highest or otherwise best offer for the Assets, and (c) constitutes reasonably equivalent value for the Assets.

## Sale Free and Clear

J.     The Debtors may sell the Assets free and clear of all liens, claims, interests, rights of setoff, recoupment, netting and deductions, any successor or successor-in-interest liability theory, and other encumbrances of any kind or nature whatsoever (collectively, the "Encumbrances") (except for the Assumed Obligations and the Permitted Liens), including, without limitation, all liabilities and obligations arising from the Specified Litigation (as defined in the APA), because, in each case, one or more of the standards set forth in Section 363(f)(1) – (5) of the Bankruptcy Code has been satisfied.  Those holders of Encumbrances who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code.  Those holders of

Encumbrances who did object fall within one or more of the other subsections of Section 363(f) and are adequately protected by having their Encumbrances, if any, attach to the net cash proceeds of the Sale attributable to the Assets in which such holder alleges an Encumbrance, in the same order of priority, with the same validity, force and effect that such Encumbrance had prior to the Sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

K.    The Purchaser is not, and shall not be considered, a successor to either of the Debtors or either of their respective estates, and there is no continuity of enterprise between the Purchaser and any Debtor.  The Purchaser (i) has not, *de facto* or otherwise, merged with or into one or more of the Debtors, (ii) is not a continuation or substantial continuation, and is not holding itself out as a mere continuation, of any of the Debtors or of their respective estates, businesses or operations, or any enterprise of the Debtors, and (iii) does not have a common identity of incorporators, directors or equity holders with either of the Debtors.

L.    The Purchaser would not have entered into the APA and would not consummate the transactions contemplated thereunder if the sale of the Assets to the Purchaser, and the assumption and assignment of the Assumed Contracts to the Purchaser, were not, except as otherwise provided in the APA, free and clear of all Encumbrances or if the Purchaser would, or in the future could (except and only to the extent expressly provided in the APA and with respect to the Assumed Obligations and the Permitted Liens), be liable for any of such Encumbrances.

**Assumption and Assignment of Assumed Contracts**

M.    The executory contracts and unexpired leases that the Debtors are authorized to assume and assign to the Purchaser pursuant to the APA and Section 365 of the Bankruptcy Code are identified on attached Exhibit B (such executory contracts and unexpired leases are

hereinafter referred to, collectively, as the "Assumed Contracts"). Each of the Assumed Contracts is valid and binding, in full force and effect, and enforceable in accordance with its terms, and is property of the Debtors' estates pursuant to Section 541(a) of the Bankruptcy Code.

N. The assumption and assignment of the Assumed Contracts pursuant to the terms of this Order is integral to the APA and is in the best interests of the Debtors and their estates, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

O. The Debtors have provided adequate assurance, within the meaning of Section 365(b)(1) of the Bankruptcy Code, of the Debtors' cure of all defaults, obligations and liabilities under the Assumed Contracts, through the Debtors' undertaking to pay the cure amount for each of the Assumed Contracts as set forth on attached Exhibit B (the "Cure Amounts"). For each Assumed Contract that is assumed and assigned at the closing of the Sale under the APA (the "Closing"), the Debtors shall pay the Cure Amounts in cash or as otherwise directed by separate order of the Court.

P. To the extent that any non-Debtor party to any Assumed Contract objects, asserts or claims some greater amount is owed to it other than the Cure Amount with respect to the Debtors' obligations under the relevant Assumed Contract, such objection, assertion and/or claim is expressly overruled, unless it has been properly preserved for future resolution pursuant to the Sale Procedures Order and this Order.

Q. The Purchaser has provided adequate assurance of its future performance under the Assumed Contracts within the meaning of Section 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

R.     The Purchaser may in accordance with the APA designate additional executory contracts to be additional Assumed Contracts, and the Debtors in accordance with the APA may seek this Court's further order authorizing the Debtors' assumption and assignment to the Purchaser of such additional Assumed Contracts.  The Purchaser may in accordance with the APA elect not to accept assignment of any one or more of the Assumed Contracts, and nothing in this Order requires the Purchaser to take assignment of any particular Assumed Contract.

S.     The Debtors shall continue to perform their post-petition obligations under the Assumed Contracts through the Closing or, as to any particular Assumed Contract, such earlier time as the Purchaser notifies the Debtors that the Purchaser has elected not to take assignment of such Assumed Contract and the Debtors have notified the non-Debtor contract party that such Assumed Contract will not be assumed and assigned.

### Compelling Circumstances for an Immediate Sale

T.     It is essential that the Sale of the Assets occur within the time constraints set forth in the APA.  Time is of the essence in consummating the Sale.

U.     The Sale does not constitute a *de facto* or *sub rosa* plan of reorganization or liquidation because it does not propose to (i) impair or restructure existing debt of, or equity interests in, the Debtors, (ii) impair or circumvent voting rights with respect to any plan proposed by the Debtors, (iii) circumvent Chapter 11 safeguards, including those set forth in Sections 1125 and 1129 of the Bankruptcy Code, or (iv) classify claims or equity interests.

V.     The consummation of the Sale is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, Sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the Sale.

**Good Faith Purchaser**

W.     The Purchaser is not an "insider" of the Debtors, as that term is defined in Section 101(31) of the Bankruptcy Code, and is not otherwise affiliated with the Debtors.

X.     The Purchaser has proceeded in good faith and without collusion in all respects in connection with the sale process, in that: (i) the Purchaser, in proposing and proceeding with the Sale in accordance with the APA, recognized that the Debtors were free to deal with other interested parties; (ii) the Purchaser agreed to provisions in the APA that would enable the Debtors to accept a higher and better offer; (iii) the Purchaser complied with all of the provisions in the Sale Procedures Order applicable to the Purchaser; (iv) all payments to be made by the Purchaser and other agreements entered into or to be entered into between the Purchaser and the Debtors in connection with the Sale have been disclosed; (v) the negotiation and execution of the APA and related documents were conducted in good faith and constituted an arm's length transaction; (vi) the Purchaser did not induce or cause the Chapter 11 filings by the Debtors; and (vii) the APA was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors.  The Purchaser is therefore entitled to all of the benefits and protections provided to a good-faith purchaser under Section 363(m) of the Bankruptcy Code.

Y.     Neither of the Debtors, nor the Purchaser, nor their respective representatives engaged in any conduct that would cause or permit the APA, any of the other documents executed in connection with the APA, or the Sale to be avoided, or that would permit the recovery of excess value or the imposition of punitive damages, under Section 363(n) of the Bankruptcy Code.

Z.     In the absence of a stay pending appeal, the Purchaser may close the transactions contemplated by the APA at any time after entry of this Order, and cause has been shown as to why this Order should not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

## No Fraudulent Transfer

AA.     The consideration provided by the Purchaser pursuant to the APA (a) is fair and reasonable, (b) is the highest or otherwise best offer for the Assets, and (c) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act, and Section 548 of the Bankruptcy Code).

## Sale Proceeds

BB.     The compensation arrangements between the Debtors and D&P, as set forth in the engagement letter agreement between the Debtors and D&P dated December 22, 2020, and approved by this Court by order entered on February 9, 2021 [Docket No. 16, 162] (the "D&P Fee"), call for payment of the D&P Fee upon the closing of a sale transaction achieved through D&P's efforts.   From the proceeds of the Sale, an amount equal to the D&P Fee shall be deposited in escrow (the "D&P Fee Escrow"), and held by the Debtors for payment of the D&P Fee upon the filing and this Court's approval of a fee application respecting D&P's services in connection with the Sale, as required under the D&P Employment Order.

CC.     Based on the record as it relates to the senior secured claim of the Agent and the Prepetition Secured Parties (both as defined in this Court's final order approving the Debtors' use of cash collateral entered on February 4, 2021 [Doc. No. 58] (the "Final Cash Collateral Order"), which includes, without limitation, those certain Claim No. 3 regarding South Bay and

Claim No. 5 regarding CIS each filed by Agent, on behalf of the Prepetition Secured Parties,

against the Debtor ("Agent's Proof of Claim"), which no party has objected to as of the date

hereof, and those certain stipulations of the Debtor contained in the Final Cash Collateral Order,

and which claim as of the commencement of the Debtors' chapter 11 cases totaled at least

$48,708,644.51, there exists no reason to delay payment to the Agent on account of such claim at

the Closing of the remaining sale proceeds following payment of (i) the Payment Amount (as

defined in the APA), and (ii) the D&P Fee Escrow or, if and to the extent approved by this Court,

the D&P Fee.

## Miscellaneous

DD.    It is necessary and appropriate, in order to ensure the validity of the sale of the

Assets to the Purchaser and to ensure compliance with this Order, for this Court to retain

jurisdiction to: (a) interpret and enforce the provisions of the APA, the Assumed Contracts, the

Sale Motion, and this Order; (b) protect the Purchaser and any of the Assets against any asserted

Encumbrances; (c) resolve any disputes arising under or relating to the APA, the Assumed

Contracts, the Sale Motion, and this Order; and (d) determine the validity, extent and priority of

asserted Encumbrances in, on, or to the Assets.

**WHEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED**

**THAT:**

## General Provisions

1.    The findings of fact entered above and the conclusions of law stated herein shall

constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052,

made applicable to this proceeding by Bankruptcy Rule 9014.  To the extent that any finding of

fact shall later be determined to be a conclusion of law, it shall be so deemed, and to the extent

that any conclusion of law shall later be determined to be a finding of fact, it shall be so deemed. Any findings of fact or conclusions of law stated by the Court on the record at the Sale Hearing are hereby incorporated, to the extent they are not inconsistent herewith.  This Court's findings of fact and conclusions of law, set forth in the Sale Procedures Order, are incorporated herein by reference.

2.    The Sale Motion is GRANTED, and the Sale contemplated thereby is approved as set forth in this Order.

3.    All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived or settled, including without limitation the Objections, and including all reservations of rights included therein which are not otherwise provided for by this Order, are overruled on the merits with prejudice.

## Approval of APA and Sale Transaction

4.    The Sale to the Purchaser pursuant to the APA is authorized under Section 363(b) of the Bankruptcy Code.  The APA and all ancillary documents, and all of the terms and conditions thereof, are approved, and the Debtors are authorized to consummate the transactions contemplated thereby.

5.    Pursuant to Section 363(b) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (i) consummate the Sale of the Assets to the Purchaser pursuant to and in accordance with the terms and conditions of the APA, (ii) close the Sale as contemplated in the APA and this Order, and (iii) execute and deliver, perform under, consummate, implement and close the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and the Sale, or as may be reasonably necessary or appropriate to the performance of the

obligations as contemplated by the APA and such ancillary documents.

6.        The APA and any related agreements, documents, or other instruments may be modified, amended or supplemented by the parties thereto in accordance of the terms thereof without further order of the Court, provided that any such modification, amendment or supplement is not material and does not materially change the economic substance of the transactions contemplated thereby.

## Sale Free and Clear

7.        Pursuant to Sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Assets at the Closing.  The Assets (including the Assumed Contracts) shall be transferred to the Purchaser upon and as of the Closing and such transfer shall constitute a legal, valid, binding and effective transfer of such Assets and, upon the Debtors' receipt of the Purchase Price, shall be free and clear of all Encumbrances, except for the Assumed Obligations and Permitted Liens under the APA.  Upon the Closing, the Purchaser shall take title to and possession of the Assets subject only to the Assumed Obligations and Permitted Liens; provided, however, that the Purchaser shall not be relieved of liability with respect to the Assumed Obligations and Permitted Liens, including any obligations accruing under the Assumed Contracts from and after the Closing.  All Encumbrances shall attach solely to the net proceeds of the Sale with the same validity, priority, force and effect that they now have as against the Assets, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

8.        Upon the Closing Date, and except as otherwise provided herein or in the APA, the Purchaser shall not bear liability for any liability or other obligation of the Debtors arising under or related to any of the Assets.  Without limiting the generality of the foregoing, and

except as otherwise expressly provided herein or in the APA, the Purchaser shall not be liable for any Encumbrances on, in, or against either of the Debtors or any of their predecessors or affiliates, their respective estates, or the Assets, and the Purchaser shall have no successor or vicarious liabilities of any kind or character, including, without limitation, under any theory of antitrust, environmental, successor, or transferee liability, labor law, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing Date, now existing, or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, without limitation, liabilities on account of warranties, intercompany loans, receivables among the Debtors and their affiliates, environmental liabilities, workers' compensation "experience rating," unemployment tax "contribution rating" rule or regulation, the Specified Litigation, or any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Assets prior to the Closing Date.

9.      Except as otherwise permitted by the APA or this Order, all persons and entities, including, without limitation, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding Encumbrances of any kind or nature whatsoever on, in, or against either of the Debtors, their respective estates, or all or any portion of the Assets, arising under, out of, in connection with, or in any way relating to, the Debtors, the Assets, the operation of the Debtors' businesses prior to the Closing Date, or the transfer of the Assets to the Purchaser, are hereby forever barred, estopped, and permanently enjoined from asserting against the Purchaser, or any of its affiliates, successors, or assigns, or their property or the Assets, such Encumbrances, including, without limitation, by taking any of the following actions against the Purchaser or its affiliates,

or their successors, assets, or properties, to the extent any such actions arise under, out of, in connection with, or in any way relate to, the Debtors, the Assets, the operation of the Debtors' businesses prior to the Closing Date, or the transfer of the Assets to the Purchaser: (a) commencing or continuing in any manner any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or other order; (c) creating, perfecting, or enforcing any lien or other claim; (d) asserting any set off, right of subrogation, or recoupment of any kind; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or any other order of this Court, or the APA or actions contemplated or taken in respect thereof, or (f) revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization relating to the Assets solely on the ground that (i) the Debtors are debtors under the Bankruptcy Code or (ii) the Purchaser is a purchaser at a sale pursuant to Section 363 of the Bankruptcy Code.

10.      If any person or entity that has filed statements or other documents or agreements evidencing Encumbrances on all or any portion of the Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary or desirable to the Purchaser for the purpose of documenting the release of all Encumbrances that the person or entity has or may assert with respect to all or any portion of the Assets, the Debtors are hereby authorized and directed, and the Purchaser is hereby authorized, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Assets.

11.       This Order is deemed to operate as an unconditional release, discharge and termination, effective as of the Closing, of all Encumbrances in, on, or to the Assets.  If the Closing does not occur, then such Encumbrances shall remain in effect.

12.       This Order is binding on filing agents and officers, all government departments and units, whether federal, state, local or of a foreign state (or subdivision thereof), who may be required by operation of law, or the duties of office or of contract, to accept, file, register or otherwise record or release any documents or instruments or who may be required to report or insure any title or state of title in or to any of the Assets (all such entities being "Recording Officers"); provided, however, that nothing in this Order shall require Recording Officers to accept for filing any transfer document or instrument not accompanied by payment of any required conveyance tax or recording fee.  Each and every federal, state and local governmental agency or department is hereby required and directed (i) to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA, and (ii) to issue any certificate, including without limitation a certificate of good standing, necessary to effect or evidence removal of a lien, claim, or interest for corporate or other income taxes from the Assets.

13.       This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system maintained by any Recording Officer.  If any entity that has filed a financing statement or other document or agreement evidencing a lien, claim, or interest in, on, or to any of the Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate individuals, termination statements, instruments of satisfaction, release of all liens, claims, or interests that the entity has with respect to any particular Assets conveyed pursuant to the APA, then each of the Debtors and the Purchaser is hereby authorized

to file, register or otherwise record a certified copy of this Order (or a Confirmatory Order (as defined herein)), which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release and discharge of such entity's liens, claims, or interests in such Assets.

### Assumption and Assignment of Assumed Contracts

14.    Subject to and conditioned on the Closing, the Debtors are authorized pursuant to Section 365(a) of the Bankruptcy Code to assume and assign the Assumed Contracts to the Purchaser.  All requirements and conditions under Sections 363 and 365 of the Bankruptcy Code for the assumption by the relevant Debtor and assignment to the Purchaser of each Assumed Contract have been satisfied and, upon Closing, the Purchaser shall be fully and irrevocably vested in all right, title and interest of each Assumed Contracts, and each Assumed Contract shall remain valid and binding and in full force and effect for the benefit of the Purchaser in accordance with its terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in Sections 365(b)(2), (e)(1), and (f)(1) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer.  The Cure Amounts constitute all of the amounts that are required to be paid under Section 365(b)(1) of the Bankruptcy Code in connection with the assumption and assignment of the Assumed Contracts.  The non-Debtor parties to the Assumed Contracts are hereby deemed to have waived any and all prepetition claims other than the Cure Amounts. Pursuant to Section 363(k) of the Bankruptcy Code, other than as provided for in the APA, upon the assignment of the Assumed Contracts to the Purchaser, the Debtors shall have no further liability or obligations with respect thereto.

15.    The Debtors shall continue to perform their post-petition obligations under the Assumed Contracts through the Closing or, as to any particular Assumed Contract, such earlier

time as the Purchaser notifies the Debtors that the Purchaser has elected not to take assignment

of such Assumed Contract and the Debtors have notified the non-Debtor contract party that such

Assumed Contract will not be assumed and assigned.   Any dispute regarding payment or

performance of the Debtors' post-petition, pre-Closing obligations under an Assumed Contract

prior to its assignment to the Purchaser (whether prior to, at, or after the Closing) shall be

determined by this Court upon appropriate motion of the Debtors or the non-Debtor party to the

Assumed Contract, but shall not affect the validity of the assumption and assignment of such

Assumed Contract pursuant to this Order.

16.     The Debtors and the Purchaser are hereby deemed to have provided adequate

assurance of the Debtors' cure of prepetition defaults under, and of the Purchaser's future

performance of, the Assumed Contracts in accordance with Sections 365(b)(1)(B) and (C) and

365(f)(2)(B) of the Bankruptcy Code.

**<u>Sale Proceeds</u>**

17.     The Cash Purchase Price shall be paid on the Closing Date for distribution as

follows:  (i) *first*, the Purchaser shall pay to EOHHS the amount of $1,562,670.61, pursuant to

that certain Settlement Agreement and Release dated on or about February 7, 2018 (the "<u>Qui</u>

<u>Tam Settlement</u>"), by and among South Bay, CIS, EOHHS, the Office of the Massachusetts

Attorney General, and Relator Christine Martino-Fleming (the "<u>Relator</u>"), which resolved certain

claims against South Bay and CIS that had been asserted in an action pending in the U.S. District

Court for the District of Massachusetts under Case No. 1:15-cv-13065-PBS (the "<u>Qui Tam</u>

<u>Litigation</u>"); (ii) *second*, the Purchaser shall pay the Payment Amount (as defined in the APA) to

those certain individuals or entities identified on the Payment Schedule (as defined in the APA)

prepared in accordance with Section 2.5 of the APA due to or on account of, respectively, (A)

the Cure Costs (as defined in the APA), and (B) the Transferred Employee Expenses (as defined

in the APA); (iii) *third*, the Purchaser shall pay the D&P Fee Escrow (or, if and to the extent

approved this Court prior to the Closing Date, the D&P Fee), and (iv) *fourth*, the remaining

proceeds from the Sale shall be remitted at the Closing to Agent in partial satisfaction of the

Prepetition Secured Parties' secured claims, which are described more fully in the Final Cash

Collateral Order and Agent's Proof of Claim (the "Secured Parties' Payment"); provided that, as

a carve-out from the proceeds of the Sale otherwise payable to the Prepetition Secured Parties,

the following amounts shall be paid by the Agent from the Secured Parties Payment: (A) the

Qualifying MIP Expenses with respect to the Sale; (B) $195,000.00 to the Relator pursuant to

that certain Settlement and Cooperation Agreement between the Agent and the Relator dated as

of March 1, 2021, (C) payments described in the Letter Agreement between the Debtors and the

Agent dated March 3, 2021, filed with the Notice of Letter Agreement Between Debtors and

Capital One, National Association Memorializing Prepetition Arrangements for Non-Insider

Employee Incentive Plan and Confirming Funding of Plan Payments Through Sale Proceeds

Carve-Out [Doc. No. 189], and (D) a payment to the Commonwealth of Massachusetts Executive

Office of Health and Human Services ("EOHHS") the amount of $6,562,500, pursuant to that

certain Settlement Agreement dated February 25, 2021 and approved by this Court pursuant to

its order dated March 4, 2021 [Doc. No.196].

## **Miscellaneous**

18.     The terms and provisions of the APA, together with the terms and conditions of

this Order, shall be binding in all respects upon all entities, including, without limitation, the

Debtors (including their employees, officers and directors), their estates, all creditors and equity

interest holders of the Debtors, the Purchaser, and their respective affiliates, successors and

assigns, agents and any affected third parties, including, but not limited to, all persons asserting a claim against or interest in any of the Assets to be sold, conveyed or assigned to the Purchaser pursuant to the APA.

19.     The transactions contemplated by the APA are undertaken by the Purchaser without collusion and in good faith, as that term is defined in Section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Assumed Contracts), unless such authorization and such Sale are duly stayed pending such appeal.  The Purchaser is a good faith buyer within the meaning of Section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of Section 363(m) of the Bankruptcy Code.

20.     The provisions of this Order shall be binding upon any Chapter 11 trustee or Chapter 7 trustee appointed in the Debtors' bankruptcy cases and shall survive and be binding in the event of any dismissal of such bankruptcy cases.

21.     Nothing contained in any Chapter 11 plan confirmed in the Debtors' cases or the order of confirmation confirming any such plan shall conflict with or derogate from the terms of this Order.

22.     The Debtors and the Purchaser may request, and upon reasonable request this Court shall enter, an order (a "Confirmatory Order"), confirming the authorized sale of any specified Assets to the Purchaser pursuant to the APA and this Order, or otherwise clarifying or confirming with particularity any matter addressed by this Order, including without limitation as may be reasonably necessary or desired for purposes of establishing or recording evidence of title to specific Assets.

23.     No bulk sales law or similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the APA, the Sale Motion, and this Order.

24.     This is a final order and is enforceable upon entry and to the extent necessary under Bankruptcy Rules 5003, 9014, 9021, and 9022 of the Federal Rules of Bankruptcy Procedure.  This Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein and the stays imposed by Bankruptcy Rules 6004(h), 6006(d), and 7062 are hereby modified and shall not apply to this Order or to the transactions contemplated by the APA.

25.     Nothing in this Order shall constitute authorization for the assumption by CIS, or the assignment to the Purchaser, or any party, of any Oracle or NetSuite agreement with CIS, including but not limited to the Oracle NetSuite Cloud Services and Support Agreement and  its Terms and Conditions,  and Payment Schedule No. 121644 and the Payment Plan Agreement by and between CIS and Oracle Credit Corporation (collectively the "Oracle Agreements") absent (i) the agreement of Oracle (in which case this Order shall constitute approval for such agreement) or (ii) further order of this Court. CIS, in performing its obligations under the Transition Services Agreement (the "TSA") to be executed by CIS and FBTC Transitional Sub, LLC ("FBTS") in connection with the sale of substantially all of the assets of Futures authorized by prior Order of this Court [Doc. No. 174] (the "Futures Sale"), shall not (i) provide access to FBTS or any party to utilize the software and/or support licensed to CIS pursuant to the Oracle Agreements, nor (ii) provide services under the Oracle Agreements to FBTS or any party under the TSA beyond the later to occur of (A) the closing of the Sale, or (B) the date that is sixty (60) days after the closing of the Futures Sale. CIS shall keep all payment obligations to NetSuite/Oracle current during the TSA period.

26.      This Court retains jurisdiction to:

a.      Interpret, implement and enforce the terms and provisions of this Order, the APA, and the assumption and assignment of the Assumed Contracts, including without limitation the sale free and clear and limitation of liability provisions;

b.      Protect the Purchaser and any of the Assets against any liens, claims, or interests;

c.      Resolve any disputes arising under or relating to the APA, the assumption and assignment of the Assumed Contracts, the Sale Motion, or this Order; and

d.      Adjudicate all issues concerning asserted pre-Closing liens, claims or interests in, on, or to the Assets.

Dated:  March 4, 2021

Honorable Elizabeth D. Katz
United States Bankruptcy Judge

## **Exhibit A**

[Final APA]

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of the 5th day of January, 2021, by and among South Bay Mental Health Center, Inc., a Massachusetts corporation ("South Bay"), Community Intervention Services, Inc., a Delaware corporation ("CIS"; South Bay and CIS are, singly and jointly as the context requires, referred to herein as Seller), and SB Transitional Sub, LLC, a Delaware limited liability company ("Purchaser").

### Recitals

A.      South Bay is a community-based, behavioral health care organization offering a continuum of services including adult behavioral health, substance abuse counseling, children's behavioral health, autism services, and early childhood services (the "Business") at the locations listed on Exhibit A (each location individually a "Facility" and, collectively, the "Facilities"). CIS owns one hundred percent (100%) of the outstanding and issued stock of South Bay, and provides management and administrative services to South Bay in connection with South Bay's operation of the Business.

B.      Purchaser wishes to purchase from Seller, and Seller is willing to sell to Purchaser, (i) substantially all of the assets of the Business, including without limitation South Bay's leases of the real properties at which the Facilities are located, and South Bay's relationships with clients and providers underlying the Business and its revenues, all on the terms and conditions hereinafter set forth, and (ii) certain of the assets of CIS.

C.      Seller desires to effectuate the contemplated sale of the Business and certain of the assets of CIS to Purchaser through a sale conducted under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and to that end Seller intends to file presently (such filing date, the "Petition Date"), in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"), voluntary petitions for relief under chapter 11 of the Bankruptcy Code commencing Seller's jointly-administered bankruptcy cases (together, the "Bankruptcy Case"), and to seek the Bankruptcy Court's approval of the contemplated sale pursuant to sections 105, 363 and 365 of the Bankruptcy Code.

D.      On the date hereof, Purchaser and Sara Hart are entering into an employment agreement, which employment agreement shall be effective upon, and conditioned in all respects on the occurrence of, the Closing (the "Employment Agreement").

### Agreement

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, Purchaser and Seller agree as follows:

QB\64781911.20

# ARTICLE I

## SALE OF ASSETS

1.1     Purchased Assets.  Subject to the terms, provisions and conditions contained in this Agreement, Purchaser shall purchase from Seller, and Seller shall sell, convey or cause to be conveyed to Purchaser, free and clear of all Liens: (i) all of South Bay's right, title, and interest in and to all assets real, personal and mixed, tangible and intangible, which relate to, or are used or held for use in connection with, the Business, including but not limited to the assets described in Sections 1.1(A) through (D), other than the Excluded Assets (as defined in Section 1.2 below), and (ii) all of CIS's right, title, and interest in and to the assets described in Section 1.1(E), other than the Excluded Assets owned by CIS (collectively, the "Assets"):

(A)     the leases, subleases, licenses or other agreements to occupy all or any part of the real property at which the Facilities are located as set forth on Schedule 1.1(A) hereto (collectively, the "Assumed Leases");

(B)     all furniture, equipment, fixtures, furnishings, medical apparatuses, motor vehicles, marketing and promotional materials and brochures, stationery, policy manuals, operating manuals, kitchen equipment, supplies and inventories, and other tangible personal property;

(C)     all rights to lease deposits made under Assumed Leases, including those set forth on Schedule 1.1(C) attached hereto;

(D)     all intangible property, including, but not limited to:

(i)     all licenses, Permits, certifications (including determinations of need and pending determination of need applications), accreditations and authorizations issued by any Governmental Entity, including but not limited to such property described on Schedule 1.1(D)(i) attached hereto;

(ii)     all business records, including, but not limited to, financial books and records, payroll records, personnel records and manuals;

(iii)     all current and historical (for clients served by South Bay in the past six years) client records maintained by or for South Bay, including without limitation, billing, medical, and clinical notes, and the entire "designated record set" as that term is defined by HIPAA (collectively, "Client Records");

(iv)     those existing commitments, Contracts, equipment or other personal property leases, purchase orders and agreements, as listed on Schedule 1.1(D)(iv) (the "Assumed South Bay Contracts");

(v)     the right to use the current name of each of the Facilities;

(vi)     all third-party warranties to the extent transferable;

2

(vii)   all proceeds under insurance policies and rights of recovery relating thereto that arise after the date hereof and are pending as of the Closing, in each case, solely with respect to any tangible Assets or with respect to any insurance claims that affect the Business and the Assets;

(viii)   (1) all patents and patent applications for inventions and discoveries, (2) all copyrights, copyright registrations and applications, and all related rights in mask works and works of authorship, including moral rights, (3) all registered and common law trademarks, trademark registrations and applications therefor, trade dress rights, trade names, registered and common law service marks, service mark registrations and applications therefor, (4) all corporate names, (5) all domain name registrations, IP addresses, network addresses and the like and the applications therefor in respect of internet domain names, (6) all email accounts, telephone numbers and fax numbers, (7) all ideas, concepts, discoveries, inventions, developments, technologies, works of authorship, trade secrets, software, firmware, tools, processes, techniques, know-how, methodologies, data, plans, devices, apparatuses, specifications, designs, circuits, layouts, mask works, algorithms, programs, code, documentation and other material and information, tangible or intangible, whether or not it may be patented, copyrighted or otherwise protected (including all versions, modifications, enhancements and derivative works thereof), (8) any and all patent rights, copyright rights, mask work rights, trade secret rights, sui generis database rights and all other intellectual and industrial property rights of any sort throughout the world (including any application therefor) and (9) any rights to any of the foregoing pursuant to a license or other agreement (collectively, "Intellectual Property"); and

(E)   the assets of CIS listed on Schedule 1.1(E), including, but not limited to, patient Contracts and insurance  provider agreements, service Contracts and employment and professional service agreements listed on Schedule 1.1(E) (the "Assumed CIS Contracts" and, together, with the Assumed South Bay Contracts, the "Assumed Contracts").

The Assets described in Section 1.1(B), (C), (D), and (E) are collectively referred to herein as the "Personal Property".  Subject to the terms of this Agreement, Seller and Purchaser may supplement or amend the Schedules of specific Personal Property at any time prior to Closing and the Schedules as so amended and supplemented as of the Closing Date shall operate to delineate those particular Assets identified in such Schedules to be acquired by Purchaser at Closing.

1.2   Excluded Assets.  Notwithstanding Section 1.1 above, the following shall be excluded from the assets sold by Seller to Purchaser hereunder (the "Excluded Assets"):

(A)   the accounts receivable, prepaid expenses, cash on hand, and other cash equivalents of the Business, and all rights and interests in and to bank accounts;

(B)   South Bay's leases subleases, licenses or other agreements to occupy all or any part of the real property, in each case that are not Assumed Leases;

(C)   Seller's Contracts that are not Assumed Contracts;

3

(D)     Seller's corporate records and securities, including stock in affiliated entities;

(E)     Seller's insurance policies and Employee Benefit Plans;

(F)     Seller's claims and causes of action, including without limitation causes of action arising under Chapter 5 of the Bankruptcy Code;

(G)     Seller's interest in and rights under this Agreement and any other agreement between Purchaser and Seller executed in connection with this Agreement;

(H)     the assets of CIS not listed on Schedule 1.1(E);

(I)     all intercompany claims between Seller and its Affiliates; and

(J)     such other assets as may be described in Schedule 1.2(J);

(K)     all claims, refunds, credits, causes of action, choices in action, rights of recovery and rights of set-off of any kind, and all proceeds under insurance policies and rights of recovery relating thereto, other than as provided in in Section 1.1(D)(vii);

(L)     all obligations with respect to client deposits and trust funds and Seller's provider numbers;

(M)     claims and causes of action arising under Assumed Leases and Assumed Contracts;  and

(N)     all claims for and rights to receive tax refunds with respect to taxable periods (or portions thereof) ending on or prior to the Closing Date.

1.3     Assumed Obligations.  On the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely pay, perform and discharge in accordance with their respective terms, only the following liabilities of Seller, other than any that are Excluded Liabilities (as defined in Section 1.4 below) (collectively, the "Assumed Obligations"):

(A)     all liabilities and obligations of South Bay or CIS, as applicable, under the Assumed Leases and the Assumed Contracts, but only to the extent (i) such liabilities or obligations arise after the Closing Date and (ii) such Assumed Leases and Assumed Contracts are assigned to Purchaser or Purchaser otherwise receives the rights and benefits of such Assumed Leases and Assumed Contracts pursuant to Section 1.5, and, in any case, specifically excluding any liability or obligation relating to or arising out of such Assumed Leases or Assumed Contracts as a result of (1) any breach of such Assumed Leases or Assumed Contracts occurring on or prior to the Closing Date, (2) any violation of applicable Law, breach of warranty, tort or infringement occurring on or prior to the Closing Date, or (3) any Action occurring on or prior to the Closing Date; and

4

(B)     the liabilities or obligations, if any, expressly described on <u>Schedule 1.3(B)</u>.

1.4     <u>Excluded Liabilities</u>. Notwithstanding anything herein to the contrary, Purchaser shall not assume or incur any liability or obligation for any other liabilities or obligations of Seller other than the Assumed Obligations (collectively, the "<u>Excluded Liabilities</u>"), including, but not limited to, the following:

(A)     subject to <u>Section 2.5</u> herein, any amounts ("<u>Cure Costs</u>") that must be paid and obligations that must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption by Seller and assignment to Purchaser of Assumed Leases and Assumed Contracts;

(B)     any of Seller's liabilities or obligations under this Agreement or any other agreements entered into by a Seller in connection with the transactions contemplated by this Agreement;

(C)     any of Seller's liabilities or obligations for expenses or fees incident to or arising out of the negotiation, preparation, approval or authorization of this Agreement or the consummation (or preparation for the consummation) of the transactions contemplated hereby (including all attorneys' and accountants' fees and brokerage fees) and transfer taxes;

(D)     any liability or obligation of any Seller or any of its Affiliates for taxes for any period;

(E)     any liability or obligation under or with respect to any Employee Benefit Plan or any other employee benefit plan, program, policy or arrangement presently or formerly maintained or contributed to by a Seller or its ERISA Affiliates, or with respect to which a Seller or any such ERISA Affiliate has any liability;

(F)     any liability or obligation with respect to any products or services that were marketed or sold prior to the Closing, including product liability, malpractice, tort liability, infringement claims and any related claims and Actions;

(G)     any of Seller's liabilities or obligations for vacation pay, sick pay, holiday pay, salary, bonuses or other payments or liabilities of any kind to any employee of Seller or current or former employee of a Seller, including any liabilities or obligations arising prior to the Closing with respect to the exempt or non-exempt status of any employee of Seller;

(H)     any liability or obligation relating to workers' compensation claims which were filed or presented on or before the Closing Date or which are filed or presented after the Closing Date but relate to claims and/or injuries first arising on or before the Closing Date;

(I)     any of Seller's liabilities or obligations (i) arising by reason of any violation or alleged violation of any Law, or (ii) arising by reason of any breach or alleged breach by Seller of any Contract;

(J)   any of Seller's liabilities or obligations relating to any Action, proceeding or claim arising out of or in connection with Seller's conduct of the Business or any other conduct of Seller or Seller's officers, directors, employees, consultants, agents or advisors on or prior to the Closing Date;

(K)   any of Seller's liabilities or obligations for indebtedness, including without limitation any funding under the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act");

(L)   any liabilities or obligations in respect of any of the Excluded Assets (including under any Contracts, leases, commitments or understandings related thereto);

(M)   any liabilities or obligations, whether financial or otherwise, arising out of or related to (i) that certain Settlement Agreement and Release dated on or about February 7, 2018, by and among South Bay, CIS, Community Intervention Services Holdings, Inc., the Commonwealth of Massachusetts Executive of Health and Human Services, the Commonwealth of Massachusetts Office of the Attorney General and Christine Martino-Fleming, (ii) the matter filed as United States of America, ex rel. Christine Martino-Fleming, Relator, and Commonwealth of Massachusetts ex rel. Christine Martino-Fleming, Relator v. South Bay Mental Health Center, Inc., Community Intervention Services, Inc., et. al, Civil Action No. 15-CV-13065-PBS, filed in the United States District Court for the District of Massachusetts or (iii) in each case of the foregoing clauses (i) and (ii), the facts, circumstances or allegations described or made in therein or related thereto (the "Specified Litigation");

(N)   any of Seller's liabilities or obligations which Purchaser may become liable for as a result of or in connection with the failure by Purchaser or any Seller to comply with any bulk sales or bulk transfers laws or as a result of any "defacto merger" or "successor-in-interest" (or similar) theories of liability;

(O)   any intercompany liabilities of Seller; and

(P)   the liabilities described on Schedule 1.4(P).

For purposes of this Section 1.4, "Seller" shall be deemed to include any predecessors to a Seller and any Person with respect to which a Seller is a successor-in-interest (including by operation of law, merger, liquidation, consolidation, assignment, assumption or otherwise).  Each of South Bay and CIS hereby acknowledge that they are each retaining the Excluded Liabilities, all of which Excluded Liabilities shall be treated in accordance with the Bankruptcy Code and any relevant orders of the Bankruptcy Court.

1.5   Assignability of Certain Contracts; Effectiveness.   To the extent that the assignment to Purchaser of any Assumed Contract or Assumed Lease pursuant to this Agreement is not permitted without the consent of a third party and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, then the parties will use their commercially reasonable efforts, before the Closing, to obtain such consent, and, if any such consent is not obtained prior to the Closing Date, (A) this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Contract or

6

any right or interest therein unless and until such consent is obtained and (B) Seller and Purchaser will reasonably cooperate with each other in any lawful and feasible arrangement designed to provide Purchaser with the benefits and obligations of any such Contract and Purchaser shall be responsible for performing all obligations under such Contract required to be performed by Seller on or after the Closing Date; provided, however, that, notwithstanding anything to the contrary in this Agreement, the assumption and assignment of any particular Assumed Contract or Assumed Lease, whether pursuant to the Sale Order, related order of the Bankruptcy Court, or this Section 1.5, shall, as permitted by Section 3.2, become effective only upon the Closing to the extent expressly designated as an "Assumed Contract" or "Assumed Lease" under the Assignment and Assumption Agreement.

## ARTICLE II
## PURCHASE PRICE

2.1    Purchase Price.  The purchase price for the Assets (the "Purchase Price") shall be Thirty-Two Million and no/100 Dollars ($32,000,000.00), plus or minus any prorations, payments, adjustments and credits shown on Schedule 2.1; provided, however, that Purchaser reserves the right to increase the Purchase Price and otherwise modify the bid represented by this Agreement as may be permitted by the Bid Procedures Order.

2.2    Payment of Purchase Price. Purchaser will deliver within three Business Days after the date of this Agreement to Seller's counsel (Casner & Edwards, LLP), in escrow, the sum of One Million Six Hundred Thousand and no/100 Dollars ($1,600,000.00) as an initial deposit (the "Deposit") for the payment of the Purchase Price.  The Deposit shall not be invested and shall be held in escrow by Seller's counsel as escrow agent under this Agreement (in such capacity, the "Escrow Agent"), and disbursed by Escrow Agent in accordance with this Agreement and the escrow provisions attached as Schedule 2.2 (the "Escrow Provisions").

2.3    Payment of Balance of the Purchase Price. At the Closing and concurrently with Purchaser's payment of the Payment Amount (as defined below), Purchaser shall deposit with Escrow Agent in immediately available funds an amount equal to (A) the Purchase Price less (B) the sum of the Deposit and the Payment Amount and (C) plus or minus, as applicable, the prorations, payments, adjustments and credits contemplated by this Agreement or provided by Schedule 2.1, all as set forth in a closing statement to be executed and delivered by Seller and Purchaser pursuant to Section 4.6(B). Upon the consummation of Closing, the Escrow Agent shall deliver to Seller the Purchase Price, as adjusted pursuant to the agreed upon closing statement pursuant to Section 4.6(B).

2.4    Purchase Price Allocation.  The Purchase Price shall be allocated as set forth in Schedule 2.1, which the parties shall agree upon prior to the Closing.  The parties shall be bound by such allocation for all purposes and shall file Form 8594 with their respective federal income tax returns in a manner consistent with such allocation.

2.5    Payment Schedule.  At least two (2) Business Days prior to the Closing, the Seller shall deliver to the Purchaser a schedule (the "Payment Schedule") identifying a dollar amount (the "Payment Amount") to be paid on account of Seller's liabilities from proceeds at Closing otherwise due to Seller, and the individuals or entities to receive such Payment Amount or

7

portion thereof.  The Payment Amounts shall be comprised of (i) the amount of Cure Costs that constitute Excluded Liabilities under Section 1.4(A), (ii) the amount of the Transferred Employee Expenses (as defined below) under Section 8.2(B), (iii) the amount of any payments deemed necessary to the Commonwealth of Massachusetts to effectuate the conveyance of the Purchased Assets under Section 1.1(D)(i) and (iv) the payment of fees to investment bankers identified on Schedule 5.1(Q).  The Payment Schedule shall provide Purchaser with the information necessary to pay the Payment Amount on Seller's behalf.  The Purchaser shall pay the Payment Amount at the Closing on Seller's behalf, but shall not be responsible for the payment of any amounts that are omitted from the Payment Schedule or that otherwise should have been included in the Payment Schedule.  The Seller acknowledges that the Purchaser is paying the amounts on the Payment Schedule, which constitute Excluded Liabilities and that no amounts contained in the Payment Schedule or any of the types of liabilities included in the Payment Schedule shall constitute or become Assumed Liabilities.

**ARTICLE III**
**TRANSFER AND ASSIGNMENT**

3.1    Bill of Sale.  At the Closing, Seller shall convey or cause to be conveyed all of Seller's right, title and interest in and to the Personal Property to Purchaser by delivery to Purchaser of a bill of sale in the form attached as Schedule 3.1 (the "Bill of Sale"), which Bill of Sale shall convey Seller's right, title and interest, free and clear of all Liens, all as and to the extent provided for in the Sale Order (as defined below).

3.2    Assumption and Assignment Agreement.  At the Closing, Seller shall, subject to Section 6.6, assign or cause to be assigned to Purchaser, and Purchaser shall assume, all of Seller's right, title and interest in and to the Assumed Leases and the Assumed Contracts, through their mutual execution and delivery of an assignment and assumption agreement in the form attached as Schedule 3.2 (the "Assignment and Assumption Agreement").  Purchaser may at any time prior to three (3) Business Days prior to the Closing (A) designate any previously designated Assumed Lease or Assumed Contract to be an Excluded Asset, and Purchaser shall have no obligation with respect to, nor assume any liability under, any such lease or contract so designated to be an Excluded Asset and (B) designate a previously undesignated lease or Contract as an Assumed Lease or Assumed Contract, as applicable, in which case Seller shall provide to any counterparty to such newly-designated Assumed Lease or Assumed Contact such notice and opportunity to object as may be provided in the Bid Procedures Order, provided that the Closing shall not be conditioned on or subject to entry of an order approving the assignment and assumption of a lease or contract described in this Section 3.2(B).

3.3    PURCHASER ACKNOWLEDGEMENT.  PURCHASER ACKNOWLEDGES AND AGREES THAT THE REPRESENTATIONS AND WARRANTIES MADE BY SELLER IN THIS AGREEMENT, AS QUALIFIED OR SUPPLEMENTED BY THE DISCLOSURE SCHEDULES (THE "SELLER REPRESENTATIONS"), ARE THE EXCLUSIVE REPRESENTATIONS AND WARRANTIES MADE BY SELLER, AND EXCEPT FOR THE SELLER REPRESENTATIONS, IT IS ACQUIRING THE ASSETS ON AN "AS-IS WHERE-IS" BASIS, WITHOUT REPRESENTATION OR WARRANTY (EXPRESS OR IMPLIED) BY SELLER AND IN EACH CASE SUBJECT TO (A) ANY STATE OF FACTS REGARDING ITS PHYSICAL CONDITION OR WHICH AN ACCURATE SURVEY OR AN INSPECTION

8

MIGHT SHOW, (B) ALL APPLICABLE LAWS, (C) VIOLATIONS OF LAWS WHICH MAY EXIST ON THE DATE HEREOF, AND (D) ANY MATTER CAUSED OR PERMITTED BY PURCHASER OR ANY AGENT, EMPLOYEE OR AFFILIATE OF PURCHASER. EXCEPT FOR SELLER REPRESENTATIONS, SELLER HAS NOT MADE NOR SHALL BE DEEMED TO HAVE MADE ANY REPRESENTATION OR WARRANTY (EXPRESS OR IMPLIED) OR SHALL BE DEEMED TO HAVE ANY LIABILITY WHATSOEVER AS TO THE VALUE, HABITABILITY, USE, CONDITION, DESIGN, OPERATION, MERCHANTABILITY OR FITNESS FOR USE OF THE ASSETS (OR ANY PART THEREOF), OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE ASSETS (OR ANY PART THEREOF). PURCHASER HAS PRIOR TO THE DATE HEREOF BEEN AFFORDED THE OPPORTUNITY TO INSPECT THE ASSETS AND THE IMPROVEMENTS THEREON (IF ANY).

## ARTICLE IV
## CLOSING

4.1    Date and Place.  Subject to the terms and conditions of this Agreement (including the satisfaction or waiver of the conditions set forth in Article VII, the closing (the "Closing") of the transactions contemplated herein shall be held virtually by the exchange of documents via PDF on the day that is five Business Days following the satisfaction or waiver of the conditions set forth in Article VII or at such other date as determined by the parties hereto. The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date". The Closing shall be deemed to be effective as of 12:01 a.m. on the Closing Date.  Notwithstanding the foregoing, the parties may mutually agree to a different Closing Date.

4.2    Required Governmental Consents.  Subject to Section 6.3, it shall be a condition precedent to Purchaser's obligation to close that Purchaser shall have made all necessary filings with governmental or regulatory authorities and shall have received all necessary governmental permits, licenses, and other approvals (which approvals shall include determinations of no action) as set forth on Schedule 4.2, including, without limitation, approvals from the DPH and the Massachusetts Health Policy Commission.

4.3    Seller's Documents.  At the Closing, Seller will deliver or cause to be delivered to Purchaser the following documents:

(A)    The Bill of Sale in favor of Purchaser in the condition required by Section 3.1 hereof.

(B)    The Assignment and Assumption Agreement in the condition required by Section 3.2 hereof.

(C)    Certified resolutions of each Seller authorizing the transactions under this Agreement.

(D)    Originals of all certificates of occupancy, licenses, permits, authorizations, and approvals issued by governmental authorities having jurisdiction, if available or in existence.

9

(E)    An affidavit sworn to by an officer of each Seller to the effect that such Seller is not a "foreign person", as that term is defined in Section 1445(f)(3) of the Code, which affidavit shall be in the form prescribed by federal regulations.

(F)    A certified copy of the Sale Order, which shall have become final and non-appealable.

(G)    All Client Records in existing form and format, in a manner compliant with 42 CFR Part 2 (including the existence within such Client Records of consents that are compliant with 42 CFR Part 2, if applicable).

(H)    Reports and supporting documentation necessary to validate compliance with the receipt and utilization by South Bay of CARES Act funding (including such funding provided under the Provider Relief Fund), including, but not limited to, evidence of South Bay's compliance with the reporting of required information and related filing deadlines.

All of the documents and instruments to be delivered by Seller hereunder shall be in form and substance reasonably satisfactory to counsel for Purchaser.

4.4    Purchaser's Documents.  At the Closing, Purchaser will deliver the following to Seller:

(A)    The Purchase Price, as adjusted pursuant to the agreed upon closing statement pursuant to Section 4.6(B).

(B)    The Assignment and Assumption Agreement, in the condition required by Section 3.2 hereof.

(C)    Certified resolutions of Purchaser authorizing the transactions under this Agreement.

All of the documents and instruments to be delivered by Purchaser hereunder shall be in form and substance reasonably satisfactory to counsel for Seller.

4.5    General.  At any time and from time to time after the Closing, at the request of one of the parties hereto and without additional consideration, the other party hereto shall execute and deliver such other documents and take such action as one of the parties may reasonably request to more effectively consummate the actions contemplated by this Agreement, provided the requested matter can be undertaken and achieved without material cost to the other party.

4.6    Joint Documents.  On the Closing Date, Purchaser and Seller shall exchange the following:

(A)    Any and all certificates, statements and declarations as may be required by federal, state, county or local law, regulation or ordinance including without limitation certificates, statements, and declarations regarding taxes assessed on or with respect to transfer of the Business, all of which such taxes, if any, shall be payable by Seller.

10

QB\64781911.20

(B)   A closing statement by and between Seller and Purchaser reflecting Purchaser's payment of the net Purchase Price after accounting for the Deposit and any prorations, payments, adjustments, and credits set forth on Schedule 2.1.

4.7   Possession.  Possession of the Facilities shall be delivered to Purchaser on the Closing Date. All tangible Personal Property and all books, files, records, Contracts, leases, third party warranties, regulatory materials and other assets constituting intangible Personal Property shall be located at the Facilities on the Closing Date and possession thereof delivered to Purchaser on such date; provided that Seller shall have the right, at Seller's sole cost and expense, to review and make copies of all books and records delivered to Purchaser in accordance with Section 8.1.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE PARTIES

5.1   Representations and Warranties of Seller.  Subject to disclosures made in the disclosure schedules delivered by Seller to Purchaser concurrently with the execution of this Agreement (the "Disclosure Schedules"), Seller hereby represents and warrants to Purchaser as of the date of this Agreement and as of the Closing as follows:

(A)   Due Organization.  South Bay is a business corporation, duly organized and validly existing under the laws of the Commonwealth of Massachusetts.  CIS is a business corporation, duly organized and validly existing under the laws of the State of Delaware.  Each Seller is duly qualified to do business and is in good standing in the Commonwealth of Massachusetts and in each jurisdiction where the operation of the Business requires such qualification.  Each Seller has the requisite corporate power and authority to enter into this Agreement and to perform its obligations hereunder.

(B)   Power and Authority; Enforceability; Consents.  Subject to the Sale Order, the execution, delivery and performance of this Agreement by each Seller and all other agreements referenced in or ancillary hereto to which such Seller is a party and the consummation of the transactions contemplated herein by such Seller:

(i)   is within its company powers and are not in contravention of the terms of its certificate of organization, operating agreement or any amendments thereto and have been duly authorized by all appropriate company action.

(ii)   will not violate any judgment of any court or Governmental Entity applicable to such Seller or the Assets.

(iii)   will not require the approval, consent or authorization of, waiver from, or declaration, filing or registration with, any other Person or Governmental Entity, except as set forth in Schedule 5.1(B)(iii).

(iv)   will neither conflict with nor result in any breach or contravention of any other Contract to which such Seller is a party or by which it or the Assets is bound, except as set forth in Schedule 5.1(B)(iv).

11

QB\64781911.20

(C)    <u>Binding Agreement</u>.    Subject to the Sale Order, this Agreement and all agreements to which Seller will become a party hereunder are and will constitute the valid and legally binding obligations of Seller, and are and will be enforceable against Seller in accordance with the respective terms hereof and thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

(D)    <u>Assets</u>.    Except as set forth in <u>Schedule 5.1(D)</u>, the Assets constitute all of the assets, properties and rights necessary for the operation of the Business as it is currently conducted. Seller has good and valid title to, or a valid leasehold interest in or license to, the Assets, and upon entry of the Sale Order such Assets shall be free and clear of all Liens, except for Permitted Liens.

(E)    <u>Financial Statements</u>.    <u>Schedule 5.1(E)</u> sets forth true, complete and correct copies of (1) an unaudited balance sheet of the Business as of October 31, 2020 and (2) an unaudited income statement of the Business for the ten months ended October 31, 2020 (collectively, the "<u>Financial Statements</u>"). The Financial Statements (x) were prepared in good faith, (y) are based upon, and accurately reflect in all material respects, the books and records of Seller and the Business, and (z) fairly present, in all material respects, the financial position of the Business as of the dates thereof and the results of operations for the periods referred to therein, in each case in accordance with GAAP applied on a consistent basis throughout.

(F)    <u>Leases</u>.

(i)    True, correct, and complete copies of all of South Bay's leases for the Facilities (including any amendments, extensions, renewals, guaranties, and other agreements with respect thereto) have been uploaded to the Data Room, and have been provided to Purchaser through Purchaser's access to the Data Room. Neither South Bay nor any other party to any of the Assumed Leases are in material default of its obligations under the Assumed Leases except to the extent set forth in <u>Schedule 5.1(F)(i)</u> in any manner that will not be cured prior to the Closing Date. No event has occurred that (with or without notice, lapse of time or both) would constitute a material breach or default by South Bay or any other party under the Assumed Leases in any manner that will not be cured prior to the Closing Date. Each of the Assumed Leases is in full force and effect and constitutes a valid and legally binding obligation of South Bay and each other party thereto, enforceable against South Bay and, to Seller's Knowledge, each other party thereto, in each case in accordance with the express terms thereof.

(ii)    Except to the extent set forth in <u>Schedule 5.1(F)(ii)</u>, South Bay has performed all material obligations required to be performed by it under each of the Assumed Leases to which it is a party, and none of the Assumed Leases is currently subject to cancellation or any other material modification by the other party thereto or is presently subject to any penalty, right of set-off or other charge by the other party thereto for late performance or delivery in any manner that will not be cured prior to the Closing Date.

(iii)    Seller does not own any real property.

12

(iv)     Except as may be set forth in Schedule 5.1(F)(iv), the transactions contemplated by this Agreement do not require the consent of any other party to an Assumed Lease, will not result in a breach of or default under any Assumed Lease, or otherwise cause an Assumed Lease to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing in any manner that will not be cured prior to the Closing Date.

(v)      South Bay's occupancy, use and operation of each of the Facilities complies in all material respects with all applicable Laws, there are no material deficiencies or defects in the Facilities, and Seller has access to utilities in sufficient capacities for the operation of the Business at each of the Facilities in the ordinary course of business.

(vi)     To Seller's Knowledge, there are no pending or threatened appropriation, condemnation, eminent domain or like proceedings relating to the Facilities or the real property on which each of the Facilities is situated.

(vii)    The Facilities comprise all of the real property used by South Bay in, or otherwise related to, the Business.

(G)    Material Contracts.  For the purposes herein, a "Material Contract" shall be defined as any Contract with a value of more than, or which provides for the payment to or by South Bay or, with respect to the Business, CIS of more than, $10,000 annually (a "Material Contract").  Except as set forth in Schedule 5.1(G), neither South Bay nor, with respect to the Business, CIS, is a party to or bound by any Material Contract.

(H)    Enforceability and Performance under Assumed Contracts.  True, correct, and complete copies of all of the Assumed Contracts and the Material Contracts set forth or required to be set forth in Schedule 5.1(G) have been uploaded to the Data Room and have been provided to Purchaser through Purchaser's access to the Data Room.  Neither Seller nor any other party to any of the Assumed Contracts are in material default of its obligations under the Assumed Contracts except to the extent set forth in Schedule 5.1(H). No event has occurred that (with or without notice, lapse of time or both) would constitute a material breach or default by Seller or any other party under the Assumed Contracts.  Each of the Assumed Contracts is in full force and effect and constitutes a valid and legally binding obligation of Seller and, to Seller's Knowledge, each other party thereto, enforceable against Seller and, to Seller's Knowledge, each other party thereto, in each case in accordance with the express terms thereof.

(I)    Employee Benefits.

(i)      Each "employee benefit plan" as defined in Section 3(3) of ERISA and each material bonus, deferred compensation, stock purchase, stock option, severance plan, salary continuation, vacation, paid-time-off, sick leave, fringe benefit, cafeteria, incentive, insurance, welfare or similar arrangement that is in each case sponsored or maintained by either South Bay or, with respect to the Business, CIS, or to which either South Bay or, with respect to the Business, CIS, contributes or has any liability (each, an "Employee Benefit Plan") is listed in Schedule 5.1(I)(i).  No Employee Benefit Plan, and no party in interest to, disqualified person

13

of, or fiduciary of, any Employee Benefit Plan, has engaged in any non-exempt "prohibited transaction" as defined in ERISA or the Code.

(ii)    Except as set forth in Schedule 5.1(I)(ii), neither Seller nor any affiliate of Seller as determined under Code Sections 414(b), (c), (m) or (o) ("ERISA Affiliate") or any of their respective predecessors maintains, contributes to, has any obligation to contribute to (or has any other liability, including contingent liability or current or potential withdrawal liability, with respect to) or has, ever, contributed to or been obligated to contribute to (1) any "multiemployer plan" (as that term is defined in Section 3(37) of ERISA), (2) any "employee pension benefit plan" (within the meaning of Section 302 of ERISA) that is subject to Section 412 of the Code, Section 302 of ERISA or Title IV of ERISA, (3) any "multiple employer plan" (within the meaning of Section 413 of the Code), or (4) any "multiple employer welfare arrangement" (within the meaning of Section 3(40) of ERISA), in each case, whether or not terminated.

(J)    Employees.

(i)    Each of South Bay, and with respect to the Business, CIS, is and for the past three years has been in compliance in all material respects with all applicable Laws, contracts, policies, plans, and programs applicable to it respecting labor, employment and employment practices in the jurisdictions within which it operates, including, without limitation, all applicable Laws respecting hiring, terms and conditions of employment, health and safety, compensation, wages and hours (including the classification of independent contractors and exempt and non-exempt employees), immigration (including the verification of I-9s for all employees), employment discrimination, disability rights or benefits, equal opportunity, termination of employment, plant closures and layoffs (including the WARN Act), workers' compensation, labor relations, employee leave and sick pay, accommodation of employees, harassment, paid time off, use of background checks and reports, use of selection procedures and tests, the provision of required meal and rest breaks, affirmative action, child labor, workers compensation, labor relations, collective bargaining, unemployment insurance and other insurance coverage, and the payment of social security and other employment-related taxes. Each of South Bay, and with respect to the Business, CIS, has properly classified all current and former employees, directors, individual consultants, temporary employees, leased employees, or any agents for tax purposes and for participation in any Employee Benefit Plans, and complied in all material respects with all applicable Laws relating to the classification of employees and independent contractors and payment of wages, has not made deductions from the pay of exempt employees which might result in loss of exempt status, and has, within the time and in the manner prescribed by applicable Laws, withheld and paid over to the proper tax authority all amounts required to be so withheld and paid over under applicable Laws.

(ii)    There are no material obligations relating to employment with respect to which South Bay or, with respect to the Business, CIS, may have any liability, including but not limited to any accrued but unpaid compensation, wages, vacation, salaries, wage premiums, commissions, bonuses, fees, and other compensation or benefits to its current or former employees or independent contractors under applicable Laws, Contract or policy; or any fines, taxes, interest, or other penalties for any failure to pay or delinquency in paying such compensation. As of the date hereof, all compensation, including wages, commissions,

14

bonuses, vacation and other paid time off, and other direct compensation for any service performed for the Business payable to current or former employees, independent contractors or consultants of South Bay, or with respect to the Business, CIS, for services or work performed on or prior to the date hereof have been paid in full (or accrued in full). Neither South Bay nor, with respect to the Business, CIS, is subject to any pending claim for overdue overtime or other compensation due to any current or former employee or independent contractor and, no such claim has been threatened.

           (iii)    Neither South Bay nor, with respect to the Business, CIS, is a party to or bound by any collective bargaining agreement, project labor agreement, or other Contract, commitment, arrangement or bargaining relationship with any labor organization, trade organization, or other representative of any of the employees of South Bay or CIS, and no employee of South Bay or, with respect to the Business, CIS, is represented by a labor union or other labor organization and there is no such contract, commitment or arrangement presently being negotiated by either South Bay or CIS. There is no labor strike, work stoppage, lockout, grievance, labor arbitration, walkout, picket, slowdown, work stoppage, or other material labor dispute pending or threatened against or affecting the Business. No labor union, organization, or other collective bargaining unit represents, claims to represent or is currently seeking to organize or represent the employees of the Business, and there have not been any union organizing activities or efforts among the employees of the Business within the past three years. There is presently no union campaign being conducted to solicit cards from employees to authorize a union to request a National Labor Relations Board certification election, and no question concerning representation exists or has existed respecting such employees; and there is no unfair labor practice charge or complaint pending or threatened against South Bay or, with respect to the Business, CIS. No labor union, labor organization, or group of employees has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or threatened in writing to be brought or filed with the National Labor Relations Board or any other labor relations Governmental Entity. Neither South Bay nor, with respect to the Business, CIS, has committed any unfair labor practices.

           (iv)    To Seller's Knowledge, no Business Employee is in material violation of any term of any employment agreement, nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, noncompetition agreement, restrictive covenant or other obligation: (1) to South Bay or, with respect to the Business, CIS, or (2) with respect to any current employee or independent contractor of Business, to any third party with respect to such person's right to be employed or engaged by a Seller or to the knowledge or use of trade secrets or proprietary information.

           (v)    Schedule 5.1(J)(v) sets forth a true, correct, and complete list of (1) all employees (including any employee who is on a leave of absence or on furlough status, as specified), employed or engaged by South Bay or, with respect to the Business, CIS (the "Business Employees") and (2) for each Business Employee, each such individual's location of employment, date of hire, classification as exempt or non-exempt (as applicable), W-2 compensation for 2019 (including bonus and incentive payments), year-to-date compensation for 2020 (including bonus and incentive payments), current hourly rate or annual base salary, and any annual bonus opportunity, job titles or offices, notice period, whether such individual is

15

on leave or furlough status, and the reason for leave of absence or furlough status and the anticipated date of return to full service, if known. Schedule 5.1(J)(v) also sets forth individuals classified as an independent contractor (excluding contingent workers engaged through a third-party temporary employment agency) in the past three years and for each individual identified as an independent contractor, each such individual's location, date of engagement, 1099 compensation for 2019, and year-to-date compensation for 2020.

(vi)    Neither South Bay nor, with respect to the Business, CIS, is a party to, or otherwise bound by, any consent decree with, or citation by, any Governmental Entity relating to employees or employment practices. No action, proceeding, claim, or complaint by or on behalf of any employee, prospective employee, former employee, current or former contractor, labor organization or other representative of the employees of South Bay or, with respect to the Business, CIS, is pending or, to Seller's Knowledge, threatened, which could bind or in any way affect Purchaser after Closing as the result of the transactions contemplated by this Agreement. None of South Bay's, or with respect to the Business, CIS's employment practices or policies are currently being audited or investigated by any Governmental Entity. With respect to the Business, and aside from the Specified Litigation, there are no pending or, to Seller's Knowledge, threatened: (1) unfair labor practice charges or complaints before the National Labor Relations Board or any other Governmental Entity, (2) complaints, grievances or arbitrations arising out of any collective bargaining agreement or any other complaints, grievances or arbitration procedures; or (3) charges or complaints with respect to or relating to them before the Equal Employment Opportunity Commission or any other Governmental Entity responsible for the prevention of unlawful employment practices.

(K)    Compliance with Law.

(i)    Each of South Bay and, with respect to the Business, CIS, is currently in, and during the past three years has been in, compliance in all material respects with (1) all Laws applicable to it or its business, properties or assets (including, without limitation, all Laws concerning the privacy, security, safeguarding, collection, access, use, disclosure, maintenance, transmittal, and/or confidentiality of Personal Information or other health care data, including, as applicable, HIPAA, 42 C.F.R. Part 2, state data breach Laws, state health information privacy and security Laws, the Telephone Consumer Protection Act, the CAN-SPAM Act, and state consumer protection Laws), and (2) any orders of any Governmental Entity applicable to it or the Business. Neither South Bay nor, with respect to the Business, CIS, is under investigation by any Governmental Entity with respect to any violation of any Laws applicable to it or its business, properties or assets.

(ii)    In the past three years, neither South Bay nor, with respect to the Business, CIS, has received any written notice, order, inquiry, investigation, complaint or other written communication by any Governmental Entity alleging any violation by it under any Laws applicable to it or its business, employees (in their capacity as such), properties or assets.

(iii)    No employee, including temporary employees, or independent contractors (whether an individual or entity) of the Business has been excluded from participating in any Federal Health Care Program and has not been and is not currently included on the OIG List of Excluded Individuals and Entities (LEIE), or the General Services

16

Administration's Excluded Parties List System (EPLS) or System for Award Management (SAM), except as set forth in <u>Schedule 5.1(K)(iii)</u>. None of the officers, directors, agents or managing employees (as such term is defined in 42 U.S.C. §1320a-5(b)) of the Business has been excluded, suspended, or debarred from any Federal Health Care Program or been subject to sanction, charged or been convicted of a crime in connection with any Federal Health Care Program.

(iv)    There is no, and there has not been for the past three years any, actual, or threatened (in writing) breach, compromise, or security incident affecting Personal Information in the Business's possession or control that would, if confirmed, constitute a breach or security incident for which notification to individuals, organizations, contractual counterparties, media, credit reporting agencies, and/or Governmental Entities is required under any applicable Laws or under any Contracts to which South Bay, or with respect to the Business, CIS, is a party.

(L)    <u>No Proceedings</u>.  Except as disclosed in <u>Schedule 5.1(L)(i)</u>, there are no Actions, administrative proceedings, or other legal actions of any kind pending or, to Seller's Knowledge, threatened, against South Bay or, with respect to the Business, CIS, or otherwise relating to or affecting the Business or the Assets or any portion thereof.  There are no Actions pending or, to Seller's Knowledge, threatened, seeking to restrain, prohibit, or obtain damages in connection with this Agreement or the transactions contemplated hereby.  Except as set forth in <u>Schedule 5.1(L)(ii)</u>, none of South Bay or, with respect to the Business, CIS, is subject to any settlement, award or order involving any Governmental Entity or other Person.

(M)    <u>Absence of Certain Changes</u>.  From October 31, 2020 to the date of this Agreement, (i) no change, development, circumstance, effect or event has occurred or arisen that, individually or in combination with any other change, development, circumstance, effect or event, has had or would reasonably be expected to have a Material Adverse Effect and (ii) the Business has been conducted in all material respects in the ordinary course of business.  Except as set forth in <u>Schedule 5.1(M)</u>, since October 31, 2020, neither South Bay nor, with respect to the Business, CIS, has:

(i)    entered into, amended or terminated any Material Contract, entered into any other material transaction in excess of $100,000, changed in any significant respect any business practice (in anticipation of the transactions contemplated hereby or otherwise);

(ii)    sold, assigned, transferred, leased or licensed any of its material tangible assets, except in the ordinary course of business;

(iii)    sold, disposed of, assigned, licensed, sublicensed, covenanted not to sue with respect to, or otherwise transferred any Intellectual Property (other than non-exclusive licensing or sublicensing of Intellectual Property in the ordinary course of business), or abandoned or permitted to lapse or expire any Intellectual Property;

(iv)    made or granted any bonus or any compensation or salary increase to any former or current employee or group of former or current employees (except in the ordinary course of business);

17

(v)    implemented any facility closing or other layoff of employees that could implicate the WARN Act;

(vi)    suffered any material damage, destruction or other casualty loss with respect to material property owned by Seller or waived any rights of material value;

(vii)    delayed capital expenditures, repairs or maintenance;

(viii)    failed to maintain in full force and effect any insurance policy in effect, except for any policy replaced by a new or successor policy of substantially similar coverage;

(ix)    terminated, amended, failed to renew or preserve or failed to maintain in full force and effect any Permit; or

(x)    agreed, whether orally or in writing, to do any of the foregoing.

(N)    <u>Permits</u>.

(i)    Seller possesses all Permits necessary to operate the Business, or that are necessary for the lawful ownership of their properties and assets or operation of the Business, and <u>Schedule 5.1(N)(i)</u> sets forth a true, complete and correct list of such Permits. Except as set forth in <u>Schedule 5.1(N)(i)</u>, each Seller is and for the past three years has been in material compliance with all such Permits, and all such Permits are in full force and effect. There is not now pending or threatened in writing any action to revoke, cancel, rescind, modify or refuse to renew any of such Permits.  During the past three years, Seller has not received written notice of any petition, objection or other pleading with any Governmental Entity alleging the failure to hold any of the foregoing or any violations in respect thereof.

(ii)    Except as set forth in <u>Schedule 5.1(N)(ii)</u>, all individuals providing professional services for on behalf of the Business, hold, and maintain in good standing, all licenses, registrations, credentials, education and training required to perform such services in all jurisdictions where such services are performed on behalf of the Business.

(O)    <u>Intellectual Property</u>.

(i)    <u>Schedule 5.1(O)(i)</u> contains a true, complete and correct list of all registered Intellectual Property that relate to, or are used or held for use in connection with, the Business (the "<u>Business Intellectual Property</u>"). All material registration, maintenance and renewal fees due in connection with such Business Intellectual Property have been paid and all documents, recordations and certificates in connection with such Business Intellectual Property required to be filed have been filed with the relevant patent, copyright, trademark or other authorities for the purposes of prosecuting and maintaining such Business Intellectual Property and recording the Seller's ownership interests therein.

(ii)    <u>Schedule 5.1(O)(ii)</u> contains a complete and correct list of all agreements to which South Bay or, with respect to the Business, CIS, is a party and under which: (1) Seller is granted a license to use any Intellectual Property owned by a third party the

18

use of which is material to the Business (excluding any such agreement for commercially available software); and (2) Seller has granted to a third party a license to use any Business Intellectual Property.

(iii)    Except as set forth in <u>Schedule 5.1(O)(iii)</u>, South Bay owns the Intellectual Property, free and clear of all Liens (other than Permitted Liens), and South Bay has a valid and enforceable written license to use all other material Intellectual Property used in connection with the Business, in each case free and clear of all Liens (other than Permitted Liens).  The transactions contemplated by this Agreement and the consummation thereof will not impair any right, title or interest of Seller in or to any Business Intellectual Property.

(iv)    Except as set forth in <u>Schedule 5.1(O)(iv)</u>, Seller has not received any written communication in the last three years alleging that Seller has infringed, misappropriated, or violated any Intellectual Property of any Person. To Seller's Knowledge, the Business, as currently provided or conducted by Seller, does not infringe, misappropriate or violate any Intellectual Property owned by any third party.  Except as set forth in <u>Schedule 5.1(O)(iv)</u>, to Seller's Knowledge, no Person currently is infringing, misappropriating or violating any of the Business Intellectual Property.

(P)    <u>Census</u>.  <u>Schedule 5.1(P)</u> sets forth a true, complete and correct list of the daily billable hours of the Business during the 30-day period ending five (5) days prior to the date hereof, but excluding any non-Business Days during such 30-day period, and the average of the daily billable hours for such 30-day period (the "Pre-Signing 30-Day Average").

(Q)    <u>Brokerage</u>.  Except as set forth in <u>Schedule 5.1(Q)</u>, no agent, broker, Person or firm acting on behalf of Seller is, or shall be, entitled to any broker's fees, finder's fees or commissions from Seller in connection with this Agreement or any of the transactions contemplated hereby.

(R)    <u>Taxes</u>.  Each of South Bay and, with respect to the Business, CIS, has timely filed all tax returns that were required to be filed (taking into account any applicable extension of time within which to file).  All such tax returns were correct, true and complete in all material respects and were prepared in substantial compliance with all applicable Laws and regulations.  All taxes of South Bay and, with respect to the Business, CIS, that are due and payable on or prior to the Closing Date have been paid on or prior to the Closing Date (whether or not shown on any tax return).  There are no Liens for taxes upon any of the Assets.

(S)    <u>Payors</u>.  <u>Schedule 5.1(S)</u> sets forth the top 10 payors for the year ended December 31, 2019 and for the ten-month period ended October 31, 2020 (each, a "<u>Major Payor</u>").  Except as set forth in <u>Schedule 5.1(S)</u>, in the past 12 months, no Major Payor (i) has canceled, suspended or otherwise terminated its relationship with the Business, or (ii) has advised Seller of its intention to (1) cancel, suspend or otherwise terminate its relationship with the Business, or (2) materially and adversely change the terms upon which it pays for goods or services from, or provided by, the Business.

5.2    <u>Representations and Warranties of Purchaser</u>.  Purchaser hereby represents and warrants to Seller as follows:

19

      (A)    <u>Due Organization</u>.   Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware.  Purchaser has the requisite limited liability company power and authority to enter into this Agreement, perform its obligations hereunder and to conduct its business or operations as now being conducted.

      (B)    <u>Power and Authority; Enforceability; Consents.</u>   The execution, delivery and performance of this Agreement by Purchaser and all other agreements referenced in or ancillary hereto to which it is a party and the consummation of the transactions contemplated herein by Purchaser (except as would not have a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement):

      (i)    are within its powers and are not in contravention of the terms of its articles of organization or any amendments thereto and have been duly authorized by all requisite limited liability company action.

      (ii)    will neither conflict with nor result in any breach or contravention of, or the creation of any lien under, any indenture, agreement, lease, instrument or understanding to which Purchaser is a party or by which Purchaser is bound.

      (iii)    will not violate any judgment of any court or Governmental Entity applicable to Purchaser.

      (iv)    will not require the approval or consent of any other party or authority.

      (C)    <u>Binding Agreement</u>.  This Agreement and all other agreements to which Purchaser will become a party hereunder are and will constitute the valid and legally binding obligations of Purchaser and are and will be enforceable against it in accordance with the respective terms hereof and thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

      (D)    <u>Purchaser's Due Diligence</u>.  Purchaser acknowledges that it has (or with respect to the Facilities, will have an opportunity pursuant to Section 8.3 hereof to be) inspected and/or evaluated the Assets, the Facilities, and the Business, has made its own independent analysis of this transaction, and has not relied upon and is not relying upon any information provided or representations made by Seller with respect to the Assets, the Facilities, or the Business, other than the Seller Representations and the results of its Facility inspections pursuant to Section 8.3 hereof, in deciding to pursue its acquisition of the Assets pursuant to this Agreement.

      (E)    <u>Financing</u>.  Purchaser has or at the Closing will have the funds sufficient to pay the Purchase Price and perform its obligations under this Agreement.

**ARTICLE VI**
**COVENANTS PRIOR TO THE CLOSING**

6.1     <u>Seller Operations</u>.  Between the date of this Agreement and the earlier of the date of the termination of this Agreement and the Closing Date, Seller will operate the Business in the ordinary course of business and, without limiting the foregoing, will use its commercially reasonable efforts to:

(A)     take or cause to be taken all actions necessary and appropriate to consummate the transactions contemplated by this Agreement, including without limitation those necessary to enable Seller to make the deliveries set forth in <u>Section 4.3</u>.

(B)     keep in full force and effect present insurance policies or other comparable insurance.

(C)     continue to employ the employees listed on Schedule 6.1(C) (individually, a "<u>Key Employee</u>", and collectively, the "<u>Key Employees</u>").  For the purposes of this Section 6.1(C), "commercially reasonable efforts" shall mean that Seller shall (i) not terminate a Key Employee without cause, (ii) not encourage or facilitate a Key Employee to seek employment elsewhere, and (iii) promptly notify Buyer if Seller becomes aware that a Key Employee intends to terminate such Key Employee's employment and reasonably cooperate with Buyer to attempt to retain such Key Employee, unless Buyer otherwise directs in writing.

6.2     <u>Seller Negative Covenants</u>.  Between the date of this Agreement and the earlier of the date of the termination of this Agreement and the Closing Date, Seller will not, without the prior written consent of Purchaser or as set forth on <u>Schedule 6.2</u>, take, propose to take, or omit to take, directly or indirectly, any action that, if taken (or omitted to be taken) between October 31, 2020 and the date of this Agreement, would have required disclosure on <u>Schedule 5.1(M)</u>.

6.3     <u>Governmental Approvals</u>.

(A)     Upon Bankruptcy Court approval of this Agreement pursuant to <u>Section 6.4</u>, Purchaser shall use its commercially reasonable efforts to obtain as soon as reasonably possible at its own expense, and Seller shall use its commercially reasonable efforts to assist and cooperate with Purchaser and its representatives and counsel in so obtaining, all governmental consents, approvals, certificates of exemption and licenses which are necessary or appropriate, and in the preparation of any document or other material which may be required by any Governmental Entity as a condition precedent to or result of the transactions contemplated herein.

(B)     Without limiting <u>Section 6.3(A)</u>, upon Bankruptcy Court approval of this Agreement pursuant to <u>Section 6.4</u>, the parties shall make, or cause to be made, all necessary filings with Governmental Entities as set forth on <u>Schedule 4.2</u> including, without limitation, making change of ownership filings with the Massachusetts Department of Public Health ("<u>DPH</u>") and filing a material change notice filing the Massachusetts Health Policy Commission, and assignment of state contracts including with DPH and Department of Children and Families ("<u>DCF</u>").  To the extent that such filings require information relating to Seller or known only to Seller, Seller shall promptly provide timely assistance to Purchaser in completing such filings.

21

6.4     <u>Bankruptcy Court Approval</u>.  Seller's entry into this Agreement will not become effective and binding on Seller until the Bankruptcy Court has entered an appropriate order approving Seller's entry into this Agreement and the sale of the Business and the Assets pursuant to this Agreement, which order shall authorize, approve and provide for the sale of the Assets to Purchaser free and clear of all Liens (other than Permitted Liens) and shall otherwise be in form and substance reasonably agreeable to Seller, Purchaser and Capital One, National Association (successor by merger to Healthcare Financial Solutions, LLC), as successor to General Electric Capital Corporation, as Agent ("<u>Agent</u>") under that certain Credit Agreement, dated as of July 16, 2015 (as amended, amended and restated, supplemented or otherwise modified from time to time), among, without limitation, Agent and Seller (in the form entered by the Court, the "<u>Sale Order</u>").  Upon execution and delivery of this Agreement by both Seller and Purchaser, and upon Seller's commencement of the Bankruptcy Case, Seller shall, subject to <u>Section 6.5</u>, promptly undertake, to obtain entry of the Bid Procedures Order (as hereinafter defined) and the Sale Order pursuant to one or more customary and appropriate sale and sale procedures motions (singly or together, the "<u>Sale Motion</u>").  From and after the date hereof until the Closing Date, Seller shall deliver to Purchaser and Agent copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers that are filed by Seller in the Bankruptcy Case that relate, in whole or in part, to this Agreement or Purchaser.

6.5     <u>Alternative Transaction</u>.

(A)     For purposes of this Agreement:

(i)     The term "<u>Alternative Transaction</u>" means one or more agreements to sell, transfer, or otherwise dispose of all or any portion of the Assets in a transaction or series of transactions with one or more Persons, other than Purchaser.

(ii)     The term "<u>Break-Up Fee</u>" means the sum of Six Hundred Forty Thousand Dollars ($640,000.00).

(B)     This Agreement is subject to approval by the Bankruptcy Court. Purchaser acknowledges that, in connection with obtaining such approval, Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or best price for the Assets, including giving notice thereof to Seller's creditors and other interested parties, providing information about the Assets to prospective bidders, entertaining higher or better qualified offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Assets, conducting an auction, all in accordance with an order of the Bankruptcy Court governing the procedures for the solicitation of competing offers which shall be in form and substance reasonably satisfactory to Seller, Purchaser and Agent (in the form entered by the Court, the "<u>Bid Procedures Order</u>").   In connection with the solicitation of competing bids, from the date hereof (and any prior time) and until Seller's designation of a winning bid at the conclusion of any competitive bidding process described in the Bid Procedures Order, Seller is permitted to cause its representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser) in connection with any sale or other disposition of all or any part of the Business and the Assets, alone or in connection with the sale or other disposition of any other asset of Seller; provided, however, that such solicitation must be consistent with the

22

requirements of the Bid Procedures Order.  In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Business and the Assets and perform any and all other acts related thereto which are required by any order of the Bankruptcy Court, the Bankruptcy Code, applicable procedural rules, or other applicable law, including, without limitation, supplying information relating to the Business and the Assets to prospective purchasers.

(C)    Seller shall use commercially reasonable efforts to promptly provide, or identify and make available to Purchaser, any non-public information concerning Seller, the Assets or the Business provided to any other Person after the date hereof which was not previously provided to Purchaser.

(D)    Following the date of the entry of the Sale Order approving this Agreement and until the earlier of (i) the Closing and (ii) such time as this Agreement has been terminated in accordance with its express terms, and provided that Purchaser is not in material default of its obligations under this Agreement, Seller shall not, nor shall it authorize or permit any other Person to, (1) directly or indirectly solicit, initiate or encourage the submission of any offer or proposal concerning any Alternative Transaction not authorized by the Sale Order or (2) directly or indirectly participate in any discussions or negotiations regarding, or furnish to any person any information with respect to, or take any other action to facilitate the making of, any proposal or expression of interest that constitutes or is reasonably likely to lead to an Alternative Transaction not authorized by the Sale Order.

6.6    Assumed Leases and Assumed Contracts; Cure Amounts.

(A)    Seller shall take all commercially reasonable actions required to assume the Assumed Leases and Assumed Contracts and to assign them to Purchaser, including taking all actions (i) reasonably requested by Purchaser to facilitate any negotiations with the counterparties to such Assumed Leases and Assumed Contracts and (ii) to obtain an order (which may be the Sale Order) containing a finding that the proposed assumption and assignment of the Assumed Leases and Assumed Contracts to Purchaser satisfies all applicable requirements of Section 365 of the Bankruptcy Code.  In connection with the foregoing and as the case may be, Purchaser covenants to provide adequate assurance of performance and represent and warrant that it is capable of providing adequate assurance of future performance.

(B)    Schedules 1.1(A), 1.1(D)(iv), and 1.1(E) shall each include Seller's good-faith estimate of the Cure Costs (if any) associated with each Assumed Lease and Assumed Contract.  At the Closing, upon Purchaser's final designation of the Assumed Leases and Assumed Contracts to be assigned, (i) Seller pursuant to the Assignment and Assumption Agreement shall assume and assign to Purchaser each of the Assumed Leases and Assumed Contracts that is capable of being assumed and assigned and pay promptly, subject to Section 2.5, any Cure Costs associated therewith, and (ii) Purchaser pursuant to the Assignment and Assumption Agreement shall assume and perform and discharge the Assumed Obligations under the Assumed Leases and Assumed Contracts; provided that Purchaser and Seller shall cooperate and use best commercial efforts to minimize any and all Cure Costs; provided, further, that nothing in this Section 6.6(B) shall require Purchaser to increase the Purchase Price or pay any Cure Cost or pay any other amounts or agree to be subject to any liabilities or obligations not in

23

the ordinary course of business or that are not required pursuant to the terms of the Assumed Leases or Assumed Contracts following the Closing and Purchaser's assumption of such Assumed Leases or Assumed Contracts.

(C)     Purchaser may request, in its reasonable business judgment, certain modifications and amendments to any lease or contract of a Seller as a condition to such lease or contract becoming an Assumed Lease or Assumed Contract, as applicable, and Seller shall use commercially reasonable efforts to obtain such modifications or amendments. If Seller is unable to obtain such modifications or amendments, Purchaser may, in its sole discretion, designate the relevant lease or contract as an Excluded Asset.

(D)     If, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, the consent of the non-Seller party to any Assumed Lease or Assumed Contract is required but not obtained, Seller shall, at Purchaser's sole cost and expense, cooperate with Purchaser in any reasonable arrangement proposed by Purchaser, including Purchaser's provision of credit support, designed to provide Purchaser the benefits and obligations of or under any such Assumed Lease or Assumed Contract; provided, however, that nothing in this Section 6.6 shall (i) require Seller to make any expenditure or incur any obligation on its own or on Purchaser's behalf or (ii) prohibit Seller from ceasing operations or winding up its affairs following the Closing.  Any assignment to Purchaser of the Assumed Leases and the Assumed Contracts that, notwithstanding the Sale Order (or other Bankruptcy Court order approving the assumption and assignment of such lease or contract), requires the consent of any third party for such assignment to be effective shall be made subject to such consent being obtained.  If Purchaser determines that such consent cannot be obtained on terms reasonably satisfactory to Purchaser within 30 days after the Closing, Purchaser may on notice to Seller reclassify each such Assumed Lease or Assumed Contract as an Excluded Asset.

6.7     Closing Conditions.  Between the date of this Agreement and the earlier of the termination of this Agreement and the Closing Date, Seller and Purchaser will use their respective commercially reasonable efforts to cause the conditions specified in this Agreement over which they have control to be satisfied as soon as reasonably practicable, but in all events before the Closing Date.

6.8     Tax Returns. All income, sales, franchise and payroll tax returns and reports required by law to be filed by Seller prior to the Closing will be timely filed (subject to Seller's right to timely extend the filing thereof) and will accurately reflect the tax position of Seller, and all taxes respectively due under such tax returns will be paid by Seller.  Purchaser is not assuming under this Agreement any (i) tax liabilities owed by Seller or any other tax liabilities as a result of the operation of the Business prior to the Closing Date, (ii) any liability for taxes deferred by Seller under IRS Notice 2020-65, or (iii) liability for any taxes deferred under the CARES Act.

6.9     Transfer Taxes.  All transfer, documentary, sales, use, stamp, registration and other substantially similar taxes (including any real property transfer or similar tax) incurred in connection with this Agreement and the consummation of the transactions contemplated hereby (collectively, "Transfer Taxes"), if any, and that are not exempt under Section 1146(a) of the Bankruptcy Code, shall be borne 100% by the Seller and shall be paid by Seller when due.

24

Seller will, at the Sellers' own expense, timely file all necessary tax returns and other documentation with respect to all such Transfer Taxes that are required by applicable Law.

6.10    Reporting Requirements.  Purchaser and the Seller agree to utilize, and to cause their respective affiliates to utilize, any permissible method set forth in IRS Rev. Proc. 2004-53 with respect to wage reporting as determined by Purchaser.

6.11    Bid Procedures Order.  The Bid Procedures Order shall be in form and substance satisfactory to Seller, Purchaser and Agent.  The Bid Procedures Order shall, without limitation:

(A)    set dates for (i) the hearing on entry of the Sale Order; (ii) the deadline for the filing of objections to entry of the Sale Order, and (iii) an auction sale of the Assets (the "Auction");

(B)    define the components of a qualified bid for the Assets (a "Qualified Bid"); provided that only bidders who have submitted a Qualified Bid (each a "Qualified Bidder") or who are otherwise qualified and identified by Seller pursuant to the Bid Procedures Order may participate at the Auction, and provide that this Agreement constitutes a Qualified Bid and that Purchaser is a Qualified Bidder who may, but is not required to, bid at the Auction;

(C)    (i) set a deadline for the submission of bids for the Assets that is no later than 45 days after the entry of the Bid Procedures Order and (ii) provide that, if there are no Qualified Bids other than this Agreement submitted by such deadline, Seller shall seek approval of a sale of the Assets to Purchaser;

(D)    provide that a Qualified Bid must (i) be in writing; (ii) be for substantially all of the Assets; (iii) provide for total consideration of at least $32,890,000.00; (iv) include an executed asset purchase agreement that uses this Agreement as a form and is accompanied by a redlined or blacklined version of this Agreement showing all changes made to this Agreement; (v) not contain any financing or due diligence contingencies, and (vi) be accompanied by an earnest money deposit in immediately available funds of no less than the Deposit provided by Purchaser;

(E)    provide that (i) the Seller shall designate the highest or best Qualified Bid received by Seller as the starting bid at the Auction, and (ii) each successive higher bid for the Assets made at the Auction must be in an amount at least $250,000.00 more than the immediately preceding bid(s);

(F)    approve the payment of the Break-Up Fee from the proceeds received by Seller upon the closing of an Alternative Transaction as an actual and necessary cost of preserving the Seller's bankruptcy estates that is entitled to administrative priority under Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code; and

(G)    approve the assumption of this Agreement by each Seller pursuant to Section 365 of the Bankruptcy Code, provided that Purchaser's remedies arising from any default by Seller shall be limited to those set forth in Section 9.15 of this Agreement, including, for the avoidance of doubt, the payment of the Break-Up Fee to Purchaser.

25

6.12   _Sale Order_.   The Sale Order shall be in form and substance satisfactory to Purchaser, Seller and Agent.   Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code; (y) including a determination in the Sale Order that Purchaser has not engaged in any conduct that would result in avoidance of the transactions contemplated by this Agreement under Section 363(n) of the Bankruptcy Code, and (z) establishing adequate assurance of future performance in connection with the Assumed Leases and Assumed Contracts within the meaning of Section 365 of the Bankruptcy Code.   The Sale Order shall, without limitation:

(A)   approve, pursuant to Sections 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement; (ii) the sale of the Assets to Purchaser on the terms set forth herein and free and clear of all Liens, claims, and interests (other than Permitted Liens), and (iii) the performance by Seller of its obligations under this Agreement;

(B)   find that Purchaser is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code;

(C)   find that Purchaser and Seller have engaged in no conduct that would result in the avoidance of the transactions contemplated under this Agreement pursuant to Section 363(n) of the Bankruptcy Code;

(D)   find that Purchaser is not a successor to Seller and contain substantially the language set forth in _Section 9.18_ of this Agreement (for the avoidance of doubt, including with respect to the Specified Litigation); and

(E)   find that Purchaser shall have no liability for any obligation of Seller that is not an Assumed Obligation.

6.13   _Client Records_.   Following the Closing, Seller shall refrain from the modification or destruction of Client Records until Purchaser confirms to Seller that the Client Records function in a production environment. Following the Closing, (i) Purchaser shall maintain the Client Records in such a manner as to protect their integrity, ensure their confidentiality and proper use, and ensure their accessibility and availability to Seller and Seller's clients or their authorized representatives as required by Law,  and (ii) Purchaser shall make the Client Records available for inspection or copying, or both, to Seller for billing purposes or to respond to or defend any malpractice claim or third-party audit or investigation, each as permitted by applicable Law.

## ARTICLE VII
## CONDITIONS PRECEDENT TO CLOSING

7.1   _Conditions Precedent to Seller's Obligations_.   Notwithstanding anything herein to the contrary, the obligations of Seller to consummate the transactions described herein are

26

QB\64781911.20

subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Seller at or prior to Closing:

        (A)    (i) The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects (except that the representations and warranties that are qualified as to "materiality" shall be true and correct in all respects without qualifications) when made and as of the Closing Date as though such representations and warranties had been made on and as of such Closing Date; (ii) each and all of the terms, covenants and conditions of this Agreement to be complied with or performed by Purchaser on or before the Closing Date pursuant to the terms hereof shall have been materially complied with and performed; and (iii) Purchaser shall deliver to Seller a certification to the foregoing effect.

        (B)    Purchaser shall have, at or prior to the Closing, delivered to Seller the documents required to be delivered by it pursuant to <u>Section 4.4</u>.

        (C)    The Bankruptcy Court shall have entered the Sale Order (in form and substance acceptable to Purchaser), which shall have become final and non-appealable.

    7.2    <u>Conditions Precedent to Purchaser's Obligations</u>.  Notwithstanding anything herein to the contrary, the obligations of Purchaser to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Purchaser at or prior to Closing:

        (A)    (i) the Fundamental Representations shall be true and correct in all respects when made and as of the Closing Date, as though such Fundamental Representations had been made on and as of the Closing Date (except for those Fundamental Representations that address matters only as of a particular date, which shall have been true and correct as of such particular date); (ii) the representations and warranties of Seller contained in this Agreement (other than the Fundamental Representations and the representations and warranties set forth in <u>Section 5.1(P)</u>) shall be true and correct in all respects when made and as of the Closing Date, as though such representations and warranties had been made on and as of such Closing Date (except for those representations and warranties that address matters only as of a particular date, which shall have been true as of such particular date) disregarding in each case any "materiality" or similar qualifier (except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect); (iii) each and all of the terms, covenants and conditions of this Agreement to be complied with or performed by Seller on or before the Closing Date pursuant to the terms hereof shall have been materially complied with and performed; and (iv) Seller shall deliver to Purchaser a certification to the foregoing effect.

        (B)    The average of the daily billable hours for the 30-day period ending five (5) days prior to the Closing Date (excluding any non-Business Days during such 30-day period) shall not reflect a reduction of 20% or more from the Pre-Signing 30-Day Average identified on <u>Schedule 5.1(P)</u>.

        (C)    During the period from the date of this Agreement through the Closing Date, no Material Adverse Effect shall have occurred.

QB\64781911.20

(D)    On or prior to the Closing Date, Purchaser shall have obtained documentation or other evidence reasonably satisfactory to Purchaser that Purchaser has:

(i)    received written confirmation from all applicable licensure agencies that upon Closing all licenses required by law to operate the Business as currently operated will be transferred to, or issued or reissued in the name of, Purchaser; and

(ii)    obtained reasonable assurances that insurance provider certification of the Facilities for its operation by Purchaser will be effective as of Closing and that Purchaser may participate in and receive reimbursement from such programs effective as of Closing.

(E)    No Action before a court or any other Governmental Entity shall have been instituted seeking to restrain or prohibit the transactions herein contemplated.

(F)    All consents, approvals, permits, waivers and estoppels of third parties that are listed on Schedule 7.2(F) shall have been obtained on terms reasonably satisfactory to Purchaser.

(G)    Seller shall have, at or prior to the Closing, delivered to Purchaser the documents required to be delivered by it pursuant to Section 4.3.

(H)    The Bankruptcy Court shall have entered the Sale Order, which shall have become final and non-appealable.

(I)    The Employment Agreement shall not have been terminated or repudiated by Sara Hart.

## ARTICLE VIII
## ADDITIONAL AGREEMENTS

8.1    Books and Records.  For purposes of this Agreement, the term "Retention Period" shall mean the period ending six years after the Closing.  Until the conclusion of the Retention Period, (A) Purchaser will maintain all books and records of Seller constituting a part of the Assets which are delivered to Purchaser at Closing and which relate to the pre-Closing Business in a manner reasonably consistent with Purchaser's record retention policies or practices and (B) subject to applicable Law and solely as reasonably necessary in connection with the preparation and filing of tax returns by Seller or other proper purpose including the administration of the Bankruptcy Case, upon reasonable advance written notice from Seller to Purchaser, afford Seller reasonable access to such records during normal business hours; provided, that the foregoing shall not require Purchaser or any of its Affiliates (i) to provide access to any books, records or other information to the extent such books, records or other information do not pertain to the Business (and Purchaser shall be entitled to withhold access to or redact any portion of such books and records or other information that does not pertain to the Business), (ii) to permit any inspection, or to disclose any information, that in the reasonable judgment of Purchaser would violate applicable Law, fiduciary duty, or binding agreement entered into prior to the Closing Date, or (iii) to take any action that would cause unreasonable disruption to the business of Purchaser or the Business.

28

8.2   <u>Employee Related Matters</u>.

(A)   <u>Transferred Employees</u>.  As of the Closing Date, Purchaser shall offer employment to only those employees of the Business as Purchaser shall determine in its sole discretion and such offers of employment shall contain terms and conditions of employment that Purchaser shall determine in its sole discretion. Seller shall make available to Purchaser a correct and complete list of all the current employees of the Business and such employee information as Purchaser reasonably deems necessary for Purchaser to complete its new employee onboarding processes (all in a form reasonably acceptable to Purchaser) as of 10 Business Days prior to the Closing Date, and Purchaser shall provide Seller with a list of the Business's employees to whom Purchaser intends to offer employment at least five days prior to the Closing Date.  On the Closing Date, Seller shall take all steps necessary to terminate the employment of each employee of the Seller who is offered employment by Purchaser as set forth in the immediately preceding sentence. The employees of the Seller who accept Purchaser's offer of employment and who become employed by Purchaser shall be referred to herein as "<u>Transferred Employees</u>." Nothing in this Agreement shall confer upon any Transferred Employee any right with respect to continued employment with Purchaser, nor shall anything herein limit or interfere with Purchaser's right to terminate the employment of any Transferred Employee at any time (subject to applicable Law), with or without cause or notice, or restrict Purchaser in the exercise of independent business judgment in modifying any terms or conditions of employment of the Transferred Employees on and after the Closing Date.

(B)   <u>Pre-Closing Obligations to Transferred Employees</u>. Subject to <u>Section 2.5</u> herein, Seller shall be responsible for all liabilities, obligations and commitments relating to Seller's employment of the Transferred Employees, including any severance compensation that may be owed by Seller to any Transferred Employee as a result of this transactions contemplated by this Agreement in accordance with the applicable severance agreement, and bonus payments payable to any Transferred Employees in accordance with applicable bonus arrangements entered into prior to the Closing Date (collectively, the "<u>Transferred Employee Expenses</u>").

(C)   <u>Employee Information</u>. Seller shall use commercially reasonable efforts to provide promptly to Purchaser, at Purchaser's request, any information or copies of personnel records (including addresses, dates of birth, date of hire and dependent information) relating to the Transferred Employees or relating to the service of Transferred Employees with Seller (and predecessors of Seller, as applicable) prior to the Closing Date; provided that Purchaser shall not request any information, or use any disclosed information in any manner that may violate applicable Laws, including but not limited to salary history, equal pay, discrimination and leave laws.  Seller and Purchaser shall each cooperate with the other and shall provide to the other such documentation, information and assistance as is reasonably necessary to effect the provisions of this <u>Section 8.2</u>.

## ARTICLE IX
## MISCELLANEOUS

9.1   <u>Exhibits and Schedules and Other Instruments</u>.  Each Exhibit and Schedule to this Agreement shall be considered a part hereof as if set forth herein in full.  Any disclosure made in a Disclosure Schedule to this Agreement shall be deemed a disclosure for all purposes under this

29

Agreement to the extent that the relevance of such disclosure is reasonably apparent from the text of such disclosure in the Disclosure Schedules.

9.2  <u>Additional Assurances</u>.  The provisions of this Agreement shall be self-operative and shall not require further agreement by the parties except as may be herein specifically provided to the contrary; provided, however, at the reasonable request of a party, the other party shall execute such additional instruments and take such additional actions as the requesting party may deem necessary to effectuate this Agreement.  Seller shall, at any time and from time to time at and after the Closing, upon the reasonable request of Purchaser and at Purchaser's sole expense, take any and all steps necessary to place Purchaser in possession and operating control of the Assets to be transferred hereunder and will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may reasonably be required or requested to more effectively transfer and confirm to Purchaser or to its successors or assigns, or to reduce to possession, any or all of the Assets and to carry out the purposes and intent of this Agreement, provided however, that Purchaser shall bear all costs associated with such acts.

9.3  <u>Choice of Law</u>.

(A)  The parties agree that this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to principles of conflicts of laws, but subject as necessary or appropriate to the Bankruptcy Code.

(B)  The Bankruptcy Court will have jurisdiction over any and all disputes between or among the parties, whether at law or in equity, arising out of or relating to this Agreement; provided, however, that if the Bankruptcy Court is unwilling or unable to hear any such dispute, each of the parties submits to the exclusive jurisdiction of the United States District Court for the District of Delaware and of any Delaware State Court in any Action arising out of or relating to this Agreement or the transactions contemplated herein or therein and agrees that all claims in respect of such Action may be heard and determined in any such court.  Each of the parties waives any defense of inconvenient forum to the maintenance of any Action so brought and waives any bond, surety or other security that might be required of any other party with respect thereto.

(C)  Each of the parties hereby waives, to the fullest extent permitted by Law, any right to trial by jury of any claim, demand, Action, or cause of action (i) arising under this Agreement or (ii) in any way connected with or related or incidental to the dealings of the parties in respect of this Agreement or any of the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity, or otherwise.

9.4  <u>Benefit/Assignment</u>.  Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors and assigns; provided, however, that no party may assign this Agreement without the prior written consent of the other party and any such attempted assignment shall be null and void.  This Agreement is intended solely for the benefit of the

30

parties hereto and is not intended to, and shall not, create any enforceable third party beneficiary rights. Notwithstanding the foregoing:

(A)    Purchaser may, without the written consent of Seller, assign, in whole or in part, its rights and obligations pursuant to this Agreement to one or more of its Affiliates, provided that Purchaser will nonetheless remain liable for all of Purchaser's obligations hereunder;

(B)    Purchaser may, without the written consent of Seller, collaterally assign its rights under this Agreement for security purposes to any lender providing financing to Purchaser or any of its Affiliates, and any such lender may exercise all of the rights and remedies of Purchaser hereunder; and

(C)    Following the Closing, Purchaser may, without the written consent of Seller, assign its rights under this Agreement, in whole or in part, to any subsequent third party purchaser of Purchaser or all or substantially all of its assets (whether such sale is structured as a sale of stock, a sale of assets, a merger, or otherwise).

Notwithstanding anything to the contrary in this Agreement, the Agent shall be a third party beneficiary of all provisions of this Agreement that expressly relate to the Agent.

9.5    <u>Cost of Transactions</u>.  Whether or not the transactions contemplated hereby shall be consummated, the parties agree as follows: except as otherwise expressly provided in this Agreement (i) Seller will pay the fees, expenses, and disbursements of Seller and its agents, representatives, accountants, and counsel incurred in connection with the subject matter hereof and any amendments hereto, and (ii) Purchaser shall pay the fees, expenses and disbursements of Purchaser and its agents, representatives, accountants and counsel incurred in connection with the subject matter hereof and any amendments hereto.

9.6    <u>Confidentiality</u>.  Notwithstanding anything to the contrary set forth herein, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms until the Closing, at which time it shall terminate and be of no further force or effect.  From and after the Closing, Seller shall, and shall cause its Affiliates to, keep confidential and not use any written, oral, or other information relating to the Business or the Assets obtained by virtue of Seller's ownership of the Business and the Assets prior to the Closing ("<u>Confidential Information</u>"), except (i) to the extent disclosure is required by applicable Law (in which case, unless prohibited by Law, the disclosing party shall promptly notify the other party in writing of the same, and such disclosing party shall reasonably cooperate with the non-disclosing party (at the disclosing party's sole cost and expense) to preserve the confidentiality of such information consistent with applicable Law), (ii) to the extent such information has been made public through no fault of the applicable party, and (iii) each of Purchaser and Seller may disclose such information to such Person's equityholders or Affiliates, and their respective representatives and financing sources (provided that such equityholders, Affiliates, representatives or financing sources are instructed to keep such Confidential Information confidential, and Purchaser and/or Seller (as applicable) shall be responsible for any breach of this <u>Section 9.6</u> by their respective equityholders, Affiliates, representatives or financing sources as if they were a party hereto).

9.7    <u>Public Announcements</u>.  Seller and Purchaser mutually agree that no party hereto shall release, publish or otherwise make available to the public in any manner whatsoever any information or announcement regarding the transactions herein contemplated without the prior written consent of the other party, except for information and filings reasonably necessary to obtain Bankruptcy Court approval of this Agreement or required by any Governmental Entity, or by Purchaser or its Affiliates after the Closing if made in the ordinary course.

9.8    <u>Waiver of Breach</u>.  The waiver by any party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or any other provision hereof.

9.9    <u>Notice</u>.  Any notice, demand or communication required, permitted or desired to be given hereunder shall be in writing and shall be delivered in person, by electronic mail (e-mail), by overnight delivery service such as Federal Express or Express Mail, or by certified mail, return receipt requested, with postage prepaid, to the parties at the following addresses (or such other or further addresses as the parties may hereafter designate by written notice):

(a)    <u>If to Seller</u>:

South Bay Mental Health Center, Inc.
c/o Community Intervention Services
Attention:  Andrew R. Calkins, CEO
200 Friberg Parkway, Suite 2000
Westborough, MA 01581
E-mail:  acalkins@communityinterventionservices.com

With a copy to (which shall not constitute notice):
Casner & Edwards, LLP
Attention:  Michael J. Goldberg, Esq.
303 Congress Street, #201
Boston, MA 02210
E-mail:  Goldberg@casneredwards.com

(b)    <u>If to Purchaser</u>:

SB Transitional Sub, LLC
c/o National Mentor Holdings, LLC
Attention: Nate Lewis, VP, Mergers and Acquisitions; Gina Martin, Chief Legal Officer
313 Congress Street, 5th Floor
Boston, MA 02210
Email: Nate.Lewis@TheMentorNetwork.com;
        Gina.Martin@TheMentorNetwork.com

With a copy to (which shall not constitute notice):
Quarles & Brady LLP

32

Attention: Ryan P. Haas
411 E. Wisconsin Avenue, Suite 2400
Milwaukee, WI 53202
E-mail: ryan.haas@quarles.com

(c)    If to Escrow Agent:

Casner & Edwards, LLP
Attention:  Michael J. Goldberg, Esq.
303 Congress Street, #201
Boston, MA 02210
E-mail:  Goldberg@casneredwards.com

All notices given in accordance with the foregoing shall be deemed to have been duly given and to be effective when delivered and received.

9.10    Interpretation

(A)    Whenever the context of this Agreement requires, the gender of all words herein shall include the masculine, feminine and neuter, and the number of all words herein shall include the singular and plural.

(B)    The words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(C)    Wherever the word "include," "includes," or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation."

(D)    The word "or" shall be inclusive and not exclusive.

(E)    Each reference herein to "days" shall be to calendar days unless "Business Days" are otherwise specified.

(F)    Each reference herein to any Contract shall be to such Contract as amended, supplemented, waived or otherwise modified from time to time.

(G)    Each reference herein to a Law is to such Law as it may be amended from time to time.

(H)    The phrase "made available to Purchaser" and phrases of similar import when used in this Agreement will mean uploaded to the Data Room on or prior to the date that is one Business Day prior to the date hereof (and remains available to Purchaser therein through the Closing); and

(I)    The phrase "ordinary course of business" and phrases of similar import when used in this Agreement will mean the ordinary course of business consistent with past practice.

33

9.11    Divisions and Headings.  The divisions of this Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

9.12    Entire Agreement.  This Agreement, together with all other agreements and documents to be delivered hereunder, constitutes the entire agreement of Seller and Purchaser and supersedes all prior agreements and understandings, both oral and written, between them concerning the subject matter hereof.

9.13    Counterparts.  This Agreement may be executed in several counterparts by one or more of the undersigned and all such counterparts so executed shall together be deemed and constitute one final agreement, as if one document had been signed by all parties hereto; and each such counterpart shall be deemed an original, binding the parties subscribed hereto and multiple signature pages affixed to a single copy of this Agreement shall be deemed to be a fully executed original Agreement. Signatures delivered by facsimile or by e-mail in PDF format shall be deemed to be effective as original signatures.

9.14    Proration.  The operation of the Business and the income and normal operating expenses attributable thereto through the date preceding the Closing Date shall be for the account of Seller and thereafter for the account of Purchaser, and, if any income or expense is properly allocable or credited, then it shall be allocated, charged or prorated accordingly.  Expenses for goods or services received both before and after the Closing Date, such as power and utilities charges and rents and similar prepaid and deferred items shall be prorated between Seller and Purchaser as of the Closing Date in accordance with GAAP.  All special assessments and similar charges or Liens imposed against the Assets in respect of any period of time through the Closing Date, whether payable in installments or otherwise, shall be the responsibility of Seller, and amounts payable with respect to such special assessments, charges or liens in respect of any period of time after the Closing Date shall be the responsibility of Purchaser, and such charges shall be adjusted as required hereunder.  To the extent that any of the foregoing prorations and adjustments cannot be determined as of the Closing Date, Purchaser and Seller shall conduct a final accounting and make any further payments, as required on a date mutually agreed upon, within 90 days after the Closing.

9.15    Termination of Agreement.

(A)    Termination.  This Agreement may be terminated prior to Closing:

(i)    by the mutual written consent of Seller and Purchaser;

(ii)    as provided in Sections 9.15(B) and (C);

(iii)    by Seller or Purchaser upon the closing of an Alternative Transaction;

(iv)    by Purchaser if (a) any person files a motion seeking to have the Bankruptcy Court enter an Order (1) dismissing the Bankruptcy Case or either one of them; (2) converting the Bankruptcy Case or either one of them from Chapter 11 to Chapter 7 of the Bankruptcy Code; (3) appointing a trustee in the Bankruptcy Case or either one of them; and/or

34

(4) appointing in the Bankruptcy Case or in either of them a responsible officer or an examiner with enlarged powers relating to the operation of the Business (beyond those powers set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), or (b) an order granting any of the relief described in the preceding clause (iii)(a) is entered for any reason and is not vacated within 14 days after entry thereof;

(v)    by written notice from the Purchaser, if the Petition Date has not occurred on or before the date this is seven days after the date of this Agreement as set forth in the preamble to this Agreement;

(vi)    by written notice from Purchaser, if (a) the Bid Procedures Order shall not have been approved by the Bankruptcy Court by the close of business on the date that is 25 days after the Petition Date, or (b) following its entry, the Bid Procedures Order shall fail to be in full force and effect or shall have been stayed, reversed, modified, supplemented or amended in any respect without the prior written consent of Purchaser;

(vii)    by written notice from Purchaser if (a) the Bankruptcy Court has not held a hearing on the Sale Motion on or prior to the first Business Day after the date that is 120 days after the Petition Date; (b) the Bankruptcy Court has not entered the Sale Order on or prior to the first Business Day after the date that is 122 days following the Petition Date; (c) the Sale Order shall not have become final and non-appealable on the 15th day after its entry; or (d) following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed, vacated, reversed, modified, supplemented or amended in any respect without the prior written consent of Purchaser;

(viii)    by Purchaser or, prior to entry of the Sale Order, by Seller, if: (a) Seller or either one of them enters into an asset purchase agreement or other definitive agreement with respect to an Alternative Transaction; (b) the Bankruptcy Court enters an order approving an Alternative Transaction; or (c) Purchaser is not the successful bidder at the Auction; provided, however, that, if Purchaser is designated as the back-up bidder at the Auction, then Purchaser shall not be permitted to terminate this Agreement pursuant to this clause (vii) until the earlier of (1) the closing of an Alternative Transaction or (2) the Outside Date;

(ix)    by Seller or Purchaser, if an order is entered by a court, tribunal, or other adjudicatory body of competent jurisdiction having valid enforcement authority permanently restraining, prohibiting or enjoining either party from consummating the transactions described in this Agreement and such order shall have become final and non-appealable or shall not have been vacated prior to the Outside Date; or

(x)    by Seller or Purchaser if Closing has not occurred on or before 5:00 p.m. Eastern time on the date that is 120 days from the date hereof (the "Outside Date");

provided, however, that the right to terminate this Agreement under this Section 9.15(A) shall not be available to any party if the action of such party or any of its Affiliates has been a principal cause of or resulted in the failure of the Closing to occur on or before such date, and such action or failure to act constitutes a breach of any of such party's representations,

35

warranties, covenants or obligations under this Agreement.   Upon a termination of this Agreement pursuant to this Section 9.15(A), and except as otherwise provided by Sections 9.15(B), 9.15(C), and 9.15(D), the Deposit shall be returned by the Escrow Agent to Purchaser and the parties hereto shall have no further obligations under this Agreement except as shall expressly survive the termination hereof.

(B)     Seller's Default. Notwithstanding anything to the contrary contained herein, if, prior to or at the Closing, there has been a violation or breach by (i) Seller of any representation or warranty set forth in Section 5.1 (or any such representation or warranty shall have become untrue in any material respect after the date of this Agreement) or (ii) Seller of any covenant or agreement contained in this Agreement which, in the case of either clause (i) or (ii), would prevent the satisfaction of or result in the failure of any condition to the obligations of Purchaser at the Closing and such violation or breach has not been waived by Purchaser or, in the case of a breach of any covenant or agreement under this Agreement that is curable, has not been cured by Seller (as applicable) prior to the earlier to occur of (a) 10 days after receipt by Seller, as applicable, of written notice of such breach from Purchaser and (b) the Outside Date, then Purchaser may elect to (1) terminate this Agreement by written notice to Seller, in which case the Deposit shall be promptly refunded to Purchaser by Escrow Agent, or (2) seek specific performance of Seller's obligations that are to be performed on or prior to Closing, including without limitation Seller's delivery obligations under Section 4.3 of this Agreement, unless such obligations cannot reasonably be performed by Seller for reasons beyond Seller's reasonable control.

(C)     Purchaser's Default. Notwithstanding anything to the contrary contained herein, if, prior to or at the Closing, there has been a violation or breach by (i) Purchaser of any representation or warranty set forth in Section 5.2 (or any such representation or warranty shall have become untrue in any material respect after the date of this Agreement) or (ii) Purchaser of any covenant or agreement contained in this Agreement which, in the case of either clause (i) or (ii), would prevent the satisfaction of or result in the failure of any condition to the obligations of Seller at the Closing and such violation or breach has not been waived by Seller or, in the case of a breach of any covenant or agreement under this Agreement that is curable, has not been cured by Purchaser (as applicable) prior to the earlier to occur of (a) 10 days after receipt by Purchaser, as applicable, of written notice of such breach from Seller and (b) the Outside Date, then Seller may elect to (1) terminate this Agreement by written notice to Purchaser, in which case the Deposit shall be promptly delivered by Escrow Agent to Seller as Seller's liquidated damages, in which case such liquidated damages shall be the sole remedy of Seller for Purchaser's default and Seller shall not be entitled to any additional legal or equitable relief against Purchaser, or (2) seek (a) specific performance of Purchaser's obligations to be performed on or prior to Closing, including without limitation Purchaser's delivery obligations under Section 4.4 of this Agreement, and (b) such other remedies available to Seller at law or in equity.

(D)     Alternative Transaction. If this Agreement is terminated without breach by Purchaser pursuant to Section 9.15(A)(vii), (i) the Deposit shall be promptly refunded to Purchaser by Escrow Agent, and (ii) Purchaser shall be entitled to payment of, and Seller shall pay or cause to be paid, the Break-Up Fee from the proceeds received by Seller upon the closing of an Alternative Transaction.

QB\64781911.20

(E)   <u>Liability Limitation</u>.   Notwithstanding anything to the contrary in this Agreement, the maximum aggregate liability of Purchaser for money damages in respect of any losses, damages, costs or expenses of Seller relating to the failure of the transactions contemplated hereby to be consummated or a breach of this Agreement by Purchaser in the absence of a Closing shall be limited to the Deposit (the "<u>Liability Limitation</u>"), and in no event shall the Seller or any of their Affiliates seek any amount in excess of the Liability Limitation in connection with this Agreement or the transactions contemplated hereby or in respect of any other document or theory of law or equity or in respect of any oral representations made or alleged to be made in connection herewith, whether at law or in equity, whether in contract, tort or otherwise.

9.16   <u>Amendments</u>.   Except as otherwise expressly provided herein, neither this Agreement nor any term or provision hereof may be changed, waived, discharged or terminated except by the mutual written agreement of the parties (and, in the case of any amendment extending the Outside Date or that would reasonably be expected to materially diminish the amount paid to Agent at the Closing, the Agent).

9.17   <u>Construction</u>.   The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any of the parties hereto, and this Agreement shall be deemed to have been prepared jointly by the parties, and thus shall not necessarily be construed against any of the parties as the drafter hereof.

9.18   <u>No Successor Liability</u>.   The parties intend that, to the fullest extent permitted by applicable Law (including under Section 363 of the Bankruptcy Code), upon the Closing, Purchaser shall not be deemed to: (A) be the successor of Seller, (B) have, de facto, or otherwise, merged with or into Seller, (C) be a mere continuation or substantial continuation of Seller or the enterprise(s) of Seller or (D) be liable for any acts or omissions of Seller in the conduct of the Business or arising under or related to the Assets other than as set forth in this Agreement, including without limitation, any liability or obligation arising out of or in connection with the Specified Litigation. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the parties intend that Purchaser shall not be liable for any Lien (other than Assumed Liabilities and Permitted Liens) against Seller or any of Seller's predecessors or Affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Assets or any liabilities of Seller arising prior to the Closing Date, including, without limitation any liability or obligation arising out of or related to the Specified Litigation. The Parties agree that the provisions substantially in the form of this <u>Section 9.18</u> shall be reflected in the Sale Order.

9.19   <u>Equitable Relief</u>.   The parties hereto agree that if any of the provisions of this Agreement were not to be performed as required by their specific terms or were to be otherwise breached, irreparable damage will occur, no adequate remedy at Law would exist and damages would be difficult to determine, and that each party shall be entitled to an injunction or injunctions to prevent breaches, and to specific performance of the terms, of this Agreement (including causing the transactions contemplated hereby to be consummated on the terms and subject to the conditions thereto set forth in this Agreement) without posting any bond and

37

without proving that monetary damages would be inadequate, in addition to any other remedy at Law or equity. None of the parties shall oppose, argue, contend or otherwise be permitted to raise as a defense that an adequate remedy at law exists or that specific performance or equitable or injunctive relief is inappropriate or unavailable.

9.20    <u>Certain Definitions</u>.  When used in this Agreement, the following terms have the meanings set forth below:

"<u>Action</u>" means any claim, charge, audit, complaint, order, decree, ruling, eminent domain action, judgment, injunction, inspection, condemnation, notice of violation, citation, penalty or administrative action or proceeding, whether private or by or before any Governmental Entity.

"<u>Affiliate</u>" means, with respect to any subject Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such subject Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made.  For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"<u>Business Day</u>" means any day other than a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in Boston, Massachusetts.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Confidentiality Agreement</u>" means that certain Project Plymouth Non-Disclosure Agreement, dated as of May 21, 2020, executed by Duff Phelps Securities LLC, on behalf of Seller, and National Mentor Holdings, Inc.

"<u>Contracts</u>" means all agreements, contracts, leases and subleases, arrangements, letters of credit, guarantees and binding commitments, whether written or oral.

"<u>Data Room</u>" means the "Project Plymouth" virtual data room hosted by "dealroom.net" created by Seller for the transaction governed by this Agreement.

"<u>Dollars</u>" or "<u>$</u>" means the lawful currency of the United States of America.

"<u>ERISA</u>" means the Employment Retirement Income Security Act of 1974, as amended.

"<u>Federal Health Care Programs</u>" means any health care program administered or funded, in whole or in part, by the government of the United States of America, including the Medicare, Medicaid and TRICARE programs.

"<u>Fundamental Representations</u>" means the representations and warranties of Seller set forth in <u>Sections 5.1(A)</u> (Due Organization), <u>(B)</u> (Power and Authority; Enforceability; Consents), <u>(C)</u> (Binding Agreement), <u>(D)</u> (Assets), and <u>(Q)</u> (Brokerage).

38

"GAAP" means United States generally accepted accounting principles, consistently applied during the periods involved.

"Governmental Entity" means any United States or foreign federal, state, provincial or local government or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as amended (Pub. L. No. 104-191) and the Health Information Technology for Economic and Clinical Health Act (Pub. L. No. 111-5), any implementing regulations, and any state privacy or medical information Laws applicable to the Business.

"Law" means any constitution, law, common law, statute, ordinance, rule, regulation, regulatory requirement, code, order, judgment, injunction or decree enacted, issued, promulgated, enforced or entered by a Governmental Entity or securities exchange.

"Lien" means any charge, mortgage, pledge, security interest, lien, preference, license, covenant, claim, easement, encroachment or other similar encumbrance.

"Material Adverse Effect" means any change, event, occurrence, fact, state of facts, development or effect that (a) prevents, materially delays or materially impairs the ability of Seller to consummate the transactions contemplated by this Agreement or the other Transaction Documents or (b) has, or would reasonably be expected to have, a material adverse effect upon the condition (financial or otherwise), business, assets or results of operations of the Business, taken as a whole; provided, however, that, in the case of clause (b), any adverse change, event, occurrence, fact, state of facts, development or effect arising from or related to (i) conditions affecting the economy generally, (ii) pandemic (including without limitation changes caused by the COVID 19 virus or any other epidemic, pandemic or disease outbreak), any act of terrorism, similar calamity or war (whether or not declared) or any escalation or worsening of any of the foregoing or any natural disaster, (iii) financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index), or (iv) changes in any Laws, policies or other binding directives issued by any Governmental Entity, will not be taken into account in determining whether a "Material Adverse Effect" has occurred; provided that, with respect to a matter described in any of the foregoing clauses, such matter will only be excluded so long as such matter does not have a disproportionate effect on the Business relative to other comparable businesses operating in the industry in which the Business operates.

"Permits" means all licenses, permits, certificates, grants, franchises, waivers, consents, expirations of waiting periods, and other similar authorizations or approvals issued by or obtained from a Governmental Entity or any securities exchange.

"Permitted Liens" means (i) zoning, entitlement, building and other land use and similar laws or regulations imposed by any Governmental Entity having jurisdiction over such parcel which are not violated by the current use and operation thereof; (ii) non-exclusive licenses to Intellectual Property granted in the ordinary course of business; and (iii) easements, covenants,

39

conditions, restrictions and other similar matters of record which would not materially impair the use or occupancy of such parcel in the operation of the Business.

"Person" means an individual, a corporation, a partnership, an association, a limited liability company, a Governmental Entity, a trust or other entity or organization.

"Personal Information" means any information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular individual or household, including without limitation Protected Health Information as the term is defined in the Health Insurance Portability and Accountability Act of 1996, and any other information subject to protection, regulation, or safeguarding as set forth in any applicable Law governing privacy, information security or health information.

"Seller's Knowledge" or any similar knowledge qualification with respect to Seller, means the actual knowledge, after reasonable inquiry, of any of the following individuals: Sara Hart, Andrew Calkins and Matthew Lesniewski.

"WARN Act" means the Worker Adjustment Retaining and Notification Act of 1988, as amended, or any similar state or local law.

QB\64781911.20

IN WITNESS WHEREOF, Seller and Purchaser have executed this Agreement, and Escrow Agent has executed this Agreement for purposes of Sections 2.2, 2.3, 6.6, and 9.16, as of the day and year first above written.

"SELLER"

"PURCHASER"

SOUTH BAY MENTAL
HEALTH CENTER, INC.,
a Massachusetts corporation

SB TRANSITIONAL SUB, LLC, a Delaware
limited liability company

By: _____
    Andrew Calkins, President

By: _____
Its: _____

COMMUNITY INTERVENTION
SERVICES, INC., a Delaware corporation

By: _____
    Andrew Calkins, President

"ESCROW AGENT"

CASNER & EDWARDS, LLP

By: _____
    Michael J. Goldberg, Esq.

41

IN WITNESS WHEREOF, Seller and Purchaser have executed this Agreement, and Escrow Agent has executed this Agreement for purposes of Sections 2.2, 2.3, 6.6, and 9.16, as of the day and year first above written.

"SELLER"                                          "PURCHASER"

SOUTH BAY MENTAL                                  SB TRANSITIONAL SUB, LLC, a Delaware
HEALTH CENTER, INC.,                              limited liability company
a Massachusetts corporation
                                                  By:_____
By:_____                 William McKinney, CEO
    Andrew Calkins, President

COMMUNITY INTERVENTION
SERVICES, INC., a Delaware corporation

By:_____
    Andrew Calkins, President


"ESCROW AGENT"


CASNER & EDWARDS, LLP


By:_____
    Michael J. Goldberg, Esq.


*[Signature Page to Asset Purchase Agreement]*

## LIST OF EXHIBITS AND SCHEDULES

Exhibit A—Facility Locations

Schedule 1.1(A)—Assumed Leases

Schedule 1.1(C)—Deposits

Schedule 1.1(D)(i)—Licenses and Permits

Schedule 1.1(D)(iv)—Assumed Contracts

Schedule 1.1(E)—CIS Assets

Schedule 1.2(J)—Other Excluded Assets

Schedule 1.3(B)—Other Assumed Obligations

Schedule 1.4(P)—Other Excluded Liabilities

Schedule 2.1—Purchase Price Adjustments and Allocation

Schedule 2.2—Escrow Provisions

Schedule 3.1—Bill of Sale

Schedule 3.2—Assumption and Assignment Agreement

Schedule 4.2—Required Governmental Consents

Schedule 5.1(B)—Seller Required Approvals

Schedule 5.1(D)—Title to Assets

Schedule 5.1(E)—Financial Statements

Schedule 5.1(F)—Leases

Schedule 5.1(G)—Material Contracts

Schedule 5.1(H)—Enforceability

Schedule 5.1(I)—Employee Benefits

Schedule 5.1(J)—Employees

Schedule 5.1(K)—Compliance with Law

Schedule 5.1(L)—No Proceedings

Schedule 5.1(M)—Absence of Certain Changes

Schedule 5.1(N)—Permits

Schedule 5.1(O)—Intellectual Property

Schedule 5.1(P)—Census

Schedule 5.1(Q)—Brokerage

Schedule 5.1(S)—Payors

Schedule 5.2(B)—Purchaser Required Approvals

Schedule 6.1(C)—Seller Key Employees

Schedule 6.2—Seller Negative Covenants

Schedule 7.2(F)—Required Third Party Consents

## EXHIBIT A

### South Bay Facility Locations

1.  607 Pleasant St., Attleboro, MA
2.  88 Lincoln St., Brockton, MA
3.  Unit 2-10 of the Liberty Commerce Center Condominium, 195 Liberty St., Brockton, MA
4.  1115 West Chestnut St., Brockton, MA
5.  70 Everett Avenue, Chelsea, MA
6.  415 Neponset Ave., Dorchester, MA
7.  1 Grant Street, Framingham, MA
8.  360 Merrimack Street, Lawrence, MA
9.  80 Erdman Way, Leominster, MA 01453
10. 148 Warren St., Lowell, MA
11. 22 Old Canal Drive, Lowell, MA
12. 181 Union Street, Lynn, MA
13. 470 Main St., Mashpee, MA
14. 50 Aldrin Road, Plymouth, MA
15. 35 Congress St., Salem, MA
16. 140 High St., Springfield, MA
17. 463 Swansea Mall Drive, Swansea, MA
18. 37 Water St., Wakefield, MA
19. 541 Main St., Weymouth, MA
20. 324 Clark St., Worcester, MA
21. 540-548 Park Avenue, Worcester, MA
22. 97-101 South St., West Hartford, CT

*EXECUTION VERSION*

# DISCLOSURE SCHEDULE

## to

## ASSET PURCHASE AGREEMENT

## among

## SB TRANSITIONAL SUB, LLC,

## SOUTH BAY MENTAL HEALTH CENTER, INC.,

## and

## COMMUNITY INTERVENTION SERVICES, INC.

## dated as of

## January 5, 2021

The following Disclosure Schedule is being furnished by the Seller to the Purchaser pursuant to and as part of that certain Asset Purchase Agreement (the "**Agreement**"), dated as of January 5, 2021, by and among South Bay Mental Health Center, Inc., a Massachusetts corporation ("**South Bay**"), Community Intervention Services, Inc., a Delaware corporation ("**CIS**"; South Bay and CIS are, singly and jointly as the context requires, referred to herein as "**Seller**"), and SB Transitional Sub, LLC, a Delaware limited liability company ("**Purchaser**").  Capitalized terms used herein but not otherwise defined herein have the meanings ascribed to such terms in the Agreement.

## Schedule 1.1(A)

## Assumed Leases

1. **607 Pleasant St., Attleboro, MA**
   a. Lease entered into with Legacy Heritage, LLC dated May 13, 2010;
      i. As amended by the First Amendment to Lease dated February 13, 2013;
      ii. As further amended by the Second Amendment to Lease dated April 7, 2015;
      iii. As further amended by the Third Amendment to Lease dated July 31, 2015;
      iv. As further amended by the Fourth Amendment to Lease dated June 4, 2019.

2. **88 Lincoln St., Brockton, MA**
   a. Lease entered into with 88 Lincoln Street Brockton, LLC dated November 27, 2013;
      i. As amended by the First Amendment to Lease dated June 29, 2020.

3. **Unit 2-10 of the Liberty Commerce Center Condominium, 195 Liberty St., Brockton, MA**
   a. Indenture of Lease entered into with Benjamin W. Kravitz, as trustee of Rubber Realty Trust u/d/t dated December 16, 1988, dated April 1, 2013;
      i. As amended by the First Amendment to Indenture of Lease dated April 1, 2018.

4. **1115 West Chestnut St., Brockton, MA**
   a. Lease entered into with West Chestnut Street LLC dated April 12, 2012;
      i. As amended by the First Amendment to Lease dated January 30, 2015;
      ii. As further amended by the Second Amendment to Lease, with Victory Human Services, Inc., successor in interest to West Chestnut Street LLC, dated June 18, 2018;
      iii. As further amended by the Lease Amendment/Extension, with Victory Human Services, Inc., successor in interest to West Chestnut Street LLC, dated May 14, 2019.

5. **70 Everett Avenue, Chelsea, MA**
   a. Lease entered into with 70 Harbour Pointe Park, LLC dated December 16, 2014. Current landlord is NC 70E Chelsea LLC pursuant to Quit Claim Deed dated November 20, 2019.

6. **415 Neponset Ave., Dorchester, MA**
   a. Office Lease entered into with Neponset Circle CG Realty Trust dated July 2, 2012;

2

    b.  As amended by the First Amendment to Lease with Neponset Circle Realty, LLC, formerly known as Neponset Circle CG Realty Trust, dated December 14, 2018.

7.  **1 Grant Street, Framingham, MA**

    a.  1 Grant Street Lease entered into with Framingham 300 Howard LLC dated September 2, 2015.

8.  **360 Merrimack Street, Lawrence, MA**

    a.  Lease entered into with Riverwalk Partners LLC, for Building 5, dated February 18, 2015.

    b.  Lease entered into with Riverwalk Partners LLC, for Building 9, dated January 14, 2013;

        i.  As amended by the Lease Extension with Riverwalk Partners LLC dated September 30, 2019.

9.  **80 Erdman Way, Leominster, MA 01453**

    a.  Commercial Lease entered into with 80 Erdman Way, LLC dated February 29, 2012;

        i.  As amended by the Exhibit D Lease Addendum dated March 5, 2012;

       ii.  As further amended by the Lease Extension - Southbay Mental Health Center, Inc., 80 Erdman Way, Leominster MA dated September 27, 2018.

10.  **148 Warren St., Lowell, MA**

    a.  Lease entered into with Peter J. Scanlon, Trustee of the Scanlon Realty Trust u/d/t dated December 20, 2005 dated April 12, 2012;

        i.  As amended by the First Amendment to Lease with Scanlon Realty Trust dated January 30, 2015;

       ii.  As further amended by the Second Amendment to Lease with 148 Warren Street LLC dated December 12, 2016.

11.  **22 Old Canal Drive, Lowell, MA**

    a.  Lease entered into with 22 Olde Canal Drive, LLC dated February 2014.

12.  **181 Union Street, Lynn, MA**

    a.  Lease entered into with John Ryder and Gordon Hall III, Trustees of Maolis Realty Trust dated October 25, 2011;

        i.  As amended by the Amendment of Lease with Maolis Realty Trust dated January 10, 2012;

       ii.  As further amended by the Lease Extension and Amendment Agreement B with Maolis Realty Trust dated November 30, 2016;

      iii.  As further amended by the Lease Extension Agreement C with Maolis Realty Trust dated July 5, 2019.

13.  **470 Main St., Mashpee, MA**

    a.  Lease entered into with Mashpee 130 Shops, Inc. dated October 7, 2011;

        i.  As amended by the Lease Addendum: Mashpee 130 Shops, Inc. with Mashpee 130 Shops, Inc. dated July 14, 2015;

      ii.    As further amended by the Commercial Lease Extension with Mashpee 130 Shops, Inc. dated June 7, 2016;

      iii.   As further amended by the Lease Addendum with David Dyson & Rebecca Dyson dated August 18, 2020.

## 14. 50 Aldrin Road, Plymouth, MA

   a.  Lease entered into with 50 Aldrin Road, LLC dated April 12, 2012;

      i.    As amended by the First Amendment to Lease with 50 Aldrin Road, LLC dated October 26, 2015;

      ii.    As certified by the Lessee Estoppel Certificate dated October 26, 2015;

      iii.   As further amended by the Second Amendment to Lease with Edgar Goheen, LLC, dated April 16, 2018.

## 15. 35 Congress St., Salem, MA

   a.  Lease No. 4801 entered into with Shetland Trust dated March 12, 2019.

## 16. 140 High St., Springfield, MA

   a.  Lease entered into with South Campus Group LLC dated April 13, 2012;

      i.    As amended by the Amendment to Lease with South Campus Group LLC dated June 24, 2016;

      ii.    As further amended by the Second Amendment to Lease with South Campus Group LLC dated March 9, 2017.

      iii.   Current landlord is South Campus BH Holdings LLC pursuant to letter dated December 12, 2018.

## 17. 463 Swansea Mall Drive, Swansea, MA

   a.  Lease entered into with Swansea Healthcare, LLC dated April 12, 2012;

      i.    As amended by the First Amendment to Lease with Swansea Healthcare, LLC dated January 2015.

      ii.    As amended by the Second Amendment to Lease with Swansea Healthcare, LLC dated July 28, 2016;

      iii.   As further amended by the Third Amendment to Lease with Edgar, LLC dated March 22, 2017.

## 18. 37 Water St., Wakefield, MA

   a.  Commercial Lease Agreement entered into with Water Street Land, LLC dated July 22, 2019.

## 19. 541 Main St., Weymouth, MA

   a.  Lease entered into with Atlantic-Stetson Realty LLC dated June 10, 2010.

      i.    As amended by the First Amendment to Lease with Atlantic-Stetson Realty LLC dated May 15, 2012;

      ii.    As further amended by the Second Amendment to Lease with HTA-Stetson Medical Center, LLC, as successor for Atlantic-Stetson Realty, LLC, dated May 22, 2017.

## 20. 324 Clark St., Worcester, MA

      a.  Lease entered into with Worcester Investment Group, LLC dated August 2018.

21. **540-548 Park Avenue, Worcester, MA**

      a.  Lease entered into with 540 Park Avenue, LLC dated August 12, 2011;

          i.  As amended by the Amendment to Lease with 540 Park Avenue, LLC dated September 29, 2011;

          ii.  As further amended by the Lease Extension with 540 Park Avenue, LLC dated April 2018.

22. **97-101 South St., West Hartford, CT**

      Lease entered into with 101 South, LLC dated December 2017.


**Cure Costs**

None.

QB\66061092.8

Schedule 1.1(C)

Lease Deposits

Community Intervention Services Holdings, Inc.
CIS Holdings : South Bay Community Services
Balance Sheet Detail

| Financial Row | Type | Date | Document Number | Name | Amount | Balance |
|---|---|---|---|---|---|---|
| ASSETS | | | | | $0.00 | $0.00 |
| Other Assets | | | | | $0.00 | $0.00 |
| 16300 - Security Deposits | | | | | $0.00 | $0.00 |
| SBMH Salem | | 2008 | Opening Balance transfer | Rent Deposit - Salem | $1,802.66 | $1,802.66 |
| SBMH Weymouth | | 2010 | Opening Balance transfer | Rent Deposit - Weymouth (Atlantic Stetson Realty) | $4,917.92 | $6,720.58 |
| SBMH Leominster | | 2010 | Opening Balance transfer | Rent Deposit - Leominster (80 Erdman Way) | $3,526.50 | $10,247.08 |
| SBMH Attleboro | | 2010 | Opening Balance transfer | Rent Deposit - Legacy Heritage (Attleboro) | $4,583.33 | $14,830.41 |
| SBMH Worcester (EI) | | 2011 | Opening Balance transfer | Rent Deposit - Worcester EI (540 Park Ave) | $5,941.66 | $20,772.07 |
| SBMH Mashpee | | 10/7/2012 | Opening Balance transfer | Rent Deposit- Cape/Cape Day Tx (Mashpee) | $24,524.00 | $45,296.07 |
| | | | Opening Balance transfer | Rent Deposit - (Jefferson Realty - Fall River) | $2,968.46 | $48,264.53 |
| SBMH Springfield | JE | 4/2/2012 | BACF3-1333638549 | V15153 South Campus BH Holdings LLC | $5,253.50 | $53,518.03 |
| 13-SBMH-Dorchester | JE | 6/5/2012 | BF6D3-1338929238 | V14612 NEPONSET CIRCLE REALTY, LLC | $7,182.00 | $60,700.03 |
| SBMH Malden | JE | 8/14/2012 | C3921-1345043186 | V15082 SFA MALDEN LLC | $3,354.17 | $64,054.20 |
| 16-SBMH-Lawrence Clinic # 9 | JE | 1/23/2013 | CDAD4-1359404833 | V14920 RIVERWALK PARTNERS LLC | $22,000.00 | $86,054.20 |
| 16-SBMH-Lawrence Clinic # 9 | JE | 10/24/2019 | JESBCS8312014093201860 9 | V14920 RIVERWALK PARTNERS LLC | ($7,333.33) | $78,720.87 |
| SBMH Liberty | JE | 3/19/2013 | D1E8F-1363698385 | V14967 195 LIBERTY STREET REALTY, LLC | $7,684.70 | $86,405.57 |

| Rubber Storage | | | | | | |
|---|---|---|---|---|---|---|
| SBMH Brockton | JE | 5/31/2014 | JESBMH24642338 | To reclass Security Deposit Commercial St to deposits | $26,420.13 | $112,825.70 |
| SBMH Lowell (b) | Bill | 7/1/2014 | SECURITY DEPOSIT 2014 | V17800 22 OLDE CANAL DRIVE, LLC | $43,414.85 | $156,240.55 |
| 32-SBMH-Chelsea | Bill | 12/8/2014 | SECURITY DEPOSIT 2014 | V18572 70 HARBOUR POINT PARK LLC | $24,000.00 | $180,240.55 |
| 16-SBMH-Lawrence Clinic #5 | Bill | 3/25/2015 | 032515 1st, Last, Security | V14920 RIVERWALK PARTNERS LLC | $16,376.25 | $196,616.80 |
| 16-SBMH-Lawrence Clinic #5 | JE | 10/24/2019 | JESBCS83120140932018609 | V14920 RIVERWALK PARTNERS LLC | ($5,458.75) | $191,158.05 |
| 31-SBMH-Framingham | Bill | 7/31/2015 | Security Deposit Framingham | V19706 Howard One Grant LLC | $7,031.25 | $198,189.30 |
| 15-SBMH-Hartford CT Clinic | Bill | 12/5/2017 | Security Deposit | V22574 101 SOUTH, LLC | $5,000.00 | $203,189.30 |
| 20-SBMH-Malden Clinic | Bill | 9/12/2019 | Security Deposit | V24213 Water Street, Wakefield Security Deposit | $9,562.50 | $212,751.80 |
| 37-New Haven CT Clinic | Bill | 8/17/2020 | | V22592 85 Willow St Equities LLC | $3,466.00 | $216,217.80 |
| 37-New Haven CT Clinic | Bill | 8/17/2020 | | V22592 85 Willow St Equities LLC | ($3,466.00) | $212,751.80 |
| Total - 16300 - Security Deposits | | | | | | $212,751.80 |

7

QB\66061092.8

Schedule 1.1(D)(i)

Licenses and Permits

**National Provider Identifier Numbers:**
  a.  110000049
  b.  110000050
  c.  110104404

| Location | Certificate | Effective Date | Expiration Date |
|---|---|---|---|
| All Locations | CARF International | 11/30/2018 | 11/30/2021 |
| Attleboro, MA | Certificate of Inspection[1] | 1/15/2019 | 12/30/2020 |
| Attleboro, MA | Clinic License | 4/12/2020 | 4/11/2022 |
| Attleboro, MA | Fire Extinguishers | N/A | 7/14/2021 |
| Attleboro, MA | Fire Inspection | N/A | 7/16/2021 |
| Attleboro, MA | Sprinkler Test Report | N/A | 6/2/2021 |
| Attleboro, MA | Fire Alarm Report | N/A | 6/2/2021 |
| Attleboro, MA | DPS Certificate | 12/7/2020 | 12/30/2022 |
| Attleboro, MA | Business Certificate | N/A | 9/3/2024 |
| Boston, MA | Business Certificate | 8/31/2016 | 8/13/2024 |
| Brockton, MA | Early Childhood Intervention Certification | 7/1/2020 | 6/30/2021 |
| Brockton, MA | Clinic License | 4/12/2020 | 4/11/2021 |
| Brockton, MA | Outpatient Substance Abuse Treatment Services Certificate of Approval | 9/21/2018 | 9/21/2020 |
| Brockton, MA | Certificate of Inspection | 7/2/2020 | 6/28/2022 |
| Brockton, MA | Business Certificate | 8/12/2016 | 8/10/2024 |
| Brockton, MA (Admin/EI) | Fire Extinguishers | N/A | 6/24/2021 |
| Brockton, MA (Admin/EI) | Sprinkler Test Report | N/A | 2/20/2021 |
| Brockton, MA (Admin/EI) | Fire Alarm Report | N/A | 7/8/2021 |
| Brockton, MA (Admin/EI) | Fire Inspection | N/A | 12/9/2021 |
| Brockton, MA | Elevator Inspection | N/A | 2/28/2021 |

---

[1] Certificate renewal in process.

| (Admin/EI) | | | |
|---|---|---|---|
| Brockton, MA (Admin/EI) | DPS Certificate | 10/1/2018 | 10/13/2022 |
| Brockton, MA (Commercial Street) | Fire Inspection | N/A | 7/13/2021 |
| Brockton, MA (Commercial Street) | Fire Extinguishers | N/A | 6/18/2021 |
| Brockton, MA (Commercial Street) | Sprinkler Test Report | N/A | 6/24/2021 |
| Brockton, MA (Commercial Street) | Fire Alarm Report | N/A | 6/24/2021 |
| Brockton, MA (Commercial Street) | Elevator Inspection | N/A | 4/30/2021 |
| Brockton, MA (Commercial Street) | DPS Certificate | 7/2/2020 | 6/28/2022 |
| Chelsea, MA | Clinic License | 4/12/2020 | 4/11/2022 |
| Chelsea, MA | New and Renewal Certificate of Inspection | 4/18/2019 | 4/11/2021 |
| Chelsea, MA | Fire Inspection | N/A | 6/23/2021 |
| Chelsea, MA | DPS Inspection | 4/18/2019 | 4/11/2021 |
| Chelsea, MA | Fire Extinguishers | N/A | 6/18/2021 |
| Chelsea, MA | Sprinkler Test Report | 8/31/2020 | 8/31/2021 |
| Chelsea, MA | Fire Alarm Report | N/A | 8/31/2021 |
| Chelsea, MA | Business Certificate | 9/11/2020 | 9/11/2024 |
| Dorchester, MA | Clinic License | 4/12/2020 | 4/11/2022 |
| Dorchester, MA | Certificate of Inspection | 5/21/2019 | 5/21/2021 |
| Dorchester, MA | Fire Inspection | N/A | 3/31/2021 |
| Dorchester, MA | DPS Inspection | 5/21/2019 | 5/21/2021 |
| Dorchester, MA | Fire Extinguishers | N/A | 10/11/2021 |

QB\66061092.8

| | | | |
|---|---|---|---|
| Dorchester, MA | Sprinkler Test Report | N/A | 4/17/2021 |
| Dorchester, MA | Fire Alarm Report | N/A | 4/17/2021 |
| Framingham, MA | Certificate of Inspection | 7/24/2020 | 6/30/2022 |
| Framingham, MA | Early Childhood Intervention Certification | 7/1/2020 | 6/30/2021 |
| Framingham, MA | DPS Inspection | 7/24/2020 | 6/30/2022 |
| Framingham, MA | Fire Extinguishers | N/A | 7/2/2021 |
| Framingham, MA | Fire Inspection | N/A | 7/7/2021 |
| Framingham, MA | Sprinkler & Fire Alarm Report | N/A | 7/15/2021 |
| Framingham, MA | Business Certificate | 8/20/2020 | 8/19/2024 |
| Hartford, CT | Sprinkler Test Report[2] | N/A | 7/30/2020 |
| Hartford, CT | Fire Alarm Report[3] | N/A | 7/30/2020 |
| Hartford, CT | Fire Inspection | N/A | 9/30/2021 |
| Lawrence, MA (EI) | Early Childhood Intervention Certification | 7/1/2020 | 6/30/2021 |
| Lawrence, MA (EI) | Certificate of Inspection | 1/10/2020 | 1/31/2022 |
| Lawrence, MA (MH) | Clinic License | 4/12/2020 | 4/11/2022 |
| Lawrence, MA (MH) | Certificate of Inspection | 8/28/2019 | 8/21/2021 |
| Lawrence, MA (MH) | Fire Extinguishers | N/A | 3/12/2021 |
| Lawrence, MA (MH) | Sprinkler Test Report | N/A | 4/1/2021 |
| Lawrence, MA (MH) | Fire Alarm Report | N/A | 5/19/2021 |
| Lawrence, MA (MH) | Fire Inspection | 11/30/2020 | 3/31/2021 |

---

[2] The report completion and certificate renewal are in process.
[3] The report completion and certificate renewal are in process.

QB\66061092.8

| | | | |
|---|---|---|---|
| Lawrence, MA (MH) | DPS Certificate | 8/28/2019 | 8/21/2021 |
| Lawrence, MA (EI) | Fire Extinguishers | N/A | 3/12/2021 |
| Lawrence, MA (EI) | Sprinkler Test Report | N/A | 2/6/2021 |
| Lawrence, MA (EI) | Fire Alarm Report | N/A | 5/13/2021 |
| Lawrence, MA (EI) | Fire Inspection | N/A | 3/31/2021 |
| Lawrence, MA (EI) | DPS Certificate | N/A | 1/31/2022 |
| Lawrence, MA (EI) | DPH | N/A | 6/30/2021 |
| Leominster, MA | Clinic License | 4/12/2020 | 4/11/2022 |
| Leominster, MA | Certificate of Inspection | 8/28/2020 | 8/5/2022 |
| Leominster, MA | Fire Extinguishers | N/A | 7/30/2021 |
| Leominster, MA | Sprinkler Test Report | 12/8/2020 | 12/8/2021 |
| Leominster, MA | Fire Alarm Report | N/A | 6/29/2021 |
| Leominster, MA | Fire Inspection | N/A | 7/23/2021 |
| Leominster, MA | DPS Certificate | 8/28/2020 | 8/5/2022 |
| Leominster, MA | Business Certificate | 8/28/2020 | 8/28/2024 |
| Lowell, MA (EI) | Certificate of Inspection | 9/21/2020 | 9/1/2022 |
| Lowell, MA (EI) | Early Childhood Intervention Certification | 7/1/2020 | 6/30/2021 |
| Lowell, MA (MH) | Clinic License | 4/12/2020 | 4/11/2022 |
| Lowell, MA (MH) | Outpatient Substance Abuse Treatment Services Certificate of Approval | 9/21/2018 | 9/21/2020 |
| Lowell, MA | Fire Extinguishers | N/A | 3/12/2021 |

11

| (EI) | | | |
|---|---|---|---|
| Lowell, MA (EI) | Sprinkler Report | N/A | 1/21/2021 |
| Lowell, MA (EI) | Fire Alarm Report[4] | N/A | 11/8/2020 |
| Lowell, MA (EI) | Fire Inspection | N/A | 2/18/2021 |
| Lowell, MA (EI) | DPS Certificate | 9/21/2020 | 9/1/2022 |
| Lowell, MA (EI) | Dumpster Permit | N/A | 6/30/2021 |
| Lowell, MA (EI) | Building Inspection Certificate | 10/31/2020 | 10/31/2021 |
| Lowell, MA (MH) | DPS | 12/29/2020 | 12/19/2022 |
| Lowell, MA (MH) | Sprinkler Test Report | N/A | 9/2/2021 |
| Lowell, MA (MH) | Fire Extinguishers | N/A | 7/30/2021 |
| Lowell, MA (MH) | Fire Inspection | N/A | 7/22/2021 |
| Lowell, MA (MH) | Certificate of Inspection[5] | 10/31/2018 | 12/19/20 |
| Lowell, MA (MH) | Backflow Inspection[6] | N/A | 5/7/2019 |
| Lowell, MA (MH) | Fire Alarm Inspection | N/A | 9/2/2021 |
| Lynn, MA | Clinic License | 4/12/2020 | 4/11/2022 |
| Lynn, MA[7] | Certificate of Inspection | 6/30/2020 | 5/30/2022 |
| Lynn, MA | Fire Extinguishers | N/A | 2/11/2021 |
| Lynn, MA | Fire Alarm Report | N/A | 2/20/2021 |
| Lynn, MA | Fire Inspection | N/A | 3/11/2021 |
| Lynn, MA | DPS Certificate | N/A | 2/25/2022 |
| Lynn, MA | Business Certificate | 9/3/2020 | 9/3/2024 |
| Mashpee, MA | Clinic License | 4/12/2020 | 4/11/2022 |

---

[4] The report completion and certificate renewal are in process.
[5] The renewal is in process.
[6] The renewal is in process.
[7] Installation of sprinklers on property and Sprinkler Test Report in process.

12

| Mashpee, MA | Outpatient Substance Abuse Treatment Services Certificate of Approval | 9/21/2018 | 9/21/2020 |
|---|---|---|---|
| Mashpee, MA | Certificate of Inspection | 2/26/2020 | 2/25/2022 |
| Mashpee, MA | Fire Extinguishers | N/A | 2/13/2021 |
| Mashpee, MA | Fire Alarm Report | N/A | 1/28/2021 |
| Mashpee, MA | Fire Inspection | N/A | 1/8/2021 |
| Mashpee, MA | Business Certificate | 8/21/2020 | 8/31/2014 |
| Plymouth, MA | Clinic License | 4/12/2020 | 4/11/2022 |
| Plymouth, MA | Outpatient Substance Abuse Treatment Services Certificate of Approval | 9/21/2018 | 9/21/2020 |
| Plymouth, MA | Certificate of Inspection | 2/18/2020 | 3/18/2022 |
| Plymouth, MA | Fire Extinguishers | N/A | 6/23/2021 |
| Plymouth, MA | Fire Alarm Report | 10/9/2020 | 10/9/2021 |
| Plymouth, MA | Fire Inspection | N/A | 7/2/2021 |
| Plymouth, MA | Elevator/Lift Inspection | N/A | 3/31/2022 |
| Plymouth, MA | Business Certificate | 9/28/2020 | 9/28/2024 |
| Salem, MA | Clinic License | 4/12/2020 | 4/11/2022 |
| Salem, MA | Certificate of Inspection | 7/22/2020 | 4/4/2022 |
| Salem, MA | Fire Extinguishers | N/A | 6/18/2021 |
| Salem, MA | Sprinkler Test Report | N/A | 2/20/2021 |
| Salem, MA | Fire Alarm Report | 5/28/2020 | 5/28/2021 |
| Salem, MA | Fire Inspection | N/A | 6/23/2021 |
| Salem, MA | Business Certificate | 8/29/2016 | 8/13/2024 |
| Springfield, MA | Clinic License | 4/12/2020 | 4/11/2022 |
| Springfield, MA | Certificate of Inspection | 6/19/2019 | 6/19/2021 |
| Springfield, MA | Fire Extinguishers | N/A | 6/17/2021 |
| Springfield, MA | Sprinkler Test Report | 12/17/2020 | 12/17/2021 |
| Springfield, MA | Fire Alarm Report | N/A | 3/28/2021 |
| Springfield, MA | Fire Inspection | N/A | 6/17/2021 |
| Springfield, | Business Certificate | 9/1/2020 | 9/1/2024 |

13

| MA | | | |
|---|---|---|---|
| Swansea, MA (EI) | Certificate of Inspection | 8/20/2020 | 9/12/2022 |
| Swansea, MA (EI) | Early Childhood Intervention Certification | 7/1/2020 | 6/30/2021 |
| Swansea, MA (MH) | Clinic License | 4/12/2020 | 4/11/2022 |
| Swansea, MA (MH) | Outpatient Substance Abuse Treatment Services Certificate of Approval | 9/21/2018 | 9/21/2020 |
| Swansea, MA (MH) | Certificate of Inspection | 11/13/2019 | 11/27/2021 |
| Swansea, MA | Fire Extinguishers | N/A | 8/11/2021 |
| Swansea, MA | Quarterly Sprinkler Test Report | 11/20/2020 | 2/20/2020 |
| Swansea, MA | Fire Alarm Report | N/A | 3/31/2021 |
| Swansea, MA | Elevator Inspection | 10/28/2020 | 10/31/2021 |
| Swansea, MA | Fire Inspection | N/A | 3/17/2021 |
| Swansea, MA (EI) | DPS Certificate | 8/20/2020 | 9/12/2022 |
| Swansea, MA (MH) | DPS Certificate | 11/13/2019 | 11/27/2021 |
| Swansea, MA | Business Certificate | 8/13/2020 | 8/30/2024 |
| Wakefield, MA | Clinic License | 4/12/2020 | 4/11/2022 |
| Wakefield, MA | Certificate of Inspection | 1/31/2020 | 1/31/2022 |
| Wakefield, MA | Fire Extinguishers | 12/15/2020 | 12/15/2021 |
| Wakefield, MA | Elevator[8] | N/A | 12/31/2020 |
| Wakefield, MA | Sprinkler Test Report | 12/15/2020 | 12/15/2021 |
| Wakefield, MA | Fire Alarm Report | 12/4/2020 | 12/4/2021 |
| Wakefield, MA | Fire Inspection | 12/18/2020 | 12/30/2021 |
| Wakefield, | Business Certificate | N/A | 8/28/2024 |

---

[8] The renewal is in process.

14

| MA | | | |
|---|---|---|---|
| West Hartford, CT | Fire Department Operational Permit | 10/1/2018 | 9/30/2021 |
| Weymouth, MA | Clinic License | 4/12/2020 | 4/11/2022 |
| Weymouth, MA | Outpatient Substance Abuse Treatment Services Certificate of Approval | 9/21/2018 | 9/21/2020 |
| Weymouth, MA | Certificate of Inspection | 10/13/2018 | 10/13/2022 |
| Weymouth, MA | Fire Extinguishers | N/A | 10/8/2021 |
| Weymouth, MA | Fire Inspection | 12/10/2020 | 12/10/2021 |
| Weymouth, MA | Business Certificate | 8/3/2020 | 9/1/2024 |
| Worcester, MA (EI) | Certificate of Inspection | 7/15/2020 | 5/26/2022 |
| Worcester, MA (EI) | Early Childhood Intervention Certification | 7/1/2020 | 6/30/2021 |
| Worcester, MA (MH) | Clinic License | 4/12/2020 | 4/11/2022 |
| Worcester, MA (MH) | Outpatient Substance Abuse Treatment Services Certificate of Approval | 9/21/2018 | 9/21/2020 |
| Worcester, MA (MH) | Certificate of Inspection | 4/26/2019 | 4/26/2021 |
| Worcester, MA (MH) | Fire Extinguishers | N/A | 3/10/2021 |
| Worcester, MA (MH) | Sprinkler Test Report | N/A | 1/21/2021 |
| Worcester, MA (MH) | Fire Alarm Report | N/A | 9/10/2021 |
| Worcester, MA (MH) | Fire Inspection | N/A | 6/12/2021 |
| Worcester, MA (MH) | Occupancy Permit | N/A | N/A |
| Worcester, MA (EI) | Fire Extinguishers | 9/30/2020 | 9/30/2021 |
| Worcester, | Sprinkler Test Report | 9/21/2020 | 9/21/2021 |

15

| | | | |
|---|---|---|---|
| MA (EI) | | | |
| Worcester, MA (EI) | Fire Alarm Report | N/A | 6/6/2021 |
| Worcester, MA (EI) | Fire Inspection | 10/14/2020 | 10/14/2021 |
| Worcester, MA (EI) | DPS Certificate | 7/15/2020 | 5/25/2022 |
| Worcester, MA (EI) | Building Inspection | N/A | 8/19/2021 |
| Worcester, MA (MH) | Business Certificate[9] | 9/13/2016 | 9/13/2020 |
| Worcester, MA (EI) | Business Certificate[10] | 9/15/2016 | 9/15/2020 |

---

[9] The renewal is in process.
[10] The renewal is in process.

QB\66061092.8

## Schedule 1.1(D)(iv)

## Assumed South Bay Contracts

1.  ***Community Mental Health Center Provider Services Agreement*, entered into with Blue Cross Blue Shield of Massachusetts HMO Blue Inc; Blue Cross and Blue Shield of Massachusetts, Inc. dated August 1, 2009.**
    a.  As amended by the *First Amendment to the Community Mental Health Center Provider Services Agreement* with Blue Cross Blue Shield of Massachusetts HMO Blue, Inc. dated January 14, 2013;
    b.  As further amended by the *Second Amendment to the Community Mental Health Center Provider Services Agreement* with Blue Cross and Blue Shield of Massachusetts of HMO Blue, Inc. dated June 9, 2014;
    c.  As further amended by the *Third Amendment to the Community Mental Health Center Provider Services Agreement* with Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. dated March 23, 2015;
    d.  As further amended by the *Fourth Amendment to the Community Mental Health Center Provider Services Agreement* with Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. dated February 9, 2016.
2.  ***Provider Services Agreement*, entered into with Beacon Health Strategies, LLC dated October 27, 1999.**
    a.  As amended by the *Amendment to Agreement Between South Bay Mental Health-Brockton and Beacon Health Strategies, LLC* with Beacon Health Strategies, LLC dated January 1, 2001;
    b.  As further amended by the *Amendment to Agreement Between Provider and Beacon Health Strategies, LLC* with Beacon Health Strategies, LLC dated July 1, 2010;
    c.  As further amended by the *Amendment to Agreement Between Beacon Health Strategies, LLC and South Bay Mental Health* with Beacon Health Strategies, LLC dated June 27, 2012;
    d.  As further amended by the *Amendment to Agreement Between Beacon Health Strategies, LLC & South Bay Mental Health* with Beacon Health Strategies, LLC dated July 18, 2012;
    e.  As further amended by the *2nd Amendment to Agreement Between Beacon Health Strategies, LLC and South Bay Mental Health* with Beacon Health Strategies, LLC dated April 1, 2014;
    f.  As further amended by the *1st Amendment to Agreement between Beacon Health Strategies, LLC & South Bay Mental Health* with Beacon Health Strategies, LLC dated August 25, 2014;
    g.  As further amended by the *Amendment to Agreement between Beacon Health*

17

       *Strategies, LLC & South Bay Mental Health* with Beacon Health Strategies, LLC dated October 1, 2015;

    h.  As further amended by the *Amendment to Agreement Between Beacon Health Strategies, LLC & South Bay Mental Health with Beacon Health Strategies, LLC* dated March 1, 2016.

    i.  As further amended by the *Amendment to Agreement Between Beacon Health Strategies, LLC & South Bay Mental Health with Beacon Health Strategies, LLC* dated January 1, 2016.

    j.  As further amended by the *Provider Network Amendment to Adjust Rates* with Beacon Health Strategies, LLC dated May 1, 2017;

    k.  As further amended by the *6th Amendment to Agreement Between Beacon Health Strategies, LLC & South Bay Mental Health* with Beacon Health Strategies, LLC dated June 1, 2017;

    l.  As further amended by the *Amendment to Agreement Between Beacon Health Strategies, LLC and Provider* with Beacon Health Strategies, LLC dated March 1, 2018;

    m.  As further amended by the *Provider Network Amendment to Adjust Rates* with Beacon Health Strategies, LLC dated March 1, 2018;

    n.  As further amended by the *Provider Network Amendment to Adjust Rates* with Beacon Health Strategies, LLC dated March 1, 2018;

    o.  As further amended by the 2*019 Beacon Health Strategies Provider Service Agreement Amendment* with Beacon Health Strategies, LLC dated April 1, 2019;

    p.  As further amended by the *Provider Network Amendment* with Beacon Health Strategies, LLC dated July 1, 2019.

    q.  As further amended by the *Rate Letter Increase with Beacon Health Strategies, LLC* dated June 1, 2020.

**3.**   ***Contract*, entered into with Beacon ABA Services, Inc. dated June 27, 2012.**

    a.  As amended by the *Amendment to Agreement for Autism Specialty Services* with Beacon ABA Services dated September 13, 2016.

**4.**   ***Participating Behavioral Health Provider Agreement* entered into with Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated December 28, 1998.**

**5.**   ***Participating Facility Agreement* entered into with Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated May 5, 2008.**

    a.  As amended by the *Amendment to Agreement Between Participating Provider and Boston Medical Center Health Plan, Inc.* with Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated July 1, 2008;

    b.  As further amended by the *Second Amendment to Agreement Between Participating Provider and Boston Medical Center Health Plan, Inc.* with Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated October 22,

2009;

    c.  As further amended by the *Amendment to Agreement Between Participating Provider and Boston Medical Center Health Plan, Inc.* with Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated January 1, 2013.

6.  ***Participating Ancillary Provider Agreement*** **entered into with Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated January 1, 2012.**

7.  ***Commercial Products Participating Ancillary Provider Agreement*** **with Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated January 1, 2012.**

8.  ***Agreement Between South Bay Community Services, Early Intervention and Children's Center for Communication, Beverly School for the Deaf*** **entered into with Children's Center for Communication, Beverly School for the Deaf dated January 30, 2018.**

9.  ***Homemaker/Personal Care/Non-Homemakers Services Provider Agreement*** **entered into with Coastline Elderly Services, Inc., the Aging Services Access Point dated October 1, 2018.**

10.  ***Provider Agreement (ICO)*** **entered into with Commonwealth Care Alliance, Inc. dated August 1, 2013.**

    a.  As amended by the *Addendum to the Agreement by and between Commonwealth Care Alliance, Inc. and South Bay Mental Health Center, Inc.* with Commonwealth Care Alliance, Inc. dated October 1, 2013.

11.  ***SCO Provider Agreement*** **entered into with Commonwealth Care Alliance, Inc. dated December 1, 2013.**

12.  ***State of Connecticut Purchase of Service Contract*** **entered into with the State of Connecticut, Office of Early Childhood dated July 1, 2020.**

13.  ***Contract*** **entered into with the Commonwealth of Massachusetts, Department of Public Health dated July 1, 2020.**

14.  ***Health Service Agreement Between Fallon Community Health Plan, Inc. and South Bay Mental Health Center, Inc. d/b/a South Bay Community Services*** **entered into with Fallon Community Health Plan, Inc. dated December 18, 2017.**

15.  ***Harvard Pilgrim Health Care of Connecticut, Inc. Participating Provider Agreement*** **entered into with Harvard Pilgrim Health Care of Connecticut, Inc. dated June 1, 2019.**

16.  ***Homemaker/Personal Care/Non-Homemakers Services Provider Agreement*** **entered into with HESSCO Elder Services, Inc., the Aging Services Access Point dated October 1, 2018.**

17.  ***MassHealth Nonbilling Managed Care Entity (MCE) Network-Only Provider Contract*** **entered into with Commonwealth of Massachusetts, Executive Office of Health and Human Services dated June 9, 2020.**

18.  ***Facility Participation Agreement*** **entered into with Health New England Be**

19

Healthy, Massachusetts Behavioral Health Partnership dated March 1, 2018.

19. *Facility Participation Agreement* entered into with Massachusetts Behavioral Health Partnership dated March 1, 2018.

20. *Participation Agreement (Inpatient/Outpatient Facility)* entered into with Health New England Be Healthy, Massachusetts Behavioral Health Partnership dated May 1, 2017.

21. *Homemaker/Personal Care/Non-Homemakers Services Provider Agreement* entered into with Montachusett Home Care Corporation, the Aging Services Access Point, dated October 1, 2018.

22. *MultiPlan Veteran's Administration CCN Program Amendment* entered into with MultiPlan dated March 1, 2017.

23. *MPI Participating Professional Group Agreement* entered into with MultiPlan, Inc. dated September 1, 2016.

24. *Neighborhood Health Plan Letter of Agreement* for Participation in My Care Family entered into with Neighborhood Health Plan dated February 28, 2018.

25. *United Behavioral Health Facility Participation Agreement* entered into with United Behavioral Health dated April 21, 2008.

 a. As amended by the *Amendment to United Behavioral Health Provider Participation Agreement for VA Community Care Program* with United Behavioral Health, operating as Optum, dated June 26, 2019.

26. *United Behavioral Health Group Participating Provider Agreement* entered into with United Behavioral Health dated October 7, 2013.

 a. As amended by #1 Amendment to the United Behavioral Health, Inc. Group Participation Agreement with United Behavioral Health dated October 1, 2019.

27. *Agreement between the Commonwealth of MA Plymouth County Sheriff's Department and South Bay Mental Health* entered into with the Commonwealth of Massachusetts, Plymouth County Sheriff's Department dated October 1, 2019.[11]

28. *Homemaker/Personal Care/Non-Homemakers Services Provider Agreement* entered into with South Shore Elder Services, Inc., the Aging Services Access Point dated October 1, 2018.

29. *Homemaker/Personal Care/Non-Homemakers Services Provider Agreement* entered into with Tri-Valley, Inc., the Aging Services Access Point dated October 1, 2019.

 a. As amended by *Contract Amendment #001*, dated October 13.2020.

30. *Allied Health Services Provider Agreement* entered into with Tufts Associated Health Maintenance Organization Inc., Total Health Plan, Inc. dated February 10, 2011.

 a. As amended by the *HMO Products Amended Exhibit A-1 Financial Agreement*

---

[11] Renewal in process.

QB\66061092.8

with Tufts Associated Health Maintenance Organization, Inc., Total Health Plan, Inc. dated January 1, 2017;

b. As further amended by the *Financial Agreement (2019 Amendment Notification to Allied Health Services Provider Agreement)* with Tufts Associated Health Plans, Inc. dated July 1, 2019.

31. *Consulting Agreement* **entered into with the University of Connecticut dated December 18, 2019.**

32. *DMA Specified Behavioral Health Services, Appendix C* **entered into with Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated January 5, 1998.**

33. *Amendment to Master Service Agreement to Provide Ambulatory Services* **entered into with the Commonwealth of Massachusetts dated July 1, 2020.**

34. *Contract Amendment* **entered into with the Commonwealth of Massachusetts, Department of Children and Families dated July 1, 2019.**

35. *Contract Amendment* **entered into with the Commonwealth of Massachusetts, Department of Public Health dated July 1, 2020.**

36. *Contract Amendment* **entered into with the Commonwealth of Massachusetts, Department of Children and Families dated July 1, 2020.**

37. **Contract Amendment entered into with the Commonwealth of Massachusetts, Department of Public Health dated July 1, 2015.**

38. **Massachusetts Behavioral Health Partnership Provider Agreement by and between Massachusetts Behavioral Health Partnership and South Bay Mental Health Center, Inc., dated June 1, 1997.**

a. *Exhibit A, Contracted Sites* **entered into with Health New England Be Healthy, Massachusetts Behavioral Health Partnership dated January 1, 2016.**

b. *Exhibit A, Contracted Sites* **entered into with Massachusetts Behavioral Health Partnership dated November 1, 2015.**

c. *Exhibit A, Contracted Sites* **entered into with Massachusetts Behavioral Health Partnership dated March 1, 2018.**

d. *Exhibit A, Contracted Sites* **entered into with Massachusetts Behavioral Health Partnership dated July 30, 2019.**

e. *Exhibit A, Contracted Sites* **entered into with Massachusetts Behavioral Health Partnership dated May 20, 2019.**

f. *Exhibit A, Contracted Sites* **(Plymouth, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.**

g. *Exhibit A, Contracted Sites* **(Plymouth, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.**

h. *Exhibit A, Contracted Sites* **entered into with Massachusetts Behavioral Health Partnership dated August 15, 2014.**

QB\66061092.8

i. *Exhibit A, Contracted Sites* (Brockton, MA) entered into with Massachusetts Behavioral Health Partnership dated August 15, 2014.

j. *Exhibit A, Contracted Sites* (Brockton, MA) entered into with Massachusetts Behavioral Health Partnership dated August 15, 2014.

k. *Exhibit A, Contracted Sites* (Brockton, MA) entered into with Massachusetts Behavioral Health Partnership dated August 15, 2014.

l. *Exhibit A, Contracted Sites* (Brockton, MA) entered into with Massachusetts Behavioral Health Partnership dated August 15, 2014.

m. *Exhibit A, Contracted Sites* (Dorchester, MA) entered into with Massachusetts Behavioral Health Partnership dated October 15, 2014.

n. *Exhibit A, Contracted Sites* (Dorchester, MA) entered into with Massachusetts Behavioral Health Partnership dated December 15, 2014.

o. *Exhibit A, Contracted Sites* (Fall River, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

p. *Exhibit A, Contracted Sites* (Lawrence, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

q. *Exhibit A, Contracted Sites* (Leominster, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

r. *Exhibit A, Contracted Sites* (Lowell, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

s. *Exhibit A, Contracted Sites* (Lowell, MA) entered into with Massachusetts Behavioral Health Partnership dated December 5, 2014.

t. *Exhibit A, Contracted Sites* (Lowell, MA) entered into with Massachusetts Behavioral Health Partnership dated December 5, 2014.

u. *Exhibit A, Contracted Sites* (Lynn, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

v. *Exhibit A, Contracted Sites* (Lynn, MA) entered into with Massachusetts Behavioral Health Partnership dated September 8, 2014.

w. *Exhibit A, Contracted Sites* (Malden, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

x. *Exhibit A, Contracted Sites* (Malden, MA) entered into with Massachusetts Behavioral Health Partnership dated September 8, 2014.

y. *Exhibit A, Contracted Sites* (Mashpee, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

z. *Exhibit A, Contracted Sites* (Salem, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

aa. *Exhibit A, Contracted Sites* (Springfield, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2015.

bb. *Exhibit A, Contracted Sites* (Springfield, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2015.

cc. *Exhibit A, Contracted Sites* (Springfield, MA) entered into with Massachusetts Behavioral Health Partnership dated October 24, 2014.

dd. *Exhibit A, Contracted Sites* (Weymouth, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

ee. *Exhibit A, Contracted Sites* (Worcester, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

ff. *Exhibit A, Contracted Sites* entered into with Massachusetts Behavioral Health Partnership dated January 1, 2016.

gg. *Exhibit A, Contracted Sites* entered into with Massachusetts Behavioral Health Partnership dated October 1, 2016.

hh. *Exhibit A, Contracted Sites* entered into with Massachusetts Behavioral Health Partnership dated November 1, 2015.

ii. *Exhibit A, Contracted Sites* entered into with Health New England Be Healthy, Massachusetts Behavioral Health Partnership dated August 1, 2019.

jj. *Exhibit A, Contracted Sites* entered into with Health New England Be Healthy, Massachusetts Behavioral Health Partnership dated May 11, 2016.

kk. *Exhibit A, Contracted Sites* entered into with Massachusetts Behavioral Health Partnership dated November 1, 2015.

ll. *Exhibit A, Contracted Sites* entered into with Massachusetts Behavioral Health Partnership dated March 1, 2018.

mm.    *Exhibit A, Contracted Sites* entered into with Massachusetts Behavioral Health Partnership dated April 1, 2015.

39. *Amendment to the Agreement between Tufts Health Public Plans, Inc. and South Bay Mental Health Center, Inc.* entered into with Tufts Health Public Plans, Inc. dated April 1, 2018.

40. *Amendment to the Agreement between Tufts Health Public Plans, Inc. and South Bay Mental Health Center, Inc.* entered into with Tufts Health Public Plans, Inc. dated April 1, 2017.

41. *Homemaker/Non-Homemaker Services Provider Agreement* entered into with Bristol Elder Services, Inc. dated October 1, 2019.

42. Magellan Healthcare, Inc, Network Provider Agreement by and between Magellan Healthcare, Inc. and South Bay Mental Health Center, Inc., dated November 1, 2020.

43. *Contract Amendment* entered into with the Commonwealth of Massachusetts, Department of Children and Families dated June 30, 2020.

44. Participating Ancillary Provider Agreement by and between Boston Medical Center Health Plan d/b/a BMC Healthnet Plan and South Bay Mental Health, dated, March 19, 2010.

45. *Affiliation/Referral Agreement* entered into with Family Resource Center Taunton/Attleboro dated September 5, 2019.

23

46. *Mental Health Service Agreement* entered into with Mansfield Adult Day Health Center dated January 8, 2019.

47. *Norfolk Advocates for Children Linkage Agreement for Mental Health Referral, Assessment and Treatment* entered into with Norfolk Advocates for Children, dated September 23, 2019.

48. *Purchased Services Agreement* entered into with Baystate Interpreters, Inc. dated April 4, 2019.

49. *Agreement* entered into with Behavioral Concepts, Inc. dated March 19, 2018.

50. *Agreement* entered into with Boston Behavior Learning Centers dated March 4, 2019.

51. *Memorandum of Agreement/Understanding* entered into with Hope Integrative Care dated October 11, 2018.

52. *Memorandum of Understanding* entered into with E.B. Hope, Inc. dated October, 2018.

53. *Service Contract* entered into with Harbor Health Services, Inc. dated February 28, 2018.

54. *Affiliation/Referral Agreement* entered into with Serenity House dated January 30, 2019.

55. *Agreement* entered into with Horace Mann Educational Associates dated January 27, 2012.

56. *Memorandum of Understanding* entered into with Community Day Care of Lawrence, TCG Early Head Start Child Care Partnership dated July 1, 2019.

57. *Affiliation/Referral Agreement* entered into with MSPCC Healthy Families dated August 24, 2018.

58. *Qualified Service Organization Agreement* entered into with Total Wellness Centers, LLC d/b/a CleanSlate Centers dated March 13, 2020.

59. *Memorandum of Understanding* entered into with Frances Drake School dated May 7, 2018.

60. *Affiliation Agreement* entered into with Leominster Dialysis, LLC dated June 17, 2020.

61. *Early Childhood Behavioral Health Intervention Services* entered into with MOC Child Care & Head Start dated August 20, 2019.

62. *Memorandum of Understanding* entered into with Northwest Elementary dated May 4, 2018.

63. *Memorandum of Understanding* entered into with Varnum Brook Elementary School dated May 7, 2018.

64. *Memorandum of Understanding* entered into with Bailey Elementary School dated December 3, 2018.

65. *Affiliation/Referral Agreement* entered into with Lowell General dated October 23, 2018.

QB\66061092.8

66. *Qualified Service Organization/Business Associate Agreement* entered into with Habit Opco dated April 13, 2018.

67. *Memorandum of Understanding* entered into with Pawtucketville Elementary School dated November 21, 2018.

68. *Affiliation/Referral Agreement* entered into with Children's Friend and Family, A division of JRI dated July 20, 2018.

69. *Affiliation/Referral Agreement* entered into with Habit OPCO, Inc. dated August 27, 2018.

70. *Memorandum of Understanding* entered into with Malden School, Police & Fire Departments, Cambridge Health Alliance, Hallmark Health, Malden's Promise dated October 23, 2018.

71. *Agreement* entered into with the May Institute dated July 1, 2012.

72. *Agreement* entered into with the May Institute dated September 1, 2012.

73. *Qualified Service Organization Agreement* entered into with the Mercy Hospital, Inc. d/b/a Providence Behavioral Health Hospital dated September 1, 2018.

74. *Agreement* entered into with New England Center for Children dated September 8, 2015.

75. *Autism Specialty Services Contract* entered into with Northeast ARC – Building Blocks dated July 1, 2012.

76. *Affiliation Agreement* entered into with Beth Israel Deaconess Hospital dated July 26, 2018.

77. *Memorandum of Understanding* entered into with Nathaniel Morton Elementary School dated August 23, 2019.

78. *Memorandum of Understanding* entered into with Plymouth Community Intermediate School dated August 16, 2018.

79. *Project Outreach Affiliation Agreement* entered into with Plymouth County Outreach Hope, Inc. dated August 8, 2018.

80. *Memorandum of Understanding* entered into with Plymouth South Middle School dated August 23, 2019.

81. *Agreement* entered into with RCS Behavioral and Educational Consulting, LLC dated October 1, 2018.

82. *Affiliation/Referral Agreement* entered into with Right Choice Health Group LLC dated March 16, 2020.

83. *Agreement* entered into with Spectrum Autism Treatment Centers dated October 2, 2014.

84. *Affiliation Agreement* entered into with the Habit OPCO, Inc. dated January 31, 2018.

85. *Memorandum of Understanding* entered into with Worcester Public Schools, McKinney Vento Homeless Assistance dated June 8, 2018.

86. *Affiliation Agreement* entered into with Saint Vincent Hospital dated September

25

19, 2018.

87. *Memorandum of Understanding* **entered into with Greater Lawrence Family Health Center, Inc.**
   a. As amended by the *Memorandum of Understanding – First Amendment* with Greater Lawrence Family Health Center, Inc. dated February 13, 2017.
   b. As further amended by the *Memorandum of Understanding – Second Amendment* with Greater Lawrence Family Health Center, Inc. dated February 13, 2019.

88. *Memorandum of Understanding* **entered into with TCG Early Head Start Child Care Partnership dated August 11, 2020.**

89. **Service Contract by and between South Bay Elderly Intervention and Children Making Strides, dated July 2, 2012.**

90. **Professional Services Agreement by and between South Bay Community Services, Inc. and John Foster, an individual, dated February 19, 2020.**

91. **Professional Services Agreement by and between South Bay Community Services, Inc. and Robert Eckholt, an individual, dated February 25, 2020.**

92. **Professional Services Agreement by and between South Bay Community Services, Inc. and Paul Fulton, an individual, dated February 21, 2020.**

93. **Lease Agreement by and between South Bay Mental Health Center, Inc. and CIT Bank, N.A., dated February 28, 2017.**

94. **Lease Order Agreement by and between Greico Ford and South Bay Mental Health Center, Inc., dated October 10, 2017, as supplemented by the terms and conditions thereto and Master Lease Agreement, dated October 10, 2017.**

95. **Central Reach Renewal Agreement by and between Central Reach and South Bay Mental Health Center, Inc., dated December 9, 2020, as supplemented by the Terms of Service and Business Associate Agreement related thereto.**

96. **Trademark Settlement and Co-Existence Agreement, dated May 12, 2020, by and between South Bay Mental Health Center, Inc. and South Bay Community Services.**

**Cure Costs**

None.

## Schedule 1.1(E)

### Assumed CIS Contracts

1.  Letter of Renewal by and between Credible Behavioral Health and Community Invention Services, dated December 31, 2019.
2.  HIPAA Business Associate Addendum entered into with Credible Wireless, Inc. dated December 31, 2013.
3.  Oracle Netsuite Terms and Conditions and Payment Plan Agreement by and between Community Intervention and Oracle Credit Corporation, dated April 17, 2020.
4.  Master Services Agreement for ADP Vantage HCM Services by and between ADP, LLC and Community Intervention Services, Inc., dated October 22, 2014.
5.  SkillPort
6.  Credible Behavioral Healthcare Software
7.  Zoom Video Communications
8.  Business Associate Agreement entered into with Zoom Video Communications dated September 17, 2018.
9.  ABPathfinder
10. Installation Payment Agreement by and between Community Intervention Services, Inc. and Cisco Systems Capital Corporation, dated April 24, 2020, as amended by that certain Initial Payment Addendum, dated April 24, 2020.
11. G Suite Ordering Document and Consumer Agreement by and between SADA Systems, Inc. and Community Intervention Services, dated August 26, 2020.
12. Google MDM
13. Allworx Voice Over IP
14. Microsoft Windows and Microsoft Office

**Cure Costs**

None.

## Schedule 1.2(J)

### Other Excluded Assets

1. CIS's membership in the temporary multiple employer welfare arrangement as further described on Schedule 5.1(I)(ii) of this Disclosure Schedule.
2. Engagement Letter by and between Duff & Phelps Securities, LLC and Community Intervention Services, Inc., dated December 22, 2020 (the "**Duff & Phelps Engagement Letter**").

QB\66061092.8

## Schedule 1.3(B)

## Other Assumed Obligations

None.

## Schedule 1.4(P)

## Other Excluded Liabilities

1. Any liability associated with CIS's membership in the temporary multiple employer welfare arrangement as further described on Schedule 5.1(I)(ii) of this Disclosure Schedule.

2. Any liability associated with the Duff & Phelps Engagement Letter.

## Schedule 2.1

### Purchase Price Adjustments and Allocations

Purchase Price                      $32,000,000

QB\66061092.8

## Schedule 2.2

### Escrow Provisions

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement"), dated as of December __, 2020, by and among SB TRANSITIONAL SUB, LLC, a Delaware limited liability company (**"Purchaser"**), and SOUTH BAY MENTAL HEALTH CENTER, INC., a Massachusetts corporation (**"Seller"**), and **CASNER & EDWARDS, LLP** (**"Escrow Agent"** or **"Escrowee"**).

### W I T N E S E T H:

WHEREAS, Purchaser and Seller entered into that certain Asset Purchase Agreement dated as of December __, 2020  (collectively, the "**Purchase Agreement**");

WHEREAS, Seller intends to file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Massachusetts (the "**Bankruptcy Court**"), and intends, in such case, to seek approval of the Purchase Agreement and the transactions provided for therein;

WHEREAS, all capitalized terms herein shall have the same meaning ascribed to them in the Purchase Agreement, unless otherwise specified herein; and

WHEREAS, Purchaser and Seller have agreed that Escrow Agent shall serve as Escrow Agent for purposes of holding and disbursing the Earnest Money (as defined below) as contemplated under the Purchase Agreement and in accordance with the terms and conditions hereof.

NOW, THEREFORE, for and in consideration of the foregoing, the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    Purchaser and Seller do hereby appoint Escrow Agent to be and act as escrow agent, and Escrow Agent hereby accepts its appointment to hold in an escrow account the Earnest Money upon the terms and conditions as set forth in this Agreement.

2.    Pursuant to the terms of the Purchase Agreement, on the date hereof, Purchaser delivered to Escrow Agent an earnest money deposit in the amount of $1,600,000 (the "Earnest Money").

32

3.      Escrow Agent shall deposit the Earnest Money in a non-interest bearing bank account.  The Escrow Agent shall not be responsible for any bank charges or bank service fees, or for any loss, diminution in value or failure to achieve a greater profit as a result of such investment or bank charges or bank service fees.  Also, the Escrow Agent assumes no responsibility for, nor shall said Escrow Agent be held liable for, any loss occurring which arises from the fact that the amount of the Earnest Money may cause the aggregate amount of any depositor's accounts to exceed $250,000 and that the excess amount is not insured by the Federal Deposit Insurance Corporation.

4.      Escrow Agent shall hold the Earnest Money with the same degree of care as it gives to its own similar property and shall only deliver the Earnest Money (or a portion thereof) to Seller or Purchaser, as the case may be, as follows:

a)      to Seller, concurrent with the Closing under the Purchase Agreement; or

b)      to Seller or Purchaser, as designated by an instruction letter jointly executed by both Seller and Purchaser or upon order of the Bankruptcy Court.

5.      a)      Purchaser and Seller, jointly and severally, hereby agree to indemnify the Escrow Agent and hold it harmless from any and all claims, liabilities, losses, actions, suits or proceedings at law or in equity, or any other expense, fees or charges of any character or nature, which it may incur or with which it may be threatened by reason of its acting as Escrow Agent under this Agreement, including, without limitation, reasonable documented and out-of-pocket attorneys' fees and costs of defending any actions, suit or proceeding or resisting any claim, except any of the foregoing resulting from the Escrow Agent's gross negligence, willful misconduct or breach of this Agreement.

b)      If the parties hereto shall be in disagreement about the interpretation of this Agreement, or about their rights and obligations hereunder, or the propriety of any action contemplated by the Escrow Agent hereunder, any party hereto, including the Escrow Agent if the Escrow Agent has received conflicting instructions from Purchaser and Seller, may, at its discretion, seek an order of the Bankruptcy Court to resolve such disagreement. To the extent provided herein above, the Escrow Agent shall be indemnified, jointly and severally, by Purchaser and Seller for all costs, including reasonable documented and out-of-pocket attorneys' fees, in connection with any such action, and shall be fully protected in suspending all or a part of its activities under this Agreement until a final judgment, order or decree in the action is received.

c)      Other than this Agreement, Escrow Agent shall not be bound by any other agreement whether or not it has knowledge of the existence thereof or of its terms and conditions, and is required only to hold the Earnest Money and to make payment or other disposition thereof in accordance with the terms of this Agreement.

d)     Escrow Agent shall not be liable for any mistakes of fact, or errors of judgment, or for any acts or omission of any kind unless caused by the willful misconduct or gross negligence of Escrow Agent.

e)     Escrow Agent may resign upon ten (10) days' written notice to the parties to their addresses set forth herein. If a successor escrow agent is not appointed within a fourteen (14) day period following such resignation, Escrow Agent may petition a court of competent jurisdiction to name a successor. The costs of such action shall be paid by Seller, on the one hand, and Purchaser, on other hand, on an equal basis.

f)     Purchaser and Seller acknowledge that Escrow Agent has served as attorney for Seller (its "Client") in this transaction, and as an accommodation to that Client has agreed to perform the duties as Escrow Agent set forth herein. The party who is not the Client agrees that nothing herein shall in any manner limit Escrow Agent in continuing to represent its Client in all matters relating to the Agreement, including without limitation the commencement and prosecution of litigation on behalf of its Client against such party.

6.     Any notice, communication or demand required or permitted to be given under this Agreement shall be in writing (including facsimile and email communications) and shall be sent to the applicable party at the following addresses:

To Purchaser, by addressing the same to:

SB Transitional Sub, LLC
c/o National Mentor Holdings, LLC
Attention: Nate Lewis, VP, Mergers and Acquisitions;
Gina Martin, Chief Legal Officer
313 Congress Street, 5th Floor
Boston, MA 02210
Email: Nate.Lewis@TheMentorNetwork.com;
Gina.Martin@TheMentorNetwork.com

With a copy to (which shall not constitute notice):

Quarles & Brady LLP
Attention: Ryan P. Haas
411 E. Wisconsin Avenue, Suite 2400
Milwaukee, WI 53202
E-mail: ryan.haas@quarles.com

To Seller, by addressing the same to:

34

South Bay Mental Health Center, Inc.
c/o Community Intervention Services
Attention:  Andrew R. Calkins, CEO
200 Friberg Parkway, Suite 2000
Westborough, MA 01581
E-mail:  acalkins@communityinterventionservices.com

With a copy to (which shall not constitute notice):

Casner & Edwards, LLP
303 Congress Street, #201
Boston, MA 02210
Attention:  Michael J. Goldberg
Facsimile No. 617-426-8810
Email: goldberg@casneredwards.com

To Escrow Agent, by addressing the same to:

Casner & Edwards, LLP
303 Congress Street, #201
Boston, MA 02210
Attention:  Michael J. Goldberg
Facsimile No. 617-426-8810
Email: goldberg@casneredwards.com

7.      This Agreement may not be amended or modified except by an instrument in writing signed by, or on behalf of, Seller, Purchaser and Escrow Agent.

8.      This Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware without regard to its principles of conflicts of law.

9.      This Agreement may be executed in several counterparts, as long as each party to this Agreement executes at least one such counterpart.  Each of such counterparts shall be an original but all of the counterparts, when taken together, shall constitute one and the same instrument and shall become effective when each party hereto has executed at least one such counterpart.  The parties hereto agree that a signature transmitted by facsimile or email in portable document format (.pdf) shall constitute an original signature hereunder.

10.     Purchaser and Seller hereby agree to execute and deliver joint written instructions to Escrow Agent to effect any release that Purchaser and Seller, acting in good faith, believe in their respective reasonable discretion is required by the Purchase

Agreement. In the event of a conflict between the provisions of this Agreement and the provisions of the Purchase Agreement, the Purchase Agreement shall govern.

11.    Time is of the essence with respect to all time periods in this Agreement.

[signatures begin on next page]

IN WITNESS WHEREOF, the parties hereby have caused this Agreement to be executed by their duly authorized officers on the day and year first above written.

PURCHASER:

**SB TRANSITIONAL SUB, LLC,**
a Delaware limited liability company


By: _____
Name:
Title:

SELLER:

**SOUTH BAY MENTAL HEALTH CENTER, INC.,**
a Massachusetts corporation


By: _____
Name: Toby Shea
Title: Chief Restructuring Officer


ESCROW AGENT:

**CASNER & EDWARDS, LLP**

By:_____
Name:  Michael J. Goldberg
Title: Partner

36

## Schedule 3.1

## BILL OF SALE

THIS BILL OF SALE (this "Bill of Sale") is entered into and effective as of [●], 2021 by South Bay Mental Health Center, Inc., a Massachusetts corporation ("South Bay"), and Community Intervention Services, Inc., a Delaware corporation ("CIS"; South Bay and CIS are, singly and jointly as the context requires, referred to herein as "Seller").

## RECITALS

WHEREAS, Seller and SB Transitional Sub, LLC, a Delaware limited liability company ("Purchaser"), have entered into an Asset Purchase Agreement, dated [●], 2020 (the "Purchase Agreement");

WHEREAS, the execution and delivery of this Bill of Sale is contemplated by Section 3.1 of the Purchase Agreement; and

WHEREAS, capitalized terms used herein and not otherwise defined herein have the meanings given to such terms in the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Purchase Agreement, Seller, intending to be legally bound, hereby agrees as follows:

1.    Sale of Personal Property.  For true and lawful consideration paid to it by Purchaser, Seller hereby sells, conveys, transfers, assigns and delivers to Purchaser all right, title and interest in and to the Personal Property, free and clear of all Liens, in accordance with the Purchase Agreement.

2.    Further Assurances.  Seller shall take, or cause to be taken, such actions, or execute and deliver, or cause to be executed and delivered, to Purchaser such other agreements or instruments, in each case as Purchaser may reasonably request, as reasonably necessary to more effectively consummate, confirm or evidence the sale, conveyance, transfer, assignment and delivery to Purchaser of the Personal Property as contemplated under the Purchase Agreement.

3.    Conflict with the Purchase Agreement.  In the event of a conflict or inconsistency between the terms and conditions of this Bill of Sale and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.  Notwithstanding anything to the contrary in this Bill of Sale, nothing herein is intended to, nor shall it, extend, amplify, or otherwise alter the representations, warranties, covenants and obligations of the parties contained in the Purchase Agreement or the survival thereof.

37

4.      <u>Enforceability</u>.  If any provision of this Bill of Sale or the application of any such provision to any Person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not impede any other provision hereof.

5.      <u>Governing Law</u>.  This Bill of Sale shall be governed by and construed in accordance with the internal Laws of the State of Delaware, without regard to the Laws of any other jurisdiction that might be applied because of the conflicts of Laws principles of the State of Delaware.

6.      <u>No Third Party Beneficiaries</u>.  This Bill of Sale shall be binding upon and inure solely to the benefit of Seller and Purchaser and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Bill of Sale.

*[Remainder of page intentionally left blank; signature page follows]*

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be duly executed as of the day and year first above written.

**SELLER:**

SOUTH BAY MENTAL HEALTH CENTER, INC.

By: _____
Name:
Its:

COMMUNITY INTERVENTION SERVICES, INC.

By: _____
Name:
Its:

## Schedule 3.2

### ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment and Assumption Agreement") is made and entered into as of [●], 2021, by and among SB Transitional Sub, LLC, a Delaware limited liability company ("Purchaser"), South Bay Mental Health Center, Inc. a Massachusetts corporation ("South Bay"), and Community Intervention Services, Inc., a Delaware corporation ("CIS"; South Bay and CIS are, singly and jointly as the context requires, referred to herein as "Seller").

RECITALS:

WHEREAS, Seller and Purchaser have entered into an Asset Purchase Agreement, dated [●], 2020 (the "Purchase Agreement");

WHEREAS, the execution and delivery of this Assignment and Assumption Agreement is contemplated by Section 3.2 of the Purchase Agreement; and

WHEREAS, capitalized terms used herein and not otherwise defined herein have the meanings given to such terms in the Purchase Agreement.

NOW, THEREFORE, in consideration of the Recitals and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser, intending to be legally bound, agree as follows:

1. <u>Assignment</u>. Seller does hereby sell, transfer, assign, convey and deliver to Purchaser all of Seller's legal, beneficial and other right, title and interest in and to the Assumed Leases and Assumed Contracts (collectively, the "Assignment").

2. <u>Assumption</u>. Purchaser hereby confirms and accepts the Assignment and agrees to timely pay, discharge and otherwise perform when due the related Assumed Obligations in accordance with the terms of the Purchase Agreement. Purchaser does not assume, and shall have no responsibility for, or any liability with respect to, any of the Excluded Liabilities.

3. <u>Conflict with the Purchase Agreement</u>. In the event of a conflict or inconsistency between the terms and conditions of this Assignment and Assumption Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail. Notwithstanding anything to the contrary in this Assignment and Assumption Agreement, nothing herein is intended to, nor shall it, extend, amplify, or otherwise alter the representations, warranties, covenants and obligations of the parties contained in the Purchase Agreement or the survival thereof.

4. <u>Further Assurances</u>. The parties hereto shall execute and deliver all such other and further documents and perform all further acts that may be reasonably necessary or

appropriate to effectuate the terms and provisions of this Assignment and Assumption Agreement.

5.      <u>Governing Law</u>. This Assignment and Assumption Agreement shall be governed by and construed in accordance with the internal Laws of the State of Delaware, without regard to the Laws of any other jurisdiction that might be applied because of the conflicts of Laws principles of the State of Delaware.

6.      <u>Headings</u>.  The headings used in this Assignment and Assumption Agreement are for purposes of convenience only and shall not be used in construing the provisions hereof.

7.      <u>No Third Party Beneficiaries</u>.  This Assignment and Assumption Agreement shall be binding upon and inure solely to the benefit of Seller and Purchaser and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Assignment and Assumption Agreement.

8.      <u>Counterparts; Facsimile Signature</u>.  This Assignment and Assumption Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one agreement, and the signature of any party to any counterpart shall be deemed to be a signature to, and may be appended to, any other counterpart.  Facsimile, telecopied, portable document format (PDF) or electronic signatures may be relied upon as originals.

*[Remainder of page intentionally left blank; signature page follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Assumption Agreement to be executed by their duly authorized representatives as of the day and year first written above.

**SELLER:**

SOUTH BAY MENTAL HEALTH CENTER, INC.

By: _____

Name:

Its:

COMMUNITY INTERVENTION SERVICES, INC.

By: _____

Name:

**PURCHASER:**

SB TRANSITIONAL SUB, LLC

By: _____

Name:

Its:

## Schedule 4.2

## Required Governmental Consents

### Contracts

a. *State of Connecticut Purchase of Service Contract* entered into with the State of Connecticut, Office of Early Childhood dated July 1, 2020.

b. *Contract* entered into with the Commonwealth of Massachusetts, Department of Public Health dated July 1, 2020.

c. *Agreement between the Commonwealth of MA Plymouth County Sheriff's Department and South Bay Mental Health* entered into with the Commonwealth of Massachusetts, Plymouth County Sheriff's Department dated October 1, 2019.[12]

d. *Amendment to Master Service Agreement to Provide Ambulatory Services* entered into with the Commonwealth of Massachusetts dated July 1, 2020.

e. *Contract Amendment* entered into with the State of Connecticut, Office of Early Childhood dated May 28, 2020.

f. *Contract Amendment* entered into with the Commonwealth of Massachusetts, Department of Children and Families dated July 1, 2019.

g. *Contract Amendment* entered into with the Commonwealth of Massachusetts, Department of Public Health dated July 1, 2020.

h. *Contract Amendment* entered into with the Commonwealth of Massachusetts, Department of Children and Families dated July 1, 2020.

i. *Contract Amendment* entered into with the Commonwealth of Massachusetts, Department of Children and Families dated June 30, 2020.

j. Contract Amendment entered into with the Commonwealth of Massachusetts, Department of Public Health dated July 1, 2015.

### Permits

a. Submit Notice of Intent to the Massachusetts Department of Public Health (DPH), Bureau of Substance Addition Services (BSAS) ninety (90) days prior to the Closing Date.

b. Submit Notice of Material Change filed with the Massachusetts Health Policy Commission filed sixty (60) days prior to the Closing Date.

---

[12] Renewal in process

c.  Submit a Notice of Intent to Acquire a Clinic to the Massachusetts Department of Public Health, Division of Health Care Facility Licensure and Certification thirty (30) days prior to the Closing Date.

d.  Submit a notice to transfer the Early Intervention Certificates.

e.  Sixty (60) days prior to the Closing Date, submit notification of change of ownership to MassHealth.

f.  Sixty (60) days prior to the Closing Date submit Medicare Form 855B Medicare Enrollment Application - Clinics/Group Practices and Certain Other Suppliers.

g.  Sixty (60) days prior to the Closing Date, submit required 855R Medicare Enrollment Applications for Reassignment of Medicare Benefits.

h.  Thirty (30) days prior to the Closing Date, submit MassHealth Provider Enrollment Application.

i.  Thirty (30) days prior to the Closing Date, submit notice to the Massachusetts Department of Public Health Clinical Lab Program for the transfer of ownership of Clinical Laboratory Improvement Amendment (CLIA) Certificates of Waiver.

## Schedule 5.1(B)(iii)

## Required Consents or Filings

### Government Contracts

    a.  *State of Connecticut Purchase of Service Contract* entered into with the State of Connecticut, Office of Early Childhood dated July 1, 2020.

    b.  *Contract* entered into with the Commonwealth of Massachusetts, Department of Public Health dated July 1, 2020.

    c.  *Agreement between the Commonwealth of MA Plymouth County Sheriff's Department and South Bay Mental Health* entered into with the Commonwealth of Massachusetts, Plymouth County Sheriff's Department dated October 1, 2019.[13]

    d.  *Amendment to Master Service Agreement to Provide Ambulatory Services* entered into with the Commonwealth of Massachusetts dated July 1, 2020.

    e.  *Contract Amendment* entered into with the Commonwealth of Massachusetts, Department of Children and Families dated July 1, 2019.

    f.  *Contract Amendment* entered into with the Commonwealth of Massachusetts, Department of Public Health dated July 1, 2020.

    g.  *Contract Amendment* entered into with the Commonwealth of Massachusetts, Department of Children and Families dated July 1, 2020.

    h.  *Contract Amendment* entered into with the Commonwealth of Massachusetts, Department of Children and Families dated June 30, 2020.

    i.  *Contract Amendment* entered into with the Commonwealth of Massachusetts, Department of Public Health dated July 1, 2015.

### Payor/Operating Contracts

1. **Community Mental Health Center Provider Services Agreement, entered into with Blue Cross Blue Shield of Massachusetts HMO Blue Inc; Blue Cross and Blue Shield of Massachusetts, Inc. dated August 1, 2009.**

    a.  As amended by the *First Amendment to the Community Mental Health Center Provider Services Agreement* with Blue Cross Blue Shield of Massachusetts HMO Blue, Inc. dated January 14, 2013;

    b.  As further amended by the *Second Amendment to the Community Mental Health Center Provider Services Agreement* with Blue Cross and Blue Shield of Massachusetts of HMO Blue, Inc. dated June 9, 2014;

---

[13] Renewal in process.

    c.  As further amended by the *Third Amendment to the Community Mental Health Center Provider Services Agreement* with Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. dated March 23, 2015;

    d.  As further amended by the *Fourth Amendment to the Community Mental Health Center Provider Services Agreement* with Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. dated February 9, 2016.

**2.** ***Provider Services Agreement,* entered into with Beacon Health Strategies, LLC dated October 27, 1999.**

    a.  As amended by the *Amendment to Agreement Between South Bay Mental Health-Brockton and Beacon Health Strategies, LLC* with Beacon Health Strategies, LLC dated January 1, 2001;

    b.  As further amended by the *Amendment to Agreement Between Provider and Beacon Health Strategies, LLC* with Beacon Health Strategies, LLC dated July 1, 2010;

    c.  As further amended by the *Amendment to Agreement Between Beacon Health Strategies, LLC and South Bay Mental Health* with Beacon Health Strategies, LLC dated June 27, 2012;

    d.  As further amended by the *Amendment to Agreement Between Beacon Health Strategies, LLC & South Bay Mental Health* with Beacon Health Strategies, LLC dated July 18, 2012;

    e.  As further amended by the *2nd Amendment to Agreement Between Beacon Health Strategies, LLC and South Bay Mental Health* with Beacon Health Strategies, LLC dated April 1, 2014;

    f.  As further amended by the *1st Amendment to Agreement between Beacon Health Strategies, LLC & South Bay Mental Health* with Beacon Health Strategies, LLC dated August 25, 2014;

    g.  As further amended by the *Amendment to Agreement between Beacon Health Strategies, LLC & South Bay Mental Health* with Beacon Health Strategies, LLC dated October 1, 2015;

    h.  As further amended by the *Amendment to Agreement Between Beacon Health Strategies, LLC & South Bay Mental Health with Beacon Health Strategies, LLC* dated March 1, 2016.

    i.  As further amended by the *Amendment to Agreement Between Beacon Health Strategies, LLC & South Bay Mental Health* with Beacon Health Strategies, LLC dated January 1, 2016;

    j.  As further amended by the *Provider Network Amendment to Adjust Rates* with Beacon Health Strategies, LLC dated May 1, 2017;

    k.  As further amended by the *6th Amendment to Agreement Between Beacon Health Strategies, LLC & South Bay Mental Health* with Beacon Health Strategies, LLC dated June 1, 2017;

l.   As further amended by the *Amendment to Agreement Between Beacon Health Strategies, LLC and Provider* with Beacon Health Strategies, LLC dated March 1, 2018;

m.   As further amended by the *Provider Network Amendment to Adjust Rates* with Beacon Health Strategies, LLC dated March 1, 2018;

n.   As further amended by the *Provider Network Amendment to Adjust Rates* with Beacon Health Strategies, LLC dated March 1, 2018;

o.   As further amended by the 2*019 Beacon Health Strategies Provider Service Agreement Amendment* with Beacon Health Strategies, LLC dated April 1, 2019;

p.   As further amended by the *Provider Network Amendment* with Beacon Health Strategies, LLC dated July 1, 2019.

q.   As further amended by the *Rate Letter Increase with Beacon Health Strategies, LLC* dated June 1, 2020.

3.   ***Commercial Products Participating Ancillary Provider Agreement*** **with Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated January 1, 2012.**

4.   ***Contract***, **entered into with Beacon ABA Services, Inc. dated June 27, 2012.**

a.   As amended by the *Amendment to Agreement for Autism Specialty Services* with Beacon ABA Services dated September 13, 2016.

5.   ***Participating Behavioral Health Provider Agreement*** **entered into with Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated December 28, 1998.**

6.   ***Participating Facility Agreement*** **entered into with Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated May 5, 2008.**

a.   As amended by the *Amendment to Agreement Between Participating Provider and Boston Medical Center Health Plan, Inc.* with Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated July 1, 2008;

b.   As further amended by the *Second Amendment to Agreement Between Participating Provider and Boston Medical Center Health Plan, Inc.* with Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated October 22, 2009;

c.   As further amended by the *Amendment to Agreement Between Participating Provider and Boston Medical Center Health Plan, Inc.* with Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated January 1, 2013.

7.   ***Agreement Between South Bay Community Services, Early Intervention and Children's Center for Communication, Beverly School for the Deaf*** **entered into with Children's Center for Communication, Beverly School for the Deaf dated January 30, 2018.**

8.   ***Homemaker/Personal Care/Non-Homemakers Services Provider Agreement*** **entered into with Coastline Elderly Services, Inc., the Aging Services Access Point dated**

October 1, 2018.

9. *Provider Agreement (ICO)* **entered into with Commonwealth Care Alliance, Inc. dated August 1, 2013.**

    a.  As amended by the *Addendum to the Agreement by and between Commonwealth Care Alliance, Inc. and South Bay Mental Health Center, Inc.* with Commonwealth Care Alliance, Inc. dated October 1, 2013.

10. *SCO Provider Agreement* **entered into with Commonwealth Care Alliance, Inc. dated December 1, 2013.**

11. *Health Service Agreement Between Fallon Community Health Plan, Inc. and South Bay Mental Health Center, Inc. d/b/a South Bay Community Services* **entered into with Fallon Community Health Plan, Inc. dated December 18, 2017.**

12. *Harvard Pilgrim Health Care of Connecticut, Inc. Participating Provider Agreement* **entered into with Harvard Pilgrim Health Care of Connecticut, Inc. dated June 1, 2019.**

13. *Homemaker/Personal Care/Non-Homemakers Services Provider Agreement* **entered into with HESSCO Elder Services, Inc., the Aging Services Access Point dated October 1, 2018.**

14. *Facility Participation Agreement* **entered into with Health New England Be Healthy, Massachusetts Behavioral Health Partnership dated March 1, 2018.**

15. *Facility Participation Agreement* **entered into with Massachusetts Behavioral Health Partnership dated March 1, 2018.**

16. *Participation Agreement (Inpatient/Outpatient Facility)* **entered into with Health New England Be Healthy, Massachusetts Behavioral Health Partnership dated May 1, 2017.**

17. *MPI Participating Professional Group Agreement* **entered into with MultiPlan, Inc. dated September 1, 2016.**

18. *United Behavioral Health Facility Participation Agreement* **entered into with United Behavioral Health dated April 21, 2008.**

    a.  As amended by the *Amendment to United Behavioral Health Provider Participation Agreement for VA Community Care Program* with United Behavioral Health, operating as Optum, dated June 26, 2019.

19. *United Behavioral Health Group Participating Provider Agreement* **entered into with United Behavioral Health dated October 7, 2013.**

    **a.**  As amended by #1 Amendment to the United Behavioral Health, Inc. Group Participation Agreement with United Behavioral Health dated October 1, 2019.

20. *Homemaker/Personal Care/Non-Homemakers Services Provider Agreement* **entered into with South Shore Elder Services, Inc., the Aging Services Access Point dated October 1, 2018.**

21. *Homemaker/Personal Care/Non-Homemakers Services Provider Agreement* **entered into with Tri-Valley, Inc., the Aging Services Access Point dated October 1, 2019.**

    a.  As amended by *Contract Amendment #001*, dated October 13.2020.

22. *Consulting Agreement* **entered into with the University of Connecticut dated December 18, 2019.**

23. *Purchased Services Agreement* **entered into with Baystate Interpreters, Inc. dated April 4, 2019.**

24. *Agreement* **entered into with Behavioral Concepts, Inc. dated March 19, 2018.**

25. *Agreement* **entered into with Boston Behavior Learning Centers dated March 4, 2019.**

26. *Homemaker/Non-Homemaker Services Provider Agreement* **entered into with Bristol Elder Services, Inc. dated October 1, 2019.**

27. *Service Contract* **entered into with Harbor Health Services, Inc. dated February 28, 2018.**

28. *Agreement* **entered into with Horace Mann Educational Associates dated January 27, 2012.**

29. *Agreement* **entered into with the May Institute dated July 1, 2012.**

30. *Agreement* **entered into with the May Institute dated September 1, 2012.**

31. *Agreement* **entered into with New England Center for Children dated September 8, 2015.**

32. *Autism Specialty Services Contract* **entered into with Northeast ARC – Building Blocks dated July 1, 2012.**

33. *Agreement* **entered into with RCS Behavioral and Educational Consulting, LLC dated October 1, 2018.**

34. *Agreement* **entered into with Spectrum Autism Treatment Centers dated October 2, 2014.**

35. *Homemaker/Personal Care/Non-Homemaker Services Provider Agreement* **by and between Montachusett Home Care Corporation the Aging Services Access Point and South Bay Mental Health, dated October 1, 2018.**

36. *Allied Health Services Provider Agreement* **entered into with Tufts Associated Health Maintenance Organization Inc., Total Health Plan, Inc. dated February 10, 2011.**

    a.  As amended by the *HMO Products Amended Exhibit A-1 Financial Agreement* with Tufts Associated Health Maintenance Organization, Inc., Total Health Plan, Inc. dated January 1, 2017;

    b.  As further amended by the *Financial Agreement (2019 Amendment Notification to Allied Health Services Provider Agreement)* with Tufts Associated Health Plans, Inc. dated July 1, 2019.

37. **Participating Ancillary Provider Agreement by and between Boston Medical Center Health Plan d/b/a BMC Healthnet Plan and South Bay Mental Health, dated, March 19, 2010.**

38. **Magellan Healthcare, Inc, Network Provider Agreement by and between Magellan Healthcare, Inc. and South Bay Mental Health Center, Inc., dated November 1,**

2020.

39. **Service Contract by and between South Bay Elderly Intervention and Children Making Strides, dated July 2, 2012.**

40. **Lease Agreement by and between South Bay Mental Health Center, Inc. and CIT Bank, N.A., dated February 28, 2017.**

41. **Central Reach Renewal Agreement by and between Central Reach and South Bay Mental Health Center, Inc., dated December 9, 2020, as supplemented by the Terms of Service and Business Associate Agreement related thereto.**

42. **Lease Order Agreement by and between Greico Ford and South Bay Mental Health Center, Inc., dated October 10, 2017, as supplemented by the terms and conditions thereto and Master Lease Agreement, dated October 10, 2017.**

43. **Massachusetts Behavioral Health Partnership Provider Agreement by and between Massachusetts Behavioral Health Partnership and South Bay Mental Health Center, Inc., dated June 1, 1997.**

   a. *Exhibit A, Contracted Sites* **entered into with Health New England Be Healthy, Massachusetts Behavioral Health Partnership dated January 1, 2016.**

   b. *Exhibit A, Contracted Sites* **entered into with Massachusetts Behavioral Health Partnership dated November 1, 2015.**

   c. *Exhibit A, Contracted Sites* **entered into with Massachusetts Behavioral Health Partnership dated March 1, 2018.**

   d. *Exhibit A, Contracted Sites* **entered into with Massachusetts Behavioral Health Partnership dated July 30, 2019.**

   e. *Exhibit A, Contracted Sites* **entered into with Massachusetts Behavioral Health Partnership dated May 20, 2019.**

   f. *Exhibit A, Contracted Sites* **(Plymouth, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.**

   g. *Exhibit A, Contracted Sites* **(Plymouth, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.**

   h. *Exhibit A, Contracted Sites* **entered into with Massachusetts Behavioral Health Partnership dated August 15, 2014.**

   i. *Exhibit A, Contracted Sites* **(Brockton, MA) entered into with Massachusetts Behavioral Health Partnership dated August 15, 2014.**

   j. *Exhibit A, Contracted Sites* **(Brockton, MA) entered into with Massachusetts Behavioral Health Partnership dated August 15, 2014.**

   k. *Exhibit A, Contracted Sites* **(Brockton, MA) entered into with Massachusetts Behavioral Health Partnership dated August 15, 2014.**

   l. *Exhibit A, Contracted Sites* **(Brockton, MA) entered into with Massachusetts Behavioral Health Partnership dated August 15, 2014.**

   m. *Exhibit A, Contracted Sites* **(Dorchester, MA) entered into with Massachusetts**

Behavioral Health Partnership dated October 15, 2014.

n. *Exhibit A, Contracted Sites* (Dorchester, MA) entered into with Massachusetts Behavioral Health Partnership dated December 15, 2014.

o. *Exhibit A, Contracted Sites* (Fall River, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

p. *Exhibit A, Contracted Sites* (Lawrence, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

q. *Exhibit A, Contracted Sites* (Leominster, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

r. *Exhibit A, Contracted Sites* (Lowell, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

s. *Exhibit A, Contracted Sites* (Lowell, MA) entered into with Massachusetts Behavioral Health Partnership dated December 5, 2014.

t. *Exhibit A, Contracted Sites* (Lowell, MA) entered into with Massachusetts Behavioral Health Partnership dated December 5, 2014.

u. *Exhibit A, Contracted Sites* (Lynn, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

v. *Exhibit A, Contracted Sites* (Lynn, MA) entered into with Massachusetts Behavioral Health Partnership dated September 8, 2014.

w. *Exhibit A, Contracted Sites* (Malden, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

x. *Exhibit A, Contracted Sites* (Malden, MA) entered into with Massachusetts Behavioral Health Partnership dated September 8, 2014.

y. *Exhibit A, Contracted Sites* (Mashpee, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

z. *Exhibit A, Contracted Sites* (Salem, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

aa. *Exhibit A, Contracted Sites* (Springfield, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2015.

bb. *Exhibit A, Contracted Sites* (Springfield, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2015.

cc. *Exhibit A, Contracted Sites* (Springfield, MA) entered into with Massachusetts Behavioral Health Partnership dated October 24, 2014.

dd. *Exhibit A, Contracted Sites* (Weymouth, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

ee. *Exhibit A, Contracted Sites* (Worcester, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

ff. *Exhibit A, Contracted Sites* entered into with Massachusetts Behavioral Health Partnership dated January 1, 2016.

gg. *Exhibit A, Contracted Sites* entered into with Massachusetts Behavioral

Health Partnership dated October 1, 2016.

    hh. *Exhibit A, Contracted Sites* **entered into with Massachusetts Behavioral Health Partnership dated November 1, 2015.**

    ii. *Exhibit A, Contracted Sites* **entered into with Health New England Be Healthy, Massachusetts Behavioral Health Partnership dated August 1, 2019.**

    jj. *Exhibit A, Contracted Sites* **entered into with Health New England Be Healthy, Massachusetts Behavioral Health Partnership dated May 11, 2016.**

    kk. *Exhibit A, Contracted Sites* **entered into with Massachusetts Behavioral Health Partnership dated November 1, 2015.**

    ll. *Exhibit A, Contracted Sites* **entered into with Massachusetts Behavioral Health Partnership dated March 1, 2018.**

    mm.   *Exhibit A, Contracted Sites* **entered into with Massachusetts Behavioral Health Partnership dated April 1, 2015.**

44. **Installation Payment Agreement by and between Community Intervention**
45. **Services, Inc. and Cisco Systems Capital Corporation, dated April 24, 2020, as amended by that certain Initial Payment Addendum, dated April 24, 2020.**
46. **G Suite Ordering Document and Consumer Agreement by and between SADA Systems, Inc. and Community Intervention Services, dated August 26, 2020.**

## Leases

1. **607 Pleasant St., Attleboro, MA**
   a. Lease entered into with Legacy Heritage, LLC dated May 13, 2010;
      i. As amended by the First Amendment to Lease dated February 13, 2013;
      ii. As further amended by the Second Amendment to Lease dated April 7, 2015;
      iii. As further amended by the Third Amendment to Lease dated July 31, 2015;
      iv. As further amended by the Fourth Amendment to Lease dated June 4, 2019.

2. **88 Lincoln St., Brockton, MA**
   a. Lease entered into with 88 Lincoln Street Brockton, LLC dated November 27, 2013;
      i. As amended by the First Amendment to Lease dated June 29, 2020.

3. **Unit 2-10 of the Liberty Commerce Center Condominium, 195 Liberty St., Brockton, MA**
   a. Indenture of Lease entered into with Benjamin W. Kravitz, as trustee of Rubber Realty Trust u/d/t dated December 16, 1988, dated April 1, 2013;
      i. As amended by the First Amendment to Indenture of Lease dated April 1, 2018.

4. **1115 West Chestnut St., Brockton, MA**
   a. Lease entered into with West Chestnut Street LLC dated April 12, 2012;
      i. As amended by the First Amendment to Lease dated January 30, 2015;
      ii. As further amended by the Second Amendment to Lease, with Victory Human Services, Inc., successor in interest to West Chestnut Street LLC, dated June 18, 2018;
      iii. As further amended by the Lease Amendment/Extension, with Victory Human Services, Inc., successor in interest to West Chestnut Street LLC, dated May 14, 2019.

5. **70 Everett Avenue, Chelsea, MA**
   a. Lease entered into with 70 Harbour Pointe Park, LLC dated December 16, 2014. Current landlord is NC70E Chelsea LLC pursuant to Quit Claim Deed dated November 20, 2019.

6. **415 Neponset Ave., Dorchester, MA**
   a. Office Lease entered into with Neponset Circle CG Realty Trust dated July 2, 2012;
   b. As amended by the First Amendment to Lease with Neponset Circle Realty, LLC, formerly known as Neponset Circle CG Realty Trust, dated December 14, 2018.

7. **1 Grant Street, Framingham, MA**
   a. 1 Grant Street Lease entered into with Framingham 300 Howard LLC dated September 2, 2015.

8. **360 Merrimack Street, Lawrence, MA**
   a. Lease entered into with Riverwalk Partners LLC, for Building 5, dated February 18, 2015.
   b. Lease entered into with Riverwalk Partners LLC, for Building 9, dated January 14, 2013;
      i. As amended by the Lease Extension with Riverwalk Partners LLC dated September 30, 2019.

9. **80 Erdman Way, Leominster, MA 01453**
   a. Commercial Lease entered into with 80 Erdman Way, LLC dated February 29, 2012;
      i. As amended by the Exhibit D Lease Addendum dated March 5, 2012;
      ii. As further amended by the Lease Extension - Southbay Mental Health Center, Inc. 80 Erdman Way, Leominster MA dated September 27, 2018.

10. **470 Main St., Mashpee, MA**
   a. Lease entered into with Mashpee 130 Shops, Inc., dated October 7, 2011;
      i. As amended by the Lease Addendum: Mashpee 130 Shops, Inc. with Mashpee 130 Shops, Inc. dated July 14, 2015;
      ii. As further amended by the Commercial Lease Extension with Mashpee 130 Shops, Inc. dated June 7, 2016;

      iii.    As further amended by the Lease Addendum with David Dyson & Rebecca Dyson dated August 18, 2020.

11. **140 High St., Springfield, MA**

  a. Lease entered into with South Campus Group LLC dated April 13, 2012;

      i.    As amended by the Amendment to Lease with South Campus Group LLC dated June 24, 2016;

      ii.    As further amended by the Second Amendment to Lease with South Campus Group LLC dated March 9, 2017.

      iii.    Current landlord is South Campus BH Holdings LLC pursuant to letter dated December 12, 2018.

12. **37 Water St., Wakefield, MA**

  a. Commercial Lease Agreement entered into with Water Street Land, LLC dated July 22, 2019.

13. **541 Main St., Weymouth, MA**

  a. Lease entered into with Atlantic-Stetson Realty LLC dated June 10, 2010.

      i.    As amended by the First Amendment to Lease with Atlantic-Stetson Realty LLC dated May 15, 2012;

      ii.    As further amended by the Second Amendment to Lease with HTA-Stetson Medical Center, LLC, as successor for Atlantic-Stetson Realty, LLC, dated May 22, 2017.

14. **540-548 Park Avenue, Worcester, MA**

  a. Lease entered into with 540 Park Avenue, LLC dated August 12, 2011;

      i.    As amended by the Amendment to Lease with 540 Park Avenue, LLC dated September 29, 2011;

      ii.    As further amended by the Lease Extension with 540 Park Avenue, LLC dated April 2018.

## Schedule 5.1(B)(iv)

## Conflict, Contravention, or Breach

None.

**Schedule 5.1(D)**

**Excluded Necessary Assets**

None.

Schedule 5.1(E)

Financial Statements

**Community Intervention Services Holdings, Inc.**
**SouthBay Community Services**
# Balance Sheet
## As of October 31, 2020

| Financial Row | Amount |
|---|---|
| ASSETS | |
| Current Assets | |
| Bank | |
| 10111 - Cash - SBMH 5/3 | $13,538,775.04 |
| **Total Bank** | **$13,538,775.04** |
| Accounts Receivable | |
| 12001 - Accounts Receivable II | $5,202,644.61 |
| 12010 - Accounts Receivable - Charge Lag | ($74,093.41) |
| 13001 - Allowance for Doubtful Accounts | ($1,028,451.17) |
| 13100 - Cash Clearing 1 | $32,767.29 |
| 13102 - Cash Clearing 3 | ($101,901.78) |
| 13200 - Refund Cash Clearing | $27,472.07 |
| 14000 - Non-Consumer AR | $1,920.00 |
| 14004 - Non-Consumer AR V | $5,094.54 |
| **Total Accounts Receivable** | **$4,065,452.15** |
| Other Current Asset | |
| 11501 - Petty Cash 1 | $39.74 |
| **14199 - Prepaid/Other** | |
| 14220 - Prepaid Expense | $13,940.01 |
| 14226 - Prepaid EHR | $20,189.95 |
| **Total - 14199 - Prepaid/Other** | **$34,129.96** |
| 14400 - Current Tax Receivable | ($1,031.59) |
| 14500 - Payroll Clearing | ($1,206.25) |
| **Total Other Current Asset** | **$31,931.86** |
| **Total Current Assets** | **$17,636,159.05** |
| Fixed Assets | |
| 16103 - Fixed Assets - Furniture and Fixtures | $310,704.15 |
| 16104 - Fixed Assets - Equipment | $1,296,606.81 |
| 16105 - Fixed Assets - Leasehold Improvements | $2,504,024.39 |
| 16106 - Fixed Assets - Accumulated Depreciation 1 | ($4,060,003.31) |
| 16117 - Fixed Assets - Software | $22,217.71 |
| 16121 - Fixed Assets - Computer Equipment 1 | $270,530.57 |
| **Total Fixed Assets** | **$344,080.32** |
| Other Assets | |
| **15111 - Inter-Company** | |
| 15111 - Inter-Company | $7,427,790.31 |
| 15100 - Inter-Company 1 | $1,126,695.08 |
| 15101 - Inter-Company 2 | $1,956,013.21 |
| 15102 - Inter-Company 3 | $866,098.58 |
| 15103 - Inter-Company 4 | $23,816.94 |
| 15109 - Inter-Company CIS/SBMH | ($32,095,487.35) |

| | |
|---|---:|
| 15112 - Inter-Company FBR/AERI | $408,167.33 |
| 15114 - Inter-Company SB/Futures | $6,188,205.90 |
| 15117 - Inter-Company SB/FBR | $498,196.93 |
| 15120 - Inter-Company SB/NPS | $936,133.06 |
| 15121 - Inter-Company SB/AFS | $162,053.08 |
| 15122 - Inter-Company SB/AERI | ($202,000.00) |
| **Total - 15111 - Inter-Company** | **($12,704,316.93)** |
| 16300 - Security Deposits | $212,751.80 |
| **17000 - Intangible & Goodwill** | |
| **17004 - Intangibles - Referral Network** | |
| 17004 - Intangibles - Referral Network | $17,000,000.00 |
| 17104 - Accum Amort- Referral Network | ($5,241,666.68) |
| **Total - 17004 - Intangibles - Referral Network** | **$11,758,333.32** |
| **17005 - Intangibles - Trade Name** | |
| 17005 - Intangibles - Trade Name | $6,180,000.00 |
| 17105 - Accum Amort- Trade Name | ($1,905,500.00) |
| **Total - 17005 - Intangibles - Trade Name** | **$4,274,500.00** |
| **Total - 17000 - Intangible & Goodwill** | **$16,032,833.32** |
| **Total Other Assets** | **$3,541,268.19** |
| **Total ASSETS** | **$21,521,507.56** |
| **LIABILITIES & EQUITY** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| 21000 - Accounts Payable | $153,759.40 |
| **Total Accounts Payable** | **$153,759.40** |
| **Other Current Liability** | |
| 21001 - Accrued Expense | $194,237.59 |
| 21204 - Current - Masshealth Lawsuit Settlement | $536,233.41 |
| 21210 - Provider Level Balance (PLB) | $7,814,523.16 |
| 21302 - Current - Deferred Rent | $305,572.52 |
| **21400 - Payroll Accrual** | |
| 21401 - Payroll Accrual 1 | $740.00 |
| 21409 - Payroll Accrual 9 | $910,498.10 |
| 21698 - HSA ER Liability | $8,500.00 |
| 21700 - 401K Retirement Accrual | $26,062.80 |
| 21701 - Vacation Accrual | $882,216.97 |
| 21702 - Bonus Accrual | $48,405.55 |
| 21703 - HSA Accrual | $1,545.04 |
| 21704 - Dental Accrual | ($7,753.18) |
| 21705 - Vision Accrual | ($396.64) |
| 21706 - Short Term Disablity Accrual | ($491.29) |
| 21707 - Long Term Disablity Accrual | $2,473.13 |
| 21708 - Insurance Accrual | $26,910.64 |
| 21723 - Life Insurance Accrual | $5,115.32 |
| 21734 - Holiday Accrual | $185,687.08 |
| 21736 - Sick Accrual | $189,582.49 |
| 21800 - TVA Accrual | $5,724.98 |
| **Total - 21400 - Payroll Accrual** | **$2,284,820.99** |
| **21500 - Payroll Tax Accrual** | |
| 21600 - FICA Accrual 1 | $783,871.77 |
| 21602 - FUTA Accrual 1 | $199.81 |
| 21604 - SUTA Accrual 1 | $32,940.80 |
| **Total - 21500 - Payroll Tax Accrual** | **$817,012.38** |
| **21711 - Current Tax Payable** | |
| 21711 - Current Tax Payable | ($0.03) |
| **Total - 21711 - Current Tax Payable** | **($0.03)** |
| **Total Other Current Liability** | **$11,952,400.02** |

| | |
|---|---|
| **Total Current Liabilities** | **$12,106,159.42** |
| **Long Term Liabilities** | |
| 22015 - Masshealth Lawsuit Settlement | $1,700,875.00 |
| **Total Long Term Liabilities** | **$1,700,875.00** |
| **Equity** | |
| 31000 - Common Stock 1 | $15.95 |
| 32000 - APIC 1 | $837,394.00 |
| Retained Earnings | ($5,105,948.73) |
| Net Income | $11,983,011.92 |
| **Total Equity** | **$7,714,473.14** |
| **Total LIABILITIES & EQUITY** | **$21,521,507.56** |

QB\66061092.8

**Community Intervention Services Holdings, Inc.**
**SouthBay Community Services**
**Income Statement**
**From January 1, 2020 to October 31, 2020**

| | Total YTD 2020 Amount |
|---|---|
| **Revenue** | |
| 41000 - Direct Billable Service 2 | $64,363,596.09 |
| 42000 - Direct Billable Service - Other | $2,145.00 |
| 44000 - Contractual Adjustments - System | ($15,667,178.05) |
| 45000 - Contractual Adjustments - Manual | ($224,027.54) |
| 46000 - Contractual Adjustment- Charge Lag | ($136,299.76) |
| 48000 - Other Revenue | $111,268.78 |
| **Total - Revenue** | **$48,449,504.52** |
| **Total - Revenue** | **$48,449,504.52** |
| **Expense** | |
| **50000 - Direct Expenses** | |
| **51000 - Direct Labor** | |
| 51010 - Direct Care Billable Wages | $20,801,187.02 |
| 51020 - Direct Care Overtime | $159,634.45 |
| 51030 - Direct Care Bonus | $300,491.70 |
| 51031 - Direct Sign-on Bonus | $9,000.00 |
| 51032 - Direct Referral Bonus | $11,000.00 |
| 51040 - Direct Outside Services | $711,902.26 |
| 51070 - Direct MD/Consultant Wages | $1,239,504.45 |
| 51090 - Direct Vacation Accrual | $983,508.52 |
| 51091 - Direct Sick & Holiday | $646,030.96 |
| **Total - 51000 - Direct Labor** | **$24,862,259.36** |
| **52000 - Direct Payroll Taxes** | |
| 52100 - Direct FUTA | $30,192.76 |
| 52200 - Direct SUTA | $385,665.05 |
| 52300 - Direct FICA | $1,748,828.85 |
| **Total - 52000 - Direct Payroll Taxes** | **$2,164,686.66** |
| **53000 - Direct Benefits** | |
| 53100 - Direct Health Insurance | $1,714,150.51 |
| 53200 - Direct Disability Insurance | $75,167.63 |
| 53400 - Direct Life Insurance | $10,300.64 |
| 53500 - Direct 401k ER Match | $0.00 |
| 53502 - Direct HSA ER Expense | $68,125.00 |
| **Total - 53000 - Direct Benefits** | **$1,867,743.78** |
| **55000 - Direct Program Expenses** | |
| 55000 - Direct Program Expenses | $491.94 |
| 55100 - Direct Consumable Supplies | $23,054.05 |
| 55160 - Direct Office Supplies | $1,306.28 |
| 55200 - Direct Clinical Supplies | $1,497.06 |
| 55201 - Direct Shipping | $7.75 |
| 55500 - Direct Training | $19,071.95 |
| 55700 - Direct Credentialing / Certification | $105.69 |
| **Total - 55000 - Direct Program Expenses** | **$45,534.72** |
| **57000 - Direct Travel and Entertainment** | |
| 57230 - Direct Meals - Entertainment | $270.07 |

| | |
|---|---|
| 57240 - Direct Parking & Tolls | $114.00 |
| 57250 - Direct Staff Mileage | $329,976.08 |
| 57260 - Direct Auto Expense | $20.50 |
| **Total - 57000 - Direct Travel and Entertainment** | **$330,380.65** |
| **58000 - Direct All Other** | |
| 58010 - Direct Professional Fees | $1,555.93 |
| 58012 - Direct EE Awards | $7,780.47 |
| **Total - 58000 - Direct All Other** | **$9,336.40** |
| **Total - 50000 - Direct Expenses** | **$29,279,941.57** |
| | |
| **60000 - Indirect Expenses** | |
| **61000 - Indirect Labor** | |
| 61010 - Indirect Wages | $5,915,224.77 |
| 61020 - Indirect Overtime | $4,129.08 |
| 61030 - Indirect Bonus | $7,195.81 |
| 61032 - Indirect Referral Bonus | $500.00 |
| 61040 - Indirect Outside Services | $4,673.60 |
| 61090 - Indirect Vacation Accrual | $551,467.35 |
| 61091 - Indirect Sick & Holiday | $144,386.08 |
| **Total - 61000 - Indirect Labor** | **$6,627,576.69** |
| **62000 - Indirect Payroll Taxes** | |
| 62100 - Indirect FUTA | $6,111.90 |
| 62200 - Indirect SUTA | $88,150.73 |
| 62300 - Indirect FICA | $465,404.74 |
| **Total - 62000 - Indirect Payroll Taxes** | **$559,667.37** |
| **63000 - Indirect Benefits** | |
| 63100 - Indirect Health Insurance | $546,816.90 |
| 63200 - Indirect Disability Insurance | $32,330.54 |
| 63400 - Indirect Life Insurance | $2,693.36 |
| 63500 - Indirect 401k ER Match | $0.00 |
| 63502 - Indirect HSA ER Expense | $18,913.99 |
| **Total - 63000 - Indirect Benefits** | **$600,754.79** |
| **64000 - Indirect Insurance** | |
| 64010 - Indirect General Liability Insurance | $73,710.69 |
| 64200 - Indirect Property Insurance | $25,257.11 |
| 64300 - Indirect Professional Liability | $84,612.41 |
| 64400 - Indirect D&O Insurance | $79,181.24 |
| 64500 - Indirect Worker's Compensation | $255,976.75 |
| 64600 - Indirect Auto Insurance | $14,959.17 |
| 64700 - Indirect Cyber Insurance | $6,397.47 |
| **Total - 64000 - Indirect Insurance** | **$540,094.84** |
| **66000 - Indirect Facilities Cost** | |
| 66100 - Indirect Rent | $2,686,759.06 |
| 66101 - Indirect CAM | $711,663.82 |
| 66110 - Indirect Rent - Equipment | $97,622.76 |
| 66140 - Indirect Trash | $10,284.43 |
| 66150 - Indirect Utilities | $160,427.61 |
| 66160 - Indirect Repairs and Maintenance - Building | $241,253.00 |
| 66170 - Indirect Repairs and Maintenance - IT | $175.00 |
| 66180 - Indirect Repairs and Maintenance - Equip | $5,413.22 |
| 66190 - Indirect Telecommunication Voice/Data | $414,244.65 |
| 66191 - Indirect Telecommunication Data | $4,234.09 |
| 66192 - Indirect Computer Hardware | $2,894.17 |
| 66193 - Indirect Computer Software | $220,929.41 |
| 66200 - Indirect Property Tax | $111,511.51 |
| 66210 - Indirect Security | $972.00 |
| 66220 - Indirect Landscaping | $1,935.00 |

| | |
|---|---:|
| **Total - 66000 - Indirect Facilities Cost** | **$4,670,319.73** |
| **67000 - Indirect Travel and Entertainment** | |
| 67220 - Indirect Airfare | ($296.80) |
| 67221 - Indirect Lodging | $688.08 |
| 67230 - Indirect Meals - Entertainment | $6,161.79 |
| 67231 - Indirect Meals - Business | $2,234.11 |
| 67240 - Indirect Parking & Tolls | $5,429.80 |
| 67250 - Indirect Staff Mileage | $35,065.51 |
| 67260 - Indirect Auto Expense | $386.06 |
| **Total - 67000 - Indirect Travel and Entertainment** | **$49,668.55** |
| **68000 - Indirect All Other** | |
| 68010 - Indirect Professional Fees | $2,059.72 |
| 68011 - Indirect IT Purchased Services | $14,288.15 |
| 68012 - Indirect EE Awards | $7,702.59 |
| 68030 - Indirect Training & Conferences | $23,219.11 |
| 68040 - Indirect Admin Expenses | $598.00 |
| 68190 - Indirect Purchased Services | $9,822.76 |
| 68330 - Indirect Vehicle - Leasing | $6,572.50 |
| 68340 - Indirect Advertising | $47,500.00 |
| 68350 - Indirect Recruiting Services | $1,500.00 |
| 68351 - Indirect On Boarding | $1,500.00 |
| 68370 - Indirect Legal | $8,502.50 |
| 68380 - Indirect Office Supplies | $86,168.66 |
| 68390 - Indirect Payroll Processing Fee | $147,344.56 |
| 68400 - Indirect Donation/ Charitable Contributions | $504.00 |
| 68410 - Indirect Bank Charges | $38,957.27 |
| 68420 - Indirect Dues & Subscription | $51,263.18 |
| 68430 - Indirect Licenses | $10,193.30 |
| 68440 - Indirect Postage | $43,310.44 |
| 68450 - Late Fees & Charges | $6,623.05 |
| **Total - 68000 - Indirect All Other** | **$507,629.79** |
| **69000 - Bad Debt** | |
| 69001 - Deduction Expense - Bad Debt | ($478.80) |
| **Total - 69000 - Bad Debt** | **($478.80)** |
| **Total - 60000 - Indirect Expenses** | **$13,555,232.96** |
| **Total - Expense** | **$42,835,174.53** |
| **Net Ordinary Income (EBITDA)** | **$5,614,329.99** |
| **Other Income and Expenses** | |
| **Other Expense** | |
| **70000 - Non Operating Expenses** | |
| 70016 - Interest Expense - Masshealth Settlement | $51,744.38 |
| 70020 - Depreciation | $381,845.68 |
| 70022 - Disposal of Fixed Assets | ($500.00) |
| 70030 - Amortization | $1,931,666.68 |
| 70050 - Other Income | ($9,129,212.99) |
| 70060 - Other Expense | $69,952.87 |
| 70062 - Lease Termination | ($342.44) |
| 70066 - Legal Settlement Expense | $79,062.25 |
| 70080 - Taxes -Federal | ($83.60) |
| 70100 - HIG Management Fee | $183,750.00 |
| 71010 - Non Operating Labor | $63,435.24 |
| **Total - 70000 - Non Operating Expenses** | **($6,368,681.93)** |
| **Total - Other Expense** | **($6,368,681.93)** |
| **Net Other Income** | **$6,368,681.93** |
| **Net Income** | **$11,983,011.92** |

**Schedule 5.1(F)(i)**

**Leases in Material Default**

None.

## Schedule 5.1(F)(ii)

### Seller Defaults Under Assumed Leases and Assumed Contracts

None.

**Schedule 5.1(F)(iv)**

**Assumed Leases Requiring Consent**

The leases set forth on Schedule 5.1(B)(iii) are hereby incorporated by reference.

**Schedule 5.1(G)**

**Material Contracts**

1. ***Community Mental Health Center Provider Services Agreement*, entered into with Blue Cross Blue Shield of Massachusetts HMO Blue Inc; Blue Cross and Blue Shield of Massachusetts, Inc. dated August 1, 2009.**
   a. As amended by the *First Amendment to the Community Mental Health Center Provider Services Agreement* with Blue Cross Blue Shield of Massachusetts HMO Blue, Inc. dated January 14, 2013;
   b. As further amended by the *Second Amendment to the Community Mental Health Center Provider Services Agreement* with Blue Cross and Blue Shield of Massachusetts of HMO Blue, Inc. dated June 9, 2014;
   c. As further amended by the *Third Amendment to the Community Mental Health Center Provider Services Agreement* with Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. dated March 23, 2015;
   d. As further amended by the *Fourth Amendment to the Community Mental Health Center Provider Services Agreement* with Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. dated February 9, 2016.

2. ***Provider Services Agreement*, entered into with Beacon Health Strategies, LLC dated October 27, 1999.**
   a. As amended by the *Amendment to Agreement Between South Bay Mental Health-Brockton and Beacon Health Strategies, LLC* with Beacon Health Strategies, LLC dated January 1, 2001;
   b. As further amended by the *Amendment to Agreement Between Provider and Beacon Health Strategies, LLC* with Beacon Health Strategies, LLC dated July 1, 2010;
   c. As further amended by the *Amendment to Agreement Between Beacon Health Strategies, LLC and South Bay Mental Health* with Beacon Health Strategies, LLC dated June 27, 2012;
   d. As further amended by the *Amendment to Agreement Between Beacon Health Strategies, LLC & South Bay Mental Health* with Beacon Health Strategies, LLC dated July 18, 2012;
   e. As further amended by the *2nd Amendment to Agreement Between Beacon Health Strategies, LLC and South Bay Mental Health* with Beacon Health Strategies, LLC dated April 1, 2014;
   f. As further amended by the *1st Amendment to Agreement between Beacon Health Strategies, LLC & South Bay Mental Health* with Beacon Health Strategies, LLC dated August 25, 2014;

    g.  As further amended by the *Amendment to Agreement between Beacon Health Strategies, LLC & South Bay Mental Health* with Beacon Health Strategies, LLC dated October 1, 2015;

    h.  As further amended by the *Amendment to Agreement Between Beacon Health Strategies, LLC & South Bay Mental Health with Beacon Health Strategies, LLC* dated March 1, 2016.

    i.  As further amended by the *Amendment to Agreement Between Beacon Health Strategies, LLC & South Bay Mental Health with Beacon Health Strategies, LLC* dated January 1, 2016.

    j.  As further amended by the *Provider Network Amendment to Adjust Rates* with Beacon Health Strategies, LLC dated May 1, 2017;

    k.  As further amended by the *6th Amendment to Agreement Between Beacon Health Strategies, LLC & South Bay Mental Health* with Beacon Health Strategies, LLC dated June 1, 2017;

    l.  As further amended by the *Amendment to Agreement Between Beacon Health Strategies, LLC and Provider* with Beacon Health Strategies, LLC dated March 1, 2018;

    m.  As further amended by the *Provider Network Amendment to Adjust Rates* with Beacon Health Strategies, LLC dated March 1, 2018;

    n.  As further amended by the *Provider Network Amendment to Adjust Rates* with Beacon Health Strategies, LLC dated March 1, 2018;

    o.  As further amended by the *2019 Beacon Health Strategies Provider Service Agreement Amendment* with Beacon Health Strategies, LLC dated April 1, 2019;

    p.  As further amended by the *Provider Network Amendment* with Beacon Health Strategies, LLC dated July 1, 2019.

    q.  As further amended by the *Rate Letter Increase with Beacon Health Strategies, LLC* dated June 1, 2020.

3.   ***Contract*, entered into with Beacon ABA Services, Inc. dated June 27, 2012.**

    a.  As amended by the *Amendment to Agreement for Autism Specialty Services* with Beacon ABA Services dated September 13, 2016.

4.   ***Participating Behavioral Health Provider Agreement* entered into with Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated December 28, 1998.**

5.   ***Participating Facility Agreement* entered into with Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated May 5, 2008.**

    a.  As amended by the *Amendment to Agreement Between Participating Provider and Boston Medical Center Health Plan, Inc.* with Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated July 1, 2008;

    b.  As further amended by the *Second Amendment to Agreement Between Participating Provider and Boston Medical Center Health Plan, Inc.* with Boston

Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated October 22, 2009;

   c. As further amended by the *Amendment to Agreement Between Participating Provider and Boston Medical Center Health Plan, Inc.* with Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated January 1, 2013.

6. ***Participating Ancillary Provider Agreement* entered into with Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated January 1, 2012.**

7. ***Commercial Products Participating Ancillary Provider Agreement* with Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated January 1, 2012.**

8. ***Agreement Between South Bay Community Services, Early Intervention and Children's Center for Communication, Beverly School for the Deaf* entered into with Children's Center for Communication, Beverly School for the Deaf dated January 30, 2018.**

9. ***Homemaker/Personal Care/Non-Homemakers Services Provider Agreement* entered into with Coastline Elderly Services, Inc., the Aging Services Access Point dated October 1, 2018.**

10. ***Provider Agreement (ICO)* entered into with Commonwealth Care Alliance, Inc. dated August 1, 2013.**

   a. As amended by the *Addendum to the Agreement by and between Commonwealth Care Alliance, Inc. and South Bay Mental Health Center, Inc.* with Commonwealth Care Alliance, Inc. dated October 1, 2013.

11. ***SCO Provider Agreement* entered into with Commonwealth Care Alliance, Inc. dated December 1, 2013.**

12. ***State of Connecticut Purchase of Service Contract* entered into with the State of Connecticut, Office of Early Childhood dated July 1, 2020.**

13. ***Contract* entered into with the Commonwealth of Massachusetts, Department of Public Health dated July 1, 2020.**

14. ***Health Service Agreement Between Fallon Community Health Plan, Inc. and South Bay Mental Health Center, Inc. d/b/a South Bay Community Services* entered into with Fallon Community Health Plan, Inc. dated December 18, 2017.**

15. ***Harvard Pilgrim Health Care of Connecticut, Inc. Participating Provider Agreement* entered into with Harvard Pilgrim Health Care of Connecticut, Inc. dated June 1, 2019.**

16. ***Homemaker/Personal Care/Non-Homemakers Services Provider Agreement* entered into with HESSCO Elder Services, Inc., the Aging Services Access Point dated October 1, 2018.**

17. ***MassHealth Nonbilling Managed Care Entity (MCE) Network-Only Provider Contract* entered into with Commonwealth of Massachusetts, Executive Office of Health and Human Services dated June 9, 2020.**

18. ***Facility Participation Agreement* entered into with Health New England Be Healthy, Massachusetts Behavioral Health Partnership dated March 1, 2018.**

19. ***Facility Participation Agreement* entered into with Massachusetts Behavioral Health Partnership dated March 1, 2018.**

20. ***Participation Agreement (Inpatient/Outpatient Facility)* entered into with Health New England Be Healthy, Massachusetts Behavioral Health Partnership dated May 1, 2017.**

21. ***Homemaker/Personal Care/Non-Homemakers Services Provider Agreement* entered into with Montachusett Home Care Corporation, the Aging Services Access Point, dated October 1, 2018.**

22. ***MultiPlan Veteran's Administration CCN Program Amendment* entered into with MultiPlan dated March 1, 2017.**

23. ***MPI Participating Professional Group Agreement* entered into with MultiPlan, Inc. dated September 1, 2016.**

24. ***Neighborhood Health Plan Letter of Agreement* for Participation in My Care Family entered into with Neighborhood Health Plan dated February 28, 2018.**

25. ***United Behavioral Health Facility Participation Agreement* entered into with United Behavioral Health dated April 21, 2008.**
    a. As amended by the *Amendment to United Behavioral Health Provider Participation Agreement for VA Community Care Program* with United Behavioral Health, operating as Optum, dated June 26, 2019.

26. ***United Behavioral Health Group Participating Provider Agreement* entered into with United Behavioral Health dated October 7, 2013.**
    b. As amended by #1 Amendment to the United Behavioral Health, Inc. Group Participation Agreement with United Behavioral Health dated October 1, 2019.

27. ***Agreement between the Commonwealth of MA Plymouth County Sheriff's Department and South Bay Mental Health* entered into with the Commonwealth of Massachusetts, Plymouth County Sheriff's Department dated October 1, 2019.[14]**

28. ***Homemaker/Personal Care/Non-Homemakers Services Provider Agreement* entered into with South Shore Elder Services, Inc., the Aging Services Access Point dated October 1, 2018.**

29. ***Homemaker/Personal Care/Non-Homemakers Services Provider Agreement* entered into with Tri-Valley, Inc., the Aging Services Access Point dated October 1, 2019.**
    a. As amended by *Contract Amendment #001*, dated October 13.2020.

30. ***Allied Health Services Provider Agreement* entered into with Tufts Associated Health Maintenance Organization Inc., Total Health Plan, Inc. dated February 10, 2011.**

---

[14] Renewal in process.

    a.  As amended by the *HMO Products Amended Exhibit A-1 Financial Agreement* with Tufts Associated Health Maintenance Organization, Inc., Total Health Plan, Inc. dated January 1, 2017;

    b.  As further amended by the *Financial Agreement (2019 Amendment Notification to Allied Health Services Provider Agreement)* with Tufts Associated Health Plans, Inc. dated July 1, 2019.

31. ***Consulting Agreement* entered into with the University of Connecticut dated December 18, 2019.**

32. ***DMA Specified Behavioral Health Services, Appendix C* entered into with Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan dated January 5, 1998.**

33. ***Amendment to Master Service Agreement to Provide Ambulatory Services* entered into with the Commonwealth of Massachusetts dated July 1, 2020.**

34. ***Contract Amendment* entered into with the Commonwealth of Massachusetts, Department of Children and Families dated July 1, 2019.**

35. ***Contract Amendment* entered into with the Commonwealth of Massachusetts, Department of Public Health dated July 1, 2020.**

36. ***Contract Amendment* entered into with the Commonwealth of Massachusetts, Department of Children and Families dated July 1, 2020.**

37. **Contract Amendment entered into with the Commonwealth of Massachusetts, Department of Public Health dated July 1, 2015.**

38. **Massachusetts Behavioral Health Partnership Provider Agreement by and between Massachusetts Behavioral Health Partnership and South Bay Mental Health Center, Inc., dated June 1, 1997.**

    a.  ***Exhibit A, Contracted Sites* entered into with Health New England Be Healthy, Massachusetts Behavioral Health Partnership dated January 1, 2016.**

    b.  ***Exhibit A, Contracted Sites* entered into with Massachusetts Behavioral Health Partnership dated November 1, 2015.**

    c.  ***Exhibit A, Contracted Sites* entered into with Massachusetts Behavioral Health Partnership dated March 1, 2018.**

    d.  ***Exhibit A, Contracted Sites* entered into with Massachusetts Behavioral Health Partnership dated July 30, 2019.**

    e.  ***Exhibit A, Contracted Sites* entered into with Massachusetts Behavioral Health Partnership dated May 20, 2019.**

    f.  ***Exhibit A, Contracted Sites* (Plymouth, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.**

    g.  ***Exhibit A, Contracted Sites* (Plymouth, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.**

    h.  ***Exhibit A, Contracted Sites* entered into with Massachusetts Behavioral**

Health Partnership dated August 15, 2014.

i. *Exhibit A, Contracted Sites* (Brockton, MA) entered into with Massachusetts Behavioral Health Partnership dated August 15, 2014.

j. *Exhibit A, Contracted Sites* (Brockton, MA) entered into with Massachusetts Behavioral Health Partnership dated August 15, 2014.

k. *Exhibit A, Contracted Sites* (Brockton, MA) entered into with Massachusetts Behavioral Health Partnership dated August 15, 2014.

l. *Exhibit A, Contracted Sites* (Brockton, MA) entered into with Massachusetts Behavioral Health Partnership dated August 15, 2014.

m. *Exhibit A, Contracted Sites* (Dorchester, MA) entered into with Massachusetts Behavioral Health Partnership dated October 15, 2014.

n. *Exhibit A, Contracted Sites* (Dorchester, MA) entered into with Massachusetts Behavioral Health Partnership dated December 15, 2014.

o. *Exhibit A, Contracted Sites* (Fall River, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

p. *Exhibit A, Contracted Sites* (Lawrence, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

q. *Exhibit A, Contracted Sites* (Leominster, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

r. *Exhibit A, Contracted Sites* (Lowell, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

s. *Exhibit A, Contracted Sites* (Lowell, MA) entered into with Massachusetts Behavioral Health Partnership dated December 5, 2014.

t. *Exhibit A, Contracted Sites* (Lowell, MA) entered into with Massachusetts Behavioral Health Partnership dated December 5, 2014.

u. *Exhibit A, Contracted Sites* (Lynn, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

v. *Exhibit A, Contracted Sites* (Lynn, MA) entered into with Massachusetts Behavioral Health Partnership dated September 8, 2014.

w. *Exhibit A, Contracted Sites* (Malden, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

x. *Exhibit A, Contracted Sites* (Malden, MA) entered into with Massachusetts Behavioral Health Partnership dated September 8, 2014.

y. *Exhibit A, Contracted Sites* (Mashpee, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

z. *Exhibit A, Contracted Sites* (Salem, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

aa. *Exhibit A, Contracted Sites* (Springfield, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2015.

bb. *Exhibit A, Contracted Sites* (Springfield, MA) entered into with

       Massachusetts Behavioral Health Partnership dated January 1, 2015.

cc. *Exhibit A, Contracted Sites* (Springfield, MA) entered into with Massachusetts Behavioral Health Partnership dated October 24, 2014.

dd. *Exhibit A, Contracted Sites* (Weymouth, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

ee. *Exhibit A, Contracted Sites* (Worcester, MA) entered into with Massachusetts Behavioral Health Partnership dated January 1, 2014.

ff. *Exhibit A, Contracted Sites* entered into with Massachusetts Behavioral Health Partnership dated January 1, 2016.

gg. *Exhibit A, Contracted Sites* entered into with Massachusetts Behavioral Health Partnership dated October 1, 2016.

hh. *Exhibit A, Contracted Sites* entered into with Massachusetts Behavioral Health Partnership dated November 1, 2015.

ii. *Exhibit A, Contracted Sites* entered into with Health New England Be Healthy, Massachusetts Behavioral Health Partnership dated August 1, 2019.

jj. *Exhibit A, Contracted Sites* entered into with Health New England Be Healthy, Massachusetts Behavioral Health Partnership dated May 11, 2016.

kk. *Exhibit A, Contracted Sites* entered into with Massachusetts Behavioral Health Partnership dated November 1, 2015.

ll. *Exhibit A, Contracted Sites* entered into with Massachusetts Behavioral Health Partnership dated March 1, 2018.

mm.     *Exhibit A, Contracted Sites* entered into with Massachusetts Behavioral Health Partnership dated April 1, 2015.

39. *Amendment to the Agreement between Tufts Health Public Plans, Inc. and South Bay Mental Health Center, Inc.* entered into with Tufts Health Public Plans, Inc. dated April 1, 2018.

40. *Amendment to the Agreement between Tufts Health Public Plans, Inc. and South Bay Mental Health Center, Inc.* entered into with Tufts Health Public Plans, Inc. dated April 1, 2017.

41. *Homemaker/Non-Homemaker Services Provider Agreement* entered into with Bristol Elder Services, Inc. dated October 1, 2019.

42. **Magellan Healthcare, Inc, Network Provider Agreement by and between Magellan Healthcare, Inc. and South Bay Mental Health Center, Inc., dated November 1, 2020.**

43. *Contract Amendment* entered into with the Commonwealth of Massachusetts, Department of Children and Families dated June 30, 2020.

44. **Participating Ancillary Provider Agreement by and between Boston Medical Center Health Plan d/b/a BMC Healthnet Plan and South Bay Mental Health, dated, March 19, 2010.**

45. *Affiliation/Referral Agreement* entered into with Family Resource Center

Taunton/Attleboro dated September 5, 2019.

46. *Mental Health Service Agreement* entered into with Mansfield Adult Day Health Center dated January 8, 2019.

47. *Norfolk Advocates for Children Linkage Agreement for Mental Health Referral, Assessment and Treatment* entered into with Norfolk Advocates for Children, dated September 23, 2019.

48. *Purchased Services Agreement* entered into with Baystate Interpreters, Inc. dated April 4, 2019.

49. *Agreement* entered into with Behavioral Concepts, Inc. dated March 19, 2018.

50. *Agreement* entered into with Boston Behavior Learning Centers dated March 4, 2019.

51. *Memorandum of Agreement/Understanding* entered into with Hope Integrative Care dated October 11, 2018.

52. *Memorandum of Understanding* entered into with E.B. Hope, Inc. dated October, 2018.

53. *Service Contract* entered into with Harbor Health Services, Inc. dated February 28, 2018.

54. *Affiliation/Referral Agreement* entered into with Serenity House dated January 30, 2019.

55. *Agreement* entered into with Horace Mann Educational Associates dated January 27, 2012.

56. *Memorandum of Understanding* entered into with Community Day Care of Lawrence, TCG Early Head Start Child Care Partnership dated July 1, 2019.

57. *Affiliation/Referral Agreement* entered into with MSPCC Healthy Families dated August 24, 2018.

58. *Qualified Service Organization Agreement* entered into with Total Wellness Centers, LLC d/b/a CleanSlate Centers dated March 13, 2020.

59. *Memorandum of Understanding* entered into with Frances Drake School dated May 7, 2018.

60. *Affiliation Agreement* entered into with Leominster Dialysis, LLC dated June 17, 2020.

61. *Early Childhood Behavioral Health Intervention Services* entered into with MOC Child Care & Head Start dated August 20, 2019.

62. *Memorandum of Understanding* entered into with Northwest Elementary dated May 4, 2018.

63. *Memorandum of Understanding* entered into with Varnum Brook Elementary School dated May 7, 2018.

64. *Memorandum of Understanding* entered into with Bailey Elementary School dated December 3, 2018.

65. *Affiliation/Referral Agreement* entered into with Lowell General dated October 23,

2018.

66. *Qualified Service Organization/Business Associate Agreement* entered into with Habit Opco dated April 13, 2018.

67. *Memorandum of Understanding* entered into with Pawtucketville Elementary School dated November 21, 2018.

68. *Affiliation/Referral Agreement* entered into with Children's Friend and Family, A division of JRI dated July 20, 2018.

69. *Affiliation/Referral Agreement* entered into with Habit OPCO, Inc. dated August 27, 2018.

70. *Memorandum of Understanding* entered into with Malden School, Police & Fire Departments, Cambridge Health Alliance, Hallmark Health, Malden's Promise dated October 23, 2018.

71. *Agreement* entered into with the May Institute dated July 1, 2012.

72. *Agreement* entered into with the May Institute dated September 1, 2012.

73. *Qualified Service Organization Agreement* entered into with the Mercy Hospital, Inc. d/b/a Providence Behavioral Health Hospital dated September 1, 2018.

74. *Agreement* entered into with New England Center for Children dated September 8, 2015.

75. *Autism Specialty Services Contract* entered into with Northeast ARC – Building Blocks dated July 1, 2012.

76. *Affiliation Agreement* entered into with Beth Israel Deaconess Hospital dated July 26, 2018.

77. *Memorandum of Understanding* entered into with Nathaniel Morton Elementary School dated August 23, 2019.

78. *Memorandum of Understanding* entered into with Plymouth Community Intermediate School dated August 16, 2018.

79. *Project Outreach Affiliation Agreement* entered into with Plymouth County Outreach Hope, Inc. dated August 8, 2018.

80. *Memorandum of Understanding* entered into with Plymouth South Middle School dated August 23, 2019.

81. *Agreement* entered into with RCS Behavioral and Educational Consulting, LLC dated October 1, 2018.

82. *Affiliation/Referral Agreement* entered into with Right Choice Health Group LLC dated March 16, 2020.

83. *Agreement* entered into with Spectrum Autism Treatment Centers dated October 2, 2014.

84. *Affiliation Agreement* entered into with the Habit OPCO, Inc. dated January 31, 2018.

85. *Memorandum of Understanding* entered into with Worcester Public Schools, McKinney Vento Homeless Assistance dated June 8, 2018.

86. ***Affiliation Agreement* entered into with Saint Vincent Hospital dated September 19, 2018.**

87. ***Memorandum of Understanding* entered into with Greater Lawrence Family Health Center, Inc.**

    a. As amended by the *Memorandum of Understanding – First Amendment* with Greater Lawrence Family Health Center, Inc. dated February 13, 2017.

    b. As further amended by the *Memorandum of Understanding – Second Amendment* with Greater Lawrence Family Health Center, Inc. dated February 13, 2019.

88. ***Memorandum of Understanding* entered into with TCG Early Head Start Child Care Partnership dated August 11, 2020.**

89. **Service Contract by and between South Bay Elderly Intervention and Children Making Strides, dated July 2, 2012.**

90. **Letter of Renewal by and between Credible Behavioral Health and Community Invention Services, dated December 31, 2019.**

91. **Oracle Netsuite Terms and Conditions and Payment Plan Agreement by and between Community Intervention and Oracle Credit Corporation, dated April 17, 2020.**

92. **Master Services Agreement for ADP Vantage HCM Services by and between ADP, LLC and Community Intervention Services, Inc., dated October 22, 2014.**

93. **Professional Services Agreement by and between South Bay Community Services, Inc. and John Foster, an individual, dated February 19, 2020.**

94. **Professional Services Agreement by and between South Bay Community Services, Inc. and Robert Eckholt, an individual, dated February 25, 2020.**

95. **Professional Services Agreement by and between South Bay Community Services, Inc. and Paul Fulton, an individual, dated February 21, 2020.**

96. **Lease Agreement by and between South Bay Mental Health Center, Inc. and CIT Bank, N.A., dated February 28, 2017.**

97. **Lease Order Agreement by and between Greico Ford and South Bay Mental Health Center, Inc., dated October 10, 2017, as supplemented by the terms and conditions thereto and Master Lease Agreement, dated October 10, 2017.**

98. **Central Reach Renewal Agreement by and between Central Reach and South Bay Mental Health Center, Inc., dated December 9, 2020, as supplemented by the Terms of Service and Business Associate Agreement related thereto.**

## Schedule 5.1(H)

## Material Contracts in Default

None.

**Schedule 5.1(I)(i)**

**Employee Benefit Plans**

1. 401K Plan with Fidelity Investments, Inc.
2. Vision Insurance Plan with EyeMed Vision Care, LLC.
3. Medical Insurance Plan with Blue Cross Blue Shield of Massachusetts.
4. Life and Disability Insurance Plan with Cigna.
5. Dental Insurance Plan with Blue Cross Blue Shield of Massachusetts.

**Schedule 5.1(I)(ii)**

**Multiemployer Benefit Plans**

CIS is a member of a temporary multiple employer welfare arrangement (through 12/31/20) that is not subject to Department of Labor regulations. CIS and its affiliates do not have any withdrawal liability with respect to this arrangement.

Schedule 5.1(J)(v)

**Business Employees and Independent Contractors**

LIST OF BUSINESS EMPLOYEES REDACTED.

**Independent Contractors**

| Name | Status | Program | Date of Engagement | 1099 Compensation for 2019 | 1099 Year-to-Date Compensation for 2020 |
|------|--------|---------|--------------------|-----------------------------|------------------------------------------|
| Paul Fulton (a) | Child Psychologist. Works on as-needed basis | Swansea/MH (S. Hart) | April 2020 | $0 | $4,637 |
| Rob Eckholt (b) | Maintenance worker - very part time, works on as-needed basis | All locations (M. Allen) | March 2020 | $0 | $542 |
| John Foster (c) | Maintenance worker - very part time, works on as-needed basis | All locations (M. Allen) | March 2020 | $0 | $938 |
| Kara Lane (d) | Interpreter - sign language, works on as-needed basis | EI (A. Miner-Fletcher) | Nov. 2017 | $0 | $151 |

**Notes:**

(a) Paul Fulton was formerly a South Bay employee, hired on 4/3/2018 and termed as an employee 2/18/2020, as part of the Corrective Action Plan. In April 2020 Paul Fulton began working on a part-time basis for South Bay. Paul Fulton is a certified child and adolescent psychiatrist.

QB\66061092.8

(b) Rock Eckholt helped replace the former full-time Director of Maintenance (Steve Patten), whom left South Bay in February 2020 as part of the Corrective Action Plan.  Rock Eckholt has only done work for South Bay two times thus far in 2020.

(c ) John Foster helped replace the former full-time Director of Maintenance (Steve Patten), whom left South Bay in February 2020 as part of the Corrective Action Plan.  John Foster has only done work for South Bay three times thus far in 2020.

(d) Kara Lane is an interpreter for the deaf, and has worked for South Bay twice; once in November 2017, and again in March of 2020.

QB\66061092.8

## Schedule 5.1(K)(iii)

## Employees Excluded from Federal Health Care Program

None.

**Schedule 5.1(L)(i)**

**Legal Proceedings**

1. In 2017, a former employee ("Relator") of the Company filed a lawsuit against the Company and a number of other affiliated entities on behalf of the Commonwealth of Massachusetts and the U.S. federal government alleging violations of the federal False Claims Act and a parallel Massachusetts state-level statute. The Company settled the lawsuit with respect to the state law claims with Massachusetts pursuant to a Settlement Agreement and Release in February 2018 (the "Settlement Agreement"). The federal claims have not been settled. With respect to the federal claims, fact and expert discovery are complete. Summary judgment motions were fully briefed and argued on October 23, 2020. The Company sought summary judgment on all elements at issue in the case. Relator sought summary judgment on two out of three elements at issue. A decision on the summary judgment motions is currently pending.

## Schedule 5.1(L)(ii)
## Settlements, Awards, or Orders

1.  The Settlement Agreement.

## Schedule 5.1(M)

(i)
None.

(ii)
None.

(iii)
None.

(iv)
None.

(v)
None.

(vi)
None.

(vii)
None.

(viii)
None.

(ix)
None.

(x)
None.

## Schedule 5.1(N)(i)

### Seller's Permits

| Certificate | Location | Effective Date | Expiration Date |
|---|---|---|---|
| Business Certificate | Attleboro, MA | 08/13/20 | 09/03/24 |
| Certificate of Business | Brockton, MA | N/A | 08/10/24 |
| Business Certificate | Chelsea, MA | 09/11/20 | 09/11/24 |
| Business Certificate | Boston, MA | 08/13/20 | 08/13/24 |
| Business Certificate | Framingham, MA | 08/05/20 | 08/19/24 |
| Business Certificate | Leominster, MA | 08/28/20 | 08/28/24 |
| Business Certificate | Lynn, MA | 09/03/20 | 09/03/24 |
| Business Certificate | Mashpee, MA | 08/21/20 | 08/31/24 |
| Business Certificate | Plymouth, MA | 9/28/2020 | 9/28/2024 |
| Business Certificate | Salem, MA | 08/13/20 | 08/13/24 |
| Business Certificate | Springfield, MA | 09/01/20 | 09/01/24 |
| Business Certificate | Swansea, MA | 08/13/20 | 08/30/24 |
| Business Certificate | Wakefield, MA | 08/29/20 | 08/28/24 |
| Business Certificate | Weymouth, MA | 09/01/20 | 09/01/24 |
| Business Certificate[15] | Worcester, MA | 9/13/2016 | 9/13/2020 |
| Business Certificate[16] | Worcester, MA | 9/15/2016 | 9/15/2020 |

---

[15] Renewal in process.
[16] Renewal in process.

## Schedule 5.1(N)(ii)

### Professionals Not in Good Standing

None.

**Schedule 5.1(O)(i)**

**Business Intellectual Property**

Domain Names:
   1. southbaymentalhealth.com
   2. southbaycommunityservices.com
   3. sbaycs.com
   4. joinsouthbay.com

## Schedule 5.1(O)(ii)

### License Agreements for Business Intellectual Property

1. Credible Behavioral Healthcare Software
2. ADP Vantage HCM Services
3. Oracle NetSuite
4. Credible Wireless, Inc.
5. Zoom Video Communications
6. ABPathfinder
7. Cisco Meraki
8. Google Apps, through SADA, Inc.
9. Google MDM
10. Allworx Voice Over IP
11. Microsoft Windows and Microsoft Office
12. SkillPort

## Schedule 5.1(O)(iii)

## Not Owned/Unlicensed Intellectual Property

None.

## Schedule 5.1(O)(iv)

### Claimed Infringement on Intellectual Property

1. Trademark Settlement and Co-Existence Agreement, dated May 12, 2020, by and between South Bay Mental Health Center, Inc. and South Bay Community Services.

## Schedule 5.1(P)[17]

### Average Daily Billable Hours

| Date | Billable Hours |
|------|----------------|
| 11/12/2020 | 2,794 |
| 11/13/2020 | 1,969 |
| 11/16/2020 | 2,409 |
| 11/17/2020 | 2,771 |
| 11/18/2020 | 2,871 |
| 11/19/2020 | 2,716 |
| 11/20/2020 | 2,001 |
| 11/23/2020 | 2,599 |
| 11/24/2020 | 2,931 |
| 11/25/2020 | 2,700 |
| 11/27/2020 | 864 |
| 11/30/2020 | 2,274 |
| 12/1/2020 | 2,651 |
| 12/2/2020 | 2,883 |
| 12/3/2020 | 2,658 |
| 12/4/2020 | 1,941 |
| 12/7/2020 | 2,339 |
| 12/8/2020 | 2,688 |
| 12/9/2020 | 2,809 |
| 12/10/2020 | 2,649 |
| 12/11/2020 | 1,938 |
| 12/14/2020 | 2,369 |
| 12/15/2020 | 2,700 |
| 12/16/2020 | 2,667 |
| 12/17/2020 | 2,575 |
| 12/18/2020 | 1,985 |
| 12/21/2020 | 2,453 |
| 12/22/2020 | 2,697 |
| 12/23/2020 | 2,432 |
| 12/24/2020 | 838 |

| Trailing 30 Day Average | 2,406 |
|-------------------------|-------|

Last 30 Days Workdays as of 12/24/2020

---

[17] Within 5 days of the date of the Agreement, Seller shall deliver to Purchaser an updated Schedule 5.1(P), which such updated schedule shall set forth a true, complete and correct list of the daily billable hours of the Business during the 30-day period ending five (5) days prior to the date of the Agreement, but excluding any non-Business Days during such 30-day period, and the average of the daily billable hours for such 30-day period, and shall deemed to replace in its entirety the foregoing Schedule 5.1(P).

## Schedule 5.1(Q)

## Seller's Broker's Fees

1.  The Duff & Phelps Engagement Letter.

Schedule 5.1(S)

**Major Payors**

## 2019 Revenue

| No. | Payor Name | Revenue |
|-----|------------|---------|
| 1. | MBHP | $15,833,521 |
| 2. | Tufts-Together | $8,335,703 |
| 3. | BMC/Beacon Health | $6,966,653 |
| 4. | Medicaid | $5,850,579 |
| 5. | Medicaid-Medicare Crossover | $4,196,586 |
| 6. | Connecticut Dept of Developmental Services | $4,029,703 |
| 7. | FCHP/BHS Medicaid | $2,732,418 |
| 8. | Department of Public Health – Early Intervention | $2,039,130 |
| 9. | Fallon Early Intervention Medicaid | $1,999,580 |
| 10. | MBHP/Be Healthy | $1,650,844 |

## Year-to-Date (through October 31, 2020) Revenue

| No. | Payor Name | Revenue |
|-----|------------|---------|
| 1. | MBHP | $11,003,789 |
| 2. | Tufts-Together | $6,557,022 |
| 3. | Medicaid | $4,687,879 |
| 4. | BMC/Beacon Health | $4,260,036 |
| 5. | Medicaid-Medicare Crossover | $2,825,579 |
| 6. | Connecticut Dept of Developmental Services | $2,519,283 |
| 7. | FCHP/BHS Medicaid | $2,221,507 |
| 8. | Fallon Early Intervention Medicaid | $1,326,722 |
| 9. | Department of Public Health – Early Intervention | $1,290,923 |
| 10. | MBHP/Be Healthy | $1,287,643 |

## Schedule 6.1(C)

## Key Employees

**REDACTED.**

## Schedule 6.2

### Exceptions to Seller Negative Covenants

None.

**Schedule 7.2(F)**

**Required Third-Party Consents**

**Please see Schedule 5.1(B)(iii), which is incorporated herein by reference.**

<u>**Client Consent**</u>

1. Seller shall obtain authorization and consent from each patient of Seller's "Part 2 Program" (as that term is defined in 42 C.F.R. § 2.11) in compliance with HIPAA, applicable state law, and 42 C.F.R. Part 2 prior to disclosing and transferring the Facilities' "Substance Use Disorder" "Records" (as such terms are defined in 42 C.F.R. § 2.11) to Purchaser in order to effectuate the transition described in this Agreement.

<u>**Permits**</u>

a. A Determination of suitability issued by the Massachusetts Department of Public Health (DPH) for the Transfer of Ownership of the Clinics and Bureau of Substance Addition Services (BSAS) Certificates.

b. A finding from the Massachusetts Health Policy Commission that it will not undertake a cost market impact review of the transaction.

c. Approval of the transfer of ownership of the Early Intervention Certificate.

d. Letter from CMS and/or a Medicare Administrative Contractor approving Purchaser's Initial Enrollment Application for Medicare.

## Exhibit B

[Assumed Contracts and Cure Amounts]

**Exhibit** **B-1**

[Assumed Contracts – Payor Contracts]

| Contract Party | Contract Name | Date | Type | Cure Amount |
|---|---|---|---|---|
| Allways Health Partners (formerly Neighborhood Health Plan) | Neighborhood Health Plan Letter of Agreement for Participation in My Care Family | 2/28/2018 | Payor | $0.00 |
| Beacon ABA Services, Inc. | Contract | 6/27/2012 | Payor | $24,647.02 |
| Beacon Health Strategies, LLC | Provider Services Agreement, as amended | 10/27/1999 | Payor | $0.00 |
| Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc. | Community Mental Health Center Provider Services Agreement, as amended | 8/1/2009 | Payor | $0.00 |
| Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan | Commercial Products Participating Ancillary Provider Agreement | 1/1/2012 | Payor | $0.00 |
| Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan | Participating Ancillary Provider Agreement | Not Indicated | Payor | $0.00 |
| Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan | Participating Facility Agreement, as amended | 5/8/2008 | Payor | $0.00 |
| Boston Medical Center Health Plan, Inc., d/b/a BMC HealthNet Plan | DMA Specified Behavioral Health Services - Appendix C | 1/5/1998 | Payor | $0.00 |

| | | | | |
|---|---|---|---|---|
| Boston Medical Center HealthNet Plan, Inc. | Participating Behavioral Health Provider Agreement, as amended | 11/98 (no specified day) | Payor | $0.00 |
| Children's Center for Communication, Beverly School for the Deaf | Agreement Between South Bay Community Services, Early Intervention and Children's Center for Communication, Beverly School for the Deaf | 1/30/2018 | Payor | $0.00 |
| Coastline Elderly Services, Inc., the Aging Services Access Point | Homemaker/Personal Care/Non-Homemakers Services Provider Agreement | 10/1/2018 | Payor | $0.00 |
| Commonwealth Care Alliance, Inc. | Provider Agreement (ICO), as amended | 8/1/2013 | Payor | $0.00 |
| Commonwealth Care Alliance, Inc. | SCO Provider Agreement | 12/1/2013 | Payor | $0.00 |
| Commonwealth of Massachusetts, Department of Public Health | Master Agreement, as amended | 5/21/2015 | Payor | $0.00 |
| Commonwealth of Massachusetts, Executive Office of Health and Human Services | MassHealth Nonbilling Managed Care Entity (MCE) Network-Only Provider Contract | 6/9/2020 | Payor | $0.00 |

| | | | | |
|---|---|---|---|---|
| Commonwealth of Massachusetts, Plymouth County Sheriff's Department | Agreement Between The Commonwealth of MA Plymouth County Sheriff's Department and South Bay Mental Health | 10/1/2019 | Payor | $0.00 |
| Fallon Community Health Plan, Inc. | Health Service Agreement between Fallon Community Health Plan, Inc. and South Bay Mental Health Center, Inc. d/b/a South Bay Community Services | 12/18/2017 | Payor | $0.00 |
| Harvard Pilgrim Health Care of Connecticut, Inc. | Harvard Pilgrim Health Care of Connecticut, Inc. Participating Provider Agreement | 6/1/2019 | Payor | $0.00 |
| Health New England Be Healthy, Massachusetts Behavioral Health Partnership | Participation Agreement (Inpatient/Outpatient Facility) | 5/1/2017 | Payor | $0.00 |
| Health New England Be Healthy, Massachusetts Behavioral Health Partnership | Facility Participation Agreement, as amended | 3/1/2018 | Payor | $0.00 |
| HESSCO Elder Services, Inc, the Aging Services Access Point | Homemaker/Personal Care/Non-Homemakers Services Provider Agreement | 10/1/2018 | Payor | $0.00 |

| | | | | |
|---|---|---|---|---|
| Montachusett Home Care Corporation, the Aging Services Access Point | Homemaker/Personal Care/Non-Homemakers Services Provider Agreement | 10/1/2018 | Payor | $0.00 |
| MultiPlan | MultiPlan Veteran's Administration CCN Program Amendment | 3/1/2017 | Payor | $0.00 |
| MultiPlan, Inc. | MPI Participating Professional Group Agreement | 9/1/2016 | Payor | $0.00 |
| South Shore Elder Services, Inc., the Aging Services Access Point | Homemaker/Personal Care/Non-Homemakers Services Provider Agreement | 10/1/2018 | Payor | $0.00 |
| State of Connecticut, Office of Early Childhood | State of Connecticut Purchase of Service Contract, as amended | 7/1/2020 | Payor | $0.00 |
| Tri-Valley, Inc., the Aging Services Access Point | Homemaker/Personal Care/Non-Homemakers Services Provider Agreement | 10/1/2019 | Payor | $0.00 |
| Tufts Associated Health Maintenance Organization, Inc., Total Health Plan, Inc. | HMO Products Amended Exhibit A-1 Financial Agreement | 1/1/2017 | Payor | $0.00 |
| Tufts Associated Health Maintenance Organization, Inc., Total Health Plan, Inc. | Allied Health Services Provider Agreement | 2/10/2011 | Payor | $0.00 |

| | | | | |
|---|---|---|---|---|
| Tufts Associated Health Plans, Inc. | Financial Agreement (2019 Amendment Notification to Allied Health Services Provider Agreement) | 7/1/2019 | Payor | $242.64 |
| United Behavioral Health | United Behavioral Health Facility Participation Agreement | 4/21/2008 | Payor | $1,928.92 |
| United Behavioral Health | United Behavioral Health Group Participating Provider Agreement | 10/7/2013 | Payor | $0.00 |
| University of Connecticut | Consulting Agreement | 12/18/2019 | Payor | $0.00 |

**Exhibit** **B-2**

[Assumed Contracts – Leases]

| Contract Party | Contract Name | Date | Type | Cure Amount |
|---|---|---|---|---|
| 101 South, LLC | Lease for 97-101 South St., West Hartford, CT | 1/1/2018 | Lease | $0.00 |
| 22 Olde Canal Drive, LLC | Lease for 22 Old Canal Drive, Lowell, MA | 1/1/2014 | Lease | $0.00 |
| 540 Park Avenue, LLC | Lease for 540-548 Park Avenue, Worcester, MA, as amended | 8/12/2011 | Lease | $0.00 |
| 70 Harbour Pointe Park, LLC | Lease for 70 Everett Avenue, Chelsea, MA | 12/16/2014 | Lease | $0.00 |
| 80 Erdman Way, LLC | Commercial Lease, for 80 Erdman Way, Leominster, MA, as amended | 2/29/2012 | Lease | $288.48 |
| 85 Willow Street Equities, LLC | Lease Agreement for 85 Willow St., New Haven, CT | 9/14/2017 | Lease | $0.00 |
| 88 Lincoln Street Brockton LLC | Lease for 88 Lincoln Street, Brockton, MA, as amended | 11/27/2013 | Lease | $0.00 |
| Edgar Goheen, LLC (successor to 50 Aldrin Road, LLC) | Commercial Lease for 50 Aldrin Road, Plymouth, MA 02360, as amended | 9/1/2009 | Lease | $0.00 |
| Edgar Goheen, LLC (successor to 50 Aldrin Road, LLC) | Lease | 4/12/2012 | Lease | $0.00 |

| | | | | |
|---|---|---|---|---|
| Edgar, LLC (successor to Swansea Healthcare, LLC) | Lease for 463 Swansea Mall Drive, Swansea, MA, as amended | 4/12/2012 | Lease | $0.00 |
| Framingham 300 Howard LLC | 1 Grant Street Lease | 9/2/2015 | Lease | $0.00 |
| HTA-Stetson Medical Center, LLC (as successor for Atlantic-Stetson Realty, LLC) | Lease Between Atlantic-Stetson Realty LLC and South Bay Mental Health Center, Inc. for 541 Main Street, Weymouth, MA, as amended | 6/10/2010 | Lease | $0.00 |
| Legacy Heritage LLC | Lease for 607 Pleasant St., Attleboro, MA, as amended | 5/13/2010 | Lease | $2,426.30 |
| Maolis Realty Trust | Lease for 181 Union Street, 2nd Floor, Lynn, MA, as amended | 10/25/2011 | Lease | $0.00 |
| Mashpee 130 Shops, Inc. | Lease for 470 Main Street, Mashpee, MA, as amended | 10/7/2011 | Lease | $0.00 |
| Neponset Circle Realty, LLC (formerly Neponset Circle CG Realty Trust) | Office Lease for 415 Neponset Ave, Dorchester, MA | 8/1/2012 | Lease | $0.00 |
| Riverwalk Partners LLC | Lease for 360 Merrimack Street, Lawrence, MA | 2/18/2015 | Lease | $0.00 |

| | | | | |
|---|---|---|---|---|
| Riverwalk Partners LLC | Standard Form Commercial Lease for 360 Merrimack Street, Building 9, Lawrence, MA, as amended | 1/14/2013 | Lease | $0.00 |
| Rubber Realty Trust | Indenture of Lease for Unit 2-10, Liberty Commerce Center Condominium, 195 Liberty St., Brockton MA, as amended | 4/1/2013 | Lease | $0.00 |
| Scanlon Realty Trust | Lease for 148 Warren Street, Lowell, MA, as amended | 4/12/2012 | Lease | $0.00 |
| Scarafoni Associates | Standard Form Lease for 37 Main St., North Adams, MA | 7/23/2014 | Lease | $0.00 |
| SFA Malden, LLC | Office Lease for Dowling Building, 22 Pleasant St., Malden, MA | 8/15/2012 | Lease | $0.00 |
| Shetland Trust | Lease No. 4801 for 35 Congress St., Salem, MA, as amended | 3/12/2019 | Lease | $0.00 |
| South Campus Group LLC | Lease for 140 High Street, Springfield, MA, as amended | 4/13/2012 | Lease | $0.00 |

| | | | | |
|---|---|---|---|---|
| Victory Human Services, Inc. (successor to West Chestnut Street LLC) | Lease for 1115 West Chestnut Street, Brockton, MA, as amended | 4/12/2012 | Lease | $8,351.00 |
| Water Street Land, LLC | Commercial Lease Agreement for 37 Water Street, Wakefield, MA | 7/22/2019 | Lease | $0.00 |
| Worcester Investment Group, LLC | Lease for 324 Clark St., Worcester, MA | 1/1/2019 | Lease | $0.00 |

**Exhibit** **B-3**

[Assumed Contracts – Operating Contracts]

| Contract Party | Contract Name | Date | Type | Cure Amount |
|---|---|---|---|---|
| Bailey Elementary School | Memorandum of Understanding | 12/3/2018 | Operating Contract | $0.00 |
| Baystate Interpreters, Inc. | Purchased Services Agreement | 4/4/2019 | Operating Contract | $10,444.25 |
| Behavioral Concepts, Inc. | Agreement | 3/19/2018 | Operating Contract | $2,674.36 |
| Beth Israel Deaconess Hospital | Affiliation Agreement | 7/26/2018 | Operating Contract | $0.00 |
| Boston Behavior Learning Centers | Agreement | 3/4/2019 | Operating Contract | $4,989.35 |
| Bristol Elder Services, Inc. | Homemaker/Non-Homemaker Services Provider Agreement | 10/1/2018 | Operating Contract | $0.00 |
| CentralReach | Contract for CR Essentials: Clinical Outreach | 12/14/2020 | Operating Contract | $1,232.50 |
| Children's Center for Communication Beverly School for the Deaf | Agreement | 1/30/2018 | Operating Contract | $0.00 |
| Children's Friend and Family, A Division of JRI | Affiliation/Referral Agreement | 7/20/2018 | Operating Contract | $0.00 |
| CIT Bank, N.A. | Lease Agreement | 3/23/2017 | Operating Contract | $4,969.03 |

| Columbia Gas of Massachusetts | Memorandum of Understanding, as amended | 9/20/2018 | Operating Contract | $0.00 |
|---|---|---|---|---|
| Community Day Care of Lawrence, TCG Early Head Start Child Care Partnership | Memorandum of Understanding | 7/1/2019 | Operating Contract | $0.00 |
| E.B. Hope, Inc. | Memorandum of Understanding | Oct-18 | Operating Contract | $0.00 |
| Family Resource Center Taunton/Attleboro | Affiliation/Referral Agreement | 9/5/2019 | Operating Contract | $0.00 |
| Frances Drake School | Memorandum of Understanding | 5/7/2018 | Operating Contract | $0.00 |
| Greater Lawrence Family Health Center, Inc. | Memorandum of Understanding - Second Amendment | 2/13/2019 | Operating Contract | $0.00 |
| Greater Lawrence Family Health Center, Inc. | Memorandum of Understanding, as amended | 3/27/2015 | Operating Contract | $0.00 |
| Habit Opco, Inc. | Qualified Service Organization/Business Associate Agreement | 4/13/2018 | Operating Contract | $0.00 |
| Habit OPCO, Inc. | Affiliation/Referral Agreement | 8/27/2018 | Operating Contract | $0.00 |
| Habit OPCO, Inc. | Affiliation/Referral Agreement | 8/27/2018 | Operating Contract | $0.00 |
| Habit OPCO, Inc. | Affiliation Agreement | 1/31/2018 | Operating Contract | $0.00 |
| Harbor Health Services, Inc. | Harbor Health | 2/28/2018 | Operating Contract | $0.00 |

| | | | | |
|---|---|---|---|---|
| Hope Integrative Care | Memorandum of Agreement/Understanding | 10/11/2018 | Operating Contract | $0.00 |
| Horace Mann Educational Associates | Agreement | 1/27/2012 | Operating Contract | $0.00 |
| John Foster | Professional Services Agreement | 2/19/2020 | Contractor | $0.00 |
| Leominster Dialysis, LLC | Affiliation Agreement | 6/17/2020 | Operating Contract | $0.00 |
| Lowell General | Affiliation/Referral Agreement | 10/24/2018 | Operating Contract | $0.00 |
| Malden School, Police & Fire Departments, Cambridge Health Alliance, Hallmark Health, Malden's Promise | Memorandum of Understanding | 10/23/2018 | Operating Contract | $0.00 |
| Mansfield Adult Day Health Center | Mental Health Service Agreement | 1/8/2019 | Operating Contract | $0.00 |
| MOC Child Care & Head Start | Early Childhood Behavioral Health Intervention Services | 8/20/2019 | Operating Contract | $0.00 |
| MSPCC Healthy Families | Affiliation/Referral Agreement | 8/24/2018 | Operating Contract | $0.00 |
| Nathaniel Morton Elementary School | Memorandum of Understanding | 8/23/2019 | Operating Contract | $0.00 |
| New England Center for Children | Agreement | 9/8/2015 | Operating Contract | $0.00 |

| | | | | |
|---|---|---|---|---|
| Norfolk Advocates for Children | Norfolk Advocates for Children Linkage Agreement for Mental Health Referral, Assessment and Treatment | 9/23/2019 | Operating Contract | $0.00 |
| Northeast ARC - Building Blocks | Autism Specialty Services Contract | 7/1/2012 | Operating Contract | $20,463.45 |
| Northwest Elementary | Memorandum of Understanding | 5/4/2018 | Operating Contract | $0.00 |
| Old Colony Elder Services/Greater Brockton Area Hoarding Task Force | Memorandum of Agreement, as amended | 9/17/2019 | Operating Contract | $0.00 |
| Old Colony Elder Services/Greater Brockton Area Hoarding Task Force | Memorandum of Agreement | 10/8/2018 | Operating Contract | $0.00 |
| Old Colony Elder Services/Greater Brockton Area Hoarding Task Force | Memorandum of Agreement | 9/17/2019 | Operating Contract | $0.00 |
| Paul Fulton | Professional Services Agreement | 2/21/2020 | Contractor | $0.00 |
| Pawtucketville Elementary School | Memorandum of Understanding | 11/21/2018 | Operating Contract | $0.00 |
| Plymouth Community Intermediate School | Memorandum of Understanding | 8/16/2018 | Operating Contract | $0.00 |
| Plymouth County Outreach Hope, Inc. | Memorandum of understanding | 9/13/2019 | Operating Contract | $0.00 |

| | | | | |
|---|---|---|---|---|
| Plymouth County Outreach Hope, Inc. | Project Outreach Affiliation Agreement | 8/8/2018 | Operating Contract | $0.00 |
| Plymouth South Middle School | Memorandum of Understanding | 8/23/2019 | Operating Contract | $0.00 |
| RCS Behavioral and Educational Consulting, LLC | Agreement | 10/1/2018 | Operating Contract | $627.54 |
| Right Choice Health Group LLC | Affiliation/Referral Agreement | 3/16/2020 | Operating Contract | $0.00 |
| Robert Eckholt | Professional Services Agreement | 2/25/2020 | Contractor | $0.00 |
| Saint Vincent Hospital | Affiliation Agreement | 9/19/2018 | Operating Contract | $0.00 |
| Serenity House | Affiliation/Referral Agreement | 1/30/2019 | Operating Contract | $0.00 |
| Spectrum Autism Treatment Centers | Agreement | 10/2/2014 | Operating Contract | $0.00 |
| TCG Early Head Start Child Care Partnership | Memorandum of Understanding | 8/11/2020 | Operating Contract | $0.00 |
| The Learning Center for the Deaf | Agreement | 3/19/2018 | Operating Contract | $0.00 |
| The May Institute | Autism Specialty Services Contract | 7/1/2012 | Operating Contract | $0.00 |
| The May Institute | Autism Specialty Services Contract | 9/1/2012 | Operating Contract | $0.00 |
| The Mercy Hospital, Inc. d/b/a Providence Behavioral Health Hospital | Qualified Service Organization Agreement | 9/1/2018 | Operating Contract | $0.00 |

| | | | | |
|---|---|---|---|---|
| The Mercy Hospital, Inc. d/b/a Providence Behavioral Health Hospital | Qualified Service Organization Agreement | 9/1/2018 | Operating Contract | $0.00 |
| Total Wellness Centers, LLC d/b/a CleanSlate Centers | Qualified Service Organization Agreement | 3/13/2020 | Operating Contract | $0.00 |
| Varnum Brook Elementary School | Memorandum of Understanding | 5/7/2018 | Operating Contract | $0.00 |
| Worcester Public Schools, McKinney Vento Homeless Assistance | Memorandum of Understanding | 6/8/2018 | Operating Contract | $0.00 |

**Exhibit B-4**

[Assumed CIS Contracts]

| Contract Party | Contract Name | Date | Type | Cure Amount |
|---|---|---|---|---|
| ADP Vantage HCM Services | Master Services Agreement for ADP Vantage HCM Services | 10/22/2014 | Service Agreement | $0.00 |
| Cisco Systems Capital Corporation | Installation Payment Agreement | 4/24/2020 | Software License Agreement | $0.00 |
| Credible Behavioral Health, Inc. | Letter of Renewal | 12/31/2018 | Operating Contract | $890.69 |
| Credible Wireless, Inc. | HIPAA Business Associate Addendum | 12/31/2013 | Operating Contract | $0.00 |
| Oracle Netsuite | Oracle Netsuite Terms and Conditions and Payment Plan Agreement | 4/17/2020 | Software License Agreement | $0.00 |
| SADA Systems, Inc. | G Suite Ordering Document and Consumer Agreement | 8/26/2020 | Software License Agreement | $9,976.93 |
| Zoom Video Communications | Business Associate Agreement | 9/17/2018 | Operating Contract | $0.00 |